1    Robert A. Bailey (# 214688)
       rbailey@afrct.com
2    Grace Kang (# 229464)
       gkang@afrct.com
3    ANGLIN, FLEWELLING, RASMUSSEN,
       CAMPBELL & TRYTTEN LLP
4    199 South Los Robles Avenue, Suite 600
     Pasadena, California 91101-2459
5    Telephone:  (626) 535-1900
     Facsimile:   (626) 577-7764
6
7    Attorneys for Defendant
     WELLS FARGO BANK, N.A., successor
8    by merger with Wells Fargo Bank
     Southwest, N.A., f/k/a Wachovia Mortgage,
9    FSB and World Savings Bank, FSB ("Wells
     Fargo") (named herein as "World Savings,
10   Inc.; Wachovia Mortgage Corporation;
     Wells Fargo Bank, N.A.")

11

12                   UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

14   JERRY PUTZ,                          CASE NO.:  5:11-CV-05677-LHK

15                 Plaintiff,             [The Honorable Lucy H. Koh]

16   v.                                   **DEFENDANT WELLS FARGO'S
                                          REQUEST FOR JUDICIAL NOTICE IN
17   WORLD SAVINGS, INC.; WACHOVIA        SUPPORT OF MOTION TO STAY
     MORTGAGE CORPORATION, WELLS          PROCEEDINGS**
18   FARGO BANK, N.A.; NDeX WEST, LLC;
     RECON TRUST COMPANY, N.A.; and       Date:     February 23. 2012
19   DOES 1 through 50, inclusive,        Time:     1:30 p.m.
                                          Ctrm:     8
20                 Defendants.

21

22   TO PLAINTIFF AND HIS COUNSEL OF RECORD:

23          Pursuant to Rule 201(b)(2) of the Federal Rules of Evidence, defendant WELLS FARGO

24   BANK, N.A., successor by merger with Wells Fargo Bank Southwest, N.A., formerly known as

25   Wachovia Mortgage, FSB and World Savings Bank, FSB ("Wells Fargo") (named herein as

26   "World Savings, Inc.; Wachovia Mortgage Corporation; Wells Fargo Bank, N.A."), requests

27   judicial notice of the following documents submitted in support of Wells Fargo's motion to stay

28   proceedings:

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1.      Deed of Trust signed and dated December 28, 2006 by Jerry D. Putz and recorded in the official records of the Santa Clara County Recorder's Office on January 5, 2007 as Document No. 19252528; a true and correct copy is attached as Exhibit A.

2.      Official Certification of the Comptroller of the Currency ("OCC") stating that effective November 1, 2009, Wachovia Mortgage, FSB converted to Wells Fargo Bank Southwest, N.A., which then merged with and into Wells Fargo Bank, N.A.; a true and correct copy is attached as Exhibit B.

3.      Printout from the website of the Federal Deposit Insurance Corporation dated September 2, 2010 showing the history of Wachovia Mortgage, FSB; a true and correct copy is attached as Exhibit C.

4.      Notice of Default dated July 13, 2011 and recorded in the official records of the Santa Clara County Recorder's Office on July 15, 2011 as Document No. 21239734; a true and correct copy is attached as Exhibit D.

5.      Notice of Trustee's Sale dated October 10, 2011 and recorded in the official records of the Santa Clara County Recorder's Office on October 12, 2011 as Document No. 21360730; a true and correct copy is attached as Exhibit E.

6.      Corrected Second Amended Class Action Complaint in the matter entitled, *Dolores Mandrigues, individually and on behalf of all others similarly situated v. World Savings, Inc., World Savings Bank, FSB, et al.*, United States District Court For The Northern District of California Case No.:  Case No. 5:07-cv-04497-JF (RS); a true and correct copy is attached as Exhibit F.

7.      Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement and Memorandum of Points and Authorities in Support Thereof in the matter entitled *Dolores Mandrigues, individually and on behalf of all others similarly situated v. World Savings, Inc.*, World Savings Bank, FSB, et al., United States District Court For The Northern District of California Case No.:  Case No. 5:07-cv-04497-JF (RS); a true and correct copy is attached as Exhibit G.

8.      Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Final

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1  Approval of Class Action Settlement in the matter entitled *In Re Wachovia Corporation "Pick-

2  A-Payment" Mortgage Marketing And Sales Practice Litigation*, United States District Court For

3  The Northern District of California Case No. 5:09-md-02015-JF; a true and correct copy is

4  attached as Exhibit H.

5          9.      Declaration of Jeffrey Burns in Support of Plaintiffs' Motion for Final Approval

6  of Class Action Settlement in the matter entitled *In Re Wachovia Corporation "Pick-A-

7  Payment" Mortgage Marketing And Sales Practice Litigation*, United States District Court For

8  The Northern District of California Case No. 5:09-md-02015-JF; a true and correct copy is

9  attached as Exhibit I.

10         10.     Order (1) Granting Final Approval of Class Action Settlement; (2) Addressing

11 Objections; (3) Denying Motion to Intervene; (4) Approving Service Payments to Class

12 Representatives; and (5) Awarding Attorneys' Fees and Costs in the matter entitled *In Re

13 Wachovia Corporation "Pick-A-Payment" Mortgage Marketing And Sales Practice Litigation*,

14 United States District Court For The Northern District of California Case No. 5:09-md-02015-

15 JF; a true and correct copy is attached as Exhibit J.

16         11.     Judgment in the matter entitled *In Re Wachovia Corporation "Pick-A-Payment"

17 Mortgage Marketing And Sales Practice Litigation*, United States District Court For The

18 Northern District of California Case No. 5:09-md-02015-JF; a true and correct copy is attached

19 as Exhibit K.

20         12.     Orders Dismissing Appeal Nos. 11-16507 11-16510 and in the matter entitled *In

21 Re Wachovia Corporation "Pick-A-Payment" Mortgage Marketing And Sales Practice

22 Litigation*, United States District Court For The Northern District of California Case No. 5:09-

23 md-02015-JF; a true and correct copy is attached as Exhibit L.

24         Grounds for judicial notice of Exhibits A, D and E are that they are true and correct

25 copies of official records of the Santa Clara County Recorder's Office, whose authenticity is

26 capable of accurate and ready determination by resort to sources whose accuracy cannot

27 reasonably be questioned.  *See Gamboa v. Tr. Corps & Cent. Mortg. Loan Servicing Co.*, Case

28 No. 09-0007, 2009 U.S. Dist. LEXIS 19613, at *4-10 (N.D. Cal. Mar. 12, 2009) (court took

1    judicial notice of recorded documents related to the foreclosure sale, including grant deed and

2    deed of trust; "[t]hese documents are also part of the public record and are easily verifiable. *See*

3    *Fed. R. Evid. 201(b); Castillo-Villagra v. INS, 972 F.2d 1017, 1026 (9th Cir. 1992)*).

4          Grounds for judicial notice of Exhibits C and D are that these documents reflect official

5    acts of United States' executive departments. *Hite v. Wachovia Mortgage*, Case No. 2:09-cv-

6    02884, 2010 U.S. Dist. LEXIS 57732, at *6-9 (E.D. Cal. June 10, 2010) (court took judicial

7    notice of Exhibits C through E).

8          Grounds for judicial notice of Exhibits F through L are that these documents are true and

9    correct copies of official records of the United States District Court for the Northern District of

10   California and United Sates Court of Appeals for the Ninth Circuit.

11                                           Respectfully submitted,

12   Dated:  January 17, 2012               ANGLIN, FLEWELLING, RASMUSSEN,
                                            CAMPBELL & TRYTTEN LLP
13

14                                          By:   */s/ Grace B. Kang*
                                                  Grace B. Kang
15                                                gkang@afrct.com
                                            Attorneys for Defendant
16                                          WELLS FARGO BANK, N.A., successor by
                                            merger with Wells Fargo Bank Southwest, N.A.,
17                                          f/k/a Wachovia Mortgage, FSB and World Savings
                                            Bank, FSB ("Wells Fargo") (named herein as
18                                          "World Savings, Inc.; Wachovia Mortgage
                                            Corporation; Wells Fargo Bank, N.A.")
19

20

21

22

23

24

25

26

27

28

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

EXHIBIT A

RECORDING REQUESTED BY:
FIRST AMERICAN TITLE

RECORDING REQUESTED BY:
**WORLD SAVINGS BANK**

WHEN RECORDED MAIL TO:
**WORLD SAVINGS BANK**
**FINAL DOCUMENTATION**
**CLOSING DEPARTMENT**
**P.O. BOX 659548**
**SAN ANTONIO, TX 78265-9548**

LOAN NUMBER:REDACTED

NOTE AMOUNT: $550,000.00

3161740-LA

**DOCUMENT: 19252528**

Pages: 17

Fees.... 57 00
Taxes. .
Copies.
AMT PAID 57 00

REGINA ALCOMENDRAS          RDE # 007
SANTA CLARA COUNTY RECORDER  1/05/2007
Recorded at the request of   8:00 AM
First American Title Company

**FOR RECORDER'S USE ONLY**

## DEED OF TRUST

**THIS IS A FIRST DEED OF TRUST WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR MONTHLY PAYMENTS OF PRINCIPAL AND INTEREST.**

**THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS DEED OF TRUST IS $687,500.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.**

I.   **DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST**
     **(A)   Security Instrument.** This Deed of Trust, which is dated **December 28, 2006,** will be called the "Security Instrument."

     **(B)   Borrower.** JERRY D PUTZ, AN UNMARRIED MAN  sometimes will be called "Borrower" and sometimes simply "I" or "me."

     **(C)   Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES,** will be called "Lender." Lender is **a FEDERAL SAVINGS BANK,** which is organized and exists under the laws of the United States. Lender's address is **1901 Harrison Street, Oakland, CA 94612** .

0 0 3

**LENDER'S USE ONLY**

SD001A (2004-03-3)
DEFERRED INTEREST                    Page 1                    CA

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 5**

REDACTED

**(D) Note.** The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$550,000.00**, plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay this debt in regularly scheduled periodic payments as provided in the Note and to pay the debt in full by **January 15, 2037** ("Maturity Date").

**(E) Property.** The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

**(F) Sums Secured.** The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

**(G) Person.** Any person, organization, governmental authority or other party will be called "Person."

**(H) Trustor, Beneficiary, Trustee.** Borrower is the "Trustor," Lender is the "Beneficiary" and **Golden West Savings Association Service Co., A California Corporation** is the "Trustee."

## II. BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY

I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with a power of sale subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender and Trustee those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who are beneficiaries of a deed of trust and to trustees of a deed of trust. I am giving Lender and Trustee these rights to protect Lender from possible losses that might result if I fail to:

 (i)   pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

 (ii)   pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

 (iii)   keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

## III. DESCRIPTION OF THE PROPERTY

I give Trustee rights in the Property described below:

 (i)   The Property which is located at **3337 JERICHO LN, SAN JOSE, CA 95117-3031**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

 (ii)   All buildings and other improvements that are located on the Described Property;

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 6**

REDACTED

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

## IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (i) I lawfully own the Property; (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and the Trustee has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

### COVENANTS

I promise and I agree with Lender as follows:

## 1.    BORROWER'S PROMISE TO PAY

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

## 2.    PAYMENTS FOR TAXES AND INSURANCE

### (A)    Borrower's Obligations

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

SD001C (2004-03-3)

CA

REDACTED

**(B)     Escrow Accounts**

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 28, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

SD001D (2004-03-3)

CA

REDACTED

**3.     APPLICATION OF BORROWER'S PAYMENTS**
Unless applicable law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;

Second, to pay any advances due to Lender under this Security Instrument;

Third, to pay the amounts due to Lender under Paragraph 2 above;

Fourth, to pay interest due under the Secured Notes;

Fifth, to pay deferred interest due under the Secured Notes;

Sixth, to pay principal due under the Secured Notes;

Last, to pay late charges due under the Secured Notes.

**4.     BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien.** I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.     BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**
At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

SD001E (2004-03-3)                                                                                        CA

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 9**

REDACTED

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender or the insurance company stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. I will notify Lender immediately of any offer to settle a claim I receive from the insurance company. I will immediately deliver any Proceeds I receive from any insurer or other persons to Lender. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of the outstanding balance of the Sums Secured, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 28 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any Proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those Proceeds will not be greater than the total amount of the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6.    **BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS**

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

SD001F (2004-03-3)

CA

EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 10

REDACTED

## 7. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (including but not limited to any manner of legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may include, without limitation, appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5, above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

## 8. LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

## 9. AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender. If I receive any such proceeds, I will immediately deliver them to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the Sums Secured have been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, Sums Secured will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds and settle the claim. Lender may then use the proceeds to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of the outstanding principal of the Secured Notes, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

SD001G (2004-03-3)                                                                 CA

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 11**

REDACTED

**10.    CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**

    **(A)    Borrower's Obligations**

        Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

        Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

    **(B)    Lender's Rights**

        Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 28 below to demand that I make immediate payment in full of the Sums Secured.

**11.    OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

        Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

        Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

        Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

**12.    MAXIMUM LOAN CHARGES**

        If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the outstanding principal balance of the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 12**

REDACTED

**13.   LEGISLATION AFFECTING LENDER'S RIGHTS**

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

**14.   NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **3337 JERICHO LN, SAN JOSE, CA 95117-3031**. A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I.(C) above entitled, "Definitions of Words Used In This Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15.   GOVERNING LAW; SEVERABILITY**

**This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located.** In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

**16.   BORROWER'S COPY**

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

**17.   LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS**
**PAGE 13**

REDACTED

Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.   INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**

An assignment is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include but are not limited to an action for breach of contract, fraud, concealment of a material fact, or for intentional or negligent acts. I assign these rights, and any and all proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to the Sum Secured and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment. I will notify Lender immediately if I believe I have the right to bring any such legal action against any persons, and will notify Lender immediately if I assert any claim or demand against or commence any legal action against any such person. If I receive any proceeds from any persons besides Lender in connection with any such claim, demand or legal action, I will immediately deliver such proceeds to Lender.

**19.   CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to execute such documentation as Lender deems necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.   LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.   WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.   CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.   MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.   CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

**(A)**   If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 14**

REDACTED

**(B)**      The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

**(C)**      If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a **master** or **blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such **master** or **blanket** policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master** or **blanket** policy to Lender annually.

In the event of a distribution of any hazard insurance proceeds, including without limitation any earthquake or special hazards insurance whether or not such coverage was required by Lender, in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me. If I receive any such proceeds, I will immediately deliver them to Lender or otherwise apply them as set forth above.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

**(D)**      I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the **master** or **blanket** hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

## 25.   FUTURE ADVANCES

At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 15**

REDACTED

**26.     AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

_Acceleration of Payment of Sums Secured._ Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

_Exception to Acceleration of Payment of Sums Secured._ If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)     Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)    Lender approves the creditworthiness of the transferee in writing;

(iii)   transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the then outstanding balance of Principal and interest under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)     the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with Lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**27.     SUBSTITUTION OF TRUSTEE**
I agree that Lender may at any time appoint a successor trustee and that Person shall become the Trustee under this Security Instrument as if originally named as Trustee.

SD001L (2004-03-3)                                                                                          CA

REDACTED

**28.    RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each regularly scheduled payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, Lender may exercise the power of sale, take action to have the Property sold under applicable law, and invoke such other remedies as may be permitted under any applicable law.

Lender does not have to give me notice of a Breach of Duty. If Lender does not make a demand for full payment of the Sums Secured upon a Breach of Duty, Lender may make a demand for full payment of the Sums Secured upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender. If the Property is sold, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including but not limited to trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**29.    RECONVEYANCE**

Upon payment of all Sums Secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all Secured Notes to Trustee. Trustee shall reconvey the Property without warranty to Borrower. Lender may charge Borrower a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (including the Trustee) for services rendered and the charging of the fee is permitted, whether expressly or by lack of express prohibition, under applicable law. If the fee charged does not exceed any maximum fee set by applicable law, the fee is conclusively presumed to be reasonable.

**30.    STATEMENT OF OBLIGATION**

Lender may collect a fee of $60.00, or such greater maximum amount as may from time to time be allowed by law, for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

SD001M (2004-03-3)

CA

EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 17

REDACTED

**31.    ( X )  QUICK QUALIFYING LOAN PROGRAM**

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**32.    ( X )  OWNER OCCUPANCY**

Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

**( X )  VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 18

**REDACTED**

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

**BORROWER(S):**

_Jerry D Putz_ _____ (Seal)

JERRY D PUTZ

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 19**

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of ——SANTA CLARA—————— } ss.

On __DECEMBER 29, 2006__ before me, __MAUREEN M. SULLIVAN, A NOTARY PUBLIC.__
       Date                                            Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared __JERRY D. PUTZ_____,
                                        Name(s) of Signer(s)

☐ personally known to me
☒ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
            Signature of Notary Public

MAUREEN M. SULLIVAN
Commission # 1512232
Notary Public - California
San Mateo County
My Comm. Expires Sep 10, 2008

———————— OPTIONAL ————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document*

### Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer

Signer's Name: _____

☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other. _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org     Prod. No. 5907     Reorder: Call Toll-Free 1-800-876-6827

Order No: 3161740c
Reference No.:
Escrow Officer: Gay Gibson
Escrow Number: 3161740c

## DESCRIPTION

All that certain land situated in the State of California, County of **SANTA CLARA**, City of **SAN JOSE**, described as follows:

**ALL OF LOT 64, AS DELINEATED UPON THAT CERTAIN MAP ENTITLED, "TRACT NO. 1490 WALGROVE MANOR", FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON MAY 17, 1955 IN BOOK 57 OF MAPS, AT PAGES 18 AND 19.**

**EXCEPTING THEREFROM THE UNDERGROUND WATER OR RIGHTS THERETO WITH NO RIGHTS OF SURFACE ENTRY, AS GRANTED IN THE DEEDS FROM FRANK L. CALLERO, AT UX, TO SAN JOSE WATER WORKS, A CALIFORNIA CORPORATION, BY INSTRUMENT DATED JUNE 3, 1955, RECORDED JUNE 14, 1955 IN BOOK 3197 OF OFFICIAL RECORDS, PAGE 589 AND ONE DATED FEBRUARY 9, 1956 AND RECORDED FEBRUARY 14, 1956 IN BOOK 3412 OF OFFICIAL RECORDS, PAGE 370.**

APN No: **299-23-055**

**EXHIBIT A ISO MOTION TO STAY PROCEEDINGS
PAGE 21**

EXHIBIT B



Comptroller of the Currency
Administrator of National Banks

Large Bank Licensing

November 1, 2009

Mr. James E. Hanson
Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re:   Application to convert Wachovia Mortgage, FSB, North Las Vegas, Nevada to a national
      bank and application to merge the converted bank with and into Wells Fargo Bank,
      National Association, Sioux Falls, South Dakota
      Application Control Numbers:  2009-ML-01-0007 and 2009-ML-02-0010

Dear Mr. Hanson:

This letter is the official certification of the Comptroller of the Currency (OCC) of the
conversion of Wachovia Mortgage FSB, North Las Vegas, Nevada to a national bank with the
name Wells Fargo Bank Southwest, National Association, effective November 1, 2009.  This is
also the official certification to merge Wells Fargo Bank Southwest, National Association with
and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota, effective
November 1, 2009.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by email at:
Stephen.Lybarger@occ.treas.gov .  Please reference the application control number or numbers
in any correspondence.

Sincerely,

*Stephen A. Lybarger*

Stephen A. Lybarger
Large Bank Licensing Lead Expert

**EXHIBIT B ISO MOTION TO STAY PROCEEDINGS
PAGE 22**

EXHIBIT C

Back to Search Bank Find

**History of Wachovia Mortgage, Fsb, North Las Vegas, Nevada (FDIC Cert: 27076)**

| | Date | Event |
|---|---|---|
| 1 | 10/8/1987 | Institution established. Original name: Watchung Hills Bank For Savings (27076) |
| 2 | 1/21/1995 | Changed name to **World Savings Bank, F.S.B. (27076).** |
| 3 | 1/21/1995 | Changed primary regulatory agency from Federal Deposit Insurance Corporation to Office Of Thrift Supervision. |
| 4 | 7/24/1996 | Moved bank headquarters from Warren, New Jersey to El Cajon, California. |
| 5 | 8/30/1996 | Moved bank headquarters from El Cajon, California to Oakland, California. |
| 6 | 12/31/2000 | Acquired World Savings And Loan Association, A Federal Savings And Loan Associati (31315) in Oakland, California. |
| 7 | 4/16/2001 | Changed name to **World Savings Bank, Fsb (27076)**. |
| 8 | 12/31/2007 | Changed name to **Wachovia Mortgage, Fsb (27076)**. |
| 9 | 12/31/2007 | Moved bank headquarters from Oakland, California to North Las Vegas, Nevada. |
| 10 | 11/1/2009 | **Merged into and subsequently operated as part of Wells Fargo Bank, National Association in Sioux Falls, South Dakota (3511)** |
| 11 | 11/1/2009 | Changed name to **Wells Fargo Bank Southwest, National Association (27076).** |
| 12 | 11/1/2009 | Changed institution class to Insured Commercial Bank, National, Member Frs. |
| 13 | 11/1/2009 | Changed organization type to Commercial Bank. |
| 14 | 11/1/2009 | Changed primary regulatory agency from Office Of Thrift Supervision to Comptroller Of The Currency. |
| 15 | 11/7/2009 | Acquired Wachovia Bank Of Colorado, Interim National Association (59019) in Denver, Colorado. |
| 16 | 3/20/2010 | Acquired Wachovia Bank, National Association (33869) in Charlotte, North Carolina. |
| 17 | 3/20/2010 | Acquired Wachovia Bank Of Delaware, National Association (33931) in Wilmington, Delaware. |
| 18 | 4/10/2010 | Acquired Wachovia Card Services, National Association (58496) in Atlanta, Georgia. |
| 19 | 5/10/2010 | Acquired Wells Fargo Hsbc Trade Bank, National Association (34075) in San Francisco, California. |

Back

**EXHIBIT C ISO MOTION TO STAY PROCEEDINGS
PAGE 23**

EXHIBIT D



Recording requested by:
LSI Title Company

When Recorded Mail To:
NDEx West, L.L.C.
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013

APN #: 299-23-055
Property Address:
3337 JERICHO LN
SAN JOSE, CALIFORNIA 95117-3031

DFF20110015003171

**DOCUMENT: 21239734**

Pages: 4

| | |
|---|---|
| Fees | 27 00 |
| Taxes | |
| Copies | |
| AMT PAID | 27.00 |

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Title Company

RDE # 004
7/15/2011
8:52 AM

Space above this line for Recorder's use only

Trustee Sale No.: 20110015003171          Title Order No.: 110293489

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER
## DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until approximately 90 days from the date this Notice of Default may be recorded (which date of recordation appears on this notice).

This amount is $28,932.73 as of 07/13/2011 and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor

FCUS_NoticeOfDefault rpt - Record - (05/12/2011) - Ver-32                    Page 1 of 3

**EXHIBIT D ISO MOTION TO STAY PROCEEDINGS**
**PAGE 24**

permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

WELLS FARGO BANK, N.A., A/K/A WACHOVIA MORTGAGE, A DIVISION OF WELLS FARGO
BANK, N.A. AND F/K/A WACHOVIA MORTGAGE, FSB
c/o NDEX WEST, LLC
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013
(866) 795-1852

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.
Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

## REMEMBER, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN THAT:     NDEX WEST, LLC is the original Trustee, duly appointed Substituted Trustee, or acting as Agent for the Trustee or Beneficiary under a Deed of Trust dated 12/28/2006, executed by JERRY D PUTZ, as Trustor, to secure obligations in favor of WORLD SAVINGS BANK, FSB, as Beneficiary Recorded on 01/05/2007 as Instrument No. 19252528 of official records in the Office of the Recorder of SANTA CLARA  County, California, as more fully described on said Deed of Trust.   Including a Note(s)/ Unconditional Guaranty which had a principal amount of $550,000.00 that the beneficial interest under said Deed of Trust and the obligations secured thereby are presently held by the Beneficiary; that a breach of, and default in, the obligations for which said Deed of Trust is security has occurred in that the payment has not been made of:

THE INSTALLMENT OF PRINCIPAL AND INTEREST WHICH BECAME DUE ON 9/15/2010 AND ALL SUBSEQUENT INSTALLMENTS, TOGETHER WITH LATE CHARGES AS SET FORTH IN SAID NOTE AND DEED OF TRUST, ADVANCES, ASSESSMENTS, FEES, AND/OR TRUSTEE FEES, IF ANY.

NOTHING IN THIS NOTICE SHALL BE CONSTRUED AS A WAIVER OF ANY FEES OWING TO THE BENEFICIARY UNDER THE DEED OF TRUST, PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS.

EXHIBIT D ISO MOTION TO STAY PROCEEDINGS
PAGE 25

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said agent, a written Declaration of Default and Demand for same, and has deposited with said agent such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

DATED: 07/13/2011

NDEX WEST, LLC as Agent for Beneficiary

By: _____

Melissa Hayes

EXHIBIT D ISO MOTION TO STAY PROCEEDINGS
PAGE 26



Wachovia Mortgage
P.O. Box 659558
San Antonio, TX 78265-9558

Jerry D Putz     **WACHOVIA**

## Declaration of Wells Fargo Bank, N.A.

As required by California Civil Code Section 2923.5, I, **Jennifer Spear**
an officer of Wells Fargo Bank, N.A., declare as follows:

Regarding Jerry D Putz (hereinafter referred to as
"borrower"), Wells Fargo Bank, N.A., has met the requirement of
California Civil Code Section 2923.5 as indicated below.

(x) Wells Fargo Bank, N.A., has contacted the borrower as set
forth in California Civil Code Section 2923.5(a)(2).

( ) Wells Fargo Bank, N.A., has tried with due diligence, as
prescribed by California Civil Code Section 2923.5(g), to
contact the borrower.

The undersigned authorizes the trustee, foreclosure agent and/or their
authorized agent to sign, on behalf of the beneficiary/authorized agent,
the Notice of Default containing the declaration required pursuant to
Civil Code 2923.5.

I certify (or declare) under penalty of perjury under the laws of the
State of California that the foregoing is true and correct.

JUN 0 2 2011
_____
Date

_____
By:
Title: Vice President Loan Documentation

FP006 012 JEE

EXHIBIT E



Recording requested by:
**LSI Title Company**

When Recorded Mail To:
**NDEx West, L.L.C.**
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013
(866) 795-1852

APN #: 299-23-055
Property Address:
3337 JERICHO LN
SAN JOSE, CALIFORNIA 95117-3031


NTSP20110015003171

DOCUMENT: 21360730      Pages: 1



Fees .      18.00
Taxes...
Copies..
AMT PAID      18.00

REGINA ALCOMENDRAS      RDE # 010
SANTA CLARA COUNTY RECORDER      10/12/2011
Recorded at the request of      1:39 PM
Recording Service

Space above this line for Recorder's use only

Trustee Sale No. : 20110015003171  Title Order No.: 110293489     FHA/VA/PMI No.:

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 12/28/2006. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

NDEX WEST, LLC, as duly appointed Trustee under and pursuant to Deed of Trust **Recorded on 01/05/2007 as Instrument No.** 19252528 of official records in the office of the County Recorder of **SANTA CLARA** County, State of CALIFORNIA.

**EXECUTED BY:    JERRY D PUTZ,**
WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK/CASH EQUIVALENT or other form of payment authorized by 2924h(b), (payable at time of sale in lawful money of the United States).
**DATE OF SALE:**    11/07/2011      **TIME OF SALE:**     11:00 AM
**PLACE OF SALE:**    AT THE NORTH MARKET STREET ENTRANCE TO THE COUNTY COURTHOUSE, 190 NORTH MARKET STREET, SAN JOSE, CA.
**STREET ADDRESS** and other common designation, if any, of the real property described above is purported to be:
         3337 JERICHO LN, SAN JOSE, CALIFORNIA 95117-3031
**APN#:**          299-23-055

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. Said sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by said Deed of Trust, with interest thereon, as provided in said note(s), advances, under the terms of said Deed of Trust, fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is **$616,896.89.** The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located.       :

FOR TRUSTEE SALE INFORMATION PLEASE CALL:
AGENCY SALES & POSTING
3210 EL CAMINO REAL, SUITE 200
IRVINE, CA 92602
714-730-2727
www.lpsasap.com

NDEx West, L.L.C. as Trustee

BY: Ric Juarez

NDEx West, L.L.C. MAY BE ACTING AS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Dated: 10/10/2011

FCUS_NoticeOfTrusteeSale.rpt - Pub - 12/07/2010 - Ver-25

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS**
**PAGE 28**

EXHIBIT F

1   David M. Arbogast (SBN 167571)
    David@SpiroMoss.com
2   Ira Spiro (SBN 67641)
    Ira@SpiroMoss.com
3   **SPIRO MOSS BARNESS LLP**
    11377 W. Olympic Boulevard, Fifth Floor
4   Los Angeles, CA 90064-1683
    Phone: (310) 235-2468; Fax: (310) 235-2456
5
    Paul R. Kiesel, Esq. (SBN 119854)          Jonathan Shub (SBN 237708)
6   kiesel@kbla.com                            jshub@seegerweiss.com
    Patrick DeBlase, Esq. (SBN 167138)         **SEEGER WEISS LLP**
7   deblase@kbla.com                           1515 Market Street, Suite 1380
    Michael C. Eyerly, Esq. (SBN 178693)       Philadelphia, PA 19107
8   eyerly@kbla.com                            Phone: (215) 564-2300; Fax (215) 851-8029
    **KIESEL BOUCHER LARSON LLP**
9   8648 Wilshire Boulevard                    Jeffrey K. Berns, Esq. (SBN 131351)
    Beverly Hills, California 90211            jberns@jeffbernslaw.com
10  Phone: (310) 854-4444; Fax: (310) 854-0812 **LAW OFFICES OF JEFFREY K. BERNS**
                                               19510 Ventura Boulevard, Suite 200
11                                             Tarzana, California 91356
                                               Phone: (818) 961-2000; Fax: (818) 867-4820
12
    Attorneys for Plaintiffs and all others Similarly Situated
13

14              **UNITED STATES DISTRICT COURT**

15      **NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION**

16  DOLORES MANDRIGUES, JUANITA        )  **CASE NO. C-07-04497 JF (RS)**
    JONES, AL F. MINYEN and WILMA R.   )
17  MINYEN, MARK CLAUSON and           )  ***CORRECTED* SECOND AMENDED CLASS**
    CHRISTINA CLAUSON, individually and on )  **ACTION COMPLAINT FOR:**
18  behalf of all others similarly situated, )
                                       )  **(1)   Violations of the Truth in Lending Act, 15**
19              Plaintiffs,            )        **U.S.C. §1601, *et seq*;**
                                       )
20                                     )  **(2)   Fraudulent Omissions;**
          v.                           )
21                                     )  **(3)   Violation of Bus. & Prof. Code §17200, *et***
                                       )        ***seq*. – "Unfair" and "Fraudulent" Business**
22  WORLD SAVINGS, INC., WORLD SAVINGS )        **Practices;**
    BANK, FSB, WACHOVIA MORTGAGE       )
23  CORPORATION, and DOES 1 through 10 )  **(4)   Breach of Contract; and**
    inclusive,                         )
24                                     )  **(5)   Breach of the Covenant of Good Faith and**
              Defendants.             )        **Fair Dealings.**
25                                     )
                                       )
26                                     )
                                       )
27                                     )  **JURY TRIAL DEMANDED**
                                       )
28

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS
PAGE 29**

Plaintiffs, DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R. MINYEN, individually and on behalf of all others similarly situated allege as follows:

# I.

## INTRODUCTION

1.     This is an action pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. §1601, *et seq.,* California's Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, *et seq.,* and other statutory and common law in effect.  Plaintiffs DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R. MINYEN, and on behalf of all others similarly situated, bring this action against WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1-10 (collectively "Defendants"), based, in part, on Defendants' failure to clearly and conspicuously disclose to Plaintiffs and the Class Members, in Defendants Option Adjustable Rate Mortgage ("ARM") loan documents, and in the required Truth In Lending Disclosure Statements ("TILDS"), accompanying the loans, (i)  the actual interest rate on which the payment amounts listed in the TILDS are based (12 C.F.R. § 226.17 (c)); (ii) that making the payments according to the payment schedule listed in the TILDS will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the payment amounts listed on the TILDS are insufficient to pay both principle and interest.

# II.

## THE PARTIES

2.     Plaintiff, DOLORES MANDRIGUES is, and at all times relevant to this Complaint, was an individual residing in Milpitas, California.  On or about August 4, 2006, Plaintiff MANDRIGUES refinanced her existing home loan and entered into an Option ARM loan agreement with Defendants. The Option ARM loan was secured by Plaintiff's primary residence.  Attached hereto as Exhibit 1 is a true and correct copy of the Note and the Truth In Lending Act Disclosure Statement (hereafter "TILDS") pertinent to this action.

/ / /

3.    Plaintiff, JUANITA JONES is, and at all times relevant to this Complaint, was an individual residing in Los Angeles, California.  On or about January 9, 2007, Plaintiff JONES refinanced her existing home loan and entered into an Option ARM loan agreement with Defendants.  The Option ARM loan was secured by Plaintiff's primary residence.  Attached hereto as Exhibit 2 is a true and correct copy of the Note and TILDS pertinent to this action.

4.    Plaintiffs, AL F. MINYEN and MILDRED R. MINYEN are, and at all times relevant to this Complaint, were individuals residing in San Pablo, California.  On or about May 25, 2005, Mr. and Mrs. Minyen entered into an Option ARM loan agreement with Defendants.  However, Defendants did not provide Mr. and Mrs. Minyen with a copy of their loan documents, including but not limited to a copy of, the Note, the TILDS, and the notice of right to rescind until December 20, 2007.  The Option ARM loan was secured by Plaintiffs' primary residence.  Attached hereto as Exhibit 3 is a true and correct copy of the Note, TILDS and Loan Program Disclosure that Defendants produced, through their counsel, on December 20, 2007.

5.    Plaintiffs, MARK CLAUSON and CHRISTINA CLAUSON are, and at all times relevant to this Complaint, were individuals residing in Santee, California.  On or about June 24, 2005, Mr. and Mrs. Clauson refinanced their existing home loan and entered into an Option ARM loan agreement with Defendants.  The Option ARM loan was secured by Plaintiffs' primary residence.  Attached hereto as Exhibit 4 is a true and correct copy of the Note and the Truth In Lending Act Disclosure Statement (hereafter "TILDS") pertinent to this action.

6.    Plaintiffs, DOLORES MANDRIGUES, JUANITA JONES, AL F. MINYEN and WILMA R. MINYEN, MARK CLAUSON and CHRISTINA CLAUSON, and members of the putative Class or classes shall hereinafter be referred to collectively as "Plaintiffs."

7.    Defendant WORLD SAVINGS, INC. is a California corporation licensed to do, and is doing business in California.  At all relevant times hereto, WORLD SAVINGS, INC., was and is engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are the subject of this Complaint.  WORLD SAVINGS, INC. transacts business in Santa Clara County, California and at all relevant times promoted, distributed, and sold the Option Arm loans that are the subject of this Complaint throughout the United States, including Santa Clara County, California.

WORLD SAVINGS, INC. has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

8. Defendant, WORLD SAVINGS BANK, FSB, was and is a business organization form unknown. Plaintiffs are informed and believe and thereupon allege that Defendant WORLD SAVINGS BANK, FSB is a corporation; that Defendant WORLD SAVINGS BANK, FSB is a partnership; and that Defendant, WORLD SAVINGS BANK, FSB, is a division of Defendant, WORLD SAVINGS, INC.

9. Defendant, WACHOVIA MORTGAGE CORPORATION ("WACHOVIA"), is a North Carolina corporation licensed to do, and is doing business in California. At all relevant times hereto WACHOVIA was and is engaged in the business of promoting, marketing, distributing and selling the Option Arm loans that are the subject of this Complaint. WACHOVIA transacts business in Santa Clara County, California and at all relevant times promoted, distributed, and sold the Option Arm loans throughout the United States, including Santa Clara County, California. WACHOVIA has significant contacts with Santa Clara County, California, and the activities complained of herein occurred, in whole or in part, in Santa Clara County, California.

10. Defendants, WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB, WACHOVIA MORTGAGE CORPORATION, and DOES 1 through 10, shall hereinafter be referred to collectively as "Defendants."

11. At all times mentioned herein, Defendants, and each of them, were engaged in the business of promoting, marketing, distributing, and selling the Option Arm loans that are the subject of this Complaint, throughout the United States, including Santa Clara County, California.

12. Plaintiffs are informed and believe, and thereon allege that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiffs' injuries, as herein alleged, were proximately caused by the conduct of Defendants.

13. Plaintiffs are informed and believe, and thereon allege, that at all times material hereto and mentioned herein, each of the Defendants (both named and DOE defendants) sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-

1   ego of each of the remaining Defendants and were at all times acting within the purpose and scope of

2   such agency, servitude, joint venture, division, ownership, subsidiary, alias, assignment, alter-ego,

3   partnership or employment and with the authority, consent, approval and ratification of each remaining

4   Defendant.

5        14.    At all times herein mentioned, each Defendant was the co-conspirator, agent, servant,

6   employee, assignee and/or joint venturer of each of the other Defendants and was acting within the

7   course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the

8   permission and consent of each of the other Defendants.

9        15.    Plaintiffs are informed and believe, and thereon allege, that Defendants, and each of

10  them, are, and at all material times relevant to this Complaint, performed the acts alleged herein and/or

11  otherwise conducted business in California.  Defendants, and each of them, are corporations or other

12  business entities, form unknown, have, and are doing business in this judicial district.

13       16.    Plaintiffs are informed and believe, and thereon allege, that DOES 1 through 10,

14  inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters,

15  CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are

16  assignees to the loans which are the subject of this action.  Plaintiffs will seek leave of Court to replace

17  the fictitious names of these entities with their true names when they are discovered by Plaintiffs herein.

18       17.    The true names and capacities, whether individual, corporate, associate or otherwise, of

19  Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiffs at this time, and

20  Plaintiffs therefore sue said Defendants by such fictitious names.  Plaintiffs allege, on information and

21  belief, that each Doe defendant is responsible for the actions herein alleged.  Plaintiffs will seek leave of

22  Court to amend this Complaint when the names of said Doe defendants have been ascertained.

23       18.    Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein,

24  Defendants, and each of them, including without limitation those Defendants herein sued as DOES,

25  were acting in concert or participation with each other, or were joint participants and collaborators in the

26  acts complained of, and were the agents or employees of the others in doing the acts complained of

27  herein, each and all of them acting within the course and scope of said agency and/or employment by the

28  others, each and all of them acting in concert one with the other and all together.

## III.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 15 U.S.C § 1601 *et seq.* and 28 U.S.C. § 1331.

20.     This Court has personal jurisdiction over the parties in this action by the fact that Defendants are either individuals who reside in this District within California or are corporations duly licenced to do business in California.

21.     Venue is proper within this District and Division pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and because there is personal jurisdiction in this district over the named Defendant because it regularly conducts business in this judicial district.

## IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

22.     WORLD SAVINGS, INC., WORLD SAVINGS BANK, FSB and WACHOVIA are amongst the largest financial institutions in the United States.

23.     The instant action arises out of residential mortgage loan transactions in which Defendants failed to disclose important material information in a clear and conspicuous manner to Plaintiffs and the Class members, in writing, as required by law.

24.     This action also concerns Defendants' fraudulent omissions and its unlawful, fraudulent and unfair business acts or practices.  Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept this type of loan in order to maximize Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure.

25.     Plaintiffs, along with thousands of other similarly situated consumers, were sold an Option ARM home loan by Defendants.  The Option ARM loan sold to Plaintiffs and the Class is a deceptively devised financial product.  The loan has a variable rate feature with payment caps.  The product was sold based upon a low, fixed interest rate, when in fact Plaintiffs were charged a different,

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 34**

1  much greater interest rate than the rate upon which the payment amounts listed in the TILDS were

2  based. Further, Defendants failed to disclose, and by omission, failed to inform Plaintiffs the fact that

3  Defendants' Option ARM loan was designed to, and did, cause negative amortization to occur.  Further

4  still, once lured into these loans, consumers cannot easily extricate themselves from these loans because

5  Defendants' included in these loans a stiff and onerous prepayment penalty making it extremely

6  difficult, if not impossible, for borrowers to extricate themselves from these loans.

7      26.    The Option ARM loan Defendants sold to Plaintiffs violates the Truth In Lending Act

8  (TILA).  TILA is supposed to protect consumers; it mandates certain disclosures be made by lenders to

9  borrowers concerning the terms and conditions of their home loans.  Defendants failed to make these

10  disclosures in connection with the Option ARM loans sold to Plaintiffs and the Class.

11      27.    At all times relevant, Defendants sold their Option ARM loan product to consumers,

12  including Plaintiffs, in a false or deceptive manner.  Defendants sold to the general public a loan which

13  would provide a very low interest and payment rate for up to ten years and made no reference in the

14  Note and TILDS that if consumers followed Defendants schedule of payments that negative

15  amortization was absolutely certain to occur.

16      28.    Plaintiffs and others similarly situated were consumers who applied for a mortgage loan

17  through Defendants.  During the loan application process, in each case, Defendants represented to

18  Plaintiffs and the Class members that in accepting these loan terms, Plaintiffs would be able to lower

19  their mortgage payment and save money.  Defendants initiated this scheme in order to maximize the

20  amount of the loans issued to consumers thereby maximizing Defendants' profits.

21      29.    As a direct and proximate result of Defendants' representations, and the conduct alleged

22  herein, Plaintiffs agreed to finance their primary residence through Defendants' Option ARM loan.  The

23  loan sold to Plaintiffs and the Class had a low payment, which Plaintiffs reasonably believed would be

24  sufficient to pay both principle and interest.  However, the true facts are that the payment schedule was

25  not based on the interest rate disclosed in the Note and TILDS, but instead, was based on a much lower

26  rate and therefore, the payment schedule provided by Defendants was *guaranteed* to be insufficient to

27  pay all of the interest due, let alone both principle and interest, which was absolutely certain to result in

28  negative amortization.

*CORRECTED* SECOND AMENDED COMPLAINT - C-07-04497 JF (RS)

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS
PAGE 35**

30.     Plaintiffs and the Class members reasonably believed, based on the representations contained in the documents Defendants provided to Plaintiffs and the Class members, that they would be able to refinance their loan and get a new loan before their scheduled payments significantly increased. However, the payment schedule provided by Defendants failed to disclose, and by omission, failed to inform these consumers that due to the negative amortization that was purposefully built into these loans, Plaintiffs and the Class members would be unable to refinance their homes as there would be little or no equity left to refinance.

31.     Plaintiffs believed these facts to be true because that is what the Defendants intended consumers to believe.  Defendants aggressively sold their product as a fixed, low interest home loan. Defendants knew that if they sold these loans in such a manner, their Option ARM loan product would be a hugely popular and profitable product for them.  Defendants also knew, however, that they were selling their product in a false and deceptive manner.  While Defendants trumpeted their low, fixed rate loans to the public, Defendants knew their promise of a low, fixed interest rate was illusory.

32.     In fact, Defendants' Option ARM loan possessed a low, fixed payment that was wholly unrelated to the interest rate listed in the Note and TILDS.  Unbeknownst to Plaintiffs and Class members, the actual interest rate they were charged on their loans was not used to determine the payment amount listed by Defendants in the Note and TILDS.  Defendants in every instance and for every loan, listed a payment amount that was not, in anyway, related to the interest rate disclosed in the Note and TILDS.  In fact, the only way for Plaintiffs to know that the payment rate was not based on the listed interest rate was to use a sophisticated mortgage calculation device, that is, and was, far beyond the comprehension of Plaintiffs and all other similarly situated reasonable consumers.

33.     At all times relevant, Defendants knew that the payments listed in the TILDS during the initial 10 years of the Note was not based on the interest rate listed in the Note and TILDS but instead, was based on a much lower rate that was *not* disclosed in either the Note or the TILDS as required by law.

34.     Knowing the truth, and motivated by profit and market share, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members that the payment schedule provided by Defendants was not based on the listed interest rate but instead, was based upon an

1   undisclosed, and much lower, interest rate.

2       35.    Defendants, through the standardized loan contracts they created and supplied to

3   Plaintiffs and the Class, stated that negative amortization was only a mere possibility and would occur

4   only if the payments were not sufficient.  Defendants withheld and failed to disclose the fact that the

5   loan as presented and designed, in fact, *guaranteed* negative amortization.  Defendants failed to disclose

6   and omitted the objectively material fact that negative amortization was absolutely certain to occur if

7   consumers followed the payment schedule listed by Defendants in the TILDS.   This information was

8   objectively material and necessary for consumers to make an informed decision because this information

9   would have revealed that the loan's principal balance would increase if the payment schedule was

10  followed, thereby rendering it impossible to refinance the loan at or around the time the prepayment

11  penalty expired and/or by the time the interest and payment rates re-set.   In this respect, Defendants

12  utterly failed to place any warning in the TILDS that negative amortization *was* absolutely certain to

13  occur.

14      36.    At all times relevant, once Plaintiffs and the Class members accepted Defendants' Option

15  ARM loan contract, they had no viable option by which to extricate themselves because these Option

16  ARM loan agreements included a draconian pre-payment penalty for a period of up to three years.

17      37.    The Option ARM loans sold by Defendants all have the following uniform

18  characteristics:

19          (a)    The loan has a low fixed payment amount for the first 10 years of the Note;

20          (b)    The payment amount is wholly unrelated to the interest rate listed on the Note and

21              TILDS;

22          (c)    The Note states that each payment will go to both principle and interest;

23          (d)    The payment amounts listed in the TILDS are not sufficient to pay the actual

24              interest being charged, and none of the payments up through the first ten (10)

25              years of the Note are applied to principle;

26          (e)    The low payment amount listed in the Note and TILD was intended by

27              Defendants to mislead consumers into believing that the low payments for the

28              first ten years of the loan were based on the listed interest rate;

-9-

*CORRECTED* SECOND AMENDED COMPLAINT - C-07-04497 JF (RS)

(f)     The payment has a capped annual increase on the payment amount; and

(g)     The loan includes a prepayment penalty for a period of up to three (3) years.

38.     At all times relevant, Defendants knew, and failed to disclose and by omission failed inform Plaintiffs and the Class members, in a clear and conspicuous manner, that the payment amounts set forth in Defendants' schedule of payments were insufficient to cover the actual interest charged on the loans.

39.     At all times relevant, Defendants knew, and failed to disclose and by omission failed to inform Plaintiffs and the Class members, that the payment amounts set forth in Defendants' schedule of payments were insufficient to pay both principle and interest and that this was, in fact, a negative amortization loan that was absolutely certain to, and did cause Plaintiffs and the Class members to lose the equity they had in their homes.

40.     Disclosing whether a payment will result in negative amortization is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principle and interest, one of the consequences of negative amortization is a loss of equity.  Defendants are and at all times relevant hereto have been aware that clear and conspicuous disclosure of the actual interest rate and a payment rate that is sufficient to avoid negative amortization, and the concomitant loss of equity, is extremely important material information.

41.     At all times relevant, Defendants, and each of them, knew or should have known, or were reckless in not knowing, that: (i) the payment amount provided to Plaintiffs was insufficient to pay both interest and principle; (ii) that negative amortization was substantially certain to occur if Plaintiffs made payments according to the payment schedule provided by Defendants; and (iii) that loss of equity and/or loss of Plaintiffs' residences was substantially certain to occur if Plaintiffs made payments according to the payment schedule provided by Defendants.

42.     In spite of its knowledge, Defendants sold its ARM loans as a product that would provide Plaintiffs and the Class members with a low payment for up to ten years, and at all times relevant, failed to disclose and/or concealed by making partial representations of material facts when Defendants had exclusive knowledge of the material fact that negative amortization was absolutely certain to occur. This concealed and omitted information was not known to Plaintiffs and the Class members and which,

at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiffs and all others similarly situated.  Because the ARM loans did not provide a payment amount based on the actual interest rate charged on the Notes, the payment

rate disclosed by Defendants was insufficient to pay both principle and interest, and negative amortization occurred.

43.   The true facts about these loans is that they do not provide Plaintiffs and the Class members with a low interest rate loan with payment amounts sufficient to pay both principle and interest, and thus, are certain to result, and did result, in negative amortization.

44.   Disclosure of a payment rate that is sufficient to pay both principle and interest on the loans is of critical importance consumers.  If the disclosed payment rate is insufficient to pay both principle and interest, one of the consequences is that negative amortization or loss of equity will occur. Defendants are and at all times relevant hereto have been aware that the ability of the disclosed payment rate to pay both principle and interest so as to avoid negative amortization is one of the most important terms of a loan.

45.   To this day, Defendants continue to withhold and conceal material information from consumers, and the public, that: (i) the payment rate provided to Plaintiffs and the Class members is and was insufficient to pay both principle and interest; (ii) if the disclosed payment schedule is followed, Plaintiffs and the Class members have and/or are absolutely certain to suffer negative amortization; and (ii) loss of equity and/or possession of the property is absolutely certain to occur if the disclosed payment schedule is followed.  Nevertheless, Defendants have refused to clearly and conspicuously disclose to Plaintiffs the existence of this important material information and the injury caused thereby, including but not limited to the loss of equity.

46.   In the end, the harm caused by Defendants failures to disclose and omissions grossly outweighs any benefit that could be attributed to them.

47.   Knowing the truth and motivated by profit and market share, Defendants have knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiffs and others similarly situated.

48.     The ARM loans have resulted and will continue to result in significant loss and damage to the Class Members, including but not limited to the loss of equity these consumers have or had in their homes.

49.     The facts which Defendants misrepresented and concealed, as alleged in the preceding paragraphs, were material to the decisions about whether to purchase the ARM loans in that Plaintiffs and others similarly situated would not have purchased these loans but for Defendants' unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

50.     Defendants engaged in the unlawful, unfair, fraudulent, untrue and/or deceptive scheme to induce consumers to purchase their ARM loans.

51.     Defendants unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices were committed with willful and wanton disregard for whether or not Plaintiffs or others similarly situated would, in fact, receive a home loan that would actually provide the low interest and payment rate, as promised, for up to ten years of the loan that is sufficient to pay both principle and interest.

52.     Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about the ARM loans, and otherwise sold these ARM loans throughout the United States, including the State of California.

**V.**

**CLASS ACTION ALLEGATIONS**

53.     Plaintiffs bring this action on behalf of themselves, and on behalf of all others similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure, Rules 23(a), and 23(b), and the case law thereunder.  The classes Plaintiffs seek to represent are defined as follows:

> **The California Class**:  All individuals who, within the four year period preceding the filing of Plaintiffs' Complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the State of California.  Excluded from the California Class are Defendants' employees, officers, directors, agents, representatives, and their family members; and

/ / /

/ / /

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS
PAGE 40**

**The National Class**: All individuals in the United States of America who, within the four year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America.  Excluded from the National Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

An appropriate sub-Class exists for the following Class Members:

All individuals in the United States of America who, within the three year period preceding the filing of Plaintiffs' complaint through the date notice is mailed to the Class, received an Option ARM loan through Defendants on their primary residence located in the United States of America.  Excluded from the National sub-Class are Defendants' employees, officers, directors, agents, representatives, and their family members.

Plaintiffs reserve the right to amend or otherwise alter the Class definitions presented to the Court at the appropriate time, or propose or eliminate sub-Classes, in response to facts learned through discovery, legal arguments advanced by Defendants or otherwise.

54.  <u>Numerosity</u>:  The Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  While the exact number of Class members is unknown at this time, Plaintiffs are informed and believe that the entire Class or Classes consist of approximately tens of thousands of members.

55.  <u>Commonality</u>:  Common questions of law or fact are shared by the Class members.  This action is suitable for class treatment because these common questions of fact and law predominate over any individual issues.  Such common questions include, but are not limited to, the following:

(1)  Whether Defendants' acts and practices violate the Truth in Lending Act;

(2)  Whether Defendants' conduct violated 12 C.F.R. § 226.17;

(3)  Whether Defendants' conduct violated 12 C.F.R. § 226.19;

(4)  Whether Defendants' had a duty to disclose to Plaintiffs important material information concerning their loans, including but not limited to (i) that the payment amounts listed in the TILDS were insufficient to pay both principle and interest; (ii) that the payment schedule was not based on the listed interest rate; and (iii) that negative amortization would occur if Plaintiffs made the payments according to the schedule of payments Defendants listed in the TILDS;

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 41**

(5)     Whether Defendants, by and through their officers, employees and agents
concealed, omitted and/or otherwise failed to disclose information they were
mandated to disclose under TILA;

(6)     Whether Defendants' failed to disclose, and by omission, failed to inform
Plaintiffs that the payment schedule was not based on the interest rate disclosed in
the Note and TILDS;

(7)     Whether Defendants' failed to disclose, and by omission, failed to inform
Plaintiffs that the payment amounts listed in Note and TILDS are insufficient to
cover both principle and interest;

(8)     Whether Defendants' failed to disclose, and by omission, failed to inform
Plaintiffs that negative amortization was absolutely certain to occur if Plaintiffs
made the payments according to payment schedule provided by Defendants;

(9)     Whether Defendants engaged in unfair business practices aimed at deceiving
Plaintiffs and the Class members before and during the loan application process;

(10)    Whether Defendants' failure to apply Plaintiffs' and the Class members'
payments to principal as promised in the Notes constitutes a breach of contract,
including a breach of the covenant of good faith and fair dealing;

(11)    Whether Defendants' breached the covenant of good faith and fair dealing;

(12)    Whether the terms and conditions of Defendants' Option ARM home loan are
unconscionable, including but not limited to: (i) listing a payment amount and
interest rate which bear no relation to each other; (ii) stating that "from time to
time" negative amortization "may occur" when, in fact, negative amortization
was *guaranteed* to occur if consumers followed the payment schedule provided
by Defendants in the TILDS; and (iii) under the terms and conditions of these
loans, the prepayment penalty provision.

(13)    Whether Plaintiffs and the Class are entitled to declaratory relief, including but
not limited to: whether Defendants' Option ARM loans violate TILA;

(14)    Whether Plaintiffs and the Class members are entitled to rescission under TILA;

*CORRECTED* SECOND AMENDED COMPLAINT - C-07-04497 JF (RS)

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 42**

(15)   Whether Plaintiffs and the Class are entitled to statutory damages under TILA;

(16)   Whether Plaintiffs and the Class are entitled to actual damages;

(17)   Whether Plaintiffs and the Class members are entitled to punitive damages; and

(18)   Whether Plaintiffs are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

56.   <u>Typicality</u>:  Plaintiffs' claims are typical of the claims of the Class members.  Plaintiffs and the other Class members were subjected to the same kind of unlawful conduct and the claims of Plaintiffs and the other Class members are based on the same legal theories.

57.   <u>Adequacy</u>:  Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other members of the Class Plaintiffs seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation and Plaintiffs intend on prosecuting this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

58.   <u>Ascertainable Class</u>:  The proposed Classes are ascertainable in that the members can be identified and located using information contained in Defendants' mortgage lending records.

59.   This case is brought and can be maintained as a class action under Rule 23(b)(1), 23(b)(2), and 23(b)(3):

(a)   <u>Risk of Inconsistent Judgments</u>:  The unlawful acts and practices of Defendants, as alleged herein, constitute a course of conduct common to Plaintiffs and each Class member.  Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of individual Class members to protect their interests;

(b)   <u>Injunctive and/or Declaratory Relief to the Class is Appropriate</u>:  Defendants, and each of them, have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the Class as a whole appropriate; and

/ / /

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 43**

(c)   <u>Predominant Questions of Law or Fact</u>:  Questions of law or fact common to the Class members, including those identified above, predominate over questions affecting only individual Class members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would require.  Further, an important public interest will be served by addressing the matter as a class action.  The cost to the court system of adjudicating each such individual lawsuit would be substantial.

# VI.

# FIRST CAUSE OF ACTION

## (Violations of Truth in Lending Laws, 15 U.S.C. §1601, *et seq.*,

## (Against All Defendants)

60.   Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

61.   15 U.S.C. §1601, *et seq.*, is the Federal Truth in Lending Act ("TILA").  The Federal Reserve Board of Governors implements the Federal Truth in Lending Act through Regulation Z (12 C.F.R. § 226 ) and its Official Staff Commentary.  Compliance by lenders with Regulation Z became mandatory October 1, 1982.  Likewise, Official Staff Commentary issued by the Federal Reserve Board is also binding on all lenders.

62.   The purpose of TILA is to protect consumers.  This is stated in 12 C.F.R. § 226.1, which reads:

> **§ 226.1 Authority, purpose, coverage, organization, enforcement and liability. . .**
> (b)    Purpose.  The purpose of this regulation is to promote the informed use of consumer credit by requiring disclosures about its terms and costs.  The regulation also gives consumers the right to cancel certain credit transactions that involve a lien on a consumer's principal dwelling . . .

63. Reg. Z also mandates very specific disclosure requirements regarding home loans with which lenders, including Defendants, must comply:

**§ 226.17. General disclosure requirements.**

(a) Form of disclosures. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep. The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under § 226.18.

64. The purpose of the TILA is to assure a meaningful disclosure of credit terms so that the borrowers will be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit and to protect the consumer against inaccurate and unfair credit billing practices.

65. Defendants' Option ARM loans violate TILA because Defendants failed to comply with the disclosure requirements mandated by Regulation Z and Official Staff Commentary issued by the Federal Reserve Board. Defendants failed in a number of ways to clearly, conspicuously and/or accurately disclose the terms of the Option ARM loan to Plaintiffs as Defendants were required to do under TILA. These violations are apparent on the face of the TILA Disclosure Forms.

66. The TILA violations committed by Defendants are more specifically detailed as follows:

**A. Defendants' Failure to Clearly and Conspicuously Disclose That the Payment Schedules Are Not Based on the Actual Interest Rate Violates TILA**

67. 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 require the lender to make disclosures concerning the interest rate and payments in a clear and conspicuous manner. Further, a misleading disclosure is as much a violation of TILA as a failure to disclose at all.

68. As for Plaintiffs and the Class members Option ARM loans, Defendants violated 12 C.F.R. § 226.17 and 12 C.F.R. § 226.19 in that they failed to clearly and conspicuously disclose the interest rate upon which the payments listed in the TILDS are based.

69. The scheduled payment amounts and interest rate listed in the Note and TILDS for each of the subject loans are unclear and inconspicuous. In fact, the payment amounts are not based on the

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 45**

interest rate listed but instead, were based upon an interest rate which was neither disclosed nor made

conspicuous as required under TILA.

70.     At all times relevant, Defendants knowingly and intentionally included in each of the

Notes and TILDS a schedule of payments which was not based upon the interest rate listed in these

same documents.  Defendants failure to clearly and conspicuously disclose the interest rate upon which

the payment amounts were based was, and is, deceptive.

71.     Further, in addition to Defendants failure to disclose in the Note and the TILDS that the

payments listed were not based upon the interest rate listed, Defendants knowingly and intentionally

stated in each of the Notes that the payments would be applied to both principle and interest.

Defendants further stated in the Notes that, "from time to time" the payments "may not" be enough to

cover all of the interest due on the Notes.  However, in truth, if Plaintiffs followed the payment schedule

provided by Defendants, the payments were guaranteed to be insufficient to pay the principle and

interest on the loan.

72.     At all times relevant, Defendants failed to clearly and conspicuously disclose to Plaintiffs

that if they made payments according to the payment schedule set forth in the TILDS, that negative

amortization was not just a mere possibility, it was an absolute certainty.

73.     At all times relevant, Defendants purposefully and intentionally failed to disclose to

Plaintiffs, and all others similarly situated, the interest rate upon which the payment schedule was based

in order to mislead and deceive Plaintiffs into believing that they would be getting a loan with a low

fixed payment rate that would be sufficient to pay both interest and principle

74.     At all times relevant, the payment amount provided by Defendants was intended to and

did deceive consumers into falsely believing they would, in fact, receive the low interest rate upon

which the payment schedule is based.  While the Note states the amount of Plaintiffs' initial monthly

payment, however, the initial monthly payment amounts stated in the Note and TILDS are not, in

anyway related to the interest rate listed in the Note(s) and TILDS.

75.     Defendants employed the aforementioned bait-and-switch tactics in a common and

uniform class-wide basis.  In particular, had Defendants clearly and conspicuously disclosed a payment

amount sufficient to cover both principle and interest, the payment amounts would have to have been

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 46**

1   almost double  the payment amounts listed.

2       76.     The TILDS are also deceptive for much the same reason.  The TILDS list a schedule of

3   payments, yet for up to the first ten years the listed payment amounts have no relation to, and are also

4   not based on the interest rate listed in the TILDS.

5       77.     At all times relevant, Defendants' failed  to clearly, conspicuously and accurately

6   disclose a payment amount that corresponds to the actual interest rate being charged on the loan

7   sufficient to pay both principle and interest.   The Note states "the payments will be applied to principle

8   and interest."  Thus, Plaintiffs reasonably believed that if they made the payments according to

9   Defendants payment schedule, the payments would, in fact, be paying off both principal and interest.

10  However, the true fact is that the payment amounts stated in Defendants payment schedule did not

11  include any principal on the loans at all and only covered a portion of the interest Defendants were

12  charging on these loans.

13      **B.      Defendants' Failure to Clearly and Conspicuously Disclose Negative Amortization**

14              **Violates the Truth in Lending Laws**

15      78.     12 C.F.R. § 226.19 sets forth additional specific disclosure requirements for residential

16  home loans:

17          **§ 226.19.  Certain residential mortgage and variable-rate**

18          **transactions.** . . .

19          (b) Certain variable-rate transactions.  If the annual percentage rate may

20          increase after consummation in a transaction secured by the consumer's

21          principal dwelling with a term greater than one year, the following

22          disclosures must be provided at the time an application form is provided

23          or before the consumer pays a non-refundable fee, whichever is earlier. . .

24          (vii) *Any rules relating to changes in the index, interest rate, payment*

25          *amount, and outstanding loan balance including, for example, an*

26          *explanation of interest rate or payment limitations, negative amortization,*

27          *and interest rate carryover*. (Emphasis added.)

28  / / /

-19-

79. The negative amortization disclosure is required and must be made clearly and conspicuously, and done in a manner that does not obscure its significance. The disclosure must state whether the loan and payments established under the terms dictated by the Defendants is a negative amortizing loan.

80. In 1995, and continuing each time new Official Staff Commentary was issued, the Federal Reserve Board made clear that when the loan was a variable rate loan with payment caps, such as those that are the subject of this lawsuit, that the disclosure required a definitive statement about negative amortization:

12 CFR Part 226

[Regulation Z; Docket No. R-0863]

Monday, April 3, 1995

AGENCY: Board of Governors of the Federal Reserve System.

ACTION: Final rule; official staff interpretation.

"For the program that gives the borrower an option to cap monthly payments, the creditor must fully disclose the rules relating to the payment cap option, including the effects of exercising it (such as **negative amortization occurs** and that the principal balance **will increase**)…" (Found at C.F.R. § 226.19)

81. At all times relevant, statutory and common law in effect make it unlawful for a lender, such as Defendants, to fail to comply with the Federal Reserve Board's Official Staff Commentary as well as Regulation Z and TILA.

82. Defendants sold Plaintiffs and the Class members Option ARM loans which have a variable rate feature with payment caps. Defendants failed to include any reference in the TILDS or in the Note(s) that negative amortization would occur if Plaintiffs and the Class members followed the payment schedule provided by Defendants. The payment schedule makes no reference to negative amortization and makes it appear that the payments would, in fact, pay both principal and interest.

/ / /

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 48**

83.     In fact, the only place in the Note where Defendants even inferentially reference negative amortization caused Plaintiffs and all other similarly situated reasonable persons to believe that negative amortization is only a mere possibility, rather than an absolute certainty.  In fact, these loans were designed in such a way so as to make negative amortization an absolute certainty.  And, even when a separate explanation was provided, Defendant omitted the important material fact that these loans and payment schedules would, in fact, guarantee negative amortization.

84.     Defendants statement that, "from time to time" negative amortization "may occur" was a half-truth and did not alert or inform Plaintiffs that the payment schedule provided by Defendants would absolutely guarantee that negative amortization was going to occur on these loans.  Rather, Defendants made it appear that as long as the payments were made according to the schedule listed in the TILDS, that there would be no negative amortization.

85.     At all times relevant, Defendants' statement in the Note, TILDS, and any other disclosures they provided, described negative amortization as only a mere possibility, and therefore was misleading and deceptive.  In fact, Defendants' Option ARM loan was designed in such a way as to guarantee negative amortization.  TILA demands more than a statement that the payment could be less, or "may" be less, when Defendants knew that the payments were less, and would always be less, than the full amount required to pay both principle and interest.

**C.      Defendants' Failure to Clearly and Conspicuously Disclose The Interest Rate Upon Which the Payment Schedule Was Based Violates TILA**

86.     Pursuant to 12 C.F.R. § 226.17(a)(1), Defendants were required to:

      "make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.  The disclosures shall be grouped together, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under §  226.18.  The itemization of the amount financed under § 226.18(c)(1) must be separate from the other disclosures under that section."

/ / /

*CORRECTED* SECOND AMENDED COMPLAINT - C-07-04497 JF (RS)

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 49**

87.     Official Staff Commentary to 12 C.F.R. § 226.17(a)(1) states that "this standard requires that disclosures be in a reasonably understandable form.  For example, while the regulation requires no mathematical progression or format, **the disclosures must be presented in a way that does not obscure the relationship of the terms to each other**…"

88.     At all times relevant, Defendants Option ARM loans violated 12 C.F.R. § 226.17(a)(1) in that the relationship between the interest rate listed in the Note and TILD bear no relationship to the undisclosed interest rate upon which the payment schedule was based.  Therefore, as a direct and proximate result, the form of disclosure used by Defendants obscured the relationship between the interest rate listed in the Note(s) and TILDS and the payment schedule provided.

**D.     Defendants' Failure to Clearly and Conspicuously Disclose The Legal Obligation Violates Truth in Lending Laws**

89.     12 C.F.R. § 226.17(c)(1) requires that "[t]he disclosures shall reflect the terms of the legal obligation between the parties."

90.     Official binding staff commentary on 12 C.F.R. § 226.17(c)(1) requires that:  "[t]he disclosures shall reflect the credit terms to which the parties are legally bound as of the outset of the transaction.  In the case of disclosures required under § 226.20(c), the disclosures shall reflect the credit terms to which the parties are legally bound when the disclosures are provided."

91.     The Official binding staff commentary further states, at 12 C.F.R. § 226.17(c)(1)(2), that "[t]he legal obligation normally is presumed to be contained in the note or contract that evidences the agreement."

92.     Official Staff Commentary to 12 C.F.R. § 226.17(c)(1) states that "[i]f a loan contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first adjustment, from changing to the rate determined by the index or formula at consummation, **the effect of that rate or payment cap should be reflected in the disclosures**."

93.     At all times relevant, Defendants Option ARM loans violated 12 C.F.R. § 226.17(c) in that the Note and TILD do not disclose, and by omission, failed to disclose what Plaintiffs and the Class members were legally obligated to pay.  In particular, the Note(s) charged the borrowers a much higher monthly amount than what Defendants disclosed.  Defendants accomplished this deception by only

1  listing a partial payment in the TILD, rather than the full payment the borrowers were being charged for

2  the loans, and were legally obligated to pay.

3      94.     As a direct and proximate result of Defendants omission and failure to clearly and

4  conspicuously disclose Plaintiffs and Class members legal obligations under the loans, Defendants took

5  the partial payments and secretly added the deficit, each month, to principle, thereby causing negative

6  amortization to occur.

7      **E.     Defendants' Failure to Clearly and Conspicuously Disclose the Effect of the**

8      **Payment Cap on the True Cost of the Loan Violates Truth in Lending Laws**

9      95.     The Option ARM loans at issue each contained a variable rate feature with an initial

10  (undisclosed) teaser rate with payment caps.  The payment cap is a limit on how much the payment may

11  be increased annually.  Its purpose is to provide borrowers with a limit on how much their payment can

12  increase from year to year.  The loans issued by Defendants had a 7.5% payment cap, which means that

13  a borrower would only see their payment rise each year by a maximum of 7.5%.  (i.e. a $1,000 monthly

14  payment in year one, could go to a $1,075 payment in year two.)

15     96.     The Official Staff Commentary to 12 C.F.R. § 226.17(c)(1)(10) iii  states that "[i]f a loan

16  contains a rate or payment cap that would prevent the initial rate or payment, at the time of the first

17  adjustment, from changing to the rate determined by the index or formula at consummation, **the effect**

18  **of that rate or payment cap should be reflected in the disclosures**."  Thus, at all times relevant

19  during the liability period, Defendants had a duty to Plaintiffs and the Class members to disclose the

20  effect the payment caps would have on the loans in the TILD.

21     97.     At all times relevant during the liability period, Defendants failed to disclose, and by

22  omission, failed to inform Plaintiffs and the Class members that the payment cap would cause thousands

23  of dollars, each month, to be secretly added to principle.

24     98.     As a direct and proximate result, Defendants failed to disclose, and by omission, failed to

25  inform Plaintiffs and the Class members of the effect of the payment cap in violation of 12 C.F.R. §

26  226.17.

27     99.     WHEREFORE, Plaintiffs and the Class members are entitled to an order declaring that

28  Defendants violated TILA, 15 U.S.C. §1601, et seq., that Plaintiffs and the Class have the right to

rescind pursuant to 15 U.S.C. § 1635 and 12 C.F.R. § 226.23, damages pursuant to 15 U.S.C. § 1640, attorneys fees, litigation costs and expenses and costs of suit, and for an order rescinding Plaintiff's individual mortgage and those of any class member desirous of such relief, and for an order awarding other relief as the Court deems just and proper.

## VII.

## SECOND CAUSE OF ACTION

### Fraudulent Omissions

### (Against all Defendants)

90. Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

91. As alleged herein, pursuant to TILA, 15 U.S.C. §1601, *et seq*., Regulation Z (12 C.F.R. §226 ) and the Federal Reserve Board's Official Staff Commentary, Defendants had a duty to disclose to Plaintiffs, and each Class member, (i) the actual interest rate on which the payment amounts listed in the TILDS are based (12 C.F.R. § 226.17(c)); (ii) that making the payments according to the payment schedule listed in the TILDS will result in negative amortization and that the principal balance will increase (12 C.F.R. § 226.19); and (iii) that the payment amounts listed on the TILDS are insufficient to pay both principle and interest.

92. Defendants further had a duty to disclose to Plaintiffs, and each Class member: (i) the actual interest rate being charged on the Note(s), (ii) that negative amortization would occur and that the "principle balance *will* increase"; and (iii) that the initial interest rate on the note was discounted, based upon Defendants partial representations of material facts when Defendants had exclusive knowledge of material facts that negative amortization was certain to occur.

93. The Note(s) state at ¶ 3 (A) "I will pay Principle and interest by making payments every month." However, the true facts are that the payment listed by Defendants on the TILD are insufficient to pay both interest and principle. In fact, the payment amounts listed on the TILDS are insufficient to pay enough interest to avoid negative amortization which, under the terms of the Note(s) was absolutely certain to occur if Plaintiffs made the payments according to payment schedule listed in the TILDS.

/ / /

94. The Note(s) further state, at ¶ 3(E) "From time to time, my monthly payments *may be* insufficient to pay the total amount of monthly interest that is due." However, the true facts are that the payment amounts listed by Defendants in the TILDS were, at all times relevant, insufficient to pay the total amount of interest due on the note and therefore this statement was false in that it omitted important material information concerning the true facts, that negative amortization was absolutely certain to occur if consumers followed the payment schedule provided by Defendants in the TILDS.

95. The aforementioned omitted information was not known to Plaintiffs and the Class members and which, at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiffs and all others similarly situated.

96. Defendants, and each of them, failed to disclose, and by omission, failed to inform Plaintiffs, and each Class member, that (i) the payment rate provided to Plaintiffs and the Class members on the TILD was insufficient to pay both principle and interest; (ii) that negative amortization was absolutely certain to occur if Plaintiffs and the Class members made payments according to the payment schedule provided by Defendants in the TILDS; and (iii) that loss of equity and/or loss of Plaintiffs' and the Class members residence was absolutely certain to occur if Plaintiffs and the Class members made payments according to the payment schedule provided by Defendants.

97. As alleged herein, Defendants had a duty to disclose to Plaintiffs, and each Class member, and at all times relevant, failed to disclose and/or concealed material facts by making partial representations of some material facts when Defendants had exclusive knowledge of material facts, including but not limited to, (i) the payment amounts listed in the TILDS were not based on the actual interest rate charged on the Note(s); (ii) that negative amortization was absolutely certain to occur, and (iii) that the payment amounts listed in the Note and TILDS are insufficient to pay both principle and interest. The concealed and omitted information was not known to Plaintiffs and the Class members and which, at all times relevant, Defendants failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiffs and all others similarly situated.

98. From the inception of Option ARM loan scheme, until the present, Defendants have engaged in a purposeful and fraudulent scheme to omit material facts known solely to them, and not

1  reasonably discoverable by Plaintiffs and the Class members, regarding true facts concerning the interest

2  rate upon which the payment schedule was based, the negative amortization that was certain to occur,

3  and that the payment amounts listed in the Note and TILDS are insufficient to pay both principle and

4  interest, all of which Defendants were duty bound to clearly and conspicuously disclose in the TILD.

5        99.    Defendants, and each of them, have known from the inception of their Option ARM loan

6  scheme that, (i) the interest rate upon which the payment amounts listed in the Notes and TILDS are not

7  based on the listed interest rate, but instead were based on a much lower rate; (ii) that making the

8  payments according to the payment schedule listed in the Note and TILDS *will* result in negative

9  amortization and that the principal balance *will* increase; and (iii) that the payment amounts listed on the

10  TILDS are insufficient to pay both principle and interest.

11        100.    Defendants, and each of them, purposefully and intentionally devised this Option ARM

12  loan scheme to defraud and/or mislead consumers into believing that these loans would provide a low-

13  payment loan, for up to the first ten (10) years and that if they made their payments according to the

14  payment schedule provided by Defendants that it would be sufficient to pay both principle and interest.

15        101.    The omitted information, as alleged herein, was material to Plaintiffs and each Class

16  member in that had the information been disclosed, Plaintiffs and each Class member would not have

17  entered into the loans.

18        102.    As a direct and proximate result of Defendants failures to disclose and omission of

19  material facts, as alleged herein, Plaintiffs and each Class member has suffered damages, which include,

20  but are not limited to the loss of equity Plaintiffs and each Class member had in their homes prior to

21  entering these loans.

22        103.    The wrongful conduct of Defendants, as set forth herein, was willful, oppressive,

23  immoral, unethical, unscrupulous, substantially injurious, malicious and in conscious disregard for the

24  well being of Plaintiffs, and others similarly situated.  Accordingly, Plaintiffs, and all others similarly

25  situated seek punitive damages against Defendants in an amount to deter Defendants from similar

26  conduct in the future.

27        104.    WHEREFORE, Plaintiffs and members of the Classes are entitled to all legal and

28  equitable remedies provided by law, including but not limited to actual damages, exemplary damages,

*CORRECTED* SECOND AMENDED COMPLAINT - C-07-06497 JF (RS)

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 54**

prejudgment interest and costs.

## VIII.

## THIRD CAUSE OF ACTION

**(Violation of California's Unfair Competition Law, Bus. & Prof. Code §17200 *et seq*.,**

**"Unfair" and "Fraudulent" Business Acts or Practices,**

**(Against all Defendants)**

105.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

106.     Plaintiffs bring this cause of action on behalf of themselves, on behalf of the Class, and in their capacity as a private attorney generals against all Defendants for their unfair, fraudulent and/or deceptive business acts and/or practices pursuant to California Business and Professions Code Sections 17200 et seq., which prohibits all unfair and/or fraudulent business acts and/or practices.

107.     Plaintiffs assert these claims as they are representatives of an aggrieved group and as private attorney generals on behalf of the general public and other persons who have expended funds that the Defendants should be required to pay or reimburse under the equitable and restitutionary remedies provided by California Business and Professions Code Sections 17200 et seq.

108.     The instant claim is predicated on the generally applicable duty of any contracting party to disclose important material facts, and on the duty to refrain from unfair and deceptive business practices.  The Plaintiffs and the Class members hereby seek to enforce a general proscription of unfair business practices and the requirement to refrain from deceptive conduct.  The instant claim is predicated on duties that govern anyone engaged in any business and anyone contracting with anyone else.

109.     At all times relevant, Defendants engaged in a pattern of deceptive conduct and concealment aimed at maximizing the number of borrowers who would accept their Option ARM loans. Defendants, and each of them, sold to Plaintiffs and the Class members a deceptively devised financial product.  Defendants sold their Option ARM loan product to consumers, including Plaintiffs and the Class members, in a false or deceptive manner.  Defendants promised that the loan would have a very low, fixed payment, with only a small annual increase in the payment amount, for a period of up to ten

1  years; and that the payment amount would be based on the listed interest rate. Defendants withheld

2  from Plaintiffs and the Class members the fact that Defendants' Option ARM loan was designed to, and

3  did, cause negative amortization to occur.

4       110.    Defendants lured Plaintiffs and the Class members into the Option ARM loans with

5  promises of low payments. Once Plaintiffs and the Class members entered into these loans, Defendants

6  began taking away equity from Plaintiffs and the Class members homes. And, Plaintiffs and the Class

7  members could not escape because Defendants purposefully placed into these loans an extremely

8  onerous prepayment penalty that made it prohibitively expensive for consumers to extricate themselves

9  from these loans. Thus, once on the hook, consumers could not escape from Defendants loans.

10       112.    Defendants sold their Option ARM loans as having a low payment. However,

11  Defendants failed to disclose, and by omission, failed to inform Plaintiffs and the Class members that

12  the low payments listed in the Note and TILDS were completely insufficient to pay both principle and

13  interest and were, in fact, at all times relevant during the liability period, completely insufficient to pay

14  all of the interest accruing on the loans. Further, and in addition to Defendants' failure to disclose the

15  actual cost of the loans, Defendants failed to disclose, and by omission, failed to inform Plaintiffs and

16  the Class members that there was a discrepancy between the interest rate upon which the payments were

17  based and that actual interest Defendants charged on the loans.

18       113.    At all times relevant, Plaintiffs and the Class members agreed to finance their primary

19  residences through Defendants' Option ARM loans as a result of low interest and payment schedules.

20  In particular, Plaintiffs and the Class members were lead to believe that if they made payments

21  according to Defendants payment schedule, that the loans would only, "from time to time" result in

22  negative amortization. However, Defendants failed to disclose, and by omission, failed to inform

23  Plaintiffs and the Class members that if they made their payments according to Defendants payment

24  schedule, that by the 11th year of the loans, each class member will have lost between 15-25% of the

25  equity in their home, making it difficult, if not impossible to re-finance to another home loan.

26       114.    Defendants aggressively sold their product based on the low payment. Defendants

27  knew that if they sold these loans in such a manner, their Option ARM loan product would be a hugely

28  popular and profitable product for them. Defendants also knew, however, that they were selling their

1 product in a false and deceptive manner. While Defendants trumpeted their low payment loans to the

2 public, Defendants knew, however, that this was false, and at best, only partially true.

3      115. In fact, Defendants' Option ARM loan possessed a low, *fixed payment* that was

4 unrelated to the interest rate listed. Unbeknownst to Plaintiffs and Class members, the actual interest

5 rate Defendants charged on their loans would require a much larger payment to pay both "Principle and

6 interest." After purchasing Defendants' Option ARM loan product, Plaintiffs and class members never

7 actually received the benefit of the loan promised to them because immediately, Defendants in every

8 instance and for every loan began secretly taking away Plaintiffs and the Class members equity. Once

9 Plaintiffs and the Class members accepted Defendants' Option ARM loan, they had no viable option by

10 which to extricate themselves because these loan agreements included a draconian prepayment penalty.

11      116. Defendants initiated this scheme in order to maximize the amount of the loans issued to

12 consumers and to maximize Defendants' profits.

13      117. Defendants perpetrated this bait-and-switch scheme uniformly and in the same manner on

14 Plaintiffs and each member of the Class.

15      118. As alleged herein, Defendants' failures to disclose important material information

16 concerning the actual cost of the loans is, and was, unfair, fraudulent, and deceptive.

17      119. The acts, misrepresentations, omissions, and practices of Defendants alleged above

18 constitute unfair, and/or fraudulent business acts and/or practices within the meaning of California

19 Business and Professions Code Sections 17200 et seq.

20      120. By engaging in the above-described acts and practices, Defendants have

21 committed one or more acts of unfair competition within the meaning of Business and Professions Code

22 Sections 17200, et seq.

23      121. Defendants' conduct, as fully described above, was likely to deceive members of the

24 consuming public, and at all times relevant, Defendants' failures to disclose and omission of material

25 facts have been and continue to be unfair, fraudulent, untrue and/or deceptive.

26      122. Defendants' misconduct as alleged herein gave Defendants an unfair competitive

27 advantage over their competitors.

28 / / /

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 57**

123. As a direct and proximate result of the aforementioned acts, Defendants, and each of them, received monies and continues to hold the monies expended by Plaintiffs and others similarly situated who purchased the ARM loans as described herein.

124. In addition to the relief requested in the Prayer below, Plaintiffs seek the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

125. The harm to Plaintiffs, members of the general public and others similarly situated outweighs the utility of Defendants' policies, acts and/or practices and, consequently Defendants' conduct herein constitutes an unlawful business act or practice within the meaning of California Business & Professions Code Sections 17200 et seq.

126. The unfair, deceptive and/or fraudulent business practices of Defendants, as fully described herein, presents a continuing threat to members of the public to be mislead and/or deceived by Defendants ARM loans as described herein. Plaintiffs and other members of the general public have no other remedy of law that will prevent Defendants misconduct as alleged herein from occurring and/or reoccurring in the future.

127. As a direct and proximate result of Defendants' unfair and/or fraudulent conduct alleged herein, Plaintiffs and Class Members have lost thousands if not millions of dollars of equity in their homes. Plaintiffs and members of the Class are direct victims of the Defendants' unlawful conduct, and each have suffered injury in fact, and have lost money or property as a result of Defendants' unfair competition.

128. WHEREFORE, Plaintiffs and members of the Classes are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unfair, fraudulent, and deceptive acts and/or practices, attorneys fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unfair, fraudulent and deceitful activity.

/ / /

/ / /

/ / /

**IX.**

**FOURTH CAUSE OF ACTION**

**Breach of Contract**

**(Against All Defendants)**

129.     Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

130.     Plaintiffs and Class members entered into a written home loan agreement – the contract or Note – with Defendants.  The Note was drafted by Defendants and could not be modified by Plaintiffs or Class members.  The Note describes the terms and respective obligations applicable to the parties herein.

131.     The Note(s) state the interest rate and the payment amounts required for Plaintiffs and Class members' to pay off the loan.

132.     The Note(s) further state that Plaintiffs' and Class members' "will pay Principle and interest by making payments every month."

133.     The TILD, which accompanied the Note, sets forth a payment schedule for Plaintiffs and Class members' to follow.

134.     The interest rate listed in the Note and in the TILDS was not used to calculate the payment amounts stated in the Note and listed in the TILDS.  At all times relevant, Defendants knew that the payment schedule was not based on the interest rate listed, but instead, was based on a much lower rate which caused the loan contracts to be uncertain and ambiguous as to the amount borrowers would have to pay each month in order to avoid negative amortization.  Defendants caused the uncertainty and ambiguity as alleged herein, by purposefully stating in the Note that Plaintiffs "will pay Principle and interest by making payments every month" and then providing Plaintiffs with a payment schedule which is inconsistent with, and not based on the interest rate listed in the Note.

135.     At all times relevant, Defendants drafted the Note and did not allow Plaintiffs or the Class members any opportunity to make changes to the Note and due to Defendants superior bargaining position, the contract was offered on a take it or leave it basis.  As such, the loan contracts at issue are contracts of adhesion.

/ / /

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 59**

136.     Defendants expressly and/or through their conduct and actions agreed that Plaintiffs' and the Class members' monthly payment obligations would be sufficient to pay both the principal and interest owed on the loans.  Defendants breached this agreement by failing to apply any of Plaintiffs' and the Class members' payments to principal.

137.     Instead, and in order to make up the difference between the interest rate used to calculate the payment schedule and the much higher rate listed in the notes, Defendants immediately began secretly reducing Plaintiffs' and the Class members' equity in their homes and applied no part of the payments to the principal balances on their loans.   In fact, because Defendants charged more interest than was included in the payments listed in the TILDS, the payments were insufficient to cover the interest charged on the loans and thus principal balances increased (which is the negative amortization Defendants purposefully built into these loan contracts).

138.     As a result, Defendants breached the written contractual agreement by failing to apply any portion of Plaintiffs' and the Class members' monthly payments towards their principal loan balances.

139.     Plaintiffs and the Class members, on the other hand, did all of those things the contract required of them.  Plaintiffs and the Class members made monthly payments in the amounts required under the terms of the Note and reflected in the payment schedule prepared and provided by Defendants.

140.     As a result of Defendants' breach of the agreement, Plaintiffs and the Class members have suffered harm.  Plaintiffs and Class members have incurred additional charges to their principal loan balances.  Plaintiffs and the Class members have incurred and will continue to incur additional interest charges on the principal loan balance and surplus interest added to Plaintiffs' and the Class members' principal loan balances.  Furthermore, Defendants' breaches have placed Plaintiffs and the Class members in danger of losing their homes through foreclosure, as Defendants have caused Plaintiffs' and the Class members' principal loan balances to increase thereby limiting these consumers' ability to make future house payments or obtain alternative home loan financing.

141.     At all times relevant during the liability period, there existed a gross inequality of bargaining position between the parties to the ARM loan contracts.  At all times relevant, Defendants unreasonably and unconscionably exploited their superior bargaining position and foisted upon

1    Plaintiffs and the Class members extremely harsh, one-sided provisions in the contract, which Plaintiffs

2    and the Class members were not made aware of and did not comprehend (*e.g.* Defendants fraudulent

3    omissions and failures to clearly and conspicuously disclose as alleged herein), and which attempted to

4    severely limit Defendants obligations under the contracts at the expense of Plaintiffs and the Class

5    members, as alleged herein.  As a result of these extremely harsh, one-sided provisions, including but

6    not limited to the provisions which seek to limit the low interest rate upon which the payment amounts

7    listed in TILDS for one month or less, these provisions are unconscionable and therefore unenforceable.

8         142.    WHEREFORE, Plaintiffs and members of the Classes are entitled to declaratory relief,

9    compensatory damages proximately caused by Defendants breach of contract as alleged herein, pre-

10   judgment interest, costs of suit and other relief as the Court deems just and proper.

11

12                                              **X.**

13                                  **FIFTH CAUSE OF ACTION**

14                  **Breach of Implied Covenant of Good Faith and Fair Dealing**

15                                  **(Against All Defendants)**

16        143.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

17        144.    Defendants entered into written agreements with Plaintiffs and the Class members based

18   upon the terms on the loans as stated in the Note(s) and TILDS.

19        145.    The Note(s) and TILDS expressly and impliedly agreed to provide loans secured by the

20   Plaintiffs' and the Class members' residences, and that the loans would have a low payment and interest

21   rate for up to the first then (10) years of the loan.

22        146.    The Note and TILDS expressly and impliedly agreed that if Plaintiffs and the Class

23   members made the monthly payments in the amount prescribed by Defendants in the TILDS, that

24   negative amortization would not occur.  As alleged herein, the Note(s) expressly state and/or imply that

25   Plaintiffs' and Class members' monthly payment obligations *will* be applied to pay both principal and

26   interest owed on the loan.

27        147.    The written payment schedules prepared and created by Defendants, and applicable to

28   Plaintiffs' and the Class members' loans, did not disclose, and by omission, failed to inform Plaintiffs

-33-

*CORRECTED* SECOND AMENDED COMPLAINT - C-07-04497 JF (RS)

1  that the payment amounts owed by Plaintiffs and the Class members to Defendants in years one through
2  ten are insufficient to cover the true costs of the loan.

3  148.  Instead, Defendants immediately began collecting more than the required payments and
4  applied no part of Plaintiffs' and the Class members' payments to principal.  In fact, Plaintiffs and the
5  Class members' payments were insufficient to cover the interest that Defendants charged resulting in an
6  increase in the amount of principal Plaintiffs and the Class members owed on their homes.

7  149.  Defendants unfairly interfered with Plaintiffs' and the Class members' rights to receive
8  the benefits of the contract.  These loans will cost Plaintiffs and Class members thousands of dollars
9  more than represented by Defendants.  Plaintiffs and the Class members did not receive the fixed low
10  interest rate home loan promised them by Defendants.  Instead, as alleged herein, Defendants foisted
11  upon Plaintiffs a loan which was guaranteed to result in negative amortization.  As a result, Defendants
12  have caused Plaintiffs and the Class members to lose equity in their homes and therefore have denied
13  Plaintiffs and the Class members the enjoyment and security of one of their most important investments.

14  150.  Plaintiffs and the Class members, on the other hand, did all of those things the contract
15  required of them.  Plaintiffs and the Class members made the monthly payments in the amounts required
16  of them by the terms of the Note and reflected in the payment schedule prepared and provided by
17  Defendants.

18  151.  At all times relevant, Defendants unreasonably denied Plaintiffs and the Class members
19  the benefits promised to them under the terms of the Note, including providing clear and conspicuous
20  disclosure of a payment amounts sufficient to pay both principle and interest so as to avoid negative
21  amortization.

22  152.  Knowing the truth and motivated by profit and market share, Defendants have knowingly
23  and willfully breached the implied covenant of good faith and fair dealing by engaging in the acts and/or
24  fraudulent omissions to mislead and/or deceive Plaintiffs and others similarly situated as alleged herein.

25  153.  Defendants breaches, as alleged herein, were committed with willful and wanton
26  disregard for whether or not Plaintiffs or others similarly situated would actually receive a home loan
27  that would provide the promised low interest and payment rate for up to ten years sufficient to pay both
28  principle and interest.

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 62**

154. Upon information and belief and at all times relevant, Defendants possessed full knowledge and information concerning the above facts about these loans, and otherwise sold these loans throughout the United States, including the State of California.

155. Defendants' placing of their corporate and/or individual profits over the rights of others is particularly vile, base, contemptible, and wretched and said acts and/or omissions were performed on the part of officers, directors, and/or managing agents of each corporate defendant and/or taken with the advance knowledge of the officers, directors, and/or managing agents who authorized and/or ratified said acts and/or omissions. Defendants thereby acted with malice and complete indifference to and/or conscious disregard for the rights and safety of others, including Plaintiff and the General Public.

156. At all times relevant, Defendants' conduct, as alleged herein, was malicious, oppressive, and/or fraudulent.

157. As a result of Defendants' conduct, Plaintiffs and the Class members have suffered harm. Plaintiffs and the Class members have incurred additional charges to their principal loan balances. Plaintiffs and the Class members have incurred and will continue to incur additional interest charges on the principal loan balances and surplus interest added to Plaintiffs' and the Class members' principal loan balances. Furthermore, Defendants' breach has caused and/or otherwise placed Plaintiffs and the Class members in danger of losing their homes through foreclosure and, as a direct and proximate result of said misconduct, caused Plaintiffs' and the Class members' principal loan balances to increase limiting these consumers' ability to make their future house payments or obtain alternative home loan financing.

158. WHEREFORE, Plaintiffs and members of the Classes are entitled to declaratory relief, all damages proximately caused by Defendants breach of the implied covenant of good faith and fair dealing as alleged herein, punitive damages, pre-judgment interest, costs of suit and other relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS PAGE 63**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and all Class members pray for judgment against each Defendant, jointly and severally, as follows:

A.    An order certifying the case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.    For actual damages according to proof;

C.    For compensatory damages as permitted by law;

D.    For consequential damages as permitted by law;

E.    For statutory damages as permitted by law;

F.    For punitive damages as permitted by law;

G.    For rescission;

H.    For equitable relief, including restitution;

I.    For restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

J.    For interest as permitted by law;

K.    For Declaratory Relief;

L.    For reasonable attorneys' fees and costs; and

M.    For such other relief as is just and proper.

DATED: December 31, 2007          **SPIRO MOSS BARNESS LLP**

By: _____/S/_____
David M. Arbogast, Esq.
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Phone: (310) 235-2468; Fax: (310) 235-2456

Paul R. Kiesel, Esq.
Patrick Deblase, Esq.
Michael C. Eyerly, Esq.
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90210
Phone: (310) 854-4444; Fax: (310) 854-0812

/ / /

**EXHIBIT E ISO MOTION TO STAY PROCEEDINGS
PAGE 64**

Jonathan Shub, Esq.
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19107
Phone: (215) 564-2300; Fax (215) 851-8029

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Blvd, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000; Fax:  (818) 867-4820

Attorneys for Plaintiffs, DOLORES MANDRIGUES,
JUANITA JONES, AL F. MINYEN and WILMA R.
MINYEN, MARK CLAUSON and CHRISTINA
CLAUSON, and all others Similarly Situated.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a trial by jury to the full extent permitted by law.

DATED: December 31, 2007          **SPIRO MOSS BARNESS LLP**

By:  _____ _/S/_ _____

David M. Arbogast, Esq.
11377 W. Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Phone: (310) 235-2468; Fax: (310) 235-2456

Paul R. Kiesel, Esq.
Patrick Deblase, Esq.
Michael C. Eyerly, Esq.
**KIESEL BOUCHER LARSON LLP**
8648 Wilshire Boulevard
Beverly Hills, California 90210
Phone: (310) 854-4444; Fax: (310) 854-0812

Jonathan Shub, Esq.
**SEEGER WEISS LLP**
1515 Market Street, Suite 1380
Philadelphia, PA 19107
Phone: (215) 564-2300; Fax (215) 851-8029

Jeffrey K. Berns, Esq.
**LAW OFFICES OF JEFFREY K. BERNS**
19510 Ventura Blvd, Suite 200
Tarzana, California 91356
Phone: (818) 961-2000; Fax:  (818) 867-4820

Attorneys for Plaintiffs, DOLORES MANDRIGUES,
JUANITA JONES, AL F. MINYEN and WILMA R.
MINYEN, MARK CLAUSON and CHRISTINA
CLAUSON, and all others Similarly Situated.

Exhibit No. 1

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: 0043651850                           DATE:  **August 4, 2006**

BORROWER(S):  DOLORES MANDRIGUES, AN UNMARRIED WOMAN   sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **524 CESTARIC DR, MILPITAS, CA  95035-4006**

**1.  BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S.  $170,000.00 , called "Principal," plus interest, to the order of the Lender. The Lender is WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred.

**2.  INTEREST**

**(A)  Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will pay interest at the yearly rate of 6.790%. The interest rate I will pay  may change as described in this Section 2.  Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Change Dates**
The interest rate I will pay may change on the 15th day of September, 2006 and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)  Interest Rate Limit**
My lifetime maximum interest rate limit is 11.950% , called "Lifetime Rate Cap."

SD253A (2004-03-1)                    ADJUSTABLE NOTE            CA
                                              Page 1



001

LENDER'S USE ONLY

00001

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 67**

0043651850

**(D)  Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an Index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E)  Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.850** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)  Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F) the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and Interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **September 15, 2006.** I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **August 15, 2036,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$ 628.36.** This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)  Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **September, 2007** and on that day every **12th**  month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

SD283B (2004-03-1)      [B01 (2004-03-1)]

COSI

ADJUSTABLE NOTE
Page 2

CA.

00002

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS PAGE 68**

0043651850

**(E)   Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)   Payment Cap Limitation; Exceptions**

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)   Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.   FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.   MAXIMUM LOAN CHARGES**

If law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be 5.00% of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

00003

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 69**

0043651850

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **524 CESTARIC DR,  MILPITAS, CA  95035-4006**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26**:

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

00004

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 70**

0043651850

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

        (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

        (ii)    Lender approves the creditworthiness of the transferee in writing;

        (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

        (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

        (v)    the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12. GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13. CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

00005

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 71**

0043651850

**SIGNATURE PAGE**

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)

DOLORES MANDRIGUES

00006

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 72

## WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name:
DOLORES MANDRIGUES

Date: July 24, 2006
Loan No.: 0043651850

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total price of your purchase on credit including your down payment of Not Applicable |
| 6.853 % | $283,991.46 | $167,713.28 | $451,704.74 | Not Applicable |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $ 628.36 | 10/01/06 |
| 12 | 675.49 | 10/01/07 |
| 12 | 726.15 | 10/01/08 |
| 12 | 780.61 | 10/01/09 |
| 12 | 839.16 | 10/01/10 |
| 12 | 902.10 | 10/01/11 |
| 12 | 969.76 | 10/01/12 |
| 12 | 1,042.49 | 10/01/13 |
| 12 | 1,120.68 | 10/01/14 |
| 12 | 1,204.73 | 10/01/15 |
| 239 | 1,437.64 | 10/01/16 |
| 1 | 1,434.42 | 09/01/36 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance: You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security: You are giving a security interest in the real property located at 524 CESTARIC DR, MILPITAS, CA 95035-4006.

Filing Fees: $ 80.00

Late Charge: If a payment is late, you will be charged 5.00% of the payment.

Prepayment: If you pay off the loan early, you MAY have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption: SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS – SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale: If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

ALL NUMERICAL DISCLOSURES EXCEPT THE LATE PAYMENT DISCLOSURE ARE ESTIMATED.

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

DOLORES MANDRIGUES _____

Date _____



GF004A1 (2004-03-1)   UPFRONT
DISTRIBUTION:  1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE

CA.
0  2  2
LENDER'S USE ONLY

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS PAGE 73**

# Exhibit No. 2

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT℠ LOAN

### CERTIFICATES OF DEPOSIT INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: **0044892941**                    DATE: **January 9, 2007**

BORROWER(S):  **JUANITA JONES, AN UNMARRIED WOMAN**  sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$248,500.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

### 2.  INTEREST

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **7.881%**. The interest rate I will pay  may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Change Dates**

The interest rate I will pay may change on the **1st** day of **March, 2007** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)  Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%** , called "Lifetime Rate Cap."

00001

AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT.

Case 5:07-cv-06497-JFK   Document 244   Filed 02/37/02   Page 82 of 812

LOAN NUMBER: **0044892941**

DATE: **January 9, 2007**

BORROWER(S): **JUANITA JONES, AN UNMARRIED WOMAN**  sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$248,500.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

**2.  INTEREST**

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **7.681%**. The interest rate I will pay  may change as described in this Section 2.  Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Change Dates**

The interest rate I will pay may change on the **1st** day of **March, 2007** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)  Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%** , called "Lifetime Rate Cap."

SD253A (2006-09-2)

ADJUSTABLE PICK-A-PAYMENT NOTE
Page 1

**CA**

0  0  1

LENDER'S USE ONLY

0044892941

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index". The Index is the average of the last twelve calendar months' most recently published monthly yields on 3-month certificates of deposit (secondary market) as published by the Federal Reserve Board. Lender will calculate the average by adding the twelve most recently published yields together and dividing the result by twelve. Lender will round the result of this division to the nearest one-thousandth of one percentage point (0.001%) by using the following convention: if the value of the 10,000th place is five or greater, the value of the 1,000th place will round up; if the value of the 10,000th place is less than five, the 1,000th place will not change. The most recent Index figure available on each Interest Change Date is called the "Current Index". For purposes of determining the Index, "published" means first made available to the public by the Federal Reserve Board.

**(E) Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.600** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F) Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay Principal and Interest by making payments every month.

I will make my monthly payments on the **1st** day of each month beginning on **March 1, 2007**. I will make these payments every month until I have paid (i) all the Principal and Interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **February 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **918.51**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C) Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **1st** day of **March, 2008** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in

00003

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS PAGE 77**

**(E)  Calculation of Interest Rate Changes**

to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)  Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if: (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **1st** day of each month beginning on **March 1, 2007**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **February 1, 2037**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$ 918.51**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)  Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **1st** day of **March, 2008** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

00004

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 78

0044892941

**(E)    Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)    Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)    Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)    Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.    FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.  I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal.  During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.    MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan

the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)**  **Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)**  **Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.  FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.  I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal.  During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.  MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)**  **Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00%** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

00006

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 80**

0044892941

**(B)   Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)   Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)   No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)   Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26**:

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not

00007

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS PAGE 81**

amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount plus other amounts due under the Security Instrument.

**(D)    No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)    Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **10719 MONA BLVD, LOS ANGELES, CA  90059-1426**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together  This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

<u>Acceleration of Payment of Sums Secured.</u> Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

00008

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 82**

0044892941

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)      Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)     Lender approves the creditworthiness of the transferee in writing;

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)     the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**12.  GOVERNING LAW; SEVERABILITY**
This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

**13.  CLERICAL ERRORS**
In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

**14.  LOST, STOLEN OR MUTILATED DOCUMENTS**
If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS**

00009

(iv) an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v) the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12. GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13. CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS

SD253E (2006-09-2)  ADJUSTABLE PICK-A-PAYMENT NOTE  CA
Page 5

00010

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 84

## WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
**JUANITA JONES**

Date: January 9, 2007

Loan No : 0044892941

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total price of your purchase on credit including your down payment of **Not Applicable** |
| **7.877 %** | **$ 522,053.21** | **$ 241,656.99** | **$ 763,710.20** | **Not Applicable** |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due: MONTHLY beginning on |
|---|---|---|
| 12 | $ 918.51 | 03/01/07 |
| 12 | 987.40 | 03/01/08 |
| 12 | 1,061.45 | 03/01/09 |
| 12 | 1,141.06 | 03/01/10 |
| 12 | 1,226.64 | 03/01/11 |
| 12 | 1,318.64 | 03/01/12 |
| 12 | 1,417.54 | 03/01/13 |
| 12 | 1,523.86 | 03/01/14 |
| 12 | 1,638.15 | 03/01/15 |
| 9 | 1,761.01 | 03/01/16 |
| 242 | 2,522.89 | 12/01/16 |
| 1 | 2,522.73 | 02/01/37 |

**VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.**

This loan **DOES NOT HAVE A DEMAND FEATURE.**

Insurance:     You may obtain property insurance from anyone you want who is acceptable to the Lender

Security:     You are giving a security interest in the real property located at **10719 MONA BLVD, LOS ANGELES, CA 90059-1426.**

Filing Fees     $ **.00**

Late Charge  If a payment is late, you will be charged **5.00%** of the payment

Prepayment  If you pay off the loan early, you **MAY** have to pay a penalty and you **WILL NOT** be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption  **SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.**

Due on Sale  If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the

00011

SIGNATURE PAGE

0044892941

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)

JUANITA JONES

00012

| **WORLD SAVINGS** | PREPAYMENT FEATURE ACKNOWLEDGEMENT |
|---|---|

LOAN NUMBER: 0044892941

DATE: 01/09/07

LOAN PROGRAM: ADJUSTABLE RATE MORTGAGE
PICK-A-PAYMENT LOAN

BORROWER(S):
JUANITA JONES

PROPERTY ADDRESS:
10719 MONA BLVD
LOS ANGELES, CA 90059-1426

You have selected a loan program that includes a prepayment fee provision. The following is the prepayment fee provision that will appear in your loan documents:

I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**By signing below, I/we acknowledge and agree that:**

1. As a federally chartered savings institution acting in accordance with the federal laws and regulations governing federally chartered savings institutions, **WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND OR ASSIGNEES**, has an enforceable legal right to the prepayment fee described above, even if there is a state or local law to the contrary.

2. The prepayment fee provision written above constitutes the entire prepayment fee provision that will appear in my/our Note and supersedes any other written or oral discussion to the contrary.

3. The fact that there is a prepayment fee provision is disclosed on the enclosed Truth-in-Lending Disclosure.

4. I/We have been given an opportunity to discuss the prepayment fee provision with a Loan Representative and I/we fully understand it.

5. If I/we select a different loan program subsequent to the date of this Acknowledgement, World will provide a new Acknowledgement that will supersede this and other forms related to the above named loan program. This Acknowledgement supersedes any previous Acknowledgement given to me/us.

6. I/We have received a copy of this form.

00013

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS**
**PAGE 87**

# Exhibit No. 3

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 88

Case 5:07-cv-06497-JF Document 244 Filed 02/27/02 Page 95 of 812

WORLD SAVINGS BANK, FSB

# ADJUSTABLE RATE MORTGAGE NOTE
## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

#### BIWEEKLY PAYMENT

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY BIWEEKLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY BIWEEKLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER **0040361222**                     DATE **May 26, 2005**

BORROWER(S) **AL F. MINYEN AND WILMA R. MINYEN, HUSBAND AND WIFE AND AL F. MINYEN AND WILMA R. MINYEN, TRUSTORS(S) AND TRUSTEES(S) OF THE MINYEN FAMILY TRUST, DATED MARCH 26, 1998** sometimes called "Borrower" and sometimes simply called "I" or "me"

PROPERTY ADDRESS **2251 CYPRESS AVE, SAN PABLO, CA 94806-1058**

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U S  **$343,000.00**, called "Principal," plus interest, to the order of the Lender  The Lender is WORLD SAVINGS BANK, FSB,  a FEDERAL SAVINGS BANK,,  ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred

**2.    INTEREST**
   **(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid  I will pay interest at the yearly rate of **5.190%**  The interest rate may change as described in this Section 2  Interest will be charged on the basis of a 364-day year, divided into 26 segments of two weeks each

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

   **(B)   Interest Change Dates**

The interest rate I will pay may change on the **18th** day of **July, 2005** and on every other Monday thereafter  Each date on which my interest rate could change is called an "Interest Change Date "  The new rate of interest will become effective on each Interest Change Date



LENDER'S USE ONLY

SD254A (2004-03-3)              BIWEEKLY ARM              CA
                               Page 1

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 89

0040361222

**(C) Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**, called "Lifetime Rate Cap."

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E) Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.800** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new "Interest Rate" until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, carryover or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F) Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if (a) the Index is for any reason no longer published, or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay Principal and interest by making payments every two weeks.

I will make my first biweekly payment on **July 4, 2005** and every other Monday thereafter. I will make these biweekly payments until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note, and (iii) any charges that may be due under the Security Instrument. If, on **June 20, 2035**, I still owe amounts under the Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will maintain a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, and keep sufficient funds in such deposit account to allow Lender to automatically withdraw my biweekly payment on each of the biweekly payment dates stated above. The sole purpose of the deposit account is to ensure payment of the biweekly payments on the due-date of each payment and I instruct and charge Lender to withdraw the amount of each biweekly payment from the deposit account on each due date without any further instructions from me.

**(B) Amount of My Initial Biweekly Payments**

Each of my initial biweekly payments will be in the amount of U.S. $ **591.89**. This amount will change as described in Sections 3(C) and 3(D) below. My initial biweekly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C) Payment Change Dates**

My biweekly payment will change as required by Section 3(D) below beginning on the **3rd** day of **July, 2006** and every 52 weeks thereafter. Each of these dates is called a "Payment Change Date." My biweekly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new biweekly payment every other Monday beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

00002

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 90**

0040361222

**(D)    Calculation of Payment Changes**

Subject to Section 3(F) and 3(G), on the Payment Change Date my biweekly payment may be changed to an amount sufficient to pay the unpaid Principal balance, including any deferred interest as described in Section 3(E) below, by the "Modified Maturity Date." The Modified Maturity Date is the date on which this note will be paid after accounting for acceleration of the payment schedule resulting from biweekly payments rather than the monthly payment schedule used to calculate the Maturity Date described in Section 3(A) above. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 50 but not more than 90 days before the Payment Change Date.

**(E)    Deferred Interest; Additions to My Unpaid Principal**

From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due. If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)    Limit on My Unpaid Principal; Increased Biweekly Payment**

My unpaid Principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of Deferred Interest to my unpaid Principal balance, the Principal Balance Cap limitation would be exceeded on the date that my biweekly payment is due, I will instead pay a new biweekly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new biweekly payment which is equal to an amount that will be sufficient to repay my then unpaid Principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)    Payment Cap Limitation; Exceptions**

Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my biweekly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)    Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my biweekly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.    FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5    BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. I may make a full Prepayment or partial Prepayment without paying any prepayment charge. If I make a partial Prepayment, there will be no changes in the due dates or amounts of my payments unless the Lender agrees in writing to those changes. My partial Prepayment may reduce the amount of my payments after the first Payment Change Date following my partial Prepayment.**

00003

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 91**

0040361222

## 6. MAXIMUM LOAN CHARGES

If a law which applies to this loan and which sets maximum loan charges is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Lender has not received the full amount of any biweekly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00 %** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

I will be in default if (i) I do not pay the full amount of each biweekly payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts, or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

### (C) Default - Change to Monthly Payments

If I fail to have sufficient funds in my deposit account to make my biweekly payment on the date my biweekly payment is due on two occasions in any 12 month period or four occasions any time prior to the Maturity Date or if a garnishment, attachment or seizure is made of or against my deposit account, then I will be in default and Lender will have a right, but not a duty, to change my loan to one with payments due monthly instead of biweekly. If the Lender chooses to change my loan to one with payments due monthly, Lender will provide me with written notice of the change at least 30 days in advance of the date the first monthly payment is due. This notice will also specify the amount of the monthly payment and the date the first monthly payment is due. In such event, interest on the loan balance from the last date interest was paid to the first date of the month preceding the date the first monthly payment is due will be added to my loan balance. The amount of the first monthly payment will be determined without regard to the 7-1/2% change in amount of payment cap set forth in Section 3(D) above.

I understand that I may voluntarily change the payment mode from biweekly to monthly at any time by giving written notice to Lender at least 60 days in advance of the date on which I wish the change to take effect. If I give Lender such notice, Lender will then provide me with written notice of the amount of the monthly payment and the date the first monthly payment shall be due. I may be required to pay a processing fee and sign a Modification Agreement with Lender converting my loan to a monthly payment loan. I understand that should the payment mode be changed from biweekly to monthly either voluntarily or due to an event of default it will not be reversible.

In the event that my payment mode is changed from biweekly to monthly, interest will be charged thereafter on the basis of a 12 month year and a 30-day month. The interest Rate I will pay will change on the first monthly payment date and on the same day every month thereafter. This revised interest change date will be substituted for the definition of "Interest Change Date" included in Section 2(B) above. The "Payment Change Date" as defined in Section 3(C) above will change to be the date the payment is changed from a biweekly to a monthly payment as described above in this Section 7(C) and on that day every 12 months thereafter.

### (D) Notice of Default

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

### (E) No Waiver by Lender

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full or change my loan type from biweekly to monthly at that time as described above, the Lender will still have the right to do so if I am in default at a later time.

### (F) Payment of Lender's Costs and Expenses

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

CA

00004

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 92

Case 5:07-cv-04497-JFK Document 244 Filed 02/37/02 Page 99 of 412

0040361222

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at 2261 CYPRESS AVE, SAN PABLO, CA 94806--105 or at a single alternative address if I give the Lender notice of my alternative address I may give notice to Lender of a change of my address in writing or by calling Lender's customer service telephone number provided on my billing statement I may designate only one mailing address at a time for notification purposes

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at 1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612, or at a different address if I am given a notice of that different address

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed Any person who takes over these obligations is also obligated to keep all of the promises made in this Note The Lender may enforce its rights under this Note against each person individually or against all of us together This means that any one of us may be required to pay all of the amounts owed under this Note

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor "Presentment" means the right to require the Lender to demand payment of amounts due "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid

**11. SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice or demand on me

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if

(i)        Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender,

(ii)       Lender approves the creditworthiness of the transferee in writing,

(iii)      transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards,

(iv)      an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

(v)       the transferee executes an assumption agreement which is satisfactory to Lender, such assumption agreement providing for transferee opening a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, for direct payment as provided in the secured notes

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes

00005

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS PAGE 93**

0040361222

**12. GOVERNING LAW; SEVERABILITY**

    This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

**13. CLERICAL ERRORS**

    In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

**14. LOST, STOLEN OR MUTILATED DOCUMENTS**

    If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

00006

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 94**

**SIGNATURE PAGE**

0040361222

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
AL F. MINYEN

_____ (Seal)
WILMA R. MINYEN

AL F MINYEN AND WILMA R. MINYEN, TRUSTOR(S) AND TRUSTEE(S) OF THE
MINYEN FAMILY TRUST, DATED MARCH 26, 1998

BY: _____ (Seal)
AL F. MINYEN, TRUSTEE

BY: _____ (Seal)
WILMA R. MINYEN, TRUSTEE

00007

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 95

# WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
AL F. MINYEN, ET AL.

Date May 26, 2005
Loan No 0040361222

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled | Total Sale Price<br>The total price of your purchase on credit including your down payment of<br>Not Applicable |
|---|---|---|---|---|
| 5.331 % | $ 313,680.41 | $336,744.71 | $ 650,425.12 | Not Applicable |

Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments are Due:<br>BIWEEKLY beginning on |
|---|---|---|
| 26 | $591.89 | 07/04/05 |
| 26 | 636.28 | 07/03/06 |
| 26 | 684.00 | 07/02/07 |
| 26 | 735.30 | 06/30/08 |
| 26 | 790.45 | 06/29/09 |
| 26 | 849.73 | 06/28/10 |
| 26 | 913.46 | 06/27/11 |
| 26 | 981.97 | 06/25/12 |
| 26 | 1,055.62 | 06/24/13 |
| 417 | 1,105.79 | 06/23/14 |
| 1 | 1,104.49 | 06/17/30 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance     You may obtain property insurance from anyone you want who is acceptable to the Lender

Security     You are giving a security interest in the real property located at 2251 CYPRESS AVE, SAN PABLO, CA 94806-1058

Filing Fees     $     70.00

Late Charge   If a payment is late, you will be charged 5.00% of the payment

Prepayment   If you pay off the loan early, you WILL NOT have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption   SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS – SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale   If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE

Al F. Minyen                              5/24/05
AL F. MINYEN                                Date

GF424A1 (2004-03-1)     UNIVERSAL                                                      CA
FINAL     DISTRIBUTION     1 COPY-RETURN SIGNED TO LENDER     1 COPY-CUSTOMER     2 COPIES-FILE

073
LENDER'S USE ONLY

00008

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 96**

## WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z

Customer's Name
AL F. MINYEN, ET AL.

Date May 26, 2005
Loan No 0040361222

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate | FINANCE CHARGE<br>The dollar amount the credit will cost you | Amount Financed<br>The amount of credit provided to you or on your behalf | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total price of your purchase on credit including your down payment of<br><br>Not Applicable |
|---|---|---|---|---|
| 5.331 % | $313,680.41 | $336,744.71 | $650,425.12 | Not Applicable |

**Your payment schedule will be:**

| Number of Payments | Amount of Payments | When Payments are Due:<br>BIWEEKLY beginning on |
|---|---|---|
| 26 | $591.89 | 07/04/05 |
| 26 | 636.28 | 07/03/06 |
| 26 | 684.00 | 07/02/07 |
| 26 | 735.30 | 06/30/08 |
| 26 | 790.45 | 06/29/09 |
| 26 | 849.73 | 06/28/10 |
| 26 | 913.46 | 06/27/11 |
| 26 | 981.97 | 06/25/12 |
| 26 | 1,055.62 | 06/24/13 |
| 417 | 1,105.79 | 06/23/14 |
| 1 | 1,104.49 | 06/17/30 |

VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.

This loan DOES NOT HAVE A DEMAND FEATURE.

Insurance    You may obtain property insurance from anyone you want who is acceptable to the Lender

Security    You are giving a security interest in the real property located at 2251 CYPRESS AVE, SAN PABLO, CA 94806-1058

Filing Fees    $    70.00

Late Charge    If a payment is late, you will be charged 5.00% of the payment

Prepayment    If you pay off the loan early, you WILL NOT have to pay a penalty and you WILL NOT be entitled to a refund of ANY PART OF THE FINANCE CHARGE ALREADY PAID.

Assumption    SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS – SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.

Due on Sale    If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan

By signing below, you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE

WILMA R. MINYEN                                    5-22-03
                                                    Date

GF42A1 (2004-03-1)    UNIVERSAL                                        CA
FINAL    DISTRIBUTION    1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE

0 7 3
LENDER'S USE ONLY

00009

## LOAN PROGRAM DISCLOSURE

0040361222

## PICK-A-PAYMENT[sm] EQUITY BUILDER[sm] LOAN

**BIWEEKLY ADJUSTABLE RATE MORTGAGE**
**GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX (COSI)**

---

This disclosure describes in a question-and-answer format important features of the Pick-a-Payment[sm] Equity Builder[sm] Loan Program you are considering. Federal Reserve Regulation Z and the rules and regulations of the federal Office of Thrift Supervision require that World give this disclosure to you. This disclosure is accurate as of the date of printing. However, World reserves the right to make subsequent changes to it at any time regarding any matter it covers. Such changes may occur because of changes in policy, law or regulation or for any other reason. Some terms of loans on non-owner occupied properties may be different from those described in this disclosure. If you are considering a loan on a non-owner occupied property, please ask a Loan Representative about the differences.

---

### WHAT DOES BIWEEKLY MEAN?

The term biweekly means mortgage payments are due every two weeks instead of once a month. Each year there are 26 biweekly payments. This is the equivalent of 13 monthly payments.

### CAN THE INTEREST RATE AND PAYMENT AMOUNT CHANGE?

Yes. Movement of an index causes the interest rate and payment amount to change. An index is an independent measure of interest rate activity.

### WHAT IS THE INDEX?

The index for this loan is the weighted average of the rates of interest on the deposit accounts (sometimes called cost of savings) of the federally insured depository institution subsidiaries of Golden West Financial Corporation ("COSI" or "Index"). Golden West Financial Corporation is a holding company listed on the New York Stock Exchange under the trading symbol "GDW." All of the depository institution subsidiaries of GDW currently operate under the name World Savings.

The COSI consists of the weighted annualized rate of interest in effect on deposit accounts, adjusted for the effects of financial instruments related to deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. It does not include accounts owned by GDW or its subsidiaries.

GDW computes the COSI as of the last day of each calendar month and announces it on or near the last business day prior to the fifteenth day of the following calendar month. For example, GDW announces the February COSI on or near the last business day prior to the fifteenth of March. It is in effect until the announcement of the March COSI in April.

### WHERE CAN I GET INFORMATION ABOUT THE INDEX?

You can get information about the COSI by

–  writing to World Savings
 P.O. Box 659558
 San Antonio, Texas 78265-9558
 Attn: Customer Service, or

–  telephoning (800) 642-0257

### HOW DOES WORLD DETERMINE INTEREST RATE CHANGES?

World determines interest rate changes by adding an amount (margin) that is fixed for the life of the loan to the current Index. The current Index is the most recently announced COSI value available on the date of each interest rate change. Please ask for World's current margin and interest rate.

### IS THE INITIAL INTEREST RATE BASED ON THE INDEX PLUS THE MARGIN?

Yes.

### HOW IS THE INITIAL PAYMENT AMOUNT ESTABLISHED?

You select an initial payment amount from a range of payment amounts provided by World. The range includes a minimum and a maximum initial payment amount. The maximum initial payment will not fully amortize the loan at the initial interest rate. The initial payment amount you select may not be sufficient to pay the full amount of interest due at the initial interest rate. This will cause the loan amount to increase as described below in the section "How Does The Principal Balance Change?" Please ask for the range of initial payments for the loan you are considering. The biweekly payment amount is one-half the amount of a monthly payment for an equivalent 30-year loan.

### HOW OFTEN CAN THE INTEREST RATE CHANGE?

Biweekly, beginning on the due date of the second regularly scheduled payment. However, since the index value changes only once each month, some biweekly payment cycles will not involve an interest rate change.

### HOW OFTEN CAN THE PAYMENT CHANGE?

Annually. The payment can change every 26 payments beginning with the 27th payment. Each date on which the payment may change is a "Payment Change Date."

### ARE THERE ANY LIMITS TO THE AMOUNT THE INTEREST RATE MAY CHANGE?

Yes. The maximum interest rate limit ("Lifetime Rate Cap") is between 2.000 and 8.000 percentage points over the initial index value plus margin. Please ask for World's current Lifetime Rate Cap.



LENDER'S USE ONLY

00010

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS**
**PAGE 98**

0040361222

**ARE THERE ANY LIMITS TO THE AMOUNT THAT PAYMENTS MAY CHANGE?**

Yes. The biweekly payment cannot increase ("Payment Cap") more than 7-1/2% each year

However,

– the Payment Cap does not apply on the 10th, 15th, 20th, 25th or final Payment Change Dates;

– the Payment Cap does not apply if the principal balance reaches the limits described in the section entitled "How Does the Principal Balance Change?"

**HOW DOES WORLD DETERMINE PAYMENT AMOUNT CHANGES?**

On each Payment Change Date, World determines a new biweekly payment by performing a calculation according to the steps that follow

(a) Using the original term of 360 months, the then current balance and interest Rate, compute a monthly payment

(b) Divide the monthly payment amount determined in step (a) by two

(c) Using the figure determined in step (b), the then current balance and interest Rate, compute a number of biweekly payments

(d) Subtract the number of biweekly payments already made from the number of biweekly payments computed in step (c) to determine the number of then remaining biweekly payments

(e) Using the number of remaining biweekly payments determined in step (d), the then current balance and interest Rate, compute a new biweekly payment

(f) As applicable, decrease the biweekly payment amount determined in step (e) or increase it to the maximum permitted by the 7-1/2% Payment Cap

**HOW DO I MAKE MY BIWEEKLY PAYMENTS?**

Loan payments are made through automatic withdrawals from your "Bank Account" at your bank, savings and loan, or other financial institution. Every other Monday, World will automatically debit your Bank Account for the amount of the mortgage payment then due. If you do not already have a Bank Account at a financial institution that is accessible by ACH (automated clearing house), then it will be necessary for you to open one and provide us with your Bank Account number before your loan closes. Please verify with your financial institution that your Bank Account is accessible by ACH

You are responsible for ensuring that sufficient available funds are on deposit in your Bank Account to cover the amount of your biweekly mortgage payment. If there are insufficient available funds, your loan payment will not be made. It will be necessary for you to make the payment within 15 days after it was due by mailing it to an address specified by World

Your Bank Account must remain open during the entire term of your biweekly loan

**UNDER WHAT CIRCUMSTANCES COULD THIS LOAN CONVERT TO A MONTHLY PAYMENT LOAN?**

If there are two occasions in any 12-month period of insufficient available funds in your Bank Account to cover your biweekly mortgage payment when due or a total of four such occasions during the life of your loan, World will have a right, but not a duty, to convert your biweekly payment loan to a monthly payment loan without any prior notice. If this occurs, World may charge you then current conversion fee and will send you notice of your new monthly payment amount and due date after the conversion

If World converts your biweekly loan to a monthly payment loan, your new monthly payment will not automatically be withdrawn from your Bank Account

**HOW WOULD WORLD CALCULATE MY MONTHLY PAYMENT AFTER CONVERSION?**

If your loan converted from biweekly to monthly payments, World would calculate a monthly payment sufficient to repay your then unpaid principal balance at the interest rate then in effect in substantially equal monthly installments over the remaining term of the loan

The Payment Cap would not apply at the time your loan converted to monthly payments. The monthly payment would be subject to annual changes based on changes in the interest rate as previously described in this disclosure

**HOW DOES THE PRINCIPAL BALANCE CHANGE?**

The principal balance (loan amount) can change biweekly

When the biweekly payment is more than sufficient to pay the full amount of interest due, World subtracts the amount that exceeds the interest due from the principal balance, resulting in a principal reduction

At various times during the life of your loan the biweekly payment may not be sufficient to pay the full amount of interest due. This can occur if the initial payment amount that you select is less than the full amount interest due. This can also result from increases in the interest rate prior to the Payment Change Date or from a biweekly payment that did not increase sufficiently to pay the full amount of interest due, because of the 7-1/2% Payment Cap

If the biweekly payment is not sufficient to pay the full amount of interest due, World adds this accrued but unpaid interest, called Deferred Interest, to the unpaid principal balance of the loan Until repaid, Deferred Interest bears interest at the interest rate of the loan

The principal balance may never exceed

– 125% of the original principal balance amount for a loan that had an original loan amount of 85% or less of the property's appraised value or sales price (whichever is less), or

– 110% of the original principal balance amount for a loan that had an original loan amount greater than 85% of the property's appraised value or sales price (whichever is less)

If Deferred Interest caused the principal balance to reach these limits, World would immediately increase the payment without regard to the Payment Cap. The increased payment would pay off the loan at the then current interest rate over the remaining term

00011

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 99

0040361222

**WHAT ARE THE INITIAL AND MAXIMUM INTEREST RATES AND PAYMENTS FOR A $10,000 LOAN ORIGINATED IN SEPTEMBER OF 2004?**

| | Initial payment selected * | Maximum payment and year in which maximum payment occurs ** | |
|---|---|---|---|
| Minimum initial payment | $18 36 | $70 46 | 3rd year |
| Maximum initial payment | $25 67 | $72 14 | 4th year |

\* The initial interest rate in the examples is 4 610%, which reflects an index value of 1 910% plus a margin of 2 700% Your initial interest rate may be different

\*\* The maximum interest rate in these examples is 12 610%, which reflects a Lifetime Rate Cap of 8 000% over the initial index value plus margin Your Lifetime Rate Cap may be different

Your biweekly payment can increase or decrease substantially based on changes in the interest rate

**HOW CAN I CALCULATE THE INITIAL PAYMENT FOR THE AMOUNT I PLAN TO BORROW?**

To see what the initial payments would be

step 1  divide the amount you plan to borrow by $10,000, and then

step 2  multiply the resulting amount by the payment shown under the "initial payment selected" column of the immediately previous question

For example,

the biweekly payment for a loan amount of $120,000 would be

step 1  $120,000 ÷ $10,000 = 12

step 2  12 X $18 36 = **$220.32** (minimum initial payment)
or
12 X $25 67 = **$308.04** (maximum initial payment)

**WHEN WILL I RECEIVE NOTICES OF CHANGES TO THE LOAN? WHAT INFORMATION WILL THEY INCLUDE?**

World sends a written notice at least 25 days before each Payment Change Date The notice includes information about the payment amount, interest rate and loan balance changes

**DOES THIS LOAN HAVE AN ASSUMPTION/DUE-ON-SALE PROVISION?**

If at origination your loan is not secured by additional non-real estate collateral, World will give written approval for a transfer (assumption)

and the buyer (transferee) may assume your loan at its current interest rate provided

1) the buyer meets World's then current credit standards,

2) the buyer makes a cash downpayment sufficient to meet World's then current underwriting standards,

3) World receives an assumption fee,

4) no previous transfer of the property has occurred since the original date of the loan,

5) you and the buyer sign all required assumption documents, and

6) the buyer has an ACH Bank Account, as described in the section entitled "How Do I Make My Biweekly Payments?"

The buyer might not receive the same Lifetime Rate Cap that you originally did The buyer could receive a higher Lifetime Rate Cap based on then current market conditions

If the loan program you are considering requires additional non-real estate collateral at the time of origination, the loan will not be assumable You will receive additional information that will explain the loan program in greater detail

Under certain circumstances, World could declare the entire outstanding loan amount immediately due and payable Failure to pay could then result in the forced sale of the property securing the loan This could occur

–  if there is more than one sale or transfer of the property, or

–  if you sell or transfer the property to anyone without obtaining World's prior written consent

**DOES THIS LOAN HAVE A PREPAYMENT CHARGE PROVISION?**

Some loan programs have a provision that requires that you pay a fee (a prepayment charge) if you make certain payments of principal before they are due (prepayments) Be sure to ask whether the loan program you are considering has a prepayment charge provision

If the loan program you are considering does have a prepayment charge provision, you will receive several documents during the processing of your loan that explain the prepayment charge in detail

**HOW CAN I GET INFORMATION ABOUT WORLD'S OTHER LOAN PROGRAMS?**

A Loan Representative will be happy to answer any questions you have and provide you with disclosures for other adjustable rate loan programs

**IMPORTANT - SIGNATURE**

I have received a copy of this disclosure describing the Pick-a-Payment Equity Builder Loan Program I understand that this disclosure is neither a commitment to make a loan nor a binding contract The complete contractual terms and conditions of the loan are in the Note, Security Instrument, Modification(s) and Rider(s), if any

AL F MINYEN
(Print Name)

2251 CYPROSSAVE SANPABLO, CA 94806
(Property Address)

Signature   _Al F. Minge_
_Wilma R Minyen_

5/26/05
(Date)

Please return a signed copy of this disclosure to World and retain a copy for your records.

00012
EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 100

000013

# Exhibit No. 4

**WORLD SAVINGS BANK, FSB**

# ADJUSTABLE RATE MORTGAGE NOTE

## PICK-A-PAYMENT LOAN

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER: **0040509770**                    DATE: **June 24, 2005**

BORROWER(S): **MARK CLAUSON AND CHRISTINA CLAUSON, HUSBAND AND WIFE**   sometimes called "Borrower" and sometimes simply called "I" or "me."

PROPERTY ADDRESS: **9342 KASCHUBE WAY, SANTEE, CA 92071-2227**

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$390,400.00** , called "Principal," plus interest, to the order of the Lender. The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES**, or anyone to whom this Note is transferred.

### 2. INTEREST

**(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at the yearly rate of **5.320%**. The interest rate I will pay  may change as described in this Section 2. Interest will be charged on the basis of a twelve month year and a thirty day month.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)   Interest Change Dates**

The interest rate I will pay may change on the **15th** day of **August, 2005** and on the same day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date." The new rate of interest will become effective on each Interest Change Date.

**(C)   Interest Rate Limit**

My lifetime maximum interest rate limit is **11.950%**, called "Lifetime Rate Cap."

LENDER'S USE ONLY

00001

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS**
**PAGE 103**

0040509770

**(D)   Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E)   Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.800** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F)   Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available.  For purposes of this Section 2(F): the Index is not "available" if:  (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note; or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note.  The selection of the alternative index shall be at Lender's sole discretion.  The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator.  The Lender will give me notice of the alternative index.

**3.   PAYMENTS**

**(A)   Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **August 15, 2005**. I will make these payments every month until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note; and (iii) any charges that may be due under the Security Instrument. If, on **July 15, 2035**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)   Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ **1,433.26**. This amount will change as described in Sections 3(C) and 3(D) below. My initial  monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)   Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **August, 2006** and on that day every **12th**  month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)   Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap."  The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

00002

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 104**

0040509770

**(E)   Deferred Interest; Additions to My Unpaid Principal**

From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)   Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)   Payment Cap Limitation; Exceptions**

Beginning with the **10th** Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)   Notice of Payment Changes**

The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.   FAILURE TO MAKE ADJUSTMENTS**

If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.   BORROWER'S RIGHT TO PREPAY**

**I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  I may make a full Prepayment or partial Prepayment without paying any prepayment charge.  If I make a partial Prepayment, there will be no changes in the due dates or amounts of my payments unless the Lender agrees in writing to those changes. My partial Prepayment may reduce the amount of my payments after the first Payment Change Date following my partial Prepayment.**

**6.   MAXIMUM LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Lender has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00%** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

SD253C (2004-03-1)                                  ADJUSTABLE NOTE                                  CA
                                                          Page 3

00003

EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 105

0040509770

**(B)    Default**

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

**(C)    Notice of Default**

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

**(D)    No Waiver by Lender**

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time.

**(E)    Payment of Lender's Costs and Expenses**

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **9342 KASCHUBE WAY, SANTEE, CA  92071–222**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes.

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.    SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph **26:**

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

00004
EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 106

0040509770

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

      (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

      (ii)    Lender approves the creditworthiness of the transferee in writing;

      (iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

      (iv)    an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

      (v)    the transferee executes an assumption agreement which is satisfactory to Lender.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

## 12. GOVERNING LAW; SEVERABILITY

This Note shall be governed by and construed under federal law and federal rules and regulations including those for **federally chartered savings institutions, called "Federal Law."** In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

## 13. CLERICAL ERRORS

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error.

## 14. LOST, STOLEN OR MUTILATED DOCUMENTS

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

## THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

00005

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS PAGE 107**

SIGNATURE PAGE

0040509770

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)

MARK CLAUSON

_____ (Seal)

CHRISTINA CLAUSON

00006

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS
PAGE 108**

| WORLD SAVINGS | FEDERAL TRUTH IN LENDING DISCLOSURE REQUIRED BY REGULATION Z |
|---|---|

Customer's Name:
**MARK CLAUSON, ET AL.**

Date: **June 9, 2005**
Loan No.: **0040509770**

| ANNUAL PERCENTAGE RATE<br><br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br><br>The dollar amount the credit will cost you. | Amount Financed<br><br>The amount of credit provided to you or on your behalf. | Total of Payments<br><br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br><br>The total price of your purchase on credit including your down payment of<br><br>**Not Applicable** |
|---|---|---|---|---|
| 5.469 % | $439,862.99 | $381,190.96 | $821,053.95 | **Not Applicable** |

**Your payment schedule will be:**

| Number of Payments | Amount of Payments | When Payments are Due:<br>MONTHLY beginning on |
|---|---|---|
| 12 | $ 1,431.79 | 09/01/05 |
| 12 | 1,539.17 | 09/01/06 |
| 12 | 1,654.61 | 09/01/07 |
| 12 | 1,778.71 | 09/01/08 |
| 12 | 1,912.11 | 09/01/09 |
| 12 | 2,055.52 | 09/01/10 |
| 12 | 2,209.68 | 09/01/11 |
| 12 | 2,375.41 | 09/01/12 |
| 263 | 2,430.19 | 09/01/13 |
| 1 | 2,429.98 | 08/01/35 |

**VARIABLE RATE: THIS LOAN CONTAINS AN ADJUSTABLE RATE FEATURE. SEE THE ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT PREVIOUSLY GIVEN TO YOU.**

This loan **DOES NOT HAVE A DEMAND FEATURE.**

Insurance:  You may obtain property insurance from anyone you want who is acceptable to the Lender.

Security:  You are giving a security interest in the real property located at 9342 **KASCHUBE WAY, SANTEE, CA 92071-2227.**

Filing Fees:  $    75.00

Late Charge:  If a payment is late, you will be charged **5.00%** of the payment.

Prepayment:  If you pay off the loan early, you **WILL NOT** have to pay a penalty and you **WILL NOT** be entitled to a refund of **ANY PART OF THE FINANCE CHARGE ALREADY PAID.**

Assumption:  **SOMEONE BUYING YOUR HOUSE CAN ASSUME THE REMAINDER OF THE LOAN UNDER CERTAIN TERMS AND CONDITIONS. TERMS MAY BE DIFFERENT FROM YOUR ORIGINAL TERMS - SEE YOUR ADJUSTABLE LOAN PROGRAM DISCLOSURE STATEMENT.**

Due on Sale:  If the property securing the loan is sold or transferred to anyone without first obtaining Lender's written consent, all sums owed could become immediately due and payable. In this event failure to pay all the sums declared due and payable may result in the forced sale of the property.

See your Contract documents for additional information about non-payment, default, any required repayment in full before the scheduled date and other important terms and conditions of your loan.

**ALL NUMERICAL DISCLOSURES EXCEPT THE LATE PAYMENT DISCLOSURE ARE ESTIMATED.**

**By signing below,** you acknowledge that you received a copy of this FEDERAL TRUTH IN LENDING DISCLOSURE.

**MARK CLAUSON**

6-13-05
Date

CA

022

LENDER'S USE ONLY

GF004A1 (2004-03-1)    UPFRONT
DISTRIBUTION:  1 COPY-RETURN SIGNED TO LENDER    1 COPY-CUSTOMER    2 COPIES-FILE

**EXHIBIT F ISO MOTION TO STAY PROCEEDINGS**
**PAGE 109**

00007

EXHIBIT G

1   ARBOGAST & BERNS LLP
    Jeffrey K. Berns (SBN 131351)
2   David M. Arbogast (SBN 167571)
    6303 Owensmouth Avenue, 10th Floor
3   Woodland Hills, CA  91367-2263
    Tel:  818.961.2000 -- Fax 818.936.0232
4   Email:  jberns@law111.com;
    darbogast@law111.com
5
    Attorneys for Plaintiffs and all others
6   Similarly Situated

7   [Additional Counsel listed on signature
    page]
8
                    UNITED STATES DISTRICT COURT
9
        NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION
10

11  IN RE:  WACHOVIA CORP.                    Case No. M:09-CV-2015-JF
    "PICK-A-PAYMENT" MORTGAGE
12  MARKETING AND SALES                       **PLAINTIFFS' UNOPPOSED**
    PRACTICES LITIGATION                      **MOTION FOR PRELIMINARY**
13                                            **APPROVAL OF CLASS ACTION**
                                              **SETTLEMENT AND**
14                                            **MEMORANDUM OF POINTS AND**
                                              **AUTHORITIES IN SUPPORT**
15                                            **THEREOF**

16  _____

17                                            Date: December 16, 2010
    This Document Relates to:                 Time: 1:30 p.m.
18  All Actions                               Courtroom: 3, 5th Floor
                                              Judge: Hon. Jeremy Fogel
19  _____

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... iii

NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL ........ 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 3

I. INTRODUCTION ......................................................................................... 3

II. SUMMARY OF THE CASE ........................................................................ 3

III. SUMMARY OF THE PROPOSED SETTLEMENT ................................... 7

  A. Settlement Negotiations ......................................................................... 7

  B. The Settlement Class .............................................................................. 7

  C. The Terms of the Proposed Settlement Agreement ................................ 9

    1. Settlement Payments ........................................................................ 9

    2. Loan Modification Program ........................................................... 10

    3. Short-Sale/Deed-In-Lieu of Foreclosure Incentives Program ...... 11

    4. Plaintiffs' Litigation Costs and Fees .............................................. 12

    5. Service Payments ........................................................................... 12

    6. Release By Settlement Class Members ........................................... 12

    7. Notice ............................................................................................. 12

    8. Fairness Hearing ............................................................................ 13

  D. The Proposed Implementation Schedule .............................................. 13

IV. PROVISIONAL CERTIFICATION OF THE
SETTLEMENT CLASS IS WARRANTED ............................................... 14

  A. Numerosity ........................................................................................... 15

  B. Commonality ........................................................................................ 15

  C. Typicality ............................................................................................. 16

  D. Adequacy ............................................................................................. 17

  E. Rule 23(b) ............................................................................................. 18

  F. Nationwide Certification ...................................................................... 18

i

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT A: JOINT MOTION FOR STAY OF PROCEEDINGS
PAGE 111

V.      PRELIMINARY APPROVAL OF THE TERMS OF THE
        PROPOSED SETTLEMENT IS WARRANTED .........................................19

    A.      The Settlement Terms are Fair, Reasonable, and
            Adequate, Within the Range of Reasonableness .................................22

        1.  Strength of Plaintiffs' Case .......................................................23

        2.  Risk, expense, complexity, and likely duration of further litigation ..........23

        3.  The amount offered in settlement ................................................23

        4.  The experience and views of counsel ...........................................24

    B.      The Court Should Order Dissemination Of The Proposed Class Notice ...24

    C.      The $125,000 Service Payment to Plaintiffs is Reasonable ......................26

VI.     APPOINTMENT OF PLAINTIFFS AS CLASS REPRESENTATIVES
        AND THEIR ATTORNEYS AS CLASS COUNSEL
        IS WARRANTED ..........................................................................26

VII.    A HEARING FOR FINAL APPROVAL OF THE PROPOSED
        SETTLEMENT AND FOR PAYMENT OF THE ATTORNEYS'
        FEES SHOULD BE SET, ALONG WITH PRE-HEARING
        EXCLUSION AND OBJECTION DEADLINES ..........................................27

VIII.   THE COURT SHOULD APPPOINT RUST CONSULTING, INC.
        AS SETTLEMENT ADMINISTRATOR ....................................................28

IX.     CONCLUSION.............................................................................28

-ii-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT A – ISO MOTION TO STAY PROCEEDINGS
PAGE 112**

# TABLE OF AUTHORITIES
## CASES

*Acosta v. Trans Union,*
   243 F.R.D. 377 (C.D. Cal. 2007) ................................................... 20

*Amchem Prods. Inc. v. Windsor,*
   521 U.S. 591 (1997) ............................................................... 14, 15

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ...................................................... 17

*Blackie v. Barrack,*
   524 F.2d 891 (9th Cir. 1975) ...................................................... 15

*Chun-Hoon v. McKee Foods Corp.,*
   2009 WL 3349549 (N.D. Cal. Oct. 15, 2009) .......................... 20

*Churchill Village, L.L.C. v. General Electric,*
   361 F.3d 566 (9th Cir. 2004) ................................................ 20, 21

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268 (9th Cir. 1992) .................................................... 20

*De La Fuente v. Stokely- Van Camp, Inc.,*
   713 F.2d 225 (7th Cir. 1983) ...................................................... 16

*Dukes v. Wal-Mart Stores, Inc.,*
   603 F.3d 571 (9th Cir. 2010), cert. granted, 2010 WL 3358931 (U.S.
   Dec. 6, 2010) (No. 10-277) ................................................... 15, 17

*Eisen v. Carlisle & Jacquelin,*
   417 U.S. 156 (1974) .................................................................... 25

*General Tel Co. v. Falcon,*
   457 U.S. 147 (1982) .................................................................... 18

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) .............................................. passim

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ...................................................... 16

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
   216 F.R.D. 197, 218 (D. Me. 2003) .......................................... 26

*In re Corrugated Container Antitrust Litig.,*
   643 F.2d 195, 205 (5th Cir. 1981) .............................................. 20

*In re Glassine & Greaseproof Paper Antitrust Litig.,*
   88 F.R.D. 302, 304 (E.D. Pa. 1980 ) .......................................... 16

*In re Pacific Enterprises Securities Litig.*
   47 F.3d 373, 378 (9th Cir. 1995) ................................................ 20

-iii-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT A: JOINT MOTION FOR STAY OF PROCEEDINGS
PAGE 113

*In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litigation,*
   122 F.R.D. 251, 257 (C.D. Cal. 1988) ........................................................ 17

*Nat'l Rural Telecomms. Cooperative v. DirecTV, Inc.,*
   221 F.R.D. 523 (C.D. Cal. 2004) ....................................... 20, 21, 22, 23

*Perry v. FleetBoston Financial Corp.,*
   229 F.R.D. 105 (E.D. Pa. 2003) ........................................................ 26

*Rodriguez v. West Publishing Corp.,*
   563 F.3d 948 (9th Cir. 2009) ............................................................ 20

*Rosario v. Livaditis,*
   963 F.2d 1013 (7th Cir. 1992) ..................................................... 16, 18

*Scholes v. Stone, McGuire & Benjamin,*
   143 F.R.D. 181 (N.D. Ill. 1992) ....................................................... 17

*Schwartz v. Harp,*
   108 F.R.D. 279 (C.D. Cal. 1985) ..................................................... 16

*Silber v. Mabon,*
   18 F.3d 1449 (9th Cir. 1994) ............................................................ 25

*Smith v. University of Washington Law School,*
   2 F.Supp.2d 1324 (W.D. Wash. 1998) ............................................. 16

*Staton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003) ..................................................... 20, 26

*Torrisi v. Tucson Elec. Power Co.,*
   8 F.3d 1370 (9th Cir. 1993) .............................................................. 21

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
   396 F.3d 96 (2d Cir. 2005) .............................................................. 26

*Washington Mutual Bank, FA v. Superior Court,*
   24 Cal.4th 906, 103 Cal.Rptr.2d 320 (2001) .................................... 19

*Wershba v. Apple Computer, Inc.,*
   91 Cal.App.4th 224 (2001) ......................................................... 18, 19

## STATUTES

Fed. R. Civ. P. 23 ............................................................................... *passim*

**EXHIBIT 4 - ISO MOTION FOR STAY OF PROCEEDINGS
PAGE 114**

1    **NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL**

2    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3        PLEASE TAKE NOTICE THAT on December 16, 2010, at 1:30 p.m., or as

4    soon thereafter as counsel may be heard, Plaintiffs and proposed Class

5    Representatives Dolores Mandrigues, Juanita Jones, Al F. Minyen, Wilma R.

6    Minyen, Mark Clauson, Christina Clauson, Bonnie Mincey, Stephanie O'Rourke,

7    Tina Singer, Chad R. Whatley, Anita H. Whatley, Jerrold L. Rotruck, Clara C.

8    Rotruck, Judith M. Holley, Roland Harris, Gloria Harris, Emogen White, Vanessa

9    L. McLeaurin, by Travis A. Budd, personal representative, James W. Collins, Jr.,

10    Michael Brunkhorst, Jayme Brunkhorst, Michael T. Harber, Mary Harber, Mark

11    Chaney, Gloria Chaney, and Terry L. Costello ("Plaintiffs") will bring on for

12    hearing before the Honorable Jeremy Fogel, United States District Judge, in

13    Courtroom 3, 5th Floor, at the United States Courthouse, 280 South 1st Street, San

14    Jose, CA 95113, their Motion for Preliminary Approval of Class Action Settlement.

15        The motion seeks an order:  (1) granting preliminary approval of the

16    proposed Stipulation of Settlement (the "Settlement Agreement")[1] between

17    Plaintiffs and Defendants World Savings, Inc., World Savings Bank, FSB,

18    Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells

19    Fargo Bank, N.A, Wachovia Corporation, Golden West Financial Corporation,

20    Wachovia Bank, FSB, f/k/a World Savings Bank, FSB-TX, Wachovia Mortgage

21    Corporation, Wells Fargo Home Mortgage, and Wells Fargo Bank, N.A.

22    ("Defendants"); (2) provisionally certifying the Settlement Class, as defined below,

23    for settlement purposes only; (3) appointing Plaintiffs as Class Representatives, and

24    their counsel as Class Counsel, and Rust Consulting, Inc. as Settlement

25    Administrator; (4) approving the form and manner of notice to Settlement Class

26    Members, and (5) scheduling a fairness hearing to consider final approval of the

27

28

---

[1] Capitalized terms herein shall have the same meaning as in the Settlement Agreement, which is annexed hereto as Exhibit A.

1  Agreement and Stipulation of Settlement of Class Action (the "Settlement

2  Agreement").

3      For the reasons set forth in greater detail in the accompanying Memorandum

4  of Points and Authorities, Plaintiffs respectfully submit that this Court should grant

5  preliminary approval of the proposed settlement, including:

6      1.    Conditionally certifying for settlement purposes only and authorizing

7  Plaintiffs to represent the proposed Settlement Class, because the Settlement Class

8  satisfies the requirements of Rules 23(a), (b), and (e) of the Federal Rules of Civil

9  Procedure;

10     2.    Preliminarily finding that the proposed settlement (the "Settlement")

11 reflected in the Settlement Agreement is fair, reasonable, and in the best interests of

12 the proposed Settlement Class, and that it warrants notifying the Settlement Class

13 of the terms of the proposed Settlement and of their rights in connection with the

14 proposed Settlement;

15     3.    Approving the form and content of the long form notices of settlement

16 for the Settlement Class (the "Settlement Notices") and the summary notice of

17 settlement ("Summary Notice"), substantially in the form of Exhibits 1 through 4 to

18 the Settlement Agreement;

19     4.    Directing that the Settlement Notice and Summary Notice be

20 disseminated in the manner described in Section X of the Settlement Agreement;

21     5.    Establishing deadlines for requests for exclusion from the Settlement

22 Class and the filing of objections to the proposed Settlement;

23     6.    Setting the fairness hearing on the final approval of the proposed

24 Settlement and its terms, an award of attorneys' fees and expenses for Plaintiffs'

25 counsel, and an award to Plaintiffs for their service in this action; and

26     7.    Appointing Rust Consulting, Inc. as Settlement Administrator.

27     This Motion is based on the Notice of Motion; the attached Memorandum of

28 Points and Authorities; the accompanying Declaration of Jeffrey K. Berns, with

-2-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT A: ISO MOTION FOR STAY OF PROCEEDINGS
PAGE 116**

1  exhibits (the "Berns Decl."); the Settlement Agreement, with exhibits (including the

2  proposed Settlement Notices and Summary Notice, Claim Form, and Final Order

3  and Judgment); the pleadings, orders, transcripts, and other papers on file in this

4  matter; and any further evidence and arguments as may be presented at the hearing

5  of this matter.

6  ## MEMORANDUM OF POINTS AND AUTHORITIES

7  ## I.    INTRODUCTION

8          By this motion, Plaintiffs seek preliminary approval of their proposed

9  class action Settlement with Defendants on behalf of a nationwide class of

10  consumers who obtained Pick-a-Payment mortgage loans from Defendants on or

11  after August 1, 2003 and on or before December 31, 2008.  The parties intend to

12  seek final settlement approval at a Fairness Hearing to be scheduled by the Court no

13  less than 130 calendar days from the date on which it grants preliminary approval

14  of the Settlement and, to that end, they request provisional certification of the

15  Settlement Class (as defined below), preliminary approval of the proposed

16  Settlement Agreement, appointment of Plaintiffs' counsel as Class Counsel and

17  Plaintiffs as representatives of the Settlement Class, approval of the proposed

18  Settlement and Summary Notices, and the setting of a hearing date for the Fairness

19  Hearing, and for Plaintiffs' motion for an award to Plaintiff's counsel for their

20  attorney's fees and costs and an award to Plaintiffs for their service in this action.

21  ## II.    SUMMARY OF THE CASE

22          The consolidated actions that comprise this action, concern Defendants' Pick-

23  a-Payment mortgage loans, which permitted the borrower to select and make a

24  minimum payment amount for a limited time and subject to certain conditions.  In

25  particular, for each payment, the borrower could choose from four (4) options.

26  Borrowers could (1) make a fully-amortized 30-year interest and principal payment

27  such that the loan would be satisfied in the traditional 30-year term; (2) make a

28  fully-amortized 15-year interest and principal payment such that the loan would be

-3-

satisfied in a 15-year term; (3) make an "interest-only payment"; or (4) make a lesser, minimum payment.  When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.  Plaintiffs allege that the "Pick-a-Payment" mortgage loans violated the federal Truth-in-Lending Act ("TILA"), state unfair competition and consumer protection laws, were fraudulent and breached the covenant of good faith and fair dealing because the relevant loan documents failed to make adequate disclosures regarding the potential for negative amortization, the actual payment schedules, the interest rates of these schedules, and the full terms of the parties' legal obligations.  Berns Decl., ¶2.

On August 30, 2007, after an extensive investigation by Plaintiffs' counsel involving, among other things, the review of over five hundred (500) sets of loan documents from individuals who had received Pick-a-Payment mortgage loans from World Savings Bank, FSB, Dolores Mandrigues filed a complaint in this Court (as defined hereafter) captioned *Dolores Mandrigues, individually and on behalf of all others similarly situated v. World Savings, Inc., World Savings Bank, FSB, Wachovia Mortgage Corporation, and Does 1 through 10 inclusive*, N.D. Cal., Case No. 5:07-cv-4497 ("*Mandrigues*").  The complaint alleged causes of action for violations of TILA and California's Unfair Competition Law, breach of contract, and breach of the implied covenant of good faith and fair dealing.  The *Mandrigues* action was assigned to this Court.  On October 11, 2007, Dolores Mandrigues filed a First Amended Complaint in *Mandrigues*, and, on December 14, 2007, during the initial case management conference, Dolores Mandrigues, through counsel, orally moved the Court for leave to file a Second Amended Complaint, which motion was granted.  On December 31, 2007, Dolores Mandrigues filed a Second Amended Complaint and a Corrected Second Amended Complaint in *Mandrigues*, naming additional plaintiffs and putative class representatives, and adding, among other things, a cause of action for fraud.  Berns Decl., ¶¶3-4.

EXHIBIT A
PAGE 118

1  In January 2008, Defendants World Savings, Inc., World Savings Bank, FSB, and

2  Wachovia Mortgage Corporation filed a motion to dismiss *Mandrigues*, which

3  asserted that the relevant loan documents complied with TILA and that the state law

4  causes of action were preempted by the Home Owners Loan Act ("HOLA").  The

5  *Mandrigues* plaintiffs opposed the motion.  In April 2008, the Court denied the

6  motion to dismiss.  Berns Decl., ¶5.

7      During 2008, the *Mandrigues* plaintiffs served multiple sets of interrogatories

8  and requests for production of documents on Defendants.  Defendants also served

9  discovery requests on each of the putative class representatives and took their

10  depositions, along with the depositions of certain third-party brokers who brokered

11  the subject loan transactions.  Production by Defendants included over fifteen

12  thousand (15,000) pages of documents and approximately twenty (20) hours of

13  video and audio materials, all of which was reviewed by Plaintiffs' counsel.  Berns

14  Decl., ¶6.

15      Also during 2008, other borrowers filed additional putative class actions and

16  single-plaintiff actions against Defendants, which generally asserted the same

17  claims and allegations as alleged by the *Mandrigues* plaintiffs.  In November 2008,

18  a petition to coordinate those actions was filed with the Judicial Panel on

19  Multidistrict Litigation (the "MDL Panel") and those actions subsequently were

20  coordinated and transferred to the Court.[2]  The actions are now referred to

21  _____

22  [2] The cases that were filed later did not have the same opportunity to be developed factually before stays were entered pending resolution of the MDL petition, but several of these actions

23  were actively litigated.  The later-filed cases include *Bonnie Mincey, Stephanie O'Rourke, and Tina Singer, individually and on behalf of all others similar situated v. World Savings Bank, FSB,

24  Golden West Financial Corporation, and Wachovia Corporation*, D.S.C., Case No. 2:07-cv-3762 (motion to dismiss and for judgment on the pleadings with a subsequent motion for

25  reconsideration by Defendants); *Laura Johnson v. Wachovia Mortgage Corporation, Equity Source Home Loans LLC, Don Haupt, and John Does #1 - #10*, D.N.J., Case No. 2:08-cv-04147;

26  *Chad R. Whatley, Anita H. Whatley, Jerrold L. Rotruck, and Clara C. Rotruck, individually and on behalf of others similarly situated v. World Savings Bank, FSB, now known as Wachovia

27  Mortgage, FSB, Golden West Financial Corporation, and Wachovia Corporation*, N.D. Fla., Case No. 4:08-cv-380 (motion to dismiss and for class certification); *Judith M. Holley, Roland

28  Harris, Gloria Harris, Emogen White, Vanessa L. McLeaurin, and James W. Collins, Jr.,*

-5-

1  collectively as the *In re Wachovia Corp. "Pick-a-Payment" Mortgage Marketing*
2  *and Sales Practices Litigation*, Case No. M:09-CV-2015-JF (the "Lawsuit"). Berns
3  Decl., ¶7.

4       In November 2008, the *Mandrigues* plaintiffs filed a motion for class
5  certification and a motion for preliminary injunction to prohibit Defendants from
6  foreclosing on the homes of any putative class members. In January 2009, the
7  Court stayed the class certification motion and all other litigation pending a
8  decision from the MDL Panel. The Court held a hearing on the preliminary
9  injunction motion, which it subsequently denied in a written order. Berns Decl., ¶8.

10      In August 2009, Plaintiffs requested that the Court dissolve the January 2009
11 stay entered in *Mandrigues*. At the same time, the Defendants requested that
12 Plaintiffs file a consolidated complaint for all of the coordinated actions in the
13 Lawsuit, while Plaintiffs requested that the Court conduct a hearing concerning the
14 pending class certification motion in *Mandrigues*, which had been fully briefed
15 since late 2008. The Court agreed to allow a class certification motion on the TILA
16 claims in *Mandrigues* to proceed, along with summary judgment motions from both
17 sides on the TILA claims in *Mandrigues*. Berns Decl., ¶9.

18      In December 2009, Plaintiffs filed motions for summary judgment and class

19 _____

20 *individually and on behalf of others similarly situated v. World Savings Bank, FSB, Golden West
   Financial Corporation, and Wachovia Corporation*, D. Md., Case No. 1:08-cv-02307 (motion to
21 dismiss); *Michael Brunkhorst and Jayme Brunkhorst v. World Savings Bank, FSB, Golden West
   Financial Corporation, and Wachovia Corporation*, S.D. Ill., Case No. 3:09-cv-00127 (no
22 activity); *Michael T. Harber and Mary Harber v. World Savings Bank, FSB, Golden West
   Financial Corporation, and Wachovia Corporation*, E.D. Mo., Case No. 4:09-cv-00258 (no
23 activity); *Mark Chaney, Gloria Chaney, and Terry L. Costello v. Wachovia Mortgage, FSB, f/k/a
   World Savings Bank, FSB; Wachovia Bank, FSB, f/k/a World Savings Bank, FSB-TX; and Golden
24 West Financial Corporation*, D. Ariz., Case No. 2:10-cv-01001-MHB (no activity); *Joseph
   Henning v. Wachovia Mortgage Corporation*, D. Mass, Case No. 1:09-cv-11053-MLW (no
25 activity); *Bernardino Bettinelli and Carol G. Bettinelli v. Wells Fargo Home Mortgage, Inc*., D.
   Mass., Case No. 1:09-cv-11079-MLW (no activity); *Fattu Salia v. World Savings Bank, FSB*, D.
26 Md., Civil Action No. DKC-2010-1553; and *Derrick Davis v. World Savings Bank, FSB,
   Wachovia Mortgage Corp., and Wells Fargo Bank, N.A.*, D.D.C., Case No. 1:10-cv-01761-RMC
27 (no activity).

28

**EXHIBIT A - ISO MOTION FOR STAY OF PROCEEDINGS**
**PAGE 120**

1  certification concerning the TILA claims in *Mandrigues*, while Defendants filed

2  their own summary judgment motion concerning those claims.  In January 2010,

3  both sides filed their opposition and reply briefs.  Berns Decl., ¶10.

4  **III.    SUMMARY OF THE PROPOSED SETTLEMENT**

5       **A.    Settlement Negotiations**

6       Since March 2009, the Parties have engaged in extensive settlement

7  negotiations.  At all times, the Parties' negotiations were adversarial, non-collusive,

8  and at arms' length.  As detailed above, prior to and during these negotiations, the

9  Parties engaged in vigorous, and often contentious, litigation.  Berns Decl., ¶10.

10      In February 2010, the Parties commenced mediation  with Retired Justice

11  John Trotter.  Thereafter, as progress in the negotiations was being made, the Court

12  agreed, on multiple occasions, to continue the hearing on the pending motions in

13  *Mandrigues*.  Ultimately, an agreement in principal, which is now embodied in the

14  Settlement Agreement, was reached with Justice Trotter's assistance. Berns Decl.,

15  ¶¶11-13.

16      **B.    The Settlement Class**

17      Pick-A-Payment mortgage loan borrowers fall into three categories: those

18  whose loans are paid off, those who still hold loans and are not currently in default,

19  and those who still hold loans and are currently in default.  Thus, the proposed

20  Settlement provides appropriate relief to each of these three classes (collectively,

21  the "Settlement Class"), which are defined as follows:

22      **Settlement Class A: Borrowers Who No Longer Have Their Pick-a-**

23      **Payment Mortgage Loans**

24      All current and former Borrowers of World Savings Bank, FSB or Wachovia

25      Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells

26      Fargo Bank, N.A. ("Wachovia Mortgage") who, (a) on or after August 1,

27      2003 and on or before December 31, 2008 entered into a loan transaction

28      with Wachovia Mortgage that, as of the date of the loan's funding, was

-7-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT G - INFORMATION FOR STAY OF PROCEEDINGS**

**PAGE 121**

1   secured by their primary residence; (b) obtained financing from Wachovia

2   Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c)

3   have not previously released their claims pursuant to another settlement

4   agreement, final judgment, or other dealings with Wachovia Mortgage; and

5   (d) as of the Date of Preliminary Approval, no longer have a Pick-a-Payment

6   mortgage loan because they sold the property securing the loan, refinanced

7   the loan, paid off the loan personally, or have already obtained a loan

8   modification that converted the loan from a Pick-a-Payment mortgage loan.

9   **Settlement Class B:   Non-Defaulting Borrowers Who Still Have Their**

10  **Loans**

11  All current Borrowers of World Savings Bank, FSB or Wachovia Mortgage,

12  FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank,

13  N.A. ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or

14  before December 31, 2008 entered into a loan transaction with Wachovia

15  Mortgage that is secured by their primary residence; (b) obtained financing

16  from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan

17  promissory note; (c) have not previously released their claims pursuant to

18  another settlement agreement, final judgment, or other dealings with

19  Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still

20  have a Pick-a-Payment mortgage loan and are not in Default.

21  **Settlement Class C:  Borrowers in Default Who Still Have Their Loans**

22  All current Borrowers of World Savings Bank, FSB or Wachovia Mortgage,

23  FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank,

24  N.A. ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or

25  before December 31, 2008 entered into a loan transaction with Wachovia

26  Mortgage that is secured by their primary residence; (b) obtained financing

27  from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan

28  promissory note; (c) have not previously released their claims pursuant to

-8-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS & AUTHORITIES; MOTION FOR STAY OF PROCEEDINGS

**EXHIBIT A ISO MOTION FOR STAY**
**PAGE 122**

1        another settlement agreement, final judgment, or other dealings with

2        Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still

3        have a Pick-a-Payment mortgage loan and are in Default.

4   Settlement Agreement, § IV.

5        Excluded from the Settlement Class are the Defendants, the Additional

6   Defendants, and any respective parent, subsidiary, affiliate, or control person of the

7   Defendants and the Additional Defendants, as well as the officers, directors, agents,

8   servants, and employees of the Defendants and Additional Defendants, or any judge

9   presiding over the Lawsuit and/or any of the Related Actions, and the immediate

10  family members of any such Person(s).  Settlement Agreement, § I(1.66).

11       **C.    The Terms of the Proposed Settlement Agreement**

12            **1.    Settlement Payments**

13        Within fifteen (15) calendar days after the Effective Date of the Settlement,

14   Defendants are required to pay $50 million to the Settlement Administrator (the

15   "Settlement Fund"), which will be used for (1) Settlement Payments to Settlement

16   Class A Members who timely submit a valid claim form, and Settlement Class B

17   and C Members who do not exclude themselves from the Settlement; and (2)

18   Service Payments to the Class Representatives, which are to be approved by the

19   Court in the maximum total amount of $125,000.  Settlement Agreement, §§ VI(A),

20   VII.

21        All costs of administering the Settlement, and providing notice of the

22   Settlement to the Settlement Class in accordance with the notice program discussed

23   below, will be paid by Defendants and not from the Common Fund, up to a

24   maximum of $1 million, to which the Settlement Administrator has agreed.

25   Settlement Agreement, §§ VI(C), Berns Decl., ¶17.

26        Once the Settlement is effective, after subtracting the Service Payments, the

27   entire balance of the Settlement Fund will be divided, on a *pro rata* basis, among

28   Settlement Class A Members who timely submit a valid claim form and Settlement

-9-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT C ISO MOTION FOR STAY OF PROCEEDINGS
PAGE 123**

1    Class B and C Members who do not exclude themselves from the Settlement.

2    Settlement Agreement, § VI(A).  The funds from any uncashed checks sent to

3    Settlement Class Members from the Settlement Fund will first be used to offset

4    administration and notice expenses, and then any remaining funds will be

5    distributed in a *cy pres* fund to the National Consumer Law Center, a not-for-profit

6    organization selected by Plaintiffs, and a not-for-profit organization to be selected

7    by Defendants prior to the Fairness Hearing.  *Id.*

8                     **2.    Loan Modification Program**

9         From December 18, 2010 through June 30, 2013, Defendants will offer

10   permanent loan modifications to eligible, qualified Settlement Class C Members

11   who reside in their homes and who are at least 60 days delinquent, and eligible,

12   qualified Settlement Class B Members who reside in their homes and who are in

13   "Imminent Default," due to financial hardship such as death of a borrower,

14   permanent or long-term disability, divorce, or other substantial reduction in income.

15   Settlement Agreement, §§ VI(E), I(1.33).

16        Eligible Settlement Class Members will first be considered for the federal

17   Home Affordable Modification Program ("HAMP"), and if the Settlement Class

18   Member does not qualify under HAMP or elects not to accept a HAMP

19   modification, Defendants will consider the Settlement Class Member for its new

20   modification program known as MAP2R (Mortgage Assistance Program 2).  The

21   goal of the MAP2R program is to reduce a Settlement Class Member's DTI[3] to

22   31% or less.  In order to accomplish this, Defendants will apply a series of steps to

23   reduce DTI, such as waiver of accrued interest and other charges, temporary

24   

─────────────────────

[3] "DTI" is the ratio of the Settlement Class Member's first-lien monthly mortgage obligations

25   (including monthly amounts for principal, interest, property taxes, hazard insurance, flood
     insurance, condominium association fees, and homeowners' association fees, as applicable,

26   regardless of whether any of the foregoing are included in the Settlement Class Member's
     Monthly Payment, and including any escrow payment shortage amounts subject to a repayment

27   plan) to the Settlement Class Member's gross monthly income, all determined in accordance with
     HAMP, as defined in Treasury's Supplemental Directive 9-01: Introduction of the Home

28   Affordable Modification Program, April 6, 2009.  Settlement Agreement, § 1.22.

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT G ISO MOTION FOR STAY OF PROCEEDINGS
PAGE 124

1  principal forgiveness (which can become permanent if the borrower makes timely
2  payments on account of the modified loan), and interest rate reduction. Once the
3  DTI of 31% is reached, the loan will be converted to a fully-amortizing loan and the
4  negative amortization feature will be eliminated. Settlement Agreement, § VI(E).

5      In order to ensure that Settlement Class Members are appropriately
6  considered for a MAP2R Modification in a timely manner, Defendants shall:

7      a.    Maintain a dedicated, adequately staffed help line to handle inquiries
8  from Settlement Class Members (including Spanish-speaking Settlement Class
9  Members), including Settlement Class B Members who believe that they are in
10  Imminent Default and wish to be considered for the Loan Modification Program;

11      b.    Assign a primary point of contact to each Settlement Class B Member
12  and Settlement Class C Member seeking a loan modification;

13      c.    Notify Settlement Class Members in writing within ten (10) days of
14  their submitting a modification request of any documents believed to be missing
15  and necessary for evaluation for a MAP2R loan modification; and

16      d.    Establish a formal second-look and escalation protocol for all
17  Settlement Class B Members and Settlement Class B Members seeking a loan
18  modification. Settlement Agreement, § VI(E)(8),

19      Settlement Class Members who do not qualify for HAMP or MAP2R
20  Modifications shall receive, within thirty (30) calendar days of the Defendants'
21  receipt of all required documentation from the Settlement Class Member, a written
22  description, which shall be copied to Lead Class Counsel, which clearly explains
23  the reasons that the modification was denied. *Id.*

24      **3.    Short-Sale/Deed-in-Lieu of Foreclosure Incentives Program**

25      Eligible Settlement Class B Members and Settlement Class C Members who
26  are unable to qualify for modifications under the HAMP or MAP2R guidelines and
27  who are otherwise qualified for short-sale or deed-in-lieu of foreclosure under the
28  Home Affordable Foreclosure Alternatives ("HAFA") guidelines will be offered

-11-

incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. These options will remain open through June 30, 2013. Settlement Agreement, § VI(F).

### 4. Plaintiffs' Litigation Costs and Fees

Subject to the Court's approval at a Rule 23(h) hearing, within five (5) business days after the Effective Date, Defendants shall pay attorneys' fees and costs in an amount not to exceed $25 million with respect to the Settlement of the claims of all Settlement Class Members. This amount will be paid separate from, and in addition to, the Settlement Fund. Settlement Agreement, § VI(B).

### 5. Service Payments

Within thirty (30) calendar days after the Effective Date, subject to Court approval, Service Payments in a total amount not to exceed $125,000 will be paid from the Settlement Fund to the Class Representatives. Settlement Agreement, § VII.

### 6. Release By Settlement Class Members

Following entry of Judgment, and upon the Effective Date, as defined in the Settlement Agreement, the Settlement Class will have released the "Released Parties" from the "Alleged Claims," all as defined in the Settlement Agreement, including a waiver of Civil Code § 1542. Settlement Agreement, § V.

### 7. Notice

Defendants will notify Settlement Class Members of the proposed Settlement terms as follows: (a) by having the Settlement Administrator mail, within 45 days of Preliminary Approval, the appropriate Settlement Notice to each member of the Settlement Class; and (b) by publishing a short-form Summary Notice in the main News section of *USA Today* for three consecutive days. Additionally, a dedicated web site (www.pickapaysettlement.com) will be established that will provide links to the Settlement Notices, key documents in this case, the Settlement Agreement, and other information to assist members of the Settlement Class in assessing their

-12-

rights and options under the proposed Settlement. Settlement Agreement, § X(B). As discussed above, all of the costs associated with the notice program will be paid directly by Defendants and not from the Common Fund.

### 8. Fairness Hearing

Following a 45-day objection and exclusion (opt-out) period, the Court will hold a Fairness Hearing and, if the Settlement is approved, enter a Judgment and Order of Dismissal providing Final Approval of the Settlement Agreement, certifying the Settlement Class, and dismissing with prejudice all claims by the Settlement Class that were asserted in this action. Settlement Agreement, §§ XII, I(1.26).

### D. The Proposed Implementation Schedule

The following schedule, drawn from the Settlement Agreement, sets forth a proposed sequence for the relevant dates and deadlines, assuming this court grants preliminary approval of the proposed Settlement Agreement.

| No later than 10 calendar days after preliminary approval | Defendants to notify appropriate federal and state officials (28 U.S.C. § 1715) |
| --- | --- |
| No later than 30 calendar days after preliminary approval | Defendants to provide addresses for all Settlement Class Members to Settlement Administrator; Defendants to advance to the Settlement Administrator the sums necessary to cover the costs of issuing the Settlement Notices and other Administration Expenses, up to maximum of $1 million |
| No later than 15 calendar days after receiving addresses | Settlement Administrator to mail Settlement Notices and post links to Settlement Agreement, Settlement Notices, Claim Form and case documents |

**EXHIBIT A - ISO MOTION FOR STAY OF PROCEEDINGS**
**PAGE 127**

| No later than 30 calendar days after preliminary approval (or as soon thereafter as publication schedule will permit) | Defendants to cause publication of Summary Notice in *USA Today* |
|---|---|
| No earlier than 90 calendar days after preliminary approval | Deadline for Settlement Class Members to mail Objections and requests for exclusion; deadline for Settlement Class A Members to file Claim Form |
| No later than 14 calendar days before Fairness Hearing | Parties to file joint motion for final approval, with Class Counsel filing a memorandum of points and authorities in support of such motion; Class Counsel to file motion requesting the Court's approval of the Fee Award and Service Payments; and Class Counsel to file a memorandum addressing any timely submitted Objections to the Settlement |
| No earlier than 130 calendar days after preliminary approval | Fairness Hearing |
| To be determined | Effective Date |
| No later than 5 business days after the Effective Date | Defendants to pay Fee Award to Class Counsel; Defendants to create Common Fund by paying or causing to be paid $50 million to Settlement Administrator |
| No later than 30 calendar days after the Effective Date | Settlement Administrator shall distribute payments from the Common Fund to Settlement Class Members; Settlement Administrator to pay Service Payments to Class Representatives |

## IV. PROVISIONAL CERTIFICATION OF THE SETTLEMENT CLASS IS WARRANTED

Before granting preliminary approval of a settlement, the Court must determine that the proposed settlement class is a proper class for settlement purposes. *See generally* Fed. R. Civ. P. 23(e); Manual for Complex Litigation (4th ed. 2004) § 21.632; *Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 620 (1997). All

-14-

of the Rule 23 criteria for certification of a class for litigation purposes, except manageability, apply to certification of a class for settlement purposes. *Amchem Prods.*, 521 U.S. at 620. Courts routinely and properly certify classes for settlement purposes only and the proposed certification of the class is entirely consistent with the applicable authorities. *Id.* at 619-29.

### A. Numerosity

The proposed Settlement Class meets the requirement of numerosity, in that it is comprised of hundreds of thousands of borrowers. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("The prerequisite of numerosity is discharged if the class is so large that joinder of all members is impracticable.").

### B. Commonality

The Ninth Circuit has made it clear that in the litigation context, the commonality requirement is to be "construed permissively." *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 559-600 (9th Cir. 2010), cert. granted, 2010 WL 3358931 (U.S. Dec. 6, 2010) (No. 10-277). Commonality can be established by a showing "that the class is united by a common interest." *See Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975) (holding that "slight differences in class members' positions" will not defeat commonality). Because the relevant standard for commonality is qualitative rather than quantitative, "one significant issue common to the class may be sufficient to warrant certification." *Dukes*, 603 F.3d at 559.

Here, the common questions of fact and law include the following:

> (a)   Whether the Pick-a-Payment loan documents (the "Loan Documents") failed to disclose that the payment amounts listed in the Note and TILDS were insufficient to pay both principal and interest;

> (b)   Whether the Pick-a-Payment loan documents failed to

-15-

**EXHIBIT 4 - INFORMATION FOR STAY OF PROCEEDINGS
PAGE 129**

1 disclose that negative amortization was absolutely certain to

2 occur if borrowers made payments according to the payment

3 schedule provided in the TILDS; and

4

  (c) Whether the Pick-a-Payment loan documents violated TILA.

5

**C. Typicality**

6

 A plaintiff's claim is typical "if it arises from the same event or practice or

7 course of conduct that gives rise to the claims of other class members and his or her

8 claims are based on the same legal theory." *De La Fuente v. Stokely- Van Camp,*

9 *Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Slight factual distinctions between the

10 named plaintiff and the claims of absent class members do not undermine

11 typicality. *In re Glassine & Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 304

12 (E.D. Pa. 1980). Rather, courts focus on the defendants' conduct and the plaintiff's

13 legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "Under the

14 rule's permissive standards, representative claims are 'typical' if they are

15 reasonably coextensive with those of absent class members; they need not be

16 substantially identical." *Hanlon*, 150 F.3d at 1020.

17 When it is alleged that the same unlawful conduct was directed at or affected

18 both the named plaintiffs and the classes that they seek to represent, the typicality

19 requirement is usually satisfied, irrespective of varying fact patterns which underlie

20 individual claims. *Smith v. University of Washington Law School*, 2 F.Supp. 2d

21 1324, 1342 (W.D. Wash. 1998) ("Typicality turns on the defendant's actions

22 toward the plaintiff class, not particularized defenses against individual class

23 members."). Furthermore, the test for typicality is whether other members have the

24 same or similar injury, whether the action is based on conduct which is not unique

25 to the named plaintiffs, and whether other class members have been injured by the

26 same course of conduct. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.

27 1992) (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). The

28

-16-

1  typicality requirement is construed liberally.  *Scholes v. Stone, McGuire &*
2  *Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992).  Accordingly, differences that may
3  exist in the amount of injury suffered by each class members do not render
4  plaintiffs' claims atypical.  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).
5          Here, Plaintiffs' claims are typical of the Settlement Class that they seek to
6  represent.  All of them entered into Pick-a-Payment loans and were subject to the
7  same undisclosed, or improperly disclosed terms challenged in these suits, and their
8  claims are "reasonably coextensive with those of absent class members."  *Dukes*,
9  603 F.3d at 613.  None of the Plaintiffs has any cognizable conflicts of interest with
10  the proposed classes, and they are represented by qualified and competent counsel.
11  Berns Decl., ¶¶32, 34-39, Exs. A-G.
12          **D.     Adequacy**
13          Plaintiffs will fairly and adequately protect the interests of the class for
14  purposes of this settlement.  The adequacy requirement has two prongs:  "(1) That
15  the representative parties' attorney be qualified, experienced, and generally able to
16  conduct the litigation; and (2) that the suit not be collusive and plaintiff's interests
17  not be antagonistic to the class."  *In re United Energy Corp. Solar Power Modules*
18  *Tax Shelter Inv. Sec. Litigation*, 122 F.R.D. 251, 257 (C.D. Cal. 1988).
19          Both prongs are met here.  First, Plaintiffs in the various actions have
20  retained counsel who are qualified and experienced to litigate this action.  The
21  Court appointed Class Counsel after consolidation by the order of the JPML and
22  these attorneys are highly experienced in consumer class actions and complex
23  litigation.  Second, Plaintiffs and Settlement Class Members do not have any
24  antagonistic interests.  On the contrary, Plaintiffs and the Settlement Class
25  Members are united in their common interest in pursuing claims against
26  Defendants.  Moreover, as discussed herein, this settlement was reached after
27  vigorous litigation and arms-length negotiations.
28

-17-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT 6 — INFORMATION FOR STAY OF PROCEEDINGS
PAGE 131**

1    **E.    Rule 23(b)**

2    Once the four prerequisites of Rule 23(a) are met, "the potential class must

3    also satisfy at least one provision of Rule 23(b)." *Rosario*, 963 F.2d at 1017; *see*

4    *also General Tel Co. v. Falcon*, 457 U.S. 147, 161 (1982). Here, the Settlement

5    Class satisfies Rule 23(b)(3), which states that a class may be certified when

6    "questions of law or fact common to the members of the class predominate over

7    any questions affecting only individual members, and […] a class action is superior

8    to other available methods for the fair and efficient adjudication of the

9    controversy."

10   The questions of law and fact common to all class members are set forth

11   above. These common issues predominate over any individual issues, as the claims

12   of the Settlement Class Members all turn on the sufficiency of the disclosures in the

13   form loan documents for Pick-a-Payment loans. Additionally, a class action is

14   clearly superior to other available methods for the fair and efficient adjudication of

15   the controversy because joinder of all class members would be impracticable. Fed.

16   R. Civ. P. 23(b)(3).

17   **F.    Nationwide Certification**

18   In this case, the claims "asserted by the class representatives are not

19   sufficiently anomalous" to non-California class members to justify denial of

20   certification. *Hanlon*, 150 F.3d. at 1022-23. The Court may reach this conclusion

21   without requiring a fifty-state comparison of all possible consumer claims that

22   might arise from the conduct alleged in this action. This is true for several reasons:

23   First, "to the extent distinct remedies exist, they are local variants of a generally

24   homogenous collection of causes which include products liability, breaches of

25   express and implied warranties, and 'lemon laws.'" *Id.* at 1011. Second, there is

26   little risk that non-California class members' substantive rights would be sacrificed,

27   given that "California's consumer protection laws are among the strongest in the

28   country." *Wershba v. Apple Computer, Inc.*, 91 Cal.App.4th 224, 242, 110

-18-

Cal.Rptr.2d 145 (2001) (affirming approval of nationwide class for claims based on California's Unfair Competition Law and Consumers Legal Remedies Act). Third, certification for purposes of approving a settlement does not require a showing that the class is "manageable," and thus does not implicate the concern that "claims of nonresident class members will require adjudication under the laws of the members' home states," creating a level of complexity that "results in common legal questions not predominating or makes nationwide class litigation unmanageable." *Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 915, 103 Cal.Rptr.2d 320 (2001). Fourth, "where the defendant is a California corporation (here, a California-based Delaware corporation) and some or all of the challenged conduct emanates from California," it is proper to apply California statutes to non-California members of a nationwide class. *Wershba*, 91 Cal.App.4th at 243. Fifth, "so long as the requisite significant contacts with California are shown to exist, sufficient to meet constitutional standards, the burden is on the parties challenging the nationwide certification to demonstrate that 'foreign law, rather than California law, should apply to class claims.'" *Washington Mutual*, 24 Cal.4th at 921 (certification of a nationwide class is proper where "the legal questions are sufficiently similar to be manageable and all other requirements for certification are satisfied."]); *Wershba,* 91 Cal.App.4th at 244.

Accordingly, nationwide certification is proper.

In short, the Settlement Class is suitable for certification, and the Court should certify the Settlement Class pursuant to Rule 23(b)(3), for purposes of granting preliminary approval of the Settlement.[4]

## V. PRELIMINARY APPROVAL OF THE TERMS OF THE PROPOSED SETTLEMENT IS WARRANTED

Settlements of complex class actions prior to trial are strongly favored. *See,*

---

[4] Defendants have agreed not to contest class certification solely for purposes of this Settlement. Settlement Agreement, § IV(A).

1     *e.g.*, *Churchill Village, LLC v. General Electric Co.*, 361 F.3d 566, 576 (9th Cir.

2     2004); *In re Pacific Enterprises Securities Litig.*, 47 F.3d 373, 378 (9th Cir. 1995);

3     and *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "[I]f

4     the proposed settlement appears to be the product of serious, informed, non-

5     collusive negotiations, has no obvious deficiencies, does not improperly grant

6     preferential treatment to class representatives or segments of the class, and falls

7     within the range of possible approval, then the court should direct that notice be

8     given to the class members of a formal fairness hearing." *Chun-Hoon v. McKee

9     Foods Corp.*, 2009 WL 3349549, at *2 (N.D. Cal. Oct. 15, 2009). The Ninth

10     Circuit has repeatedly ruled that the courts "put a good deal of stock in [class

11     settlements that are] the product of arms-length, non-collusive, negotiated

12     resolution." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 965 (9th Cir.

13     2009); *Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1027 (9th Cir. 1998).

14        Federal Rule of Civil Procedure 23(e) "requires the district court to

15     determine whether a proposed settlement is fundamentally fair, adequate, and

16     reasonable." *Hanlon*, 150 F.3d at 1026 (9th Cir. 1998). This "involves a two-step

17     process in which the Court first determines whether a proposed class action

18     settlement deserves preliminary approval and then, after notice is given to class

19     members, whether final approval is warranted." *Nat'l Rural Telecomms. Coop. v.

20     DirecTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

21        At the preliminary approval stage, a court must determine whether a

22     proposed settlement is "within the range of possible approval" and whether notice

23     should be sent to class members. *See Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th

24     Cir. 2003); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 205 (5th Cir.

25     1981); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007) ("To

26     determine whether preliminary approval is appropriate, the settlement need only be

27     potentially fair, as the Court will make a final determination of its adequacy at the

28     hearing on Final Approval, after such time as any party has had a chance to object

1  and/or opt out.").

2        Assessing a settlement proposal requires the district court to balance a

3  number of factors, including but not limited to:  ". . . the strength of the plaintiffs'

4  case; the risk, expense, complexity, and likely duration of further litigation; the risk

5  of maintaining class action status throughout the trial; the amount offered in

6  settlement; the extent of discovery completed and the stage of the proceedings; the

7  experience and views of counsel; the presence of a governmental participant; and

8  the reaction of the class members to the proposed settlement."  *Hanlon*, 150 F.3d at

9  1026 (citation omitted).  Other factors may include, *inter alia*:  "the advantages of

10  the proposed settlement versus the probable outcome," "the comparison of the

11  results achieved for individual class or subclass members by the settlement or

12  compromise and the results achieved or likely to be achieved for other claimants

13  pressing similar claims," "the reasonableness of any provisions for attorney fees,"

14  "the fairness and reasonableness of the procedure for processing individual claims

15  under the settlement," and "the apparent intrinsic fairness of the settlement terms."

16  MCL 4th § 21.62.

17        The fact that "the settlement could have been better . . . does not mean the

18  settlement presented was not fair, reasonable or adequate."  *Hanlon*, 150 F.3d. at

19  1027.  The district courts have "wide discretion in assessing the weight and

20  applicability of each factor."  *Nat'l Rural Telecomms. Coop.,* 221 F.R.D. at 526.

21  The factors are non-exclusive and not all need be shown.  *Churchill Village, L.L.C.*

22  *v. General Electric*, 361 F.3d 566, 576 n. 7 (9th Cir. 2004.  Indeed, "one factor

23  alone may prove determinative in finding sufficient grounds for court approval."

24  *Nat'l Rural Telecomms. Coop.,* 221 F.R.D. at 525; *Torrisi v. Tucson Elec. Power*

25  *Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (upholding settlement where one factor

26  (defendant's financial condition) predominated]).  "Ultimately, the district court's

27  determination is nothing more than an 'amalgam of delicate balancing, gross

28  

-21-

EXHIBIT A: INFORMATION FOR SHAREHOLDERS
PAGE 135

1  approximations, and rough justice.'"  *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at
2  526 (citations omitted).

3          The proposed Settlement of the Action easily satisfies the standards for
4  preliminary approval.

5          **A.      The Settlement Terms are Fair, Reasonable, and Adequate,**
6                   **Within the Range of Reasonableness**

7          The proposed Settlement "taken as a whole," is fundamentally fair, adequate,
8  and reasonable.  *Hanlon*, 150 F.3d at 1026.  The Settlement is "fair" because the
9  remedies offered are tailored to the circumstances of the various categories of
10 borrowers -- cash for all Settlement Class Members, and loan modifications for
11 Settlement Class Members who are currently in default or imminent default, or who
12 become in imminent danger of default over the next 30 months.

13         The Settlement is "reasonable" because the cash and modification remedies
14 directly and proportionately address the alleged injury from Defendants' alleged
15 failure to disclosure critical loan terms to borrowers, including that the subject Pick-
16 a-Payment loans were guaranteed to cause negative amortization even if borrowers
17 made the required payments.  *See, e.g.,* Corrected Second Amended Complaint
18 (*Mandrigues*, Docket No. 24), ¶¶ 29, 35, 71.  Thus, Settlement Class Members will
19 receive a refund of a portion of the negative amortization that they have paid or
20 incurred, while Settlement Class Members who are in default or imminent default,
21 or become in imminent danger of default, will also have the opportunity to modify
22 their loans to address the impact of the undisclosed negative amortization.

23         The Settlement is "adequate" because this relief is not any less valuable than
24 the economic relief Class Members might have obtained without using the class
25 action process, while avoiding the delay, risk and expense of litigation.  Here, out
26 of approximately 500,000 Class Members, only a handful of Borrowers have
27 brought individual claims against Defendants.  Thus, it is apparent that few Class
28 Members would be able to prove individual damages claims sufficient to justify the

-22-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES; MOTION FOR STAY OF PROCEEDINGS

EXHIBIT G ISO MOTION FOR STAY
PAGE 136

1  effort and expense of bringing an individual action.  There is thus little risk that the
2  Settlement will create real prejudice to any individual Class Member's rights.

3      Further, several of the balancing factors discussed above weigh in favor of
4  approval of the proposed Settlement Agreement:

5      **1.    Strength of Plaintiffs' case**:  If this case continued to be litigated, the
6  contested factual and legal issues of liability under TILA, state consumer, unfair
7  competition, and fraud laws stemming from the alleged nondisclosures, along with
8  contested class certification issues, would be extensive.  Approval of a settlement is
9  proper where "the settlement terms compare favorably to the uncertainties
10  associated with continued litigation regarding the contested issues in this case
11  [including where] . . . the Settlement provides Class Members with a meaningful
12  business resolution regarding contested issues." *Nat'l Rural Telecomms. Coop.*,
13  221 F.R.D. at 526.

14      **2.    Risk, expense, complexity, and likely duration of further litigation**:
15  "In most situations, unless the settlement is clearly inadequate, its acceptance and
16  approval are preferable to lengthy and expensive litigation with uncertain results."
17  *Id*. (citations omitted).  The proposed Settlement Agreement is not "clearly
18  inadequate," given that, among other things, it provides for a Settlement Fund of
19  $50 million, which will not be diminished by attorneys' fees or notice and
20  administration costs, and an extensive loan modification program that will be in
21  place until June 30, 2013.

22      **3.    The amount offered in settlement**:  "In assessing the consideration
23  obtained by the class members in a class action settlement, '[i]t is the complete
24  package taken as a whole, rather than the individual component parts, that must be
25  examined for overall fairness.' In this regard, it is well-settled law that a proposed
26  settlement may be acceptable even though it amounts to only a fraction of the
27  potential recovery that might be available to the class members at trial." (*Id*.

28

-23-

1   (citations omitted).)  The proposed Settlement Agreement, taken as a whole, is fair,

2   as discussed above.

3       **4.**    **The experience and views of counsel**:  "'Great weight' is accorded to

4   the recommendation of counsel, who are most closely acquainted with the facts of

5   the underlying litigation."  This is because '[p]arties represented by competent

6   counsel are better positioned than courts to produce a settlement that fairly reflects

7   each party's expected outcome in the litigation.'  Thus, 'the trial judge, absent

8   fraud, collusion, or the like, should be hesitant to substitute its own judgment for

9   that of counsel.'"  *Id.* (citations omitted).  Here, in pursuing this action aggressively

10   for over three years, Class Counsel have demonstrated a high degree of competence

11   in the litigation of this case, and strongly believe that the Settlement is a fair,

12   adequate, and reasonable resolution of the Settlement Class's disputes with

13   Defendants and is preferable to continued litigation.  Berns Decl., ¶¶28, 29, 41.

14   There is no evidence of fraud or collusion in the settlement negotiations, which

15   were conducted at arms-length, before Justice Trotter, a respected retired Judge for

16   the California Court of Appeals and experienced mediator with JAMS.  Berns

17   Decl., ¶¶11, 29 .

18       Accordingly, Plaintiffs respectfully request that the proposed Settlement

19   Agreement be preliminarily approved.

20       **B.**    **The Court Should Order Dissemination Of The Proposed Class**

21           **Notice**

22       Rule 23(e)(1)(B) states that, "[t]he court must direct notice in a reasonable

23   manner to all class members who would be bound by a proposed settlement,

24   voluntary dismissal, or compromise."  Rule 23(e) requires that notice of a proposed

25   settlement inform class members of the following:  (1) the nature of the pending

26   litigation; (2) the general terms of the proposed settlement; (3) that complete

27   information is available from the court files; and (4) that any class member may

28   appear and he heard at the fairness hearing.  *Newberg on Class Actions* § 8.32, at

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT C - IN FORMATION FOR STAY PROCEEDINGS**
**PAGE 138**

1  262-68.  The notice must also indicate an opportunity to opt out, that the judgment

2  will bind all class members who do not opt out, and that any member who does not

3  opt out may appear through counsel.  Fed. R. Civ. P. 23(c)(2).

4       Here, Plaintiffs request approval of the proposed Settlement Notices and

5  Summary Notice.  The Settlement Notices and Summary Notice meet all of the

6  requirements of Rule 23(e):  they identify the Plaintiffs and the Defendants and

7  describe the lawsuit and the Settlement Class in a straightforward manner;

8  succinctly describe the essential terms of the proposed Settlement, and identify all

9  parties against whom claims are being released; provide Settlement Class Members

10 with information on how to opt-out of the Settlement Class or to object to the

11 Settlement and provide all applicable deadlines for such action; and inform

12 Settlement Class Members that if they do not exclude themselves from the

13 Settlement Class, and the Settlement is approved, they will be bound by the

14 resulting judgment.  Settlement Agreement, Exs. 1-3.  In addition, the notices

15 instruct Settlement Class Members to contact Lead Class Counsel to obtain more

16 detailed information and provides information regarding counsel's fee and expense

17 application.  *Id.*  In short, the Settlement Notices will provide the necessary

18 information for Settlement Class Members to make an informed decision regarding

19 the proposed Settlement.

20      As a general rule, due process requires individualized notice where the names

21 and addresses of class members "may be ascertained through reasonable effort,"

22 *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 177 (1974), and "is appropriate,

23 for example, if class members are required to take action—such as filing claims—to

24 participate in the judgment, or if the court orders a settlement opt-out opportunity

25 under Rule 23(e)(3)."  *See* Fed. R. Civ. P. 23(e)(1), 2003 Committee Note.  As

26 courts have repeatedly held, notice by direct mail or e-mail and publication are

27 often the "best practicable" notice under the circumstances.  *Silber v. Mabon*, 18

28 F.3d 1449, 1453-54 (9th Cir. 1994).

-25-

1    Here, the proposed Settlement provides for direct mail notice to each

2  borrower, bolstered by a publication effort including a press release announcing the

3  Settlement, publication in *USA Today* for three consecutive days, and a dedicated

4  internet site with expansive information.  Settlement Agreement, § X(B).  The

5  comprehensive notice program here more than sufficiently satisfies all due process

6  requirements.  *See, e.g., Perry v. FleetBoston Financial Corp.*, 229 F.R.D. 105, 113

7  (E.D. Pa. 2003)  (direct mail notice to credit card holders with one day

8  advertisement in *USA Today* is best practicable notice)*; In re Compact Disc

9  Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 218 (D. Me. 2003)

10  (individual mailed notice normally constitutes best practicable notice).

11       **C.    The $125,000 Service Payment to Plaintiffs is Reasonable**

12    Class representatives "are eligible for reasonable incentive payments," after

13  consideration of relevant factors, including the actions the representative has taken

14  to protect the interests of the class and the degree to which the class has benefited

15  from those actions.  *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).

16  Plaintiffs, several of whom have provided document discovery and appeared for

17  depositions, should be rewarded for taking the initiative to file their actions, and for

18  their role in reaching an early Settlement providing for valuable relief to the

19  Settlement Class.  Indeed, the Ninth Circuit has approved incentive awards to class

20  representatives that far exceed the modest award proposed to be distributed among

21  Plaintiffs (an average of less than $5,000 per Plaintiff).  *Id.* at 976-77.

22  **VI.   APPOINTMENT OF PLAINTIFFS AS CLASS REPRESENTATIVES**

23       **AND THEIR ATTORNEYS AS CLASS COUNSEL IS WARRANTED**

24    Plaintiffs' claims are predicated on alleged facts identical to those alleged on

25  behalf of the putative class, and their interests in seeking relief through settlement

26  are aligned with those of the class.  Plaintiffs should thus be appointed as

27  representatives of the Settlement Class.  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,

28  396 F.3d 96, 113 (2d Cir. 2005).

-26-

1    Class Counsel (Lead Counsel Jeffrey K. Berns and David M. Arbogast, and

2    the members of Plaintiffs' Executive Steering Committee) should be appointed

3    Class Counsel for purposes of certification of the Settlement Class, as required by

4    Rule 23(g).  "An attorney appointed to serve as class counsel must fairly and

5    adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B).  The

6    appointment is to be based on the court's consideration of "the work counsel has

7    done in identifying or investigating potential claims in the action," "counsel's

8    experience in handling class actions, other complex litigation, and claims of the

9    type asserted in the action," "counsel's knowledge of the applicable law," "the

10   resources counsel will commit to representing the class," and "any other matter

11   pertinent to counsel's ability to fairly and adequately represent the interests of the

12   class."  Class Counsel amply meets these standards, and thus should be appointed

13   Class Counsel in connection with the Settlement.  *See* Berns Decl., ¶¶34-39, Exs.

14   A-G.

## VII.   A HEARING FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND FOR PAYMENT OF ATTORNEYS' FEES SHOULD BE SET, ALONG WITH PRE-HEARING EXCLUSION AND OBJECTION DEADLINES

19   "Once the judge is satisfied as to the certifiability of the class and the results

20   of the initial inquiry into the fairness, reasonableness, and adequacy of the

21   settlement, notice of a formal Rule 23(e) fairness hearing is given to the class

22   members."  MCL 4th § 21.633.  The proposed date for the Fairness Hearing is at

23   least 130 days after preliminary approval.  The proposed deadline for mailing in

24   exclusion or objection notices is 90 days after preliminary approval.

25   These dates are appropriate because, by the time of the Fairness Hearing,

26   Defendants will have had to comply with their obligations to enable the Settlement

27   Administrator to mail the Settlement Notices (including a Claim Form for

28   Settlement Class A Members), to publish the Summary Notice in *USA Today*, and

-27-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT 4, IN SUPPORT OF MOTION FOR STAY OF PROCEEDINGS
PAGE 141

1   to place the Settlement and Summary Notices, Claim Form, Settlement Agreement

2   and case documents on the dedicated settlement website.  Following dissemination

3   and publication of the Settlement and Summary Notices, Settlement Class Members

4   will have over six weeks to mail in their requests for exclusion or objections,

5   allowing for sufficient time thereafter for the parties to address any objections in the

6   moving papers.  Settlement Agreement, § XII.  Additionally, Settlement Class A

7   Members will have had the same amount of time to mail in, or complete on-line,

8   their Claim Forms.  Settlement Agreement, §§ I(1.9), VIII(B).

9        Moreover, by the time of the Fairness Hearing, the Court will be in a position

10  to rule on Class Counsel's Rule 23(h) motion for attorneys' fees, and for Service

11  Payments to Plaintiffs.

12       Plaintiffs request that the Fairness Hearing and Rule 23(h) hearing be set for

13  no earlier than 130 days after Preliminary Approval.  Submitted herewith is a

14  proposed Preliminary Approval Order, which has been approved by Defendants.

15  **VIII. THE COURT SHOULD APPOINT RUST CONSULTING, INC. AS**

16         **SETTLEMENT ADMINISTRATOR**

17       The parties have retained Rust Consulting, Inc. ("Rust") to act as Settlement

18  Administrator. As is set forth in Rust's Resume (Berns Decl., Ex. H) Rust has

19  provided settlement administration for over 2,500 class action settlements. As such,

20  Rust has the requisite experience to act as Settlement Administrator in this case.

21  **IX.  CONCLUSION**

22       For all the foregoing reasons, Plaintiffs respectfully request that the Court

23  enter an Order in the form lodged herewith:  (1) Preliminarily Approving Class

24  Action Settlement; (2) Provisionally Certifying a Settlement Class; (3) Approving

25  Form and Methods of Class Notice, Claim Form and Release; (4) Appointing Class

26  Representatives, Class Counsel and Settlement Administrator; and (5) Scheduling

27  Hearing on Motions for Final Approval of Settlement and for Payment of

28  Attorneys' Fees and Service Payments.

**EXHIBIT C - ISO MOTION FOR STAY OF PROCEEDINGS
PAGE 142**

1

2

Respectfully submitted,

Dated: December 9, 2010

3

ARBOGAST & BERNS LLP

4

By: /s/ Jeffrey K. Berns
  David M. Arbogast
  Jeffrey K. Berns

5

6

Lead Counsel for Plaintiffs and the Proposed
Settlement Class

7

SMOGER & ASSOCIATES
Gerson H. Smoger
3175 Monterey Boulevard
Oakland, California 94602-3560
Tel 510.531.4529 / Fax 510.531.4377

8

9

10

WILLIAMS CUKER BEREZOFSKY
Mark R. Cuker (Admitted *Pro Hac Vice*)
1617 J.F.K. Boulevard, Suite 800
Philadelphia, Pennsylvania 19103-1819
Tel 215.557.0099 / Fax 215.557.0673

11

12

13

BROWNE WOODS GEORGE LLP
Eric M. George
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Tel 310.274.7100 / Fax 310.275.5697

14

15

16

SEEGER WEISS LLP
Christopher A. Seeger (Admitted *Pro Hac Vice*)
One William Street
New York, New York 10004
Tel 212.584.0700 / Fax 212.584.0799

17

18

19

KABATEK BROWN KELLNER LLP
Brian S. Kabateck
644 S. Figueroa Street
Los Angeles, California 90017
Tel 213.217.5000 / Fax 213.217.5010

20

21

RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC
A. Hoyt Rowell, III (Admitted *pro hac vice*)
1037-A Chuck Dawley Blvd.
Mt. Pleasant, South Carolina 29464
Tel 843.727.6500 / Fax 843.216.6509

22

23

24

25

26

27

28

-29-

1
2
3

BUXNER LAW
Evan D. Buxner (Admitted *pro hac vice*)
230 South Bemiston, Suite 500
St. Louis, Missouri 63105
Tel 314.720.0623 / Fax 314.725.9597

4

Members of Plaintiffs' Executive Steering
Committee

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-30-

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**EXHIBIT 4 ISO MOTION FOR STAY PROCEEDINGS**
**PAGE 144**

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

IN RE: WACHOVIA CORP.
"PICK-A-PAYMENT" MORTGAGE
MARKETING AND SALES PRACTICES
LITIGATION

Case No. M:09-CV-2015-JF

**AGREEMENT AND STIPULATION OF
SETTLEMENT OF CLASS ACTION**

This Agreement and Stipulation of Class Action Settlement ("Agreement") is entered into by and among plaintiffs Dolores Mandrigues, Juanita Jones, Al F. Minyen, Wilma R. Minyen, Mark Clauson, Christina Clauson, Bonnie Mincey, Stephanie O'Rourke, Tina Singer, Chad R. Whatley, Anita H. Whatley, Jerrold L. Rotruck, Clara C. Rotruck, Judith M. Holley, Roland Harris, Gloria Harris, Emogen White, Vanessa L. McLeaurin, by Travis A. Budd, personal representative, James W. Collins, Jr., Michael Brunkhorst, Jayme Brunkhorst, Michael T. Harber, Mary Harber, Mark Chaney, Gloria Chaney, and Terry L. Costello (the "Class Representatives"), on behalf of themselves and as representatives of the Settlement Class described herein, and defendants World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A. (the "Defendants"). The Class Representatives and the Defendants are collectively referred to herein as "the Parties."

This Agreement is made for the sole purpose of attempting to consummate settlement of this action on a class-wide basis. As detailed below, in the event that the Court does not execute and file an Order Granting Final Approval of Settlement, or in the event that the associated Judgment does not become final for any reason, this Agreement shall be deemed null and void

and shall be of no effect or force whatsoever.  The Parties agree to cooperate fully with each other to accomplish the terms of this Agreement, including but not limited to execution of such documents and taking such other action as may be reasonably necessary to implement the terms of this Agreement.

## FACTUAL BACKGROUND AND RECITALS

1.     Prior to commencing any actions against Defendants, Plaintiffs' (as defined in Section 1.54 hereafter) counsel conducted a thorough investigation of the underlying facts and claims in this action, including the review of over five hundred (500) sets of loan documents from individuals who had received Pick-a-Payment mortgage loans from World Savings Bank, FSB.

2.     On August 30, 2007, Dolores Mandrigues filed a Complaint in the Court (as defined in Section 1.15 hereafter) captioned *Dolores Mandrigues, individually and on behalf of all others similarly situated v. World Savings, Inc., World Savings Bank, FSB, Wachovia Mortgage Corporation, and Does 1 through 10 inclusive*, N.D. Cal., Case No. 5:07-cv-4497 ("*Mandrigues*").  The Complaint alleged causes of action for violations of the federal Truth-in-Lending Act ("TILA"), violations of California's Unfair Competition Law, breach of contract, and breach of the implied covenant of good faith and fair dealing.  The *Mandrigues* action was assigned to the Honorable Jeremy Fogel.  On October 11, 2007, Dolores Mandrigues filed a First Amended Complaint in *Mandrigues*, and, on December 14, 2007, during the initial case management conference, Dolores Mandrigues, through counsel, orally moved the Court for leave to file a Second Amended Complaint, which was granted.  On December 31, 2007, Dolores Mandrigues filed a Second Amended Complaint and a Corrected Second Amended Complaint in *Mandrigues*, naming Juanita Jones, Al F. Minyen, Wilma R. Minyen, Mark Clauson, and Christina Clauson as additional plaintiffs and putative class representatives.  The operative

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 147**

pleading in *Mandrigues* is the Corrected Second Amended Complaint.  The Corrected Second Amended Complaint added, among other things, a cause of action for fraud.

In January 2008, Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation filed a motion to dismiss *Mandrigues*, which asserted that the relevant loan documents complied with TILA and that the state law causes of action were preempted by the Home Owners Loan Act ("HOLA").  The *Mandrigues* plaintiffs opposed the motion.  In April 2008, the Court denied the motion to dismiss.

During 2008, the *Mandrigues* plaintiffs served multiple sets of interrogatories and requests for production of documents on Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation.  Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation also served discovery requests on each of the putative class representatives and took their depositions.  Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation also took the depositions of some third-party brokers who brokered the subject loan transactions.  Production by Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation included over fifteen thousand (15,000) pages of documents and approximately twenty (20) hours of video and audio materials, all of which was reviewed by Plaintiffs' counsel.

As explained in Paragraph 3 below, also during 2008, other borrowers filed additional lawsuits against the Defendants, which generally asserted the same claims and allegations as alleged by the *Mandrigues* plaintiffs.  As explained in Paragraph 4 below, in November 2008, a petition to coordinate those actions was filed with the Judicial Panel on Multidistrict Litigation (the "MDL Panel") and those actions subsequently were coordinated and transferred to the Court.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 148**

In November 2008, the *Mandrigues* plaintiffs filed a motion for class certification and a motion for preliminary injunction to prohibit Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation from foreclosing on the homes of any putative class members. In January 2009, the Court stayed the class certification motion and all other litigation pending a decision from the MDL Panel. It did, however, hold a hearing on the preliminary injunction motion, which it subsequently denied.

3.      During 2008 and continuing through 2010, other putative class actions and single-plaintiff actions were filed against the Defendants alleging claims substantially similar to those alleged against the Defendants in *Mandrigues*, including:

a.      *Bonnie Mincey, Stephanie O'Rourke, and Tina Singer, individually and on behalf of all others similar situated v. World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation*, D.S.C., Case No. 2:07-cv-3762 ("*Mincey*"). The *Mincey* Complaint was filed on November 16, 2007 and an Amended Complaint, adding additional plaintiffs, was filed on January 18, 2008. On February 21, 2008, Defendants Golden West Financial Corporation and Wachovia Corporation filed their motion to dismiss, and Defendant World Savings Bank, FSB filed its answer as well as a motion for judgment on the pleadings. On April 4, 2008, the *Mincey* plaintiffs filed a response to Golden West Financial Corporation and Wachovia Corporation's motion to dismiss, and a cross-motion for judgment on the pleadings as to the claims alleged against Defendant World Savings Bank, FSB. On August 15, 2008, the *Mincey* court issued an order granting Golden West Financial Corporation and Wachovia Corporation's motion to dismiss, and granting in part and denying in part the motions for judgment on the pleadings (the "August 15, 2008 Order").

EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 149

Defendant World Savings Bank, FSB filed a motion for reconsideration of the August 15, 2008 Order, to which the *Mincey* plaintiffs responded. After receiving information that the Defendants and/or their agents were contacting Pick-a-Payment mortgage loan borrowers to refinance or modify their loans, the *Mincey* plaintiffs filed a Motion to Require Defendants to Provide Refinancing Documents and Information under Rule 23(d), seeking information regarding contacts with putative class members and the modification programs initiated by the Defendants. The *Mincey* court did not rule on World Savings Bank, FSB's motion for reconsideration or the *Mincey* plaintiffs' Motion to Require Defendants to Provide Refinancing Documents and Information before the MDL Panel issued its order coordinating the actions.

      b.      *Laura Johnson v. Wachovia Mortgage Corporation, Equity Source Home Loans LLC, Don Haupt, and John Does #1 - #10*, D.N.J., Case No. 2:08-cv-04147 ("*Johnson*"). The *Johnson* Complaint was filed on July 3, 2008 and an Amended Complaint adding class allegations was filed on February 13, 2009.

      c.      *Chad R. Whatley, Anita H. Whatley, Jerrold L. Rotruck, and Clara C. Rotruck, individually and on behalf of others similarly situated v. World Savings Bank, FSB, now known as Wachovia Mortgage, FSB, Golden West Financial Corporation, and Wachovia Corporation*, N.D. Fla., Case No. 4:08-cv-380 ("*Whatley*"). The *Whatley* Complaint was filed on August 25, 2008. The First Amended Complaint, which added additional plaintiffs, was filed on September 11, 2008. Defendants World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation filed their motions to dismiss on October 22, 2008. The *Whatley* plaintiffs' responses in opposition to the motions to dismiss were filed on November 10, 2008. Pursuant to the *Whatley* court's

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 150**

local rule requiring the filing of a motion for class certification within 90 days of the filing of a putative class action complaint, the *Whatley* plaintiffs filed their motion for class certification and supporting materials on November 24, 2008. The *Whatley* action was subsequently stayed pending resolution of the MDL petition.

        d.    *Judith M. Holley, Roland Harris, Gloria Harris, Emogen White, Vanessa L. McLeaurin, and James W. Collins, Jr., individually and on behalf of others similarly situated v. World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation*, D. Md., Case No. 1:08-cv-02307 ("*Holley*"). The *Holley* Complaint was filed on September 4, 2008. Defendants World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation filed their motions to dismiss on October 20, 2008. The *Holley* plaintiffs' responses in opposition to the motions to dismiss were filed on November 12, 2008. Defendants World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation filed their replies in support of their motions to dismiss on December 4, 2008. Subsequently, *Holley* was stayed pending resolution of the MDL petition.

        e.    *Michael Brunkhorst and Jayme Brunkhorst v. World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation*, S.D. Ill., Case No. 3:09-cv-00127 ("*Brunkhorst*"). The *Brunkhorst* Complaint was filed on February 17, 2009. On April 28, 2009, Defendant World Savings Bank, FSB filed its answer to the *Brunkhorst* Complaint, and Defendants Golden West Financial Corporation and Wachovia Corporation filed their motion to dismiss.

        f.    *Michael T. Harber and Mary Harber v. World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation*, E.D. Mo., Case No. 4:09-cv-

00258 ("*Harber*"). The *Harber* Complaint was filed on February 17, 2009. On April 28, 2009, Defendant World Savings Bank, FSB filed its answer to the *Harber* Complaint, and Defendants Golden West Financial Corporation and Wachovia Corporation filed their motion to dismiss.

g.   *Mark Chaney, Gloria Chaney, and Terry L. Costello v. Wachovia Mortgage, FSB, f/k/a World Savings Bank, FSB; Wachovia Bank, FSB, f/k/a World Savings Bank, FSB-TX; and Golden West Financial Corporation*, D. Ariz., Case No. 2:10-cv-01001-MHB ("*Chaney*"). The *Chaney* Complaint was filed on May 5, 2010. On August 23, 2010, Defendants Wachovia Mortgage, FSB, Wachovia Bank, FSB, and Golden West Financial Corporation filed their motion to dismiss. The *Chaney* plaintiffs and Defendants Wachovia Mortgage, FSB, Wachovia Bank, FSB, and Golden West Financial Corporation subsequently agreed to stay further briefing on the motion to dismiss pending continued settlement negotiations.

h.   *Joseph Henning v. Wachovia Mortgage Corporation and Wachovia Mortgage, FSB,* D. Mass, Case No. 1:09-cv-11053-MLW ("*Henning*"). The *Henning* Complaint was filed on May 4, 2009, and on October 20, 2009, Defendant Wachovia Mortgage Corporation filed a motion for summary judgment.

i.   *Bernardino Bettinelli and Carol G. Bettinelli v. Wells Fargo Home Mortgage, Inc*., D. Mass., Case No. 1:09-cv-11079-MLW ("*Bettinelli*"). The *Bettinelli* Complaint was filed on June 23, 2009 and an Amended Complaint was filed on June 24, 2009. On October 28, 2009, Defendant Wells Fargo Home Mortgage filed its motion to dismiss, and the *Bettinelli* plaintiffs filed their opposition to the motion to dismiss on November 24, 2009. Defendant Wells Fargo Home Mortgage filed its reply in support of

its motion to dismiss on December 31, 2009.

j.    *Fattu Salia v. World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation*, D. Md., Civil Action No. DKC-2010-1553 ("*Salia*").  The *Salia* Complaint was filed on June 11, 2010.  On July 2, 2010, Defendants World Savings Bank, FSB, Golden West Financial Corporation, and Wachovia Corporation filed their motions to dismiss.

4.    In November 2008, the *Mincey* plaintiffs filed with the MDL Panel a motion to centralize the *Mandrigues*, *Mincey*, *Holley*, and *Whatley* actions for coordinated or consolidated pretrial proceedings.  On February 13, 2009, the MDL Panel transferred *Mincey*, *Holley*, and *Whatley* to the Court and consolidated those actions with *Mandrigues* as *In re Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015-JF.  The MDL Panel subsequently transferred *Brunkhorst*, *Harber*, *Johnson, Chaney, Henning*, *Bettinelli*, and *Salia* to the Court, and also consolidated those actions with *Mandrigues*.  The *Mandrigues*, *Mincey*, *Johnson*, *Whatley*, *Holley*, *Brunkhorst*, *Harber, Chaney, Henning, Bettinelli*, and *Salia* actions now are collectively referred to as the *In re Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015-JF (the "Lawsuit").

5.    In August 2009, Plaintiffs requested that the Court dissolve the January 2009 stay entered in *Mandrigues*.  At the same time, the Defendants requested that Plaintiffs file a consolidated complaint for all of the coordinated actions in the Lawsuit, while Plaintiffs requested that the Court conduct a hearing concerning the pending class certification motion in *Mandrigues*, which had been fully briefed since late 2008.  The Court agreed to allow a class certification motion on the TILA claims in *Mandrigues* to proceed, along with summary

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 153**

judgment motions from both sides on the TILA claims in *Mandrigues*.

6. In December 2009, Plaintiffs filed motions for summary judgment and class certification concerning the TILA claims in *Mandrigues*, while Defendants filed their own summary judgment motion concerning those claims. In January 2010, both sides filed their opposition and reply briefs.

7. Since March 2009, the Parties have engaged in extensive settlement negotiations. At all times, the Parties' negotiations were adversarial, non-collusive, and at arms' length. As explained in Paragraphs 1 through 6 above, prior to and during these negotiations, the Parties engaged in vigorous, and often contentious, litigation in many of the actions that comprise the Lawsuit.

8. In February 2010, the Parties commenced mediation with Retired Justice John Trotter. Thereafter, as progress in the negotiations was being made, the Court agreed, on multiple occasions, to continue the hearing on the pending motions in *Mandrigues*. Ultimately, an agreement in principal was reached with Justice Trotter's assistance.

## GENERAL STATEMENTS

9. The Class Representatives and Class Counsel (as defined in Sections 1.12 and 1.10 hereafter) believe that the claims asserted in the Lawsuit have merit. The Class Representatives and Class Counsel, however, recognize and acknowledge the uncertainty and risks inherent in litigation, along with the significant expense and length of continued proceedings necessary to prosecute the litigation against the Defendants through trial and possible appeal. The Class Representatives and Class Counsel also are mindful of the potential problems of proof and possible defenses to the Alleged Claims (as defined in Section 1.6 hereafter). After careful consideration and after participating in seven (7) full-day mediation sessions over the past twenty-

one (21) months, the Class Representatives and Class Counsel have concluded that it is desirable that this class action lawsuit be fully and finally settled in the manner and upon the terms and conditions set forth in this Agreement.  Both the Class Representatives and Class Counsel believe that the settlement set forth in this Agreement is fair, reasonable, and adequate and confers substantial benefits upon the Settlement Class (as defined in 1.66 hereafter) and each of the Settlement Class Members (as defined in Section 1.67 hereafter).

10.     The Parties are sufficiently familiar with the facts of the Lawsuit and the applicable law so as to warrant settlement at this time.  The Parties have engaged in extensive discovery in order to evaluate the relative strength of the Parties' claims and defenses, including written discovery, document production, and depositions.  As discussed above, the Parties also have conducted significant briefing in connection with the motions in this case, including the briefing of dispositive motions in multiple cases and a motion for class certification in *Mandrigues*.  The Parties have mediated the case with two different mediators on multiple occasions.  In connection with each mediation session, the Parties exchanged information, data, and documents necessary to fully and fairly evaluate the claims of existing and putative class members.

11.     The Parties are represented by competent counsel experienced in class action litigation and have had the opportunity to consult with counsel prior to the submission of this Agreement to the Court.

12.     Nothing in this Agreement, or the fact of this Agreement itself, shall be construed or deemed an admission of liability, culpability, negligence, or wrongdoing of any kind on the part of the Defendants with respect to the Alleged Claims.  The Defendants deny all the claims and contentions alleged by the Class Representatives in the Lawsuit.  Nonetheless, the Defendants have

concluded that further litigation would be protracted and expensive, and would also divert management and employee time. The Defendants have taken into account the uncertainty and risks inherent in litigation, especially in multi-party cases. The Defendants therefore have concluded that it is desirable that the Lawsuit be fully and finally settled in the manner and upon the terms and conditions set forth in this Agreement.

13. Pursuant to Federal Rule of Evidence 408 and California Evidence Code Sections 1119 and 1152, this Agreement and any related documents filed or created in connection with it shall be inadmissible as evidence in any proceeding, except as necessary to approve, interpret, or enforce this Agreement.

## TERMS OF SETTLEMENT

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the Class Representatives, for themselves and the Settlement Class (as defined in Section 1.66 hereafter), and the Defendants that, subject to the terms and conditions precedent set forth below, the Lawsuit and the Alleged Claims (as defined in Section 1.6 hereafter) shall be finally and fully compromised, released, resolved, relinquished, discharged, and settled; and the Lawsuit shall be dismissed in accordance with Sections XIV and XV of this Agreement, without any adverse findings or conclusions against the Defendants or anyone else, upon and subject to the terms and conditions of this Agreement, as follows:

## I. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings specified below:

1.1. *Usage*. The following rules apply to the construction of this Agreement:

    1.1.1. The singular includes the plural and the plural includes the singular;

    1.1.2. "Include" and "including" are not limiting;

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 156**

1.1.3.  The headings of the Sections and Subsections are for convenience only and shall not constitute a part of this Agreement, and shall not affect the meaning, construction, or effect of the applicable provisions of this Agreement;

1.1.4.  Words such as "hereunder," "hereto," "hereof," and "herein," and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Agreement and not to any particular Section, subsection, or clause hereof.

1.2.  "*Accrued Interest*" means scheduled periodic interest owed in accordance with the applicable mortgage note.

1.3.  "*Additional Defendants*" means Wells Fargo & Company, John Stumpf, and Marc C. Oman, who are named defendants in the action entitled *Charles and Jerri H. Holmes and John D. Moller v. Wells Fargo and Company, Wachovia Mortgage Corporation, World Savings, Inc., John Stumpf, and Marc C. Oman*, N.D. Cal., Case No. 5:10-cv-02406-JF, and who will be named as Released Entities in the Judgment.

1.4.  "*Administration Expenses*" means the expenses incurred by the Settlement Administrator in handling the administration of the settlement, including, but not limited to, expenses related to the processing of the Claim Forms submitted by Settlement Class A Members pursuant to this Agreement and Notice Expenses.

1.5.  "*Agreement*" means this Agreement and Stipulation of Class Action Settlement.

1.6.  "*Alleged Claims*" means the claims that are alleged in the Lawsuit and the Related Actions, including, but not limited to, claims that the Defendants and the

Additional Defendants violated TILA, state unfair competition laws, state unfair and deceptive trade practices statutes, and state consumer protection laws; breached the terms of the Parties' contracts; engaged in fraudulent misrepresentations or omissions; and breached the implied duty of good faith and fair dealing in connection with the Plaintiffs' Pick-a-Payment mortgage loans by failing to adequately disclose the loans' potential for negative amortization, providing Borrowers with inaccurate payment schedules, failing to disclose the interest rates on which those payment schedules were based, and failing to disclose the terms of the Parties' legal obligations, entitling them to damages, statutory penalties, restitution, punitive damages, interest, attorneys' fees, costs, injunctive relief, and other legal or equitable relief under state and federal law.

1.7.     "***Borrower***" means the obligor(s) on a Pick-a-Payment mortgage loan note and the title holder(s) who signed the security instrument subjecting certain real estate property as collateral for such note.

1.8.     "***Claim Form***" means the paper and electronic claim forms referenced in Section VIII(B) of this Agreement and approved by the Court.  The Claim Form will require the Settlement Class A Member to provide basic information, including the address of the property that secured his or her Pick-a-Payment mortgage loan.  The Claim Form will not require notarization, but will require that the information supplied be attested to as true according to the Settlement Class A Member's best knowledge and belief.

1.9.     "***Claims Deadline***" means the date by which all Claim Forms must be postmarked or submitted online to be considered timely and shall be no earlier than ninety (90) calendar days after the Date of Preliminary Approval (as defined in Section 1.17

hereafter). The Claims Deadline shall be clearly set forth in the Settlement Notices, in the Claim Form, on the Settlement website, and in the Court's order granting Preliminary Approval of the Agreement.

1.10. "**_Class Counsel_**" means Lead Class Counsel and the attorneys comprising the Executive Steering Committee.

1.11. "**_Class Period_**" means August 1, 2003 through and including December 31, 2008.

1.12. "**_Class Representatives_**" means Dolores Mandrigues, Juanita Jones, Al F. Minyen, Wilma R. Minyen, Mark Clauson, Christina Clauson, Bonnie Mincey, Stephanie O'Rourke, Tina Singer, Chad R. Whatley, Anita H. Whatley, Jerrold L. Rotruck, Clara C. Rotruck, Judith M. Holley, Roland Harris, Gloria Harris, Emogen White, Vanessa L. McLeaurin, by Travis A. Budd, personal representative, James W. Collins, Jr., Michael Brunkhorst, Jayme Brunkhorst, Michael T. Harber, Mary Harber, Mark Chaney, Gloria Chaney, and Terry L. Costello.

1.13. "**_Class Representative Award_**" means such funds as may be awarded by the Court to the Class Representatives to compensate them for their efforts in bringing the Lawsuit and achieving the benefits of this Agreement on behalf of the Settlement Class.

1.14. "**_Corporate and Default-Related Advances_**" shall mean any default- or foreclosure-related fee or cost assessed to a Borrower's account for expenditures such as attorneys' fees, statutory expenses, foreclosure fees and costs, fees for property valuations, property inspections, property preservation, and protective advances.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 159**

1.15. "*Court*" means the United States District Court for the Northern District of California, the Honorable Jeremy F. Fogel, currently presiding, or any other court that obtains competent jurisdiction of the Lawsuit.

1.16. "*Date of Final Approval*" means the date the Court enters an order granting final approval of the Settlement.

1.17. "*Date of Preliminary Approval*" means the date the Court enters an order granting preliminary approval of the Settlement.

1.18. "*Default*" means that a Borrower's mortgage payment is sixty (60) or more calendar days past due.

1.19. "*Defendants*" means World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A.

1.20. "*Defendants' Counsel*" means T. Thomas Cottingham, III of Winston & Strawn LLP and Jack R. Nelson of Reed Smith LLP.

1.21. "*Deferred Interest*" means the interest charges added to the Borrower's principal balance as a result of the Borrower making a payment that did not include all of the interest that Defendants claimed was owed on the Pick-a-Payment mortgage loan.

1.22. "*DTI*" *or* "*Debt-to-Income Ratio*" means the ratio of the Borrower's first-lien monthly mortgage obligations (including monthly amounts for principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees, and

homeowners' association fees, as applicable, regardless of whether any of the foregoing are included in the Borrower's Monthly Payment (defined in Section 1.41 hereafter), and including any escrow payment shortage amounts subject to a repayment plan) to the Borrower's gross monthly income, all determined in accordance with HAMP, as defined in Treasury's Supplemental Directive 9-01: Introduction of the Home Affordable Modification Program, April 6, 2009.

1.23. "*Effective Date*" means the date, if any, on which the Judgment entered pursuant to this Agreement becomes Final.

1.24. "*Escrow-related Advances*" means advances for items such as property taxes, hazard insurance, homeowners' association or condominium fees advanced on behalf of the Borrower by World Savings Bank, FSB, now known as Wachovia Mortgage, FSB.

1.25. "*Executive Steering Committee*" means Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

1.26. "*Fairness Hearing*" means the hearing before the Court where the Parties will request that Judgment be entered by the Court approving the Agreement as fair, reasonable, and adequate, approving the Fee Award, and approving the Class Representative Award, which hearing shall occur no earlier than one hundred and thirty (130) calendar days following the Date of Preliminary Approval.

1.27. "***Fee Award***" means the amount of attorneys' fees and reimbursement of costs awarded by the Court to Class Counsel to compensate Class Counsel for all of the past, present, and future attorneys' fees, costs (including court costs), expenses, and disbursements incurred by them, their experts, staff, and consultants in connection with the Lawsuit and the Related Actions.

1.28. "***Final***" means that the Judgment has become final, binding, and effective and no longer subject to appellate review, which shall be ten (10) business days following the Court's Final Approval of the Settlement should no Settlement Class Members file Objections to the Settlement; or, if Objections to the Settlement are filed, then no earlier than one (1) business day following the latest of the following events: (a) the date upon which the time expires for filing or noticing any appeal of the Court's Judgment ordering the dismissal with prejudice of the Alleged Claims and approving the Agreement as fair, reasonable, and adequate; (b) if there is an appeal or appeals, other than an appeal or appeals solely with respect to the Fee Award, the date of completion, in a manner that finally affirms and leaves in place the Judgment without any material modification, of all proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or certiorari, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand); or (c) the date of final dismissal of any appeal or the final dismissal of any proceeding on certiorari.

1.29. "***Final Approval***" means final approval of the Settlement by the Court.

1.30.   "**_Fully Amortizing_**" means a Pick-a-Payment mortgage loan in which the Borrower's Monthly Payment covers the interest accrued and due each month, as well as paying a portion of the principal balance such that the balance of the loan should be paid in full at the expiration of the term of the loan if all Monthly Payments are made when due.

1.31.   "**_Good Standing_**" means that a Borrower is not currently and, since the effective date of the Borrower's MAP2R Modification agreement, has not ever been delinquent by the equivalent of three (3) full Monthly Payments at the end of the month in which the last of the three (3) delinquent payments was due.  Once lost, Good Standing cannot be restored even if the Borrower subsequently cures the default.

1.32.   "**_HAMP_**" means the Home Affordable Modification Program administered by the United States Department of the Treasury.

1.33.   "**_Imminent Default_**" describes a Borrower (as defined in Section 1.7) who the Defendants have determined, in accordance with applicable HAMP guidance, as necessary, that default by the Borrower in making scheduled payments on his or her Pick-a-Payment mortgage loan is reasonably foreseeable.  In assessing whether a Borrower is facing Imminent Default, the Defendants will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA.  Additionally, the fact that a Borrower is projected to Recast to a fully-amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four (4) contractual Monthly Payments (as defined in Section 1.41 hereafter) using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI (as

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS**
**PAGE 163**

defined in Section 1.22), shall be considered as a factor in the determination of Imminent Default.

1.34.   "***Judgment***" means the Order to be entered by the Court approving this Agreement, without material modifications that are unacceptable to any of the Parties, as fair, adequate, and reasonable in accordance with applicable jurisprudence, confirming the certification of the Class for settlement purposes, and issuing such other findings and determinations as the Court or the Parties deem necessary and appropriate to effectuate all terms of this Agreement.

1.35.   "***Lawsuit***" means the action styled *In re Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015-JF, the Honorable Jeremy F. Fogel presiding.

1.36.   "***Lead Class Counsel***" means Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP.

1.37.   "***LTV***" means the current ratio of the unpaid principal balance of the Pick-a-Payment mortgage loan, less any amounts of principal forbearance, to the Market Value of the residential property that secures such Pick-a-Payment mortgage loan as of the time reviewed for eligibility for modification.

1.38.   "***MAP2R***" shall mean Wells Fargo's Mortgage Assistance Program 2 which is based on the terms described in this Agreement.

1.39.   "***Market Rate***" is the Freddie Mac Weekly Primary Mortgage Market Survey ("PMMS") Rate for 30-year fixed-rate conforming loans, rounded to the nearest

0.125 percent, as of the date that the modification or option is prepared, plus one hundred (100) basis points.

1.40.   "**Market Value**" shall mean the value of the residential property that secures the Pick-a-Payment mortgage loan as determined by the Defendants in reliance on an appraisal report prepared not more than one hundred eighty (180) calendar days before the date of determination, broker price opinion prepared not more than one hundred twenty (120) calendar days before the date of determination, or automated valuation model prepared not more than ninety (90) calendar days before the date of determination.  Notwithstanding the foregoing, for the purposes of Section VI(E) of this Agreement, the Defendants may rely on the most recent value available in its system of record for determining the value of the residential property.

1.41.   "**Monthly Payment**" shall mean the amount that is due from the Borrower on a monthly basis according to the note, and shall include any principal amounts, monthly accrued interest, monthly amounts to apply to escrow for taxes, hazard insurance, and homeowners' association or condominium fees.

1.42.   "**Negative Amortization**" shall have the same meaning as Deferred Interest.

1.43.   "**Notice Expenses**" means all reasonable costs and expenses expended in the execution of the Notice Plan, including (a) all reasonable costs and expenses incurred in connection with preparing, printing, mailing, disseminating, posting, promoting, emailing, internet hosting, and publishing the Settlement Notices to the Settlement Class of the proposed settlement and identifying and notifying Settlement Class Members of the proposed settlement; (b) all reasonable costs and expenses incurred in connection with operating and maintaining an Interactive Voice Response System or

live response personnel to provide further information and address questions relating to the Settlement Notices; and (c) any other necessary notice or notice-related expenses.

1.44.   "**Notices of Class Action Settlement**" or "**Settlement Notices**" have the meaning set forth in Section X of this Agreement.

1.45.   "**Notice of Intention to Appear and Object**" means the written communication that must be filed with the Court prior to the last day of the Opt-Out Period/Objection Deadline by a Class Member in order to object to the approval of any portion of this Agreement.

1.46.   "**Notice Plan**" means the plan described in Section X(B) of this Agreement for disseminating the Settlement Notices to the Settlement Class Members.

1.47.   "**NPV Test**" means the calculation and comparison of the net present value ("NPV") of conducting a modification of a Pick-a-Payment mortgage loan versus the NPV of not conducting a modification of the same Pick-a-Payment mortgage loan. The NPV formula has been explained to Lead Class Counsel and will be disclosed to the Court, *in camera*, if the Court requests.  If the NPV of the modification would be greater than the NPV if there was no modification, the result is deemed "positive."  If the NPV of the modification would be less than the NPV if there was no modification, the result is deemed "negative."

1.48.   "**Objection**" shall have the same meaning as Notice of Intention to Appear and Object.

1.49. "**Opt-Out**" means to opt-out of the Settlement Class certified for purposes of this Settlement as provided in Section XII below.

1.50. "**Opt-Out Period/Objection Deadline**" means the date to be set by the Court in the Lawsuit for a Settlement Class Member to submit a Request for Exclusion or a Notice of Intention to Appear and Object. The deadline for submitting a Request for Exclusion or a Notice of Intention to Appear and Object will be clearly set forth in the Settlement Notices and shall be no earlier than ninety (90) calendar days after the Date of Preliminary Approval.

1.51. "**Parties**" means the Class Representatives and the Defendants.

1.52. "**Person**" means any individual, corporation, trust, partnership, limited liability company, or other legal entity and their respective predecessors, successors, or assigns.

1.53. "**Pick-a-Payment mortgage loan**" shall mean a Pick-a-Payment mortgage loan originated or acquired by World Savings Bank, FSB or Wachovia Mortgage, FSB that is or was secured by the Borrower's principal residence. The Pick-a-Payment mortgage loan permitted the Borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. In particular, for each payment, the Borrower could choose from up to four (4) options: (1) a fully-amortized 30-year interest and principal payment such that the loan would be satisfied in the traditional 30-year term; (2) a fully-amortized 15-year interest and principal payment such that the loan would be satisfied in a 15-year term; (3) an "interest-only payment"; or (4) a lesser, minimum payment. When a payment was insufficient to

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 167**

pay the interest the Defendants claimed was owed, unpaid interest was added to the loan's principal balance and the outstanding principal balance increased.

1.54.    "*Plaintiffs*" means Dolores Mandrigues, Juanita Jones, Al F. Minyen, Wilma R. Minyen, Mark Clauson, Christina Clauson, Bonnie Mincey, Stephanie O'Rourke, Tina Singer, Chad R. Whatley, Anita H. Whatley, Jerrold L. Rotruck, Clara C. Rotruck, Judith M. Holley, Roland Harris, Gloria Harris, Emogen White, Vanessa L. McLeaurin, by Travis A. Budd, personal representative, James W. Collins, Jr., Michael Brunkhorst, Jayme Brunkhorst, Michael T. Harber, Mary Harber, Mark Chaney, Gloria Chaney, and Terry L. Costello, and each of the Settlement Class Members.

1.55.    "*Plan of Allocation*" shall have the meaning set forth in Section VI(A) hereafter.

1.56.    "*Preliminary Approval*" means the Court's conditional certification of the Settlement Class, preliminary approval of this Agreement, as well as approval of the Settlement Administrator and approval of the form and methods of dissemination of the Settlement Notices, the Notice Plan, and the Claim Form.

1.57.    "*Recast*" means a recalculation establishing a new fully-amortizing periodic payment triggered by the unpaid principal balances cap, or date certain, such that the payment increase as a result of such Recast exceeds seven and one-half percent (7.5%).

1.58.    "*Related Actions*" means the following pending actions:

    a.   *Charles and Jerri H. Holmes and John D. Moller v. Wells Fargo and Company, Wachovia Mortgage Corporation, World Savings, Inc., John*

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS**
**PAGE 168**

*Stumpf, and Marc C. Oman*, N.D. Cal., Case No. 5:10-cv-02406-JF ("*Holmes*"); and

b. *Eric Hodge v. World Savings, Inc., World Savings, FSB, Wachovia Mortgage Corporation, and Does 1 through 10*, N.D. Cal., Case No. 5:09-cv-01598-JF ("*Hodge*").

1.59. "*Release*" shall have the meaning set forth in Section V(A) hereafter.

1.60. "*Released Entities*" means World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; Wells Fargo & Company; Wells Fargo Bank, N.A., John Stumpf; and Marc C. Oman, and each and all of their respective past, present, and future parents, subsidiaries, affiliated companies and corporations, and each and all of their respective past, present, and future directors, officers, managers, employees, general partners, limited partners, principals, agents, insurers, reinsurers, shareholders, attorneys, advisors, representatives, predecessors, successors, divisions, joint venturers, assigns, or related entities, and each and all of their respective executors, successors, assigns, and legal representatives.

1.61. "*Releasing Party*" means each of the Plaintiffs and any other person claiming by or through any Plaintiff and his/her/its spouse, child, heir, associate, co-owner, attorney, agent, administrator, devisee, predecessor, successor, assignee, representative of any kind, shareholder, partner, director, employee, or affiliate.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 169**

1.62.   "***Request for Exclusion***" is a timely written communication by or on behalf of a Borrower in the Settlement Class stating that he or she wishes to be excluded from the Settlement Class.  To be timely, any Request for Exclusion must be postmarked on or before the last day of the Opt-Out Period/Objection Deadline.

1.63.   "***Settlement***" means the terms and conditions set forth in this Agreement.

1.64.   "***Settlement Administrator***" means, subject to approval by the Court, a mutually-agreeable independent third-party that will oversee the dissemination of the Settlement Notices pursuant to the Notice Plan, the payment of any Settlement Benefits due to Settlement Class Members, and the collection and maintenance of Requests for Exclusion and Notices of Intent to Appear and Object, as set forth in this Agreement.

1.65.   "***Settlement Benefits***" means the benefits a Settlement Class Member may receive pursuant to this Agreement as described in Section VI hereafter.

1.66.   "***Settlement Class***" means all Settlement Class A Members, Settlement Class B Members, and Settlement Class C Members (as defined hereinafter), which classes are to be certified for purposes of Settlement only, following the entry of an appropriate Order by the Court.  Excluded from the Settlement Class are the Defendants, the Additional Defendants, and any respective parent, subsidiary, affiliate, or control person of the Defendants and the Additional Defendants, as well as the officers, directors, agents, servants, and employees of the Defendants and Additional Defendants, or any judge presiding over the Lawsuit and/or any of the Related Actions, and the immediate family members of any such Person(s).

1.67. "*Settlement Class Member*" or "*Class Member*" means all of those Persons and entities who are members of the Settlement Class and who do not submit a valid Request for Exclusion that is postmarked on or before the last day of the Opt-Out Period/Objection Deadline.

1.68. "*Unknown Claims*" means claims that could have been raised in the Lawsuit and/or in the Related Actions and that the Releasing Parties, or any one of them, do not know or suspect to exist, which, if known by him, her, or it, might affect his, her, or its agreement to release the Released Entities or the Alleged Claims, or might affect his, her, or its decision to agree, object to, or not object to the Settlement. Upon the Effective Date, any Releasing Party shall be deemed to have, and shall have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits of § 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Upon the Effective Date, each Releasing Party shall be deemed to have, and shall have, waived any and all provisions, rights, and benefits conferred by any law of any state, the District of Columbia or territory of the United States, or principle of common law, or the law of any jurisdiction outside the United States, which is similar, comparable, or equivalent to § 1542 of the California Civil Code. Plaintiffs acknowledge that they may discover facts in addition to or different from those that they now know or

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 171**

believe to be true with respect to the subject matter of the Release, but that it is their intention to finally and forever settle and release the Alleged Claims, notwithstanding any Unknown Claims they may have, as that term is defined in this Paragraph.

## II. FOR SETTLEMENT PURPOSES ONLY

This Agreement, whether or not consummated, and any actions or proceedings taken pursuant to this Agreement, are for settlement purposes only, and neither the fact of any provision contained in this Agreement, nor any action taken hereunder or in filings or arguments made with the Court in connection with seeking the approval of this Agreement, shall constitute, or be construed as, or be admissible as evidence as any admission of the validity of any claim or any fact alleged by the Plaintiffs in the Lawsuit, the Related Actions, or in any other pending or future action, nor as an admission of any wrongdoing, fault, violation of law, or liability of any kind on the part of the Defendants or the Additional Defendants, or as an admission by the Defendants or the Additional Defendants of any claim or allegation made in the Lawsuit, the Related Actions, in any other pending or future action, nor as an admission by the Plaintiffs, Settlement Class Members, or Class Counsel of the validity of any fact or defense asserted against them in the Lawsuit, the Related Actions, or in any pending or future other action, nor as an admission as to any other fact or matter of any kind.

## III. REQUIRED EVENTS AND COOPERATION BY THE PARTIES

### A. Preliminary Approval

No later than December 10, 2010, Class Counsel shall submit this Agreement to the Court for its Preliminary Approval and shall move the Court, without objection from the Defendants or any of the Additional Defendants, for one or more orders, which by their terms shall:

1.      Appoint the Class Representatives as the representatives of the Settlement Class;

2.      Appoint Class Counsel;

3.      Certify the Settlement Class under Rule 23(e) of the Federal Rules of Civil Procedure for settlement purposes only and preliminarily approve this Agreement for purposes of issuing notice to the Settlement Class;

4.      Approve the retention of a Settlement Administrator;

5.      Approve the form and contents of the Settlement Notices and the method of their dissemination to the members of the Settlement Class; and

6.      Schedule the Fairness Hearing to review Objections regarding this Settlement, to consider the Settlement's fairness, reasonableness, and adequacy, to consider the application for the Fee Award, to consider the application for the Class Representative Award, and to consider whether the Court shall issue a Judgment approving this Agreement, granting Class Counsel's application for fees and expenses and the Class Representative Award, and dismissing the Lawsuit and the Related Actions with prejudice.

B.      **Cooperation/Timing**

The Parties shall, in good faith, cooperate, assist, and undertake all reasonable actions and steps in order to accomplish these required events on the schedule set by the Court.  The Parties also agree that time is of the essence and that the dates set forth herein are material terms of this Agreement.

## IV. CERTIFICATION OF SETTLEMENT CLASSES

For the sole and limited purpose of Settlement only, the Parties stipulate to and request that the Court certify Settlement Class A, Settlement Class B, and Settlement Class C (defined below), which stipulation is contingent upon the occurrence of the Effective Date. Should the Effective Date not occur, this Agreement shall be void and will not constitute, be construed as, or be admissible in evidence as, an admission of any kind or be used for any purpose in the Lawsuit, the Related Actions, or in any other pending or future action.

The Court's certification of Settlement Class A, Settlement Class B, and Settlement Class C shall not be deemed to be an adjudication of any fact or issue for any purpose other than the accomplishment of the provisions of this Agreement, and shall not be considered the law of the case, *res judicata*, or collateral estoppel in the Lawsuit, the Related Actions, or any other proceeding unless and until the Court enters an order of Judgment, and whether or not the Judgment becomes Final, the Parties' agreement to class certification for settlement purposes only (and any statements or submissions made by the Parties in connection with seeking the Court's approval of this Agreement) shall not be deemed to be any stipulation as to the propriety of class certification, or any admission of fact or law regarding any request for class certification, in any other action or proceeding, whether or not involving the same or similar claims. In the event the Court does not enter an order of Judgment, or the Judgment does not become Final, or the Agreement is otherwise terminated or rendered null and void, the Parties' agreement to certification of the Settlement Class for settlement purposes shall be null and void and the Court's certification order shall be vacated, and thereafter no class or classes will remain certified; provided, however, that Class Representatives and Class Counsel may thereafter seek certification of the same or a new class or classes before the Court, and the Defendants and the

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 174**

Additional Defendants may oppose such certification on any available grounds. Nothing in this Agreement shall be argued as support for, or admissible in, an effort to certify any class in this Court or any other court if the Court does not enter an order of Judgment and the Judgment does not become Final, nor shall anything herein be admissible in any proceeding to certify this or any other classes in any other court under any circumstances.

A.    **Settlement Class A**

For the sole and limited purpose of Settlement only, the Parties stipulate to and request that the Court certify Settlement Class A pursuant to Rule 23 as follows:

> All current and former Borrowers of World Savings Bank, FSB, now known as Wachovia Mortgage, FSB ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that, as of the date of the loan's funding, was secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, no longer have a Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, paid off the loan personally, or have already obtained a loan modification that converted the loan from a Pick-a-Payment mortgage loan.

B.    **Settlement Class B**

For the sole and limited purpose of Settlement only, the Parties stipulate to and request that the Court certify Settlement Class B pursuant to Rule 23 as follows:

> All current Borrowers of World Savings Bank, FSB, now known as Wachovia Mortgage, FSB ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that is secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still have a Pick-a-Payment mortgage loan

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 175**

and are not in Default.

C. **Settlement Class C**

For the sole and limited purpose of Settlement only, the Parties stipulate to and request

that the Court certify Settlement Class C pursuant to Rule 23 as follows:

> All current Borrowers of World Savings Bank, FSB, now known as Wachovia Mortgage, FSB ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that is secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still have a Pick-a-Payment mortgage loan and are in Default.

## V. RELEASES

A. **The Release**: In consideration for the Settlement Benefits described herein, each

and all of the Plaintiffs hereby agree to and by operation of law shall be deemed to agree to fully,

finally, and completely release and forever discharge the Alleged Claims and any and every

actual or potential known or unknown claim, liability, right, demand, suit, matter, obligation,

damage, loss or cost, action or cause of action, of every kind and description that the Releasing

Party has or may have, including assigned claims and Unknown Claims, asserted or unasserted,

latent or patent, that is, has been, or could have been or in the future might be asserted by any

Releasing Party in the Lawsuit, the Related Actions, any other case consolidated in the Lawsuit,

or in any other action or proceeding in this Court, or any other court, administrative venue,

tribunal or arbitration or other forum, regardless of the type or amount of relief or damages

claimed, against any of the Released Entities arising out of the Alleged Claims, the origination of

the Settlement Class Member's Pick-a-Payment mortgage loan, the manner in which the

Defendants applied the Settlement Class Member's payments to principal and interest, negative

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 176**

amortization, the Pick-a-Payment mortgage loan's potential for negative amortization, the disclosure of the Pick-a-Payment mortgage loan's potential for negative amortization, and the disclosure of the manner in which payments would be applied to principal and interest.

B.　　Subject to the provisions of Section V(A), nothing in this Release shall preclude any Settlement Class Member from later negotiating a modification of the terms of their Pick-a-Payment mortgage loan with the Defendants.

C.　　The Plaintiffs hereby agree and acknowledge, and by operation of law will be deemed to agree and acknowledge as of the Effective Date, that each and all of the provisions of this Section V, separately and severally, constitute essential terms of this Agreement and shall be construed in favor of effectuating a complete settlement of the Lawsuit and the Related Actions.

## VI.　SETTLEMENT BENEFITS

A.　　**Common Fund**.  The Defendants shall establish a Common Fund in the amount of Fifty Million and No/100 Dollars ($50,000,000.00) for the benefit of all Settlement Class Members.  The Defendants shall pay or cause to be paid to the Settlement Administrator the total sum of $50 million within five (5) business days after the Effective Date.  The distribution of the Common Fund to Settlement Class Members shall be based upon a Plan of Allocation that divides the total amount of the Common Fund, after deduction of the Class Representative Award, by the total number of (1) Settlement Class A Members who timely submit a valid Claim Form pursuant to the process described in Section VIII(B) hereafter and (2) all Settlement Class B and Settlement Class C Members.  Settlement Class B and Settlement Class C Members will not be required to submit a Claim Form to receive payment.  Settlement Class Members shall be entitled to obtain only one (1) payment from the Common Fund, regardless of the number of Pick-a-Payment mortgage loans the Settlement Class Members obtained during the Class Period.

The Settlement Administrator will be responsible for distributing payments to the Settlement Class A Members who timely submit a valid Claim Form and to all Settlement Class B and Settlement Class C Members, pursuant to the Plan of Allocation. All payments to Settlement Class A Members who timely submit a valid Claim Form and to Settlement Class B and Settlement Class C Members, pursuant to the Plan of Allocation, will be by check, sent by first class mail to the address provided in the valid Claim Form for each Settlement Class A Member who timely submits a valid Claim Form, and to the last known address for each Settlement Class B and Settlement Class C Member. Each check will state on its face that the check will expire and become null and void unless cashed within ninety (90) calendar days of the date of issuance. Any check to a Settlement Class Member that is returned to the Settlement Administrator with a forwarding address will be re-sent to that forwarding address and the Settlement Administrator's database will be updated with the forwarding address information. For any check to a Settlement Class Member that is returned to the Settlement Administrator without a forwarding address, the Settlement Administrator shall check for an NCOA® update or conduct an Accurint® search to determine the Settlement Class Member's location, if possible. If any check to a Settlement Class Member is not cashed sixty (60) calendar days after the date of the instrument, the Settlement Administrator shall send a reminder notice by first class mail to that Settlement Class Member. The total amount of all checks that are returned as undeliverable, with no forwarding address, or that remain uncashed ninety (90) calendar days after the date of issuance of the instrument shall first be used to reimburse the Defendants for Administration Expenses, with any remaining funds to become part of a *cy pres* fund to be distributed equally to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 178**

B.     **Fee Award**.  Class Counsel will apply to the Court for an award of attorneys' fees and costs in a total amount not to exceed Twenty-Five Million and No/100 Dollars ($25,000,000.00).  The Defendants will not object to the request so long as it does not exceed $25,000,000.00, and the Defendants will pay the amount awarded by the Court, up to but not more than $25,000,000.00, to Class Counsel as compensation for attorneys' fees and costs.  This payment is separate from and in addition to any other payments agreed to as part of this Settlement.  The Defendants shall pay such amount, as ordered by the Court, within five (5) business days after the Effective Date, by wire transfer to an account designated by Lead Class Counsel, and such payment shall constitute complete consideration for all work performed and all expenses and costs incurred to date and for all work to be performed and all expenses and costs to be incurred through the completion of the Lawsuit, the Related Actions, and this Settlement, other than those costs described in Section VI(C) below.

C.     The Defendants shall pay all Administration Expenses in an amount not to exceed One Million and No/100 Dollars ($1,000,000.00) separate from and in addition to any other payments agreed to as part of this Settlement.

D.     The Defendants shall not be obligated to pay more than the amount of the Common Fund ($50,000,000.00), plus the amount of the Fee Award approved by the Court, Administration Expenses not to exceed $1,000,000.00, any costs associated with the Loan Modification Program discussed in Section VI(E) below, and the HAFA/Short Sale/Deed-in-Lieu of Foreclosure payments discussed in VI(F) below, in total settlement of the Lawsuit, including all Settlement Class Member payments, Administration Expenses, the Class Representative Award, the Fee Award, and any other amounts whatsoever.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 179**

E.     **Loan Modification Program**.   Commencing on December 18, 2010 and continuing until June 30, 2013, the Defendants shall make loan modifications available for Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members in accordance with the following provisions of this Section VI(E).  Such loan modifications shall be in addition to the amounts paid pursuant to the Common Fund, the Fee Award, and Administration Expenses described in Sections VI(A), (B), and (C) of this Agreement.

1.     *Loan Modifications To Be Considered*.   Subject to the provisions contained in Section VI(E)(4) and consistent with federal requirements, each Settlement Class B Member in Imminent Default, who later becomes in Imminent Default, or who later becomes in Default, and all Settlement Class C Members first shall be considered for a HAMP Modification.  Subject to the provisions contained in Section VI(E)(4), Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who do not qualify for or elect not to accept a HAMP Modification shall be considered for a MAP2R Modification on the terms as outlined in Sections VI(E)(2), (3), and (5) of this Agreement.

2.     *MAP2R Modification*.   Subject to the provisions contained in Section VI(E)(4), Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who do not qualify for or elect a HAMP Modification shall be considered for a MAP2R Modification on the terms as outlined in Sections VI(E)(3) and (5) of this Agreement. The following process shall commence upon receipt of the documents described in

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 180**

Section VI(E)(7) and subsequent verification that the Settlement Class Member's DTI is above thirty-one percent (31%). If a loan is modified under MAP2R, the loan will be converted to a fully-amortizing loan and the negative amortization feature will be eliminated.

3. ***Waiver of Prepayment Penalties***. The Defendants will waive all prepayment penalties and assess no fees in connection with a MAP2R Modification. The Defendants shall not require a Borrower to make any up-front payment of arrears as part of the MAP2R Modification process.

4. ***Borrowers With Prior Modifications***. Settlement Class Members who have received earlier loan modifications not pursuant to this Agreement will not be eligible to be considered for new loan modifications under this Agreement.

5. ***MAP2R Waterfall***. The Defendants will apply the following waterfall, in the order listed below, until the Settlement Class Member's Monthly Payment reaches a DTI of thirty-one percent (31%). The DTI may be slightly higher than thirty-one percent (31%) if the next step or action within the waterfall will result in a DTI below thirty-one percent (31%). Once a DTI as close as possible to thirty-one percent (31%) is reached, the Defendants are not required to apply any additional steps in the waterfall, nor actions within a step. If any step in the waterfall is already achieved, the Defendants will proceed to the subsequent step. If all steps of the waterfall have been exhausted and a DTI of thirty-one percent (31%) cannot be achieved, the Defendants are not required to offer a MAP2R Modification. Following application of the waterfall, all loans must pass the NPV test (as outlined in Section 1.47 and Section VI(E)(6) before a MAP2R Modification must be offered. The MAP2R Modification waterfall is as follows:

a.    ***Step 1***:  Waive all Accrued Interest, outstanding late charges, and outstanding fees.

b.    ***Step 2***:  Escrow-related Advances and Corporate and Default-Related Advances first will be capitalized, then immediately and permanently forgiven.  If this forgiveness combined with the waiver of all Accrued Interest, outstanding late charges, and outstanding fees in Section VI(E)(5)(a) does not equal a number that represents ten percent (10%) of the unpaid principal balance (calculated by multiplying the pre-modification unpaid principal balance by ten percent (10%)), then Deferred Interest, if any exists, will be waived until the total of the waived Accrued Interest, Escrow-related Advances, outstanding late charges, outstanding Corporate and Default-Related Advances, and Deferred Interest results in a number that represents ten percent (10%) of the unpaid principal balance.  In the absence of Deferred Interest, only Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, and Corporate and Default-Related Advances will be forgiven.  While Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, and Corporate and Default-Related Advances will be waived for Settlement Class B Members in Imminent Default and all Settlement Class C Members, regardless of LTV, forgiveness of Deferred Interest will be applied only to the extent that it does not reduce the Settlement Class Member's current LTV below one hundred percent (100%), even if the amount of such forgiveness represents less than ten percent (10%) of the unpaid principal balance.

c.      ***Step 3***:   Forgive principal until an LTV of one hundred fifty percent (150%) is achieved.

d.      ***Step 4***:   Extend the loan term and re-amortize the loan in one (1) month increments to a maximum term of four hundred eighty (480) months.

e.      ***Step 5***:   Forbear principal with the opportunity to be forgiven, as outlined in Section VI(E)(5)(h), until an LTV of one hundred twenty-five percent (125%) is achieved.  The principal forbearance amount is non-interest bearing and non-amortizing.   The amount of principal forbearance that is not forgiven will result in a balloon payment fully due and payable upon the earliest of the transfer of ownership of the property, payoff of the interest-bearing unpaid principal balance, or maturity of the loan.  Should the Defendants choose to participate in HAMP Principal Reduction Alternative ("PRA"), Supplemental Directive 10-05, the LTV level of this step shall be adjusted from one hundred twenty-five percent (125%) to one hundred fifteen percent (115%) for modifications done on a prospective basis from the date the Defendants elect to participate in the PRA directive.

f.      ***Step 6***:   Reduce the interest rate in .125% increments.  In all cases, the interest rate shall not be reduced below a floor of two percent (2%).  If the interest rate after modification is below the Market Rate, this reduced rate will be in effect for the first three (3) years following the date of the loan modification. Thereafter, it will be increased by a maximum of one percent (1%) per year at each twelve (12) month anniversary date of the original modification until it reaches the Market Rate, at which time the rate shall be fixed for the remaining

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 183**

loan term. If the interest rate after modification is above or equal to the Market Rate, then that resulting rate shall become the permanent rate for the remaining loan term. In no event will a step rate increase result in a greater than fifteen percent (15%) increase in the portion of the monthly payment for principal and interest. If it does, then the rate shall only be increased by the amount that results in an interest rate such that the increase in the monthly principal and interest portion of the payment is no greater than fifteen percent (15%); thereafter, the rate will continue to increase according to the terms above each year until the Market Rate is ultimately reached.

g. *Step 7*: Forbear principal without the opportunity for conditional forgiveness until an LTV of one hundred percent (100%) is reached.

h. *Step 8*: Conditional Forgiveness. Principal forborne under Section VI(E)(5)(e) will be forgiven if the Settlement Class Member who received a MAP2R Modification is in Good Standing on the first, second, and third anniversaries of the loan modification. On each of the above anniversary dates that such Settlement Class Member is in Good Standing, equal portions of one-third (1/3) of the principal forbearance amount will be permanently forgiven.

6. *NPV Test*. All potential MAP2R Modifications will be subjected to the NPV Test described in Section 1.47 prior to being offered to a Settlement Class Member. The Defendants shall not be required to offer a MAP2R Modification to any Settlement Class Member whose NPV Test yields a negative NPV result. However, the Defendants, may, in their sole discretion, offer a MAP2R Modification to a Settlement Class Member

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 184**

whose NPV Test yields a negative NPV result, or, if possible, the Defendants may offer an alternate modification.

7. **_Documentation Requirements_**. In determining the documents required of Settlement Class Members to apply for MAP2R Modifications, the Defendants, consistent with their need to obtain relevant financial information, will seek to minimize the burden on Settlement Class Members and maximize participation in the MAP2R Modification program. The Defendants will not request signed affidavits from Settlement Class Members to document their hardship, and will not require more than one (1) year's income tax return, but will require documentary evidence of the Settlement Class Member's current income.

8. **_Servicing Commitments_**. In order to ensure that Borrowers are appropriately considered for a MAP2R Modification in a timely manner, the Defendants shall:

    a. Maintain a dedicated, adequately staffed help line to handle inquiries from Settlement Class Members, including Spanish-speaking Settlement Class Members;

    b. Assign a primary point of contact to each Settlement Class B Member and Settlement Class C Member seeking a loan modification;

    c. Notify Settlement Class Members in writing within ten (10) business days of their submitting a modification request of any documents believed to be missing and necessary for evaluation for a MAP2R Modification;

    d. Provide Settlement Class Members who do not qualify for HAMP or MAP2R Modifications, within thirty (30) calendar days of the Defendants'

receipt of all required documentation from the Settlement Class Member, with a written explanation. Defendants shall provide Lead Counsel information about who did not qualify and the reason for the denial;

e. Establish a formal second-look and escalation protocol for all Settlement Class B Members and Settlement Class C Members seeking a loan modification.

9. There is no obligation for the Defendants to offer MAP2R Modifications to Settlement Class Members who cannot be qualified under the HAMP or MAP2R guidelines.

10. ***Restrictions on the Foreclosure Process***. The Defendants will apply HAMP rules under Supplemental Directive 10-02, dated March 24, 2010, and any applicable state laws regarding initiating or advancing foreclosures to Settlement Class Members being considered for HAMP or MAP2R Modifications. In addition, the Defendants will ensure that each Settlement Class B Member and Settlement Class C Member being considered for HAMP or MAP2R Modifications:

a. Has notes in his or her electronic records accessible to all loan mitigation, modification, and foreclosure departments that indicate whether he or she is being considered for a loan modification; and

b. Receives in any foreclosure-related communication notice that he or she is still being considered for a modification, with the exception of notices generated by outside counsel or foreclosure trustee companies retained by the Defendants to assist with or conduct the foreclosure process. The Defendants will develop and implement policies and procedures to provide notification to

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 186**

their foreclosure attorneys/trustees regarding a Settlement Class Member's modification status.

11. ***Loan Modifications After June 30, 2013.*** Subsequent to June 30, 2013, the Defendants will continue to evaluate Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members for potential loan workout solutions that are commercially reasonable and are designed to help avoid foreclosure. These solutions may or may not be MAP2R Modifications and their terms will be in the sole discretion of the Defendants.

F. **HAFA/Short Sale/Deed-in-Lieu of Foreclosure Provisions**. The Defendants will offer the Home Affordable Foreclosure Alternatives ("HAFA") or its internal short-sale or deed-in-lieu of foreclosure alternatives to Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who are unable to qualify for loan modifications under the HAMP or MAP2R guidelines and who are otherwise qualified for a short-sale or deed-in-lieu of foreclosure under HAFA or the Defendants' internal guidelines. Settlement Class B Members in Imminent Default, who later become in Imminent Default,or who later become in Default, and Settlement Class C Members who qualify for HAFA will receive an incentive payment of at least Three Thousand and No/100 Dollars ($3,000.00) for a short-sale or deed-in-lieu of foreclosure to assist with relocation expenses. Settlement Class B Members in Imminent Default, who later become in Imminent Default, or who later become in Default, and Settlement Class C Members who do not qualify for HAFA but otherwise qualify under the Defendants' internal guidelines for a short-sale or deed-in-lieu of foreclosure will receive payments of at least One Thousand Five Hundred

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 187**

Dollars ($1,500.00) to assist with relocation expenses. These benefits are in addition to and separate from the Common Fund and shall remain open until June 30, 2013.

G.      Settlement Class C Members who, at any time after the Date of Preliminary Approval, cure their Default but who later become in Imminent Default or who again go into Default still shall be eligible for the Loan Modification Program described in Section VI(E), or, if applicable, the HAFA/Short Sale/Deed-in-Lieu of Foreclosure Provisions described in Section VI(F).

H.      The Defendants shall designate an employee as the Compliance Officer responsible for this Agreement. The Compliance Officer will be responsible for providing Lead Class Counsel quarterly reports, through June 30, 2013, which will be provided within forty-five (45) calendar days after the end of each quarter. The quarterly reports will provide the following information: (1) the number of Settlement Class Members who have requested loan modifications; (2) the number of Settlement Class Members who received HAMP Modifications or MAP2R Modifications; (3) the number of Settlement Class Members denied loan modifications; and (4) the number of Settlement Class members who received HAFA/Short Sale/Deed-in-Lieu of Foreclosure payments.

I.      The Common Fund, the Loan Modification Program, the HAFA/Short Sale/Deed-in-Lieu of Foreclosure payments, and the payments of the Fee Award and Administration Expenses described in Sections VI(A) through (F) above will constitute adequate consideration for the Settlement and will be made in full and final settlement of:

1.      The Alleged Claims during the Class Period;

2.      Administration Expenses;

3.      Claims for attorneys' fees and costs;

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 188**

4.     The Class Representative Award; and

5.     Any other obligation of the Parties under this Agreement.

## VII.   CLASS REPRESENTATIVE AWARD

The Parties have agreed that Class Counsel shall be entitled to apply to the Court for a Class Representative Award, the total of which shall not exceed One Hundred Twenty Five Thousand and No/100 Dollars ($125,000.00) and that the Defendants will not object to any application by Class Counsel for a Class Representative Award of up to this amount.  The Class Representative Award shall be paid from the Common Fund described in Section VI(A), and is intended to collectively compensate all of the Class Representatives for their efforts in bringing these claims and achieving the benefits of this Agreement on behalf of the Settlement Class, in addition to any Settlement Benefits to which they may be entitled under this Agreement.  The Settlement Administrator will pay or cause to be paid any Class Representative Award approved by the Court (subject to the maximum described above), within thirty (30) calendar days of the Effective Date, by check to the Class Representatives, in accordance with instructions to be provided by Lead Class Counsel.  Lead Class Counsel shall be solely responsible for allocation of the Court-awarded amount of the Class Representative Award amongst the Class Representatives.

## VIII.  SETTLEMENT ADMINISTRATION

A.     **Settlement Administrator's Duties**

1.     Cost Effective Administration.  The Settlement Administrator shall, under the supervision of the Court, administer the relief provided by this Agreement in a rational, responsive, cost effective, and timely manner.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 189**

2.      Maintenance of Records.  The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement.  The Settlement Administrator shall maintain all such records as required by applicable law in accordance with its business practices and such records will be made available to Class Counsel and the Defendants' Counsel upon request.  The Settlement Administrator shall also provide reports and other information to the Court as the Court may require.  The Settlement Administrator shall provide Class Counsel and the Defendants' Counsel with information concerning notice, administration, and implementation of the Agreement.  Should the Court request, the Parties, in conjunction with the Settlement Administrator, shall submit a timely report to the Court summarizing the work performed by the Settlement Administrator, including a report of all amounts from the Common Fund paid to Settlement Class Members.   Without limiting the foregoing, the Settlement Administrator shall:

a.      Receive Requests for Exclusion from Plaintiffs seeking to exclude themselves from this Agreement and provide Class Counsel and the Defendants' Counsel with copies thereof within three (3) business days of the deadline for postmarking such forms and requests.  If the Settlement Administrator receives any Requests for Exclusion or other requests from Plaintiffs after its initial provision of Requests for Exclusion to Class Counsel and Defendants' Counsel, the Settlement Administrator shall promptly provide copies thereof to Class Counsel and the Defendants' Counsel.

b.      Receive and review Claim Forms, and reject materially incomplete Claim Forms.  In addition, the Settlement Administrator may reject a Claim Form where there is evidence of abuse or fraud.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 190**

c.      Make available for inspection by Class Counsel and the Defendants' Counsel the Claim Forms and any supporting documentation received by the Settlement Administrator at any time upon reasonable notice.

d.      Assist in the dissemination of notices to Class Members and in the publication of Notice as set forth herein.

e.      Payments to Settlement Class Members.   Within thirty (30) calendar days of the Effective Date, the Settlement Administrator shall distribute payments to the Settlement Class Members as outlined in Section VI(A).

f.      Requests for Additional Information.   In the exercise of its duties outlined in this Agreement, the Settlement Administrator shall have the right to reasonably request additional information from the Parties or any Settlement Class Member.

g.      Deposit of Common Fund.   The Settlement Administrator will place all monies received by it under the terms of this Agreement, other than payments to it for services rendered or for expenses, into a separate, interest-bearing trust account or other escrow account at an institution to be approved by Lead Class Counsel and the Defendants' Counsel until such funds are disbursed. All interest and other earnings received shall accrue to the benefit of said account. The account shall be designated the "Pick-a-Payment Settlement Fund."   Such account shall satisfy the requirements of Treas. Reg. § 1.468B-1(h).

h.      The Common Fund shall be deemed at all times a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1 and Section 468B of the Internal Revenue Code (the "Code").   The Settlement Administrator, and

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 191**

any successor administrator, shall comply with all requirements applicable to such qualified settlement fund, including all requirements under Section 468B of the Code, the Treasury Regulations promulgated thereunder, and any comparable provisions of state or local tax laws, shall take all actions necessary to create and maintain the status of the Common Fund as a qualified settlement fund for federal, state, and local income tax purposes, and shall take no action that will adversely affect the qualification of the Common Fund as a qualified settlement fund for federal, state, and local income tax purposes.  In addition, if requested by the Defendants, the Settlement Administrator, and any successor administrator, shall join with the Defendants in the timely filing of a "relation-back election" (within the meaning of Treas. Reg. § 1.468B-1(j)(2)) with respect to the Common Fund.  Pursuant to such election, the Settlement Administrator, or any successor administrator, shall comply with all of the requirements contained in Treas. Reg. § 1.468B-1(j)(2) that apply to such election.  It shall be the responsibility of the Settlement Administrator, or any successor administrator, to prepare and deliver timely and properly the necessary documentation for signature by all necessary parties and thereafter to cause the appropriate filing to occur.

      i.     For purposes of Section 468B of the Code, and the Treasury Regulations promulgated thereunder, the Settlement Administrator, or any successor administrator, shall be the "administrator" (as defined under Treas. Reg. § 1.468B-2(k)(3)) of the qualified settlement fund.  The Settlement Administrator, or any successor administrator, shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Common Fund

(including, without limitation, the returns described in Treas. Reg. §§ 1.468B-2(k) and 1.468B-2(1)). Such returns (as well as the election described in Section VIII(A)(2)(h) of this Agreement) shall be consistent with this Section VIII(A)(2)(i) and in all events shall reflect that all taxes (including any interest, penalties, or additions to tax ("Taxes") on the income earned by the Common Fund shall be paid out of the Common Fund as provided herein).

j.     All Taxes arising with respect to the income earned on the Common Fund, including any Taxes that may be imposed upon the Defendants with respect to any income earned by the Common Fund for any period during which the Common Fund does not qualify as a "qualified settlement fund" for federal and state income tax purposes, any withholding Taxes on distributions from the Common Fund, and all expenses and costs incurred in connection with the operation and implementation of this Section (including, without limitation, expenses of mailing and distribution costs and expenses relating to filing any return described in this Section) ("Tax Expenses") shall be paid by the Settlement Administrator out of the Common Fund.

k.     It shall be the duty of the Settlement Administrator, or any successor administrator, to file or cause to be filed all necessary tax returns or other necessary reports regarding the administration of the Common Fund.

**B.    Submission of Claim Forms**

1.     The Settlement Administrator shall maintain and administer a dedicated settlement website (www.pickapaysettlement.com) containing claims information and related documents, along with an electronic version of the Claim Form that Settlement

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 193**

Class A Members can view, complete, and submit electronically, as discussed below. The Parties shall agree on all information and documents to be posted on this website.

       2.      **Paper Claim Form Submission.** The Settlement Notices to Settlement Class A Members shall include a Claim Form, substantially in the form attached as Exhibit 1. Settlement Class A Members wishing to receive payment pursuant to Section VI(A) of this Agreement by submitting a paper Claim Form must mail completed paper Claim Forms to the Settlement Administrator, and those paper Claim Forms must be postmarked on or before the Claims Deadline. Any paper Claim Form that is postmarked after the Claims Deadline shall be deemed untimely, an invalid claim, and a waiver by the submitting Settlement Class A Member of any claim for payment under Section VI(A) of this Agreement.

       3.      **Electronic Claim Form Submission.** The Settlement Notices to Settlement Class A Members shall also include a statement informing Settlement Class A Members that a version of the Claim Form that can be viewed, completed, and submitted electronically is available on the Settlement website. Settlement Class A Members wishing to receive payment pursuant to Section VI(A) of this Agreement by submitting an electronic Claim Form must complete and submit the electronic Claim Form on or before the Claims Deadline. After the Claims Deadline, the electronic Claim Form shall be disabled such that electronic Claim Forms will no longer be able to be submitted.

## IX. PAYMENTS TO SETTLEMENT ADMINISTRATOR

Within ten (10) calendar days after the Date of Preliminary Approval as contemplated by this Agreement, or before, at the Defendants' sole discretion, the Defendants shall advance to the

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 194**

Settlement Administrator the sums necessary to cover the costs of issuing the Settlement Notices and other Administration Expenses.

## X. NOTICE TO THE SETTLEMENT CLASS

A. Upon Preliminary Approval of this Agreement (and as the Court may direct), the Parties shall cause the Settlement Administrator to disseminate the Settlement Notices to the Settlement Class Members. Such notices shall comport with due process and be effectuated pursuant to a Notice Plan.

B. The Notice Plan shall include:

1. Direct Notice. Within thirty (30) calendar days after the Date of Preliminary Approval, the Defendants shall—based on a review of business records and data in their possession, custody, and control—provide the Settlement Administrator with the U.S. mail addresses and property addresses for any reasonably identifiable Persons who are potential members of the Settlement Class. The Settlement Administrator shall conduct a National Change of Address Update as soon as practicable after receipt of this information. Within fifteen (15) calendar days of the receipt of such addresses, Settlement Notices substantially in the form attached as Exhibits 2 through 4 will be sent by the Settlement Administrator to such potential Persons in the Settlement Class by First Class U.S. Mail.

2. Publication Notice. Publication Notice shall be made by purchasing, for three (3) consecutive calendar days, a one-quarter (1/4) page advertising space in the main news section of *USA Today*, to be published within thirty (30) calendar days after the Date of Preliminary Approval of this Agreement or as soon thereafter as the

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 195**

publication schedule of that newspaper will permit. The text of such notice is provided in Exhibit 5.

3. Internet Publication Notice. Immediately following Preliminary Approval of the Agreement, notice shall be provided on a dedicated settlement website (www.pickapaysettlement.com) to be administered by the Settlement Administrator.

4. Press Release. After the Date of Preliminary Approval, the Parties shall prepare and distribute to local, national, and syndicated news organizations a joint press release, approved by all Parties, describing this Agreement. The Parties agree that they will keep confidential the terms of this Agreement, the existence of this Agreement, and the negotiations surrounding this Agreement, and that they will not make any comments regarding this Agreement, or the negotiations surrounding this Agreement, until the Date of Preliminary Approval. The Parties agree that if they receive media or other inquiries regarding this Agreement, or the negotiations surrounding this Agreement, prior to the Date of Preliminary Approval, they will jointly agree on the response to such inquiry, or if no joint agreement has been reached, to respond that they have no comment. Notwithstanding the provisions of this Section, the Parties agree that they are required to move the Court for Preliminary Approval and to file this Agreement with the Court in connection with moving for such Preliminary Approval, and that such filing shall not be considered a breach of this Agreement or any other agreement of the Parties.

5. The Settlement Notices shall advise the Settlement Class of its rights, including the right to opt-out and/or comment upon or object to the Agreement or its terms, and for Settlement Class A Members, contain a Claim Form. The Settlement Notices shall provide that any objection to this Agreement, and any papers submitted in

support of said objection, shall be reviewed by the Court at the Fairness Hearing, only if, on or before the Opt-Out Period/Objection Deadline as approved by the Court and to be specified in the Settlement Notices, the Person making the objection files notice of his or her intention to do so and files copies of such papers he or she proposes to submit at the Fairness Hearing with the Clerk of Court and delivers copies of the same by mail (postmarked by the Opt-Out Period/Objection Deadline), hand (delivered by the Opt-Out Period/Objection Deadline), or overnight delivery service (delivered to overnight courier by the Opt-Out Period/Objection Deadline) to both Class Counsel and the Defendants' Counsel as specified in the Settlement Notices.

## XI.    NOTICE UNDER THE CLASS ACTION FAIRNESS ACT

A.    The Class Action Fairness Act of 2005 ("CAFA") requires the Defendants to inform certain federal and state officials about this Settlement.  *See* 28 U.S.C. § 1715.1.

B.    Under the provisions of CAFA, the Settlement Administrator, on behalf of the Defendants,will serve notice upon the appropriate officials within ten (10) calendar days after the Parties file the proposed Settlement with the Court.  *See* 28 U.S.C. § 1715(b).

C.    The Parties agree that the Defendants are permitted to provide CAFA notice as required by law and that any notice by the Defendants shall be done to effectuate the Settlement and shall not be considered a breach of this Agreement or any other agreement of the Parties.

## XII.    OPT-OUTS AND OBJECTIONS

A.    Any Person may request to be excluded from the Settlement Class at any time before the Opt-Out Period/Objection Deadline, by complying with the procedures for doing so as set forth in the Court-approved Settlement Notices.  In order to exercise the right to opt-out and be excluded from the Settlement Class, the Person seeking to do so must complete and return to

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 197**

the Settlement Administrator a Request for Exclusion, such that it is postmarked on or before the Opt-Out Period/Objection Deadline.  Requests for Exclusion that are postmarked after the Opt-Out Period/Objection Deadline will be considered invalid and of no effect, and the Person who untimely submits a Request for Exclusion will remain a Settlement Class Member and will be bound by any Orders entered by the Court, including a Judgment approving the Agreement and implementing the Release contemplated thereby.  Except for those Persons who have properly and timely submitted Requests for Exclusion, all Settlement Class Members will be bound by this Agreement and the Judgment, including the Release herein contained.  Any Person who timely and properly submits a Request for Exclusion shall not (1) be bound by any orders or Judgment entered in the Lawsuit nor by the Release herein contained; (2) be entitled to any relief under this Agreement; (3) gain any rights by virtue of this Agreement; or (4) be entitled to object to any aspect of this Agreement or the Lawsuit.  Each Person requesting exclusion from the Settlement Class must personally sign his or her own individual Request for Exclusion.  No Person may opt-out of the Settlement Class any other Person, or be opted-out by any other Person, and no Person shall be deemed opted-out of the Settlement Class through any purported "mass" or "class" opt-outs.

B. Any Settlement Class Member who intends to object to this Agreement must submit to the Court, with copies sent to Lead Class Counsel and the Defendants' Counsel, such that it is postmarked on or before the Opt-Out Period/Objection Deadline, a Notice of Intent to Appear and Object that includes his or her personal signature and his or her full name and address, and includes all arguments, citations, and evidence supporting the objection, states that he or she is a member of the Settlement Class, and provides a statement whether the objector intends to appear at the Fairness Hearing, either with or without counsel.  Objections must be

postmarked on or before the Opt-Out Period/Objection Deadline. No Settlement Class Member shall be heard, and no papers, briefs, or pleadings submitted by such Settlement Class Member, shall be received or considered by the Court unless the Settlement Class Member's properly completed and signed statement of objection and Notice of Intent to Appear and Object is postmarked by the Opt-Out Period/Objection Deadline. Any Settlement Class Member who fails to timely or properly file a written objection and Notice of Intent to Appear and Object shall be deemed to have waived his or her objections and be forever barred from making any such objections in this Lawsuit, the Related Actions, or in any other action or proceeding.

C.      Any Settlement Class Member who fails to strictly comply with the provisions and deadlines of this Section shall waive and forfeit any and all rights he or she may have to appear separately and/or object, and shall be bound by all the terms of this Agreement, by the Release, and by all other proceedings, orders, and Judgment in the Lawsuit.

## XIII.   TERMINATION OF AGREEMENT

A.      The Class Representatives in the Lawsuit, on behalf of the Settlement Class Members, by Class Counsel, and the Defendants, by their counsel, shall each have the right to unilaterally terminate this Agreement by providing written notice of their or its election to do so ("Termination Notice") to all other Parties hereto within forty-five (45) calendar days of: (1) the Court's refusal to grant Preliminary Approval of this Agreement in any material respect; (2) the Court's refusal to grant final approval of this Agreement in any material respect; (3) the Court's refusal to enter the Judgment in the Lawsuit in any material respect; or (4) the date upon which the Judgment is modified or reversed in any material respect by the Ninth Circuit Court of Appeals or the U.S. Supreme Court. If, at the conclusion of Opt-Out Period/Objection Deadline, (1) more than three thousand (3,000) of the Persons identified by the Defendants as potential

Settlement Class A Members; **or** (2) more than two thousand (2,000) of the Persons identified by the Defendants as potential Settlement Class B Members; **or** (3) more than five hundred (500) of the Persons identified by the Defendants as potential Settlement Class C Members, complete and return a proper and timely Request for Exclusion or Notice of Intent to Appear and Object, the Defendants shall have, in their sole and absolute discretion, the option to terminate this Agreement, within ten (10) business days after the conclusion of the Opt-Out Period/Objection Deadline.  In order to invoke this right, the Defendants must file with the Court a document entitled "Notice of Nullification of Settlement."

## XIV. EXCLUSIVE REMEDY; DISMISSAL OF LAWSUIT; JURISDICTION OF COURT

A.     This Agreement shall be the sole and exclusive remedy of Settlement Class Members against any Released Entity relating to any and all Alleged Claims.  No Released Entity shall be subject to any other Alleged Claim-related liability or expense of any kind to any Settlement Class Member who has not timely filed a valid Request for Exclusion with respect to any Alleged Claim.  Upon the Effective Date, each and every Settlement Class Member shall be permanently barred and enjoined from initiating, asserting, and/or prosecuting any Alleged Claim(s) against any Released Entity in any court, tribunal, forum, or proceeding.

B.     The Parties agree that the Court shall retain exclusive and continuing jurisdiction over the Lawsuit, the Parties, Settlement Class Members, and the Settlement Administrator in order to interpret and enforce the terms, conditions, and obligations under this Agreement.

## XV. FINAL APPROVAL AND JUDGMENT ORDER

A.     No later than ten (10) calendar days prior to the Fairness Hearing, the Settlement Administrator shall file with the Court and serve on counsel for all Parties a declaration stating

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 200**

that any required Notice has been completed in accordance with the terms of the Preliminary Approval Order.

B.     At least fourteen (14) calendar days prior to the Fairness Hearing:

    1.     The Parties shall file a joint motion requesting that the Court grant final approval of the Settlement Agreement, with Class Counsel filing a memorandum of points and authorities in support of such motion;

    2.     Class Counsel shall file with the Court and serve on counsel for the Defendants its motion requesting the Court's approval of the Fee Award; and

    3.     Class Counsel shall file a memorandum addressing any timely submitted Objections to the Settlement.

C.     At the Fairness Hearing, the Court will consider and determine whether the provisions of this Agreement should be approved, whether the Settlement should be finally approved as fair, reasonable, and adequate, whether any Objections to the Settlement should be overruled, whether the Fee Award and the Class Representative Award should be approved, and whether a Judgment finally approving the Settlement should be entered.

D.     This Agreement is subject to and conditioned upon the issuance by the Court of the Judgment which grants final approval of this Agreement in accordance with applicable jurisprudence, and providing the relief specified below, which relief shall be subject to the terms and conditions of this Agreement, the occurrence of the Effective Date, and the Parties' performance of their continuing rights and obligations hereunder.  Such Judgment shall:

    1.     Dismiss the Lawsuit with prejudice and without costs, other than as described herein, and order Class Counsel to effectuate the dismissal of all Related Actions with prejudice;

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 201**

2.      Decree that neither the Judgment nor this Agreement constitute an admission by the Defendants or the Additional Defendants of any liability or wrongdoing whatsoever;

3.      Bar and enjoin all Settlement Class Members from asserting against any Released Entity any Alleged Claim which the Settlement Class Member had, has, or may have in the future, including in the Lawsuit and any Related Actions;

4.      Release each Released Entity from the Alleged Claims, which any Settlement Class Members have, had, or may have in the future, against such Released Entity;

5.      Determine that this Agreement is entered into in good faith and is reasonable, fair, and adequate, and in the best interests of the Settlement Class;

6.      Preserve the Court's continuing and exclusive jurisdiction over the Parties to this Agreement, including the Defendants and all Settlement Class Members, to administer, supervise, construe, and enforce this Agreement in accordance with its terms for the mutual benefit of the Parties, but without affecting the finality of the Judgment; and

7.      Incorporate any other provisions deemed necessary and just which are consistent with this Agreement.

## XVI.  REPRESENTATIONS AND WARRANTIES

Each signatory represents and warrants:

A.      That he, she, or it has all requisite power and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby;

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 202**

B.     That the execution, delivery, and performance of this Agreement and the actions contemplated herein have been duly authorized by all necessary corporate action on the part of each signatory; and

C.     That this Agreement has been duly and validly executed and delivered by each signatory and constitutes its legal, valid, and binding obligation.

## XVII.  MISCELLANEOUS PROVISIONS

A.     **Entire Agreement**

This Agreement, including all exhibits hereto, shall constitute the entire Agreement among the Parties with regard to the subject matter of this Agreement and shall supersede any previous agreements, representations, communications, and understandings among the Parties with respect to the subject matter of this Agreement.  This Agreement may not be changed, modified, or amended except in writing signed by all Parties, subject to Court approval.  The Parties contemplate that, subject to Court approval or without such approval where legally permissible, the exhibits to this Agreement may be modified by subsequent agreement of Class Counsel and Defendants' Counsel prior to dissemination to the Settlement Class.

B.     **Governing Law**

This Agreement shall be construed under and governed by the laws of the State of California, applied without regard to laws applicable to choice of law.

C.     **More Favorable Agreement**

In the event that Wells Fargo Bank, N.A. is required to change the terms of its 2010 settlement with the Attorneys General of Arizona, Florida, Georgia, Colorado, New Jersey, Washington, Texas, Illinois, and Nevada (the "AG Settlement") because it has entered into an agreement with the Attorney General of any state in a form or on terms that the Attorneys

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 203**

General who are parties to the AG Settlement determine are more favorable than those contained in the AG Settlement with respect to MAP2R, then the Parties will prospectively amend Section VI(E) of this Agreement with respect to MAP2R to reflect any such terms or form of agreement in place of the terms set forth in Section VI(E) of this Agreement, and shall submit any such amendment to the Court for approval.  The Defendants will give Lead Class Counsel notice of a request to change the terms of the AG Settlement within ten (10) business days of the Defendants' receipt of such request.

D.    **Execution by Counterparts**

This Agreement may be executed by the Parties in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Facsimile signatures or signatures sent by email shall be deemed original signatures and shall be binding.

E.    **Notices**

All notices to the Parties or counsel required by this Agreement shall be made in writing and communicated by facsimile and email to the following:

If to Plaintiffs or Class Counsel:

Jeffrey K. Berns
JBerns@law111.com
**ARBOGAST & BERNS LLP**
6303 Owensmouth Avenue, 10th Floor
Woodland Hills, CA 91367
Facsimile: (818) 936-0232

If to Defendants or Defendants' Counsel:

T. Thomas Cottingham, III
tcottingham@winston.com
**WINSTON & STRAWN LLP**
214 N. Tryon Street
Charlotte, NC 28202

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 204**

Facsimile: (704) 350-7800

**~ and~**

Jack R. Nelson
jnelson@reedsmith.com
**REED SMITH LLP**
101 Second Street, Suite 1800
San Francisco, CA 94105
Facsimile: (415) 391-8269

F.      **Miscellaneous**

    1.      This Agreement shall be binding upon and inure to the benefit of the heirs, successors, assigns, executors, and legal representatives of all Parties.   Any action seeking directly or indirectly to challenge, modify, construe, obtain relief from, extend, limit, or enforce this Agreement shall be commenced and maintained only by the Court.

    2.      No opinion concerning the tax consequences, if any, of this Agreement as to individual Settlement Class Members is being given by the Defendants or by Defendants' Counsel, nor is any representation or warranty in this regard made by virtue of this Agreement.   Settlement Class Members are directed to consult their own tax advisors regarding the tax consequences of the Agreement, and any tax reporting obligations they may have with respect thereto.   Each Settlement Class Member's tax obligations, and the determination thereof, are the sole responsibility of the Settlement Class Member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Settlement Class Member.   Nothing in this Agreement is to be construed as tax advice of any kind.

    3.      Subject to Court approval, the Parties may agree to reasonable extensions of time to carry out any of the provisions of this Agreement.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 205**

4.     The determination of the terms of, and the drafting of, this Agreement, has been by mutual agreement after negotiation, with consideration by and participation of all Parties hereto and their counsel.   Accordingly, the rule of construction that any ambiguities are to be construed against the drafter shall have no application.  All Parties agree that this Agreement was drafted by Class Counsel and Defendants' Counsel at arms' length, and that no parol or other evidence may be offered to explain, construe, contradict, or clarify its terms, the intent of the Parties or their attorneys, or the circumstances under which the Agreement was negotiated, made, or executed.

5.     The waiver by one Party of any provision or breach of this Agreement shall not be deemed a waiver of any other provision or breach of this Agreement.

6.     In the event that any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

By executing this Agreement, which consists of sixty-two (62) pages, including signature

pages, the Parties signify their agreement to abide by and be bound by all the terms of this

Agreement.

Signed on the dates below written:

ON BEHALF OF THE PLAINTIFFS:

Jeffrey K. Berns, Attorney for the Plaintiffs          Date  12/10/10

ON BEHALF OF DEFENDANTS WORLD SAVINGS, INC.; WORLD SAVINGS BANK,
FSB; WACHOVIA MORTGAGE, FSB, NOW KNOWN AS WACHOVIA MORTGAGE, A
DIVISION OF WELLS FARGO BANK, N.A.; WACHOVIA CORPORATION; GOLDEN
WEST FINANCIAL CORPORATION; WACHOVIA BANK, FSB, FORMERLY KNOWN AS
WORLD SAVINGS BANK, FSB-TX; WACHOVIA MORTGAGE CORPORATION; WELLS
FARGO HOME MORTGAGE; AND WELLS FARGO BANK, N.A.:

By: _____          12/10/2010
Terry Krapfl, Their Managing Counsel          Date

T. Thomas Cottingham, III, Attorney for the Defendants          Date  12/10/2010

Page 62 of 62

# TAB 1

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Had a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Money from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allowed borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice.  This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- The Settlement will provide payments and other benefits to those who qualify. You will need to file a Claim Form to get a payment from the Settlement.

- Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM** | The only way to get a payment. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | Get no money from the Settlement.  This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **OBJECT** | Write to the Court about why you don't like about the Settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Get no payment.  Give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement.  Payments will be made if the Court approves the Settlement and after any appeals are resolved.  Please be patient.

**For More Information:**     Call 1-800-000-0000 or Visit **www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 209**

| **WHAT THIS NOTICE CONTAINS** |
|---|

**BASIC INFORMATION** …………………………………………………………………**PAGE 3**
    1.    Why is there a notice?
    2.    What is this lawsuit about?
    3.    What is a Pick-a-Payment mortgage loan?
    4.    Why is this a class action?
    5.    Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** …………………………………………………**PAGE 4**
    6.    How do I know if I'm part of the Settlement?

**THE SETTLEMENT BENEFITS**…………………………………………………**PAGE 4**
    7.    What does the Settlement provide?
    8.    What can I get from the Settlement?
    9.    What other benefits does the Settlement provide?
    10.   What am I giving up to stay in the Class?

**HOW TO GET A PAYMENT** ………………………………………………………**PAGE 5**
    11.   How can I get a payment?
    12.   When will I get my payment?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ………………………………**PAGE 6**
    13.   How do I get out of the Settlement?
    14.   If I don't exclude myself, can I sue the Defendants for the same thing later?
    15.   If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU** ……………………………………………**PAGE 6**
    16.   Do I have a lawyer in the case?
    17.   How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** …………………………………………………**PAGE 7**
    18.   How do I tell the Court what I think about the Settlement?
    19.   What's the difference between objecting to and asking to be excluded?

**THE COURT'S FAIRNESS HEARING** ………………………………………………**PAGE 7**
    20.   When and where will the Court decide whether to approve the Settlement?
    21.   Do I have to come to the hearing?
    22.   May I speak at the hearing?

**IF YOU DO NOTHING** ………………………………………………………………**PAGE 8**
    23.   What happens if I do nothing at all?

**GETTING MORE INFORMATION** ……………………………………………………**PAGE 8**
    24.   How do I get more information?

**For More Information:**    Call 1-800-000-0000 or Visit **www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 210**

## BASIC INFORMATION

### 1.  Why is there a notice?

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015-F.  The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

### 2.  What is this lawsuit about?

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions.  When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization").  The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

### 3.  What is a Pick-a-Payment mortgage loan?

The way the loans work is that borrowers choose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment.  When a minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

### 4.  Why is this a class action?

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims.  All these people are a "class" or "class members," except for those who exclude themselves from the class.  U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

### 5.  Why is there a Settlement?

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation.  The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected.  The Settlement provides the opportunity for payments and other benefits to Class Members.

**For More Information:     Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 211**

## WHO IS IN THE SETTLEMENT

| 6. How do I know if I am part of the Settlement? |
|---|

There are three Settlement Classes.  **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class A.**  If you believe you are a member of Settlement Class B or Settlement Class C, you should call 1-800-000-0000.  You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

<u>**Settlement Class A (no longer have a Pick-a-Payment mortgage)**</u>
- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

<u>**Settlement Class B (mortgage payments are not 60 or more days past due)**</u>
- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of [insert date of preliminary approval], are <u>not</u> 60 or more days past due.

<u>**Settlement Class C (mortgage payments are 60 or more days past due)**</u>
- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of [insert date of preliminary approval], are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage loan in a prior case against any of the Defendants.

## THE SETTLEMENT BENEFITS

| 7. What does the Settlement provide? |
|---|

A $50 million Settlement Fund will be established.  After deducting a payment of up to $125,000 for the Class Representatives (*see* Question 17), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C.  Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Question 9 below).  In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs (*see* Question 17) and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses.  Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

The Settlement Agreement, available at the website, contains more details about the Settlement.

**For More Information:**     **Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 212**

**8. What can I get from the Settlement?**

If you submit a valid Claim Form, you can get a payment from the Settlement Fund (*see* Question 11). Your exact payment cannot be calculated at this time. It will depend on the number of valid claims that are filed. Please note that if you had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

**9. What other benefits does the Settlement provide?**

You are not eligible to receive a loan modification or participate in other incentive programs because you no longer have your Pick-a-Payment mortgage loan. However, the Defendants will offer permanent loan modifications to eligible Class Members who still have their Pick-a-Payment mortgage loan (Settlement Classes B and C). Settlement Class B and C Members who are unable to qualify for loan modifications may be eligible for incentive payments of at least $1,500 for a short sale or deed-in-lieu of foreclosure. More information about the Loan Modification Program and the Short Sale/Deed-in-Lieu of Foreclosure Incentive Program can be found at www.PickaPaySettlement.com.

**10. What am I giving up to stay in the Class?**

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case. It also means that all of the decisions by the Court will bind you. The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

### HOW TO GET A PAYMENT

**11. How can I get a payment?**

To ask for a payment, simply complete and submit the attached Claim Form. Claim Forms are also available at www.PickaPaySettlement.com or by calling 1-800-000-0000. Please read the instructions carefully, fill out the Claim Form, and mail it postmarked no later than **Month 00, 2011**, to:

> Pick-a-Mortgage Settlement
> PO Box 0000
> City, MN 00000

**12. When will I get my payment?**

Payments will be mailed to Class Members who send in valid Claim Forms on time, after the Court grants "final approval" to the Settlement and after any appeals are resolved. If Judge Fogel approves the Settlement after a hearing on Month 00, 2011, there may be appeals. It's always uncertain whether these appeals can be resolved, and resolving them can take time.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 213**

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement Fund, and you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

### 13. How do I get out of the Settlement?

To exclude yourself from the Settlement, you must send a letter that includes the following:
- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **Month 00, 2011**, to:

Pick-a-Payment Exclusions
PO Box 0000
City, MN 00000

### 14. If I don't exclude myself, can I sue the Defendants for the same thing later?

No. Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit.

### 15. If I exclude myself from the Settlement, can I still get a payment?

No. You will not get any money from the Settlement if you exclude yourself. If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

## THE LAWYERS REPRESENTING YOU

### 16. Do I have a lawyer in the case?

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 17. How will the lawyers be paid?

The Court will decide how much Class Counsel will be paid. Class Counsel will ask the Court for attorneys' fees, costs, and expenses of up to $25 million. These fees and expenses will be paid separately

**For More Information:** **Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 214**

by the Defendants and will not reduce the benefits available for the Class. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

## OBJECTING TO THE SETTLEMENT

### 18. How do I tell the Court that I don't like the Settlement?

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The account number(s) of your loan(s),
- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"
- The reasons you object to the Settlement,
- A list of any witnesses you may call to testify at the Fairness Hearing (*see* Question 20),
- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and
- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **Month 00, 2011**, to the following four addresses:

| Court | Defense Counsel |
|---|---|
| The United States District Court for the Northern District of California<br>280 South First Street<br>San Jose, CA 95113 | T. Thomas Cottingham, III<br>WINSTON & STRAWN LLP<br>214 North Tryon Street, Suite 2200<br>Charlotte, NC 28202 |
| **Class Counsel** | **Defense Counsel** |
| Jeffrey K. Berns<br>David M. Arbogast<br>ARBOGAST & BERNS LLP<br>6303 Owensmouth Avenue, 10th Floor<br>Woodland Hills, CA 91367 | Jack R. Nelson<br>REED SMITH LLP<br>101 Second Street, Suite 1800<br>San Francisco, CA 94105 |

### 19. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

**For More Information: Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

7

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 215**

**20. When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing at Time x.m. on **Month 00, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com.  At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate.  The Court will also consider how much to pay Class Counsel and the Class Representatives.  If there are objections, the Court will consider them at this time.  After the hearing, the Court will decide whether to approve the Settlement.  We do not know how long these decisions will take.

**21.  Do I have to come to the hearing?**

No.  Class Counsel will answer questions Judge Fogel may have.  But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it.  As long as you mailed your written objection on time to the proper address, the Court will consider it.  You may also pay your own lawyer to attend, but it's not necessary.

**22.  May I speak at the hearing?**

Yes.  You may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that it is your "Notice of Intent to Appear."  In your letter, you must include the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and
- Your signature.

You must mail your Notice of Intention to Appear, postmarked no later than **Month 00, 2011**, to the four addresses in Question 18.

## IF YOU DO NOTHING

**23.  What happens if I do nothing at all?**

If you do nothing, you will not get a payment from the Settlement.  Unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

**24.  How do I get more information?**

This notice summarizes the proposed Settlement.  More details are in the Settlement Agreement.  You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com.  You may also write with questions to Pick-a-Payment Settlement, P.O. Box 0000, City, MN 00000.  You can also get a Claim Form at the website, or by calling the toll free number, 1-800-000-0000.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 216**

# TAB 2

EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 217

SETTLEMENT CLASS B

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Have a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Benefits from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allows borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice. This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- The Settlement will provide payments and other benefits to those who qualify. You do not need to do anything to get benefits from the Settlement.

- Please note that this Settlement does not change your obligation to continue to make payments on your mortgage loan. You should continue to make your payments.

- Your legal rights are affected whether you act, or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **RECEIVE BENEFITS** | If the Court grants final approval to the Settlement, you will automatically receive benefits if you qualify. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **OBJECT** | Write to the Court about why you don't like about the Settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Obtain Settlement benefits and give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Loan modifications are being offered by the Defendants now to eligible Class Members. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

**For More Information:** Call 1-800-000-0000 or Visit **www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 218**

| WHAT THIS NOTICE CONTAINS |
|---|

**BASIC INFORMATION** ............................................................................................**PAGE 3**
    1.     Why is there a notice?
    2.     What is this lawsuit about?
    3.     What is a Pick-a-Payment mortgage loan?
    4.     Why is this a class action?
    5.     Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** ............................................................................**PAGE 4**
    6.     How do I know if I'm part of the Settlement?

**THE SETTLEMENT BENEFITS** ............................................................................**PAGE 4**
    7.     What does the Settlement provide?
    8.     What about the Attorneys General Settlement with Wells Fargo?
    9.     What can I get from the Settlement?
    10.    What is a loan modification?
    11.    What is "Imminent Default"?
    12.    What is the incentive program?
    13.    What am I giving up to stay in the Class?

**HOW TO GET A PAYMENT** .................................................................................**PAGE 6**
    14.    How can I get a payment?
    15.    When will I get my payment?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ...............................................**PAGE 7**
    16.    How do I get out of the Settlement?
    17.    If I don't exclude myself, can I sue the Defendants for the same thing later?
    18.    If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU** ................................................................**PAGE 7**
    19.    Do I have a lawyer in the case?
    20.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** .....................................................................**PAGE 8**
    21.    How do I tell the Court what I think about the Settlement?
    22.    What's the difference between objecting to and asking to be excluded?

**THE COURT'S FAIRNESS HEARING** ...................................................................**PAGE 9**
    23.    When and where will the Court decide whether to approve the Settlement?
    24.    Do I have to come to the hearing?
    25.    May I speak at the hearing?

**IF YOU DO NOTHING** .......................................................................................**PAGE 10**
    26.    What happens if I do nothing at all?

**GETTING MORE INFORMATION** ..........................................................................**PAGE10**
    27.    How do I get more information?

**For More Information:**    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 219**

## BASIC INFORMATION

### 1.  Why is there a notice?

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015.  The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, FSB, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

### 2.  What is this lawsuit about?

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions.  When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization").  The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

### 3.  What is a Pick-a-Payment mortgage loan?

The way the loans work is that borrowers chose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment.  When a minimum payment was insufficient to pay the interest that was owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

### 4.  Why is this a class action?

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims.  All these people are a "class" or "class members," except for those who exclude themselves from the class.  U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

### 5.  Why is there a Settlement?

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation.  The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected.  The Settlement provides the opportunity for payments and other benefits to Class Members.

**For More Information:      Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 220**

## WHO IS IN THE SETTLEMENT

| 6. How do I know if I am part of the Settlement? |
| --- |

There are three Settlement Classes.  **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class B.**  If you believe you are a member of Settlement Class A or Settlement Class C, you should call 1-800-000-0000.  You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

**Settlement Class A (no longer have a Pick-a-Payment mortgage)**
- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

**Settlement Class B (mortgage payments are not 60 or more days past due)**
- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of [insert date of preliminary approval], are not 60 or more days past due.

**Settlement Class C (mortgage payments are 60 days or more past due)**
- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of [insert date of preliminary approval], are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage in a prior case against any of the Defendants.

## THE SETTLEMENT BENEFITS

| 7. What does the Settlement provide? |
| --- |

The Settlement provides for a loan modification program and the establishment of a  $50 million Settlement Fund.  After deducting a payment of up to $125,000 for the Class Representatives (*see* Question 20), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C.  Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Questions 10 and 12 below).  In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs (*see* Question 20) and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses.  Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

A Settlement Agreement, available at the website, contains more details about the Settlement.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

4

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS**
**PAGE 221**

### 8. What about the Attorneys General Settlement with Wells Fargo?

If you live in Arizona, Florida, Colorado, New Jersey, Washington, Texas, Illinois, or Nevada, you may receive a separate notice relating to a 2010 Settlement between those states' Attorneys General and Wells Fargo Bank, N.A. (the "Attorneys General Settlement"), which acquired World Savings Bank, FSB/Wachovia Mortgage FSB's Pick-a-Payment mortgage loan portfolio in 2008. In the Attorneys General Settlement, Wells Fargo Bank, N.A. is offering permanent loan modifications to eligible borrowers. You are allowed to participate in both the Attorneys General Settlement and this Settlement.

### 9. What can I get from the Settlement?

As a member of Settlement Class B, you may be eligible to participate in the loan modification program if you are in "Imminent Default," if you later become in "Imminent Default," or if you later become 60 or more days past due on your mortgage payments. The loan modification program and "Imminent Default" are described below.

You are also eligible to receive a payment from the Settlement Fund after the Court grants final approval to the Settlement (*see* Question 15). Your exact payment cannot be calculated at this time. It will depend on the number of valid claims that are filed by members of Settlement Class A. Members of Settlement Class B do not have to file a claim form to receive a payment from the Settlement Fund. Please note that if you had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

### 10. What is a loan modification?

The Defendants will offer permanent loan modifications to eligible Settlement Class B Members who live in their homes, who are in "Imminent Default," (*see* Question 11), who later become in "Imminent Default," or who later become 60 or more days past due on their mortgage payments. The Loan Modification Program will operate through June 30, 2013. A loan modification is a change to your loan agreement and may include principal forgiveness, loan term extension, interest rate reduction, and principal forbearance (which gives the borrower additional time to pay off the loan principal). Please be aware that a loan modification may affect your credit rating.

Eligible Settlement Class B Members will first be considered for the federal Home Affordable Modification Program ("HAMP"). HAMP provides eligible homeowners the opportunity to modify their mortgages to make them more affordable. If the Settlement Class B Member does not qualify under HAMP or elects not to accept a HAMP loan modification, the Defendants will consider that Settlement Class B Member for their new modification program known as Mortgage Assistance Program 2 ("MAP2R").

Settlement Class B Members who remain current on their modified payments over three years may be able to earn additional principal forgiveness. More details on these programs are in the Settlement Agreement, which is available at www.PickaPaySettlement.com.

### 11. What is "Imminent Default"?

Imminent Default describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage loan because of financial hardship or other changed circumstances. Generally, the current test for "Imminent Default" is as follows:

**For More Information:** **Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

5

1.  Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; **and**

2.  Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:
    a.  Death of a borrower;
    b.  Long-term or permanent disability or illness of a borrower or dependent family member;
    c.  Legally-documented divorce or separation of the borrower and co-borrower;
    d.  Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;
    e.  A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income.  The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; **and**

3.  Cash reserves of less than $25,000, excluding retirement accounts; **and**

4.  The property is occupied by the borrower as his or her principal residence; **and**

5.  The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

## 12.  What is the other incentive program?

Settlement Class B Members who are unable to qualify for modifications under the HAMP or MAP2R guidelines may qualify for incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure.  The Settlement Class B Member must qualify for these payments under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines.  HAFA guidelines are available at http://makinghomeaffordable.gov/hafa.html.

In a short sale, the bank allows the homeowner to list and sell the mortgaged property with the understanding that the net proceeds from the sale may be less than the total amount due on the first mortgage.  Generally, if the borrower makes a good faith effort to sell the property but is not successful, a bank may consider a deed-in-lieu of foreclosure.  With a deed-in-lieu of foreclosure, the borrower voluntarily transfers ownership of the property to the bank—provided the title is free and clear of other mortgages and liens.

These options will remain open through June 30, 2013.

## 13.  What am I giving up to stay in the Class?

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case.  It also means that all of the decisions by the Court will bind you.  The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 223**

## HOW TO GET BENEFITS

| **14.  How can I get benefits?** |
|---|

You do not need to do anything to get benefits from the Settlement.  If the Court grants final approval to the Settlement, you will automatically be mailed a payment.  The Defendants have begun contacting Settlement Class B Members who are eligible for loan modifications or the incentive program.  If you move after you receive this Notice, please call 1-800-000-0000 to inform the administrator of your new address.

| **15.  When will I get my benefits?** |
|---|

Modifications are available now and eligible borrowers are being contacted by the Defendants.  Payments will be distributed to Class Members after the Court grants "final approval" to the Settlement and after any appeals are resolved.  If Judge Fogel approves the Settlement after a hearing on Month 00, 2011, there may be appeals.  It's always uncertain whether these appeals can be resolved, and resolving them can take time.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement Fund, and you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out.  This is called excluding yourself – or it is sometimes referred to as "opting" out of the Class.

| **16.  How do I get out of the Settlement?** |
|---|

To exclude yourself from the Settlement, you must send a letter that includes the following:
- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **Month 00, 2011**, to:

Pick-a-Payment Exclusions
PO Box 0000
City, MN 00000

| **17.  If I don't exclude myself, can I sue the Defendants for the same thing later?** |
|---|

No.  Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves.  If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately.  You must exclude yourself from this Class to continue your own lawsuit.

| **18.  If I exclude myself from the Settlement, can I still get a payment?** |
|---|

No.  You will not get any money from the Settlement if you exclude yourself from the Settlement.  If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

**For More Information:     Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

7

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 224**

## THE LAWYERS REPRESENTING YOU

**19.  Do I have a lawyer in the case?**

Yes.  The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement.  You will not be charged for these lawyers.  If you want to be represented by your own lawyer, you may hire one at your own expense.

**20.  How will the lawyers be paid?**

The Court will decide how much Class Counsel will be paid. Class Counsel will ask the Court for attorneys' fees, costs, and expenses of up to $25 million.  These fees and expenses will be paid separately by the Defendants and will not reduce the benefits available for the Class.  Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

## OBJECTING TO THE SETTLEMENT

**21. How do I tell the Court that I don't like the Settlement?**

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses.  To object, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The account number(s) of your loan(s),
- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"
- The reasons you object to the Settlement,
- A list of any witnesses you may call to testify at the Fairness Hearing (*see* Question 22),
- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and
- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **Month 00, 2011**, to the following four addresses:

| Court | Defense Counsel |
|---|---|
| The United States District Court for the Northern District of California<br>280 South First Street<br>San Jose, CA 95113 | T. Thomas Cottingham, III<br>WINSTON & STRAWN LLP<br>214 North Tryon Street, Suite 2200<br>Charlotte, NC 28202 |

**For More Information:      Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 225**

| Class Counsel | Defense Counsel |
|---|---|
| Jeffrey K. Berns<br>David M. Arbogast<br>ARBOGAST & BERNS LLP<br>6303 Owensmouth Avenue, 10th Floor<br>Woodland Hills, CA 91367 | Jack R. Nelson<br>REED SMITH LLP<br>101 Second Street, Suite 1800<br>San Francisco, CA 94105 |

### 22. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects

### THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

### 23. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Fairness Hearing at Time x.m. on **Month 00, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com. At this hearing, the Court will consider whether the Settlement is fair, reasonable and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

### 24. Do I have to come to the hearing?

No. Class Counsel will answer questions Judge Fogel may have. But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to the proper address, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

### 25. May I speak at the hearing?

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intent to Appear." In your letter you must include the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp."Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015 ),
- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and
- Your signature.

**For More Information:      Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 226**

You must mail your Notice of Intention to Appear, postmarked no later than **Month 00, 2011**, to the four addresses in Question 21.

## IF YOU DO NOTHING

| 26.  What happens if I do nothing at all? |
| --- |

If you do nothing, you will still get benefits from the Settlement.  However, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

| 27.  How do I get more information? |
| --- |

The notice summarizes the proposed Settlement.  More details are in a Settlement Agreement.  You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com.  You may also write with questions to Pick-a-Payment Settlement, P.O. Box 0000, City, MN 00000, or by calling the toll free number, 1-800-000-0000.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 227**

# TAB 3

EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 228

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Have a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Benefits from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allows borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice. This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- The Settlement will provide payments and other benefits to those who qualify. You do not need to do anything to get benefits from the Settlement.

- Please note that this Settlement does not change your obligation to continue to make payments on your mortgage loan. You should continue to make your payments.

- Your legal rights are affected whether you act, or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **RECEIVE BENEFITS** | If the Court grants final approval to the Settlement, you will automatically receive benefits if you qualify. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **OBJECT** | Write to the Court about why you don't like about the Settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Obtain Settlement benefits and give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Loan modifications are being offered by the Defendants now to eligible Class Members. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

**For More Information:** **Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 229**

| WHAT THIS NOTICE CONTAINS | |
|---|---|

**BASIC INFORMATION** ……………………………………………………………………**PAGE 3**
    1.      Why is there a notice?
    2.      What is this lawsuit about?
    3.      What is a Pick-a-Payment mortgage loan?
    4.      Why is this a class action?
    5.      Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** ……………………………………………….……**PAGE 4**
    6.      How do I know if I'm part of the Settlement?

**THE SETTLEMENT BENEFITS**……………………………………………………….……**PAGE 4**
    7.      What does the Settlement provide?
    8.      What about the Attorneys General Settlement with Wells Fargo?
    9.      What can I get from the Settlement?
    10.    What is a loan modification?
    11.    What is the incentive program?
    12.    What am I giving up to stay in the Class?

**HOW TO GET BENEFITS** ……………….……………………………………………**PAGE 6**
    13.    How can I get benefits?
    14.    When will I get benefits?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ………………………………………**PAGE 7**
    15.    How do I get out of the Settlement?
    16.    If I don't exclude myself, can I sue the Defendants for the same thing later?
    17.    If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU** …………………………………………………..**PAGE 7**
    18.    Do I have a lawyer in the case?
    19.    How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** ……………………………………….……**PAGE 8**
    20.    How do I tell the Court what I think about the Settlement?
    21.    What's the difference between objecting to and asking to be excluded?

**THE COURT'S FAIRNESS HEARING** ………………………………………………...**PAGE 9**
    22.    When and where will the Court decide whether to approve the Settlement?
    23.    Do I have to come to the hearing?
    24.    May I speak at the hearing?

**IF YOU DO NOTHING** ……………..…………………………………….……**PAGE 10**
    25.    What happens if I do nothing at all?

**GETTING MORE INFORMATION** ……………………………………………….……**PAGE 10**
    26.    How do I get more information?

**For More Information:**    Call 1-800-000-0000 or Visit **www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 230**

## BASIC INFORMATION

### 1. Why is there a notice?

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015. The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

### 2. What is this lawsuit about?

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

### 3. What is a Pick-a-Payment mortgage loan?

The way the loans work is that borrowers choose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment. When a minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

### 4. Why is this a class action?

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims. All these people are a "class" or "class members," except for those who exclude themselves from the class. U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

### 5. Why is there a Settlement?

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation. The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected. The Settlement provides the opportunity for payments and other benefits to Class Members.

**For More Information:** **Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 231**

## WHO IS IN THE SETTLEMENT

| 6.  How do I know if I am part of the Settlement? |
| --- |

There are three Settlement Classes.  **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class C.**  If you believe you are a member of Settlement Class A or Settlement Class B, you should call 1-800-000-0000.  You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

**Settlement Class A (no longer have a Pick-a-Payment mortgage)**
- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

**Settlement Class B (mortgage payments are not 60 or more days past due)**
- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of [insert date of preliminary approval], are <u>not</u> 60 or more days past due.

**Settlement Class C (mortgage payments are 60 days or more past due)**
- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of [insert date of preliminary approval], are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage loan in a prior case against any of the Defendants.

## THE SETTLEMENT BENEFITS

| 7. What does the Settlement provide? |
| --- |

The Settlement provides for a loan modification program and the establishment of a  $50 million Settlement Fund.  After deducting a payment of up to $125,000 for the Class Representatives (*see* Question 20), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C.  Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Questions 10 and 11 below).  In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs (*see* Question 19) and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses.  Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

**For More Information:     Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

A Settlement Agreement, available at the website, contains more details about the Settlement.

## 8.  What about the Attorneys General Settlement with Wells Fargo?

If you live in Arizona, Florida, Colorado, New Jersey, Washington, Texas, Illinois, or Nevada, you may receive a separate notice relating to a 2010 Settlement between those states' Attorneys General and Wells Fargo Bank, N.A. (the "Attorneys General Settlement"), which acquired World Savings Bank, FSB/Wachovia Mortgage, FSB's Pick-a-Payment mortgage loan portfolio in 2008.  In the Attorneys General Settlement, Wells Fargo Bank, N.A. is offering permanent loan modifications to eligible borrowers.  You are allowed to participate in both the Attorneys General Settlement and this Settlement.

## 9.  What can I get from the Settlement?

As a member of Settlement Class C, you are eligible to participate in the loan modification program, described below.

You are also eligible to receive a payment from the Settlement Fund after the Court grants final approval to the Settlement (*see* Question 15).  Your exact payment cannot be calculated at this time.  It will depend on the number of valid claims that are filed by members of Settlement Class A.  <u>Members of Settlement Class C do not have to file a claim form to receive a payment from the Settlement Fund</u>.  Please note that if you had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

## 10.  What is a loan modification?

The Defendants will offer permanent loan modifications to eligible Settlement Class C Members who live in their homes and who are at least 60 days delinquent on their mortgage payments.  Eligible Settlement Class C Members who become less than 60 days delinquent on their mortgage payments still will be eligible for the Loan Modification Program if they become in "Imminent Default" or if they again become at least 60 days delinquent on their mortgage payments.  "Imminent Default" is described in section 11 below.  The Loan Modification Program will operate through June 30, 2013.  A loan modification is a change to your loan agreement and may include principal forgiveness, loan term extension, interest rate reduction, and principal forbearance (which gives the borrower additional time to pay off the loan principal).  Please be aware that a loan modification may affect your credit rating.

Eligible Settlement Class C Members will first be considered for the federal Home Affordable Modification Program ("HAMP").  HAMP provides eligible homeowners the opportunity to modify their mortgages to make them more affordable.  If the Settlement Class C Member does not qualify under HAMP or elects not to accept a HAMP loan modification, the Defendants will consider that Settlement Class C Member for their new modification program known as Mortgage Assistance Program 2 ("MAP2R").

Settlement Class C Members who remain current on their modified payments over three years may be able to earn additional principal forgiveness.  More details on these programs are in the Settlement Agreement, which is available at <u>www.PickaPaySettlement.com</u>.

## 11.  What is "Imminent Default"?

Imminent Default describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage loan because of financial hardship or other changed circumstances.  Generally, the current test for "Imminent Default" is as follows:

**For More Information:      Call 1-800-000-0000 or Visit <u>www.PickaPaySettlement.com</u>**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 233**

1. Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; **and**

2. Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:
   a. Death of a borrower;
   b. Long-term or permanent disability or illness of a borrower or dependent family member;
   c. Legally-documented divorce or separation of the borrower and co-borrower;
   d. Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;
   e. A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; **and**

3. Cash reserves of less than $25,000, excluding retirement accounts; **and**

4. The property is occupied by the borrower as his or her principal residence; **and**

5. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

## 12. What is the other incentive program?

Settlement Class C Members who are unable to qualify for modifications under the HAMP or MAP2R guidelines may qualify for incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. The Settlement Class C Member must qualify for these payments under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines. HAFA guidelines are available at http://makinghomeaffordable.gov/hafa.html.

In a short sale, the bank allows the homeowner to list and sell the mortgaged property with the understanding that the net proceeds from the sale may be less than the total amount due on the first mortgage. Generally, if the borrower makes a good faith effort to sell the property but is not successful, a bank may consider a deed-in-lieu of foreclosure. With a deed-in-lieu of foreclosure, the borrower voluntarily transfers ownership of the property to the bank—provided the title is free and clear of other mortgages and liens.

These options will remain open through June 30, 2013.

## 13. What am I giving up to stay in the Class?

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case. It also means that all of the decisions by the Court will bind you. The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 234**

## HOW TO GET BENEFITS

| **14.  How can I get benefits?** |
|---|

You do not need to do anything to get benefits from the Settlement.  If the Court grants final approval to the Settlement, you will automatically be mailed a payment.  The Defendants are contacting Settlement Class C Members who are eligible for loan modifications or the incentive program.  If you move after you receive this Notice, please call 1-800-000-0000 to inform the administrator of your new address.

| **15.  When will I get my benefits?** |
|---|

Modifications are available now and eligible borrowers are being contacted by the Defendants.  Payments will be distributed to Class Members after the Court grants "final approval" to the Settlement and after any appeals are resolved.  If Judge Fogel approves the Settlement after a hearing on Month 00, 2011 there may be appeals.  It's always uncertain whether these appeals can be resolved, and resolving them can take time.

### EXCLUDING YOURSELF FROM THE SETTLEMENT

If you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out.  This is called excluding yourself – or is sometimes referred to as opting out of the Class.

| **16.  How do I get out of the Settlement?** |
|---|

To exclude yourself from the Settlement, you must send a letter that includes the following:
- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **Month 00, 2011**, to:

Pick-a-Payment Exclusions
PO Box 0000
City, MN 00000

| **17.  If I don't exclude myself, can I sue the Defendants for the same thing later?** |
|---|

No.  Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves.  If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately.  You must exclude yourself from this Class to continue your own lawsuit.

| **18.  If I exclude myself from the Settlement, can I still get a payment?** |
|---|

No.  You will not get any money if you exclude yourself from the Settlement.  If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

**For More Information:    Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 235**

## THE LAWYERS REPRESENTING YOU

**19. Do I have a lawyer in the case?**

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**20. How will the lawyers be paid?**

The Court will decide how much Class Counsel will be paid. Class Counsel will ask the Court for attorneys' fees, costs, and expenses of up to $25 million. These fees and expenses will be paid separately by the Defendants and will not reduce the benefits available for the Class. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

## OBJECTING TO THE SETTLEMENT

**21. How do I tell the Court that I don't like the Settlement?**

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The account number(s) of your loan(s),
- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"
- The reasons you object to the Settlement,
- A list of any witnesses you may call to testify at the Fairness Hearing (*see* Question 21),
- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and
- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **Month 00, 2011**, to the following four addresses:

| Court | Defense Counsel |
|---|---|
| The United States District Court for the Northern District of California<br>280 South First Street<br>San Jose, CA 95113 | T. Thomas Cottingham, III<br>WINSTON & STRAWN LLP<br>214 North Tryon Street, Suite 2200<br>Charlotte, NC 28202 |

**For More Information:     Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 236**

| Class Counsel | Defense Counsel |
|---|---|
| Jeffrey K. Berns<br>David M. Arbogast<br>ARBOGAST & BERNS LLP<br>6303 Owensmouth Avenue, 10th Floor<br>Woodland Hills, CA 91367 | Jack R. Nelson<br>REED SMITH LLP<br>101 Second Street, Suite 1800<br>San Francisco, CA 94105 |

### 22. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects

### THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

### 23. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Fairness Hearing at Time x.m. on **Month 00, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

### 24. Do I have to come to the hearing?

No. Class Counsel will answer questions Judge Fogel may have. But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to the proper address, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

### 25. May I speak at the hearing?

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intent to Appear." In your letter you must include the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and
- Your signature.

**For More Information:     Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 237**

You must mail your Notice of Intention to Appear, postmarked no later than **Month 00, 2011**, to the four addresses in Question 20.

## IF YOU DO NOTHING

| 26. What happens if I do nothing at all? |
|---|

If you do nothing, you may still get benefits from the Settlement. However, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

| 27. How do I get more information? |
|---|

The notice summarizes the proposed Settlement. More details are in a Settlement Agreement. You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com. You may also write with questions to Pick-a-Payment Settlement, P.O. Box 0000, City, MN 00000, and you can call the toll free number, 1-800-000-0000.

**For More Information:     Call 1-800-000-0000 or Visit www.PickaPaySettlement.com**

10

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS PAGE 238**

# TAB 4

EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 239

# If You Have or Had a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## *You Could Get Benefits from a Class Action Settlement.*

A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants marketed their Pick-a-Payment mortgages in a deceptive manner. A Pick-a-Payment mortgage loan allowed borrowers to make payments lower than the interest due on the loan.

The Defendants include: World Savings, Inc.; World Savings Bank, FSB, Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A.

### What's this About?

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product. The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

### Who's Included?

There are three Settlement Classes. Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB anytime between August 1, 2003 and December 31, 2008.

**Settlement Class A** - Includes borrowers who no longer have their Pick-a-Payment mortgage because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

**Settlement Class B** - Includes borrowers who still have their Pick-a-Payment mortgage loan and whose mortgage payments, as of Month 00, 2011, are not 60 or more days past due.

**Settlement Class C** -Includes borrowers who still have their Pick-a-Payment mortgage loan and whose mortgage payments, as of Month 00, 2011, are 60 or more days past due.

### What Does the Settlement Provide?

The Settlement provides for a loan modification program and the establishment of a $50 million Settlement Fund. After deducting a payment of up to $125,000 for the Class Representatives, the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C. Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications (until June 2013) or at least $1,500 from another incentive program for a short-sale or deed-in-lieu of foreclosure.

In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs and up to $1 million to administer the Settlement. More details on the Settlement are in the Settlement Agreement, which is available at www.PickaPaySettlement.com.

### How to Get Benefits?

Settlement Class A Members need to submit a Claim Form to get a payment from the Settlement Fund. Claim Forms are available online or by calling the toll-free number provided below. The deadline to submit a Claim Form is **Month 00, 2011**.

Settlement Class B and C Members **do not** have to do anything to get benefits from the Settlement. Settlement Class B and C Members will automatically be mailed a payment. Modifications are available now and eligible borrowers are being contacted by the Defendants. Payments will not be available until after the Court grants final approval to the Settlement.

### Your Other Rights

If you do not want to be legally bound by the Settlement, you must exclude yourself from the Settlement. The deadline to exclude yourself from the Settlement is **Month 00, 2011**. If you stay in the Settlement, you will not be able to sue the Defendants for any claims relating to the Settlement. If you stay in the Settlement, you may object to it by **Month 00, 2011**.

The Court will hold a hearing on **Month 00, 2011** to consider whether to approve the Settlement and a request for attorneys' fees and expenses of up to $25 million and up to $125,000 for the Class Representatives, who helped the lawyers on behalf of the whole Class. The Court has appointed attorneys to represent the Class. You may hire your own attorney at your own expense.

**EXHIBIT G ISO MOTION TO STAY PROCEEDINGS**
**PAGE 240**

**For More Information:    1-800-000-0000**
**www.PickaPaySettlement.com**

# TAB 5

EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 241

<table>
<tr><td>

**FILE YOUR CLAIM
ONLINE AT:**

www.pickapaysettlement.com

</td><td>

FOR OFFICIAL USE ONLY

</td></tr>
</table>

## CLAIM FORM

### In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation

In the United States District Court for the Northern District of California
San Jose Division
MDL No. 2015
Lead Case No. 5:07-cv-04497

> **If you are a Settlement Class A Member and wish to receive a Settlement Payment, your completed Claim Form must be Postmarked on or before _____ or Submitted Electronically to the Settlement Administrator at www.pickapaysettlement.com on or before _____.**

Please read the full Notice (available at www.pickapaysettlement.com) carefully before filling out this Claim Form.

To be eligible to receive any money from the Settlement in this class action lawsuit, you must either: (1) complete this Claim Form and mail it postmarked on or before _____ to: _____; or (2) complete your Claim Form online at www.pickapaysettlement.com on or before _____. The claims of Settlement Class A Members who fail to submit their Claim Forms on time by U.S. Mail (properly addressed) or fail to fill out an online Claim Form by the deadline will be rejected and the Settlement Class A Member will be not be eligible to receive a payment.

**I wish to submit a claim and in support of that claim, I submit the following information:**

### PART 1: CLAIMANT INFORMATION

Name of Claimant who is a member of Settlement Class A, as that is defined in the Notice:
_____

Claimant Street Address: _____

City: _____ State: _____ Zip Code: _____

Claimant Telephone Number(s): Daytime ( _ _ ) _ _ _ - _ _ _ _ Evening ( _ _ ) _ _ _ - _ _ _ _

### PART 2: SIGNATURE

Your signature below certifies that to the best of your knowledge the information above is truthful and correct. You certify that you had, but no longer have, a Pick-a-Payment mortgage loan because you sold the property securing the loan, refinanced the loan, paid off the loan personally, or have already obtained a loan modification that converted the loan from a Pick-a-Payment mortgage loan. You also certify that you have not previously released your claims pursuant to another settlement agreement, final judgment, or other dealings with the Defendants.

Signature: _____ Date: _____

# EXHIBIT A

EXHIBIT G ISO MOTION TO STAY PROCEEDINGS
PAGE 243

EXHIBIT H

**ARBOGAST & BERNS LLP**
David M. Arbogast (SBN 167571)
darbogast@law111.com
Jeffrey K. Berns (SBN 131351)
jberns@law111.com
6303 Owensmouth Avenue, 10th Floor
Woodland Hills, CA 91367-2263
Tel.: (818) 961-2000
Fax: (818) 936-0232

*Lead Counsel for Plaintiffs and the Class*
[Additional Counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION<br><br>_____<br><br>*This Document Relates to*:<br><br>ALL INCLUDED ACTIONS<br>_____ | **Case No. 5:09-md-02015-JF**<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date: April 29, 2011<br>Time: 9:00 a.m.<br>Courtroom: 3, 5th Floor<br>Judge: Hon. Jeremy Fogel |

TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ..................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND ........................... 2

   A. Brief Summary of Facts and Claims ..................................... 2

   B. The Litigation ................................................................ 3

      1. Investigation, Pleading, Motion Practice and Discovery ........... 3

      2. Settlement Negotiations ............................................... 5

   C. The Settlement Agreement ................................................ 5

      1. The Settlement Class .................................................. 6

      2. The Terms of the Proposed Settlement Agreement ................. 7

         a. Settlement Payments ......................................... 7

         b. Loan Modification Program ................................. 8

         c. Short-Sale/Deed-in-Lieu of Foreclosure Incentives Program ..................................................... 10

   D. Notice to Class Members .................................................. 10

   E. Claims and Settlement Administration .................................. 11

III. ARGUMENT ....................................................................... 11

   A. The Court Should Approve the Settlement Because It Is Fair, Reasonable, and Adequate ............................................... 11

      1. The Strength of Plaintiffs' Case ..................................... 12

      2. Risk, expense, complexity, and likely duration of further litigation ............................................................. 14

      3. The Risk of Maintaining Class Action Status Throughout the Trial .............................................................. 16

      4. The Amount Offered in Settlement .................................. 16

      5. The Extent of Discovery Completed and the Stage of the Proceedings ......................................................... 17

      6. The Experience and Views of Counsel .............................. 18

      7. The Reaction of the Class Members to the Proposed Settlement ........................................................... 19

      8. Absence of Collusion in the Settlement Process ................... 20

      9. The Objections to the Settlement Have No Merit .................. 20

i

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 245**

B.    Notice of Settlement to the Class Was Adequate and Satisfied All Requirements of Rule 23(e) and Due Process .................................25

     1.    The Objections to the Class Notice Have No Merit .................25

C.    Final Certification of The Settlement Class Is Warranted ...................27

     1.    Numerosity ...................27

     2.    Commonality ...................27

     3.    Typicality ...................28

     4.    Adequacy ...................29

        a.    The Adequacy Objections Have No Merit ...................30

     5.    Ascertainability ...................31

        a.    The Ascertainability Objection Fails ...................32

     6.    Rule 23(b) ...................33

D.    The Court Should Appoint Class Counsel As Counsel for the Settlement Class ...................35

     1.    The Objections to the Proposed Award of Attorneys' Fees Have No Merit ...................35

E.    Compensation To The Named Plaintiffs Is Appropriate ...................38

IV.    CONCLUSION ...................39

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 246**

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

## <u>CASES</u>

3

4

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ................................................................................27

5

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) .................................................................29

6

*Azizian v. Federated Dep't Stores,*
    499 F.3d 950, 954-55 (9th Cir. 2007)....................................................38

7

*Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) .................................................................27

8

*Boyd v. Bechtel Corp.,*
    485 F. Supp. 610 (N.D. Cal. 1979).........................................................19

9

*Churchill Vill., L.L.C. v. General Electric,*
    361 F.3d 566 (9th Cir. 2004) .................................................................12

10

*Class Plaintiffs v. City of Seattle,*
    955 F.2d 1268, (9th Cir. 1992) ..............................................................11

11

*DeBremaecker v. Short,*
    433 F.2d 733, (5th Cir. 1970) ................................................................33

12

*Fisher v. Ciba Specialty Chems. Corp.,*
    238 F.R.D. 273 (S.D. Ala. 2006)...........................................................33

13

14

*General Tel Co. v. Falcon,*
    457 U.S. 147 (1982) ..............................................................................33

15

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ...............................................12, 27, 29

16

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    186 F.3d 781 (7th Cir. 1999) .................................................................14

17

*In re Catfish Antitrust Litig.,*
    939 F. Supp. 493 (N.D. Miss. 1996) .....................................................38

18

19

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ....................................................................28

20

*In re Glassine & Greaseproof Paper Antitrust Litig.,*
    88 F.R.D. 302 (E.D. Pa. 1980) ..............................................................28

21

*In re Heritage Bond Litig.,*
    No. 02-ML-1475, 2005 WL 1594403 (C.D. Cal. June 10, 2005) .......................12

22

23

*In re Immune Response Sec. Litig.,*
    497 F. Supp. 2d 1166, (S.D. Cal. 2007) ................................................37

24

*In re Lorazepam & Chlorazepate Antitrust Litig.,*
    205 F.R.D. 369, (D.D.C. 2002) .............................................................38

25

*In re Lucent Techs., Inc., Secs. Litig.,*
    307 F. Supp. 2d 633 (D.N.J. 2004)........................................................19

26

*In re McKessonHBOC, Inc. ERISA Litig.,*
    391 F. Supp. 2d 844, 851 (N.D. Cal. 2005) ..........................................39

27

28

iii

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ................................................................. 16, 36, 38

*In re Mercury Interactive Corp. Secs. Litig.*,
618 F.3d 988 (9th Cir. 2010) ....................................................................... 37

*In re Mfrs. Life Ins. Co. Prem. Litig.*,
1998 U.S. Dist. LEXIS 23217 (S.D. Cal. Dec. 21, 1998) ................................. 38

*In re Pacific Enters. Secs. Litig.*,
47 F.3d 373 (9th Cir. 1995) ................................................................... 18, 36

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ........................................................................ 37

*In re Sprint Corp. ERISA Litig.*,
443 F. Supp. 2d 1249 (D. Kan. 2006) .......................................................... 26

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ................................................................ 19

*In re Wal-Mart Wage and Hour Empl. Pract's Litig.*,
No. 2:06-cv-00225, 2010 WL 786513, at *2 (D. Nev. March 8, 2010) ............ 38

*In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec.
Litigation*,
122 F.R.D. 251 (C.D. Cal. 1988) ............................................................... 29

*Jones-Boyle v. Washington Mut. Bank, FA*,
No. 08-02142 JF (PVT), 2010 WL 2724287 (N.D. Cal. July 8, 2010) .............. 13

*Linney v. Cellular Alaska Partn.*,
151 F.3d 1234 (9th Cir. 1998) ..................................................................... 25

*Lymburner v. U.S. Fin. Funds, Inc.*,
263 F.R.D. 534 (N.D. Cal. 2010) ................................................................. 27

*MCI Commc'ns Corp. v. AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) .................................................................... 14

*McNary v. Am. Sav. and Loan Ass'n*,
76 F.R.D. 644 (N.D. Tex. 1977) .................................................................. 18

*Nat'l Rural Telecomms. Coop. v. DIRECTV*,
221 F.R.D. 523 (C.D. Cal. 2004), ................................................... 14, 16, 18, 19

*Nichols v. SmithKline Beecham Corp.*,
No. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ............................... 16

*O'Connor v. Boeing North Am., Inc.*,
184 F.R.D. 311, (C.D. Cal. 1998) ............................................................... 31

*Officers for Justice v. Civil Serv. Comm'n of City and County of San
Francisco*,
688 F.2d 615 (9th Cir. 1982) ........................................................... 12, 17, 25

*Peltier v. City of Fargo*,
No. A3-74-78, 1975 WL 169 (D.N.D. Mar. 19, 1975) ...................................... 33

*Presley v. Carter Hawley Hale Profit Sharing Plan*,
No. C9704316SC, 2000 WL 16437, at *2 (N.D. Cal. 2000) ............................. 39

*Quezada v. Loan Center of Cal., Inc.*,
No. 2:08-00177 WBS KJM, 2009 WL 5113506 (E.D. Cal. Dec. 18,
2009) ......................................................................................................... 15

iv

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 248**

*Rodriguez v. West Publ'g Corp.*,
  No. CV-05-3222 R(MCx), 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007) ........ 16

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948, 964 (9th Cir. 2009) ..................................................................... 14

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992) ....................................................................... 28, 33

*Scholes v. Stone, McGuire & Benjamin*,
  143 F.R.D. 181 (N.D. III. 1992) ........................................................................ 28

*Schwartz v. Upper Deck Co.*,
  183 F.R.D. 672 (S.D. Cal. 1999) ....................................................................... 31

*Silber v. Mabon*,
  18 F.3d 1449 (9th Cir. 1994) ............................................................................. 25

*Silvas v. E*Trade Mortg. Corp.*,
  514 F.3d 1001 (9th Cir.2008) ............................................................................ 13

*Smith v. University of Washington Law School*,
  2 F.Supp.2d 1324 (W.D. Wash. 1998) .............................................................. 29

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) .......................................................................... 12, 25

*United States Football League* v. *NFL*,
  644 F. Supp. 1040 (S.D.N.Y. 1986) ................................................................. 14

*Van Bronkhorst v. Safeco Corp.*,
  529 F.2d 943 (9th Cir. 1976) ............................................................................. 11

*Van Vraken v. Atlantic Richfield, Inc.*,
  901 F. Supp. 295, 300 (N.D. Cal. 1995) ........................................................... 39

*Vasquez v. Coast Valley Roofing, Inc.*,
  670 F. Supp. 2d 1114 (E.D. Cal. 2009) ............................................................ 23

*Vaugh v. Am. Honda Motor Co.*,
  627 F. Supp. 2d 738 (E.D. Tex. 2007) .............................................................. 33

*Walsh v. Great Atlantic & Pacific Tea Co., Inc.*,
  726 F.2d 956, 964 (3d Cir. 1983) ...................................................................... 30

*Wilson v. Airborne, Inc.*,
  EDCV 07-770-VAP (OPx) 2008 WL 3854963 (C.D. Cal. Aug. 13, 2008) ....... 20

*Wolin v. Jaguar Land Rover North Am., LLC*,
  617 F.3d 1168, 1175 (9th Cir. 2010) ................................................................ 28

*Wolph v. Acer Am. Corp.*,
  --- F.R.D. ---, 2011 WL 1110754 (N.D. Cal. Mar. 25, 2011) ........................... 31

## STATUTES

12 U.S.C. § 1461 ....................................................................................................... 3

15 U.S.C. § 1601 ....................................................................................................... 2

15 U.S.C. § 1640(a) ................................................................................................ 13

Fed. R. Civ. P. 23 .............................................................................................. *passim*

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 249

1

2

### <u>OTHER AUTHORITIES</u>

3

The Financial Crisis Inquiry Report (U.S. Gov't Printing Office 2011)................. 24

Manual for Complex Litigation 2d § 30.44............................................................ 17

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEM. P&A's I.S.O. PLAINTIFFS' MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 250**

1    **I.    INTRODUCTION**

2         Plaintiffs respectfully move, pursuant to Rule 23(e) of the Federal Rules of

3    Civil Procedure, for final approval of the settlement of this class action brought on

4    behalf of borrowers who obtained Defendants' "Pick-a-Payment" mortgage loans,

5    alleging that Defendants' Pick-a-Payment mortgage loan documents failed to make

6    sufficient disclosures concerning material aspects, including the certainty of

7    negative amortization if borrowers made their scheduled monthly mortgage

8    payments.

9         After months of intensive, arm's-length negotiations, conducted with the

10   assistance of the Honorable John K. Trotter (Ret.), the parties have agreed to a

11   settlement of all claims asserted against Defendants.  The Settlement Agreement[1]

12   will produce real and substantial benefits for members of the affected class, and

13   constitutes a fair and reasonable resolution of a case of substantial complexity.

14        Among other terms, the settlement provides for the payment of $50 million

15   to the Class; an expansive loan modification program, valued in the range of

16   approximately $839 million to $2.7 billion to class members, that is guaranteed to

17   remain in place through June 2013; and cash payments for short sales and deeds-

18   in-lieu of foreclosure for Class members who are unable to obtain loan

19   modifications, which will also be available through June 2013.  In addition, the

20   settlement provides that Defendants shall pay attorneys' fees awarded by the Court

21   of up to $25 million and $1 million for notice and claims administration costs

22   (items which are typically paid out of the settlement fund).

23        For the reasons discussed below, the settlement is fair, reasonable and

24   ─────────────────────
       [1]  "Settlement Agreement" refers to the agreement attached as Exhibit A to
25   Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement
     Declaration of Jeffrey K. Berns in support of Plaintiffs' Motion for Preliminary
26   Approval of Class Action Settlement and Memorandum of Points and Authorities
     in Support Thereof (the "Preliminary Approval Motion"), filed December 10,
27   2010.  (Dkt. No. 112.)  Unless otherwise indicated, all terms used herein shall have
     the same meaning as set forth in the Settlement Agreement.
28

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 251**

1  adequate, and merits final approval. It was reached after well over three years of
2  hard-fought litigation and intensive negotiations. Accordingly, the Court should
3  enter the concurrently-filed Proposed Final Approval Order: (a) granting final
4  approval of the proposed settlement; (b) certifying the proposed plaintiff classes
5  pursuant to Rule 23(b) (3) for settlement purposes; and (c) appointing Plaintiffs
6  and their counsel as class representatives and class counsel, respectively.

7  **II.  FACTUAL AND PROCEDURAL BACKGROUND**

8      **A.  Brief Summary of Facts and Claims**

9          The consolidated actions that comprise this action concern Defendants' Pick-
10  a-Payment mortgage loans, which permitted the borrower to select and make a
11  minimum payment amount for a limited time and subject to certain conditions. In
12  particular, for each payment, borrowers could choose from four options.
13  Borrowers could make either: (1) a fully-amortizing 30-year interest and principal
14  payment such that the loan would be satisfied in the traditional 30-year term; (2) a
15  fully-amortizing 15-year interest and principal payment such that the loan would
16  be satisfied in a 15-year term; (3) an "interest-only payment"; or (4) a lesser,
17  "minimum payment." When a payment was insufficient to pay the interest owed,
18  unpaid interest was added to the loan balance and the outstanding loan balance
19  increased. Plaintiffs allege that the Pick-a-Payment mortgage loans violated the
20  federal Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and various state
21  laws, including unfair trade practices laws, because the relevant loan documents
22  failed to make adequate disclosures regarding the certainty of negative
23  amortization, the actual payment schedules, the interest rates on which these
24  schedules were based, and the full terms of the parties' legal obligations.
25  Declaration of Jeffrey K. Berns in support of Plaintiffs' Motion for Preliminary
26  Approval of Class Action Settlement ("Berns PA Decl."), filed December 10,
27  2010, ¶2. (Dkt. No. 112-1.)
28  / / /

2

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 252**

### B. The Litigation

#### 1. Investigation, Pleading, Motion Practice and Discovery

On August 30, 2007, after an extensive investigation by Plaintiffs' counsel, involving, *inter alia*, the review of over 500 sets of loan documents from individuals who received Pick-a-Payment mortgage loans from World Savings Bank, FSB. Dolores Mandrigues filed a complaint in this Court (as defined hereafter) captioned *Dolores Mandrigues, individually and on behalf of all others similarly situated v. World Savings, Inc., World Savings Bank, FSB, Wachovia Mortgage Corporation, and Does 1 through 10 inclusive*, No. 5:07-cv-4497 (N.D. Cal.) ("*Mandrigues*"). The complaint alleged causes of action for violations of TILA and California's Unfair Competition Law, breach of contract, and breach of the implied covenant of good faith and fair dealing. The *Mandrigues* action was assigned to this Court. On October 11, 2007, Dolores Mandrigues filed a First Amended Complaint in *Mandrigues* on October 11, 2007 and a Second Amended Complaint and a Corrected Second Amended Complaint on December 30, 2007, naming additional plaintiffs and putative class representatives, and adding, among other things, a cause of action for fraud. Berns PA Decl., ¶¶3-4. (Dkt. No. 112-1.)

In January 2008, Defendants World Savings, Inc., World Savings Bank, FSB, and Wachovia Mortgage Corporation filed a motion to dismiss *Mandrigues*, asserting that the relevant loan documents complied with TILA and that the state law causes of action were preempted by the federal Home Owners Loan Act ("HOLA"), 12 U.S.C. § 1461, *et seq.*, and regulations enacted thereunder by the Office of Thrift Supervision ("OTS"). On April 9, 2008, the Court denied that motion, holding that, "at least for pleading purposes, Plaintiffs' state law claims [we]re not subject to HOLA preemption." *See Mandrigues v. World Savings, Inc.,* No. 07-04497-JF (N.D. Cal. Apr. 9, 2008) (Slip Op.) at 5.

During 2008, the *Mandrigues* plaintiffs served multiple sets of interrogatories and requests for production of documents on Defendants.

1   Defendants also served discovery requests on each putative class representative,
2   took their depositions and the depositions of certain third-party brokers who had
3   brokered the subject loan transactions. Plaintiffs' counsel reviewed Defendants'
4   production of over 15,000 pages of documents and approximately twenty hours of
5   audio and video materials. Berns PA Decl., ¶6. (Dkt. No. 112-1.)

6          Also during 2008, other borrowers filed additional putative class actions and
7   single-plaintiff actions against Defendants, generally asserting the same claims and
8   allegations as the *Mandrigues* plaintiffs. In November 2008, a petition to
9   coordinate those actions was filed with the Judicial Panel on Multidistrict
10  Litigation (the "MDL Panel"). Those actions subsequently were transferred to this
11  Court as MDL No. 2015 for coordinated pretrial proceedings.[2] The actions are
12  now referred to collectively as the *In re Wachovia Corp. "Pick-a-Payment"*
13  *Mortgage Marketing and Sales Practices Litigation*, No. M:09-CV-2015-JF (the
14  "Lawsuit"). Berns PA Decl., ¶7. (Dkt. No. 112-1.)

15         In November 2008, the *Mandrigues* plaintiffs filed a motion for class
16  certification and a motion for preliminary injunction to prohibit Defendants from
17  foreclosing on the homes of any putative class members. In January 2009, the
18  Court stayed the class certification motion and all other litigation pending a
19  decision from the MDL Panel. In August 2009, Plaintiffs requested that the Court
20  dissolve the January 2009 stay entered in *Mandrigues*. At the same time,
21  Defendants requested that Plaintiffs file a consolidated complaint for all the
22  lawsuit's coordinated actions, while Plaintiffs requested that the Court conduct a
23  hearing concerning the pending class certification motion in *Mandrigues*, which
24  had been fully briefed since late 2008. The Court agreed to allow a class
25  certification motion on the TILA claims in *Mandrigues t*o proceed, along with

26  _____
    [2]   *See In Re Wachovia Corp. Pick-A-Payment Mortg. Mktg. and Sales Practices*
27  *Litig.*, 598 F. Supp. 2d 1383, 1384 (J.P.M.L. 2009). A complete list of the later-
    filed cases is set forth in the Preliminary Approval Motion (Dkt. No. 112) at 5 n.2.
28

MEM. P&A's I.S.O. PLAINTIFFS' MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF
**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS**
**PAGE 254**

1  summary judgment motions from both sides on the TILA claims in *Mandrigues*.
2  Berns PA Decl., ¶¶8-9. (Dkt. No. 112-1.)

3      In December 2009, Plaintiffs filed motions for summary judgment and class
4  certification concerning the TILA claims in *Mandrigues*, while Defendants filed
5  their own summary judgment motion concerning those claims.  In January 2010,
6  both sides filed their opposition and reply briefs.  Berns PA Decl., ¶10. (Dkt. No.
7  112-1.)

8  **2.  Settlement Negotiations**

9      Meanwhile, the Parties had begun settlement negotiations in March 2009.
10  At all times, the Parties' negotiations were adversarial, non-collusive, and at arm's
11  length.  As detailed above, prior to and during these negotiations, the Parties
12  engaged in vigorous, and often contentious, litigation.  Berns PA Decl., ¶10. (Dkt.
13  No. 112-1.)

14      In February 2010, after they failed to reach an agreement with a prior
15  mediator's assistance, the Parties commenced mediation with Retired Justice John
16  K. Trotter.  Thereafter, as progress in the negotiations was being made, the Court
17  agreed, on multiple occasions, to continue the hearing on the pending motions in
18  *Mandrigues*.  Ultimately, an agreement in principle, which is now embodied in the
19  Settlement Agreement, was reached with Justice Trotter's assistance.   Berns PA
20  Decl., ¶¶11-13. (Dkt. No. 112-1.)

21      After reaching final agreements on the settlement's terms, the Settlement
22  Agreement and the Preliminary Approval Motion were filed on December 10,
23  2010.  (Dkt. No. 112.)  On December 16, 2010, after a hearing, the Court entered
24  an Order granting preliminary approval of the settlement, certifying three classes
25  for settlement purposes and appointing class representatives and class counsel.
26  (Dkt. No. 113.)

27  **C.  The Settlement Agreement**

28      This settlement provides significant immediate relief to the class both

5

monetarily and by way of an extensive loan modification program. This relief is particularly valuable in light of the litigation risks discussed below. In exchange for these benefits, members of the Settlement Class will release certain claims relating to or arising from the origination of their Pick-a-Payment loans.

## 1. The Settlement Class

Pick-A-Payment borrowers fall into three categories: (i) those whose loans are paid off; (ii) those who still hold loans and are not currently in default; and (iii) those who still hold loans but are currently in default. Thus, the proposed settlement provides appropriate relief to each of these three classes (collectively, the "Settlement Class"), which are defined as follows:

**Settlement Class A: Borrowers Who No Longer Have Their Pick-a-Payment Mortgage Loans**

All current and former Borrowers of World Savings Bank, FSB or Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A. ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that, as of the date of the loan's funding, was secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, no longer have a Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, paid off the loan personally, or have already obtained a loan modification that converted the loan from a Pick-a-Payment mortgage loan.

**Settlement Class B: Non-Defaulting Borrowers Who Still Have Their Loans**

All current Borrowers of World Savings Bank, FSB or Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A. ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that is secured by their primary

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 256

residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still have a Pick-a-Payment mortgage loan and are not in Default.

**Settlement Class C: Borrowers in Default Who Still Have Their Loans**

All current Borrowers of World Savings Bank, FSB or Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A. ("Wachovia Mortgage") who, (a) on or after August 1, 2003 and on or before December 31, 2008 entered into a loan transaction with Wachovia Mortgage that is secured by their primary residence; (b) obtained financing from Wachovia Mortgage pursuant to a Pick-a-Payment mortgage loan promissory note; (c) have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage; and (d) as of the Date of Preliminary Approval, still have a Pick-a-Payment mortgage loan and are in Default.

Settlement Agreement, § IV. (Dkt. No. 112, Ex. A.)

Excluded from the Settlement Class are Defendants, the Additional Defendants, and any respective parent, subsidiary, affiliate, or control person of the Defendants and the Additional Defendants, as well as the officers, directors, agents, servants, and employees of the Defendants and Additional Defendants, or any judge presiding over the Lawsuit and/or any of the Related Actions, and the immediate family members of any such Person(s). Settlement Agreement, § I (1.66). (Dkt. No. 112, Ex. A.)

**2.  The Terms of the Proposed Settlement Agreement**

**a.  Settlement Payments**

Once the settlement is effective, the **entire balance** of the Settlement Fund (less Service Payments to the proposed class representatives, which are to be approved by the Court in the maximum total amount of $125,000) will be distributed, on a *pro rata* basis, to Settlement Class A Members who have timely

submitted a valid claim form and Settlement Class B and C Members who do not exclude themselves from the Settlement. Settlement Agreement, § VI(A). (Dkt. No. 112, Ex. A.) Because the entire Settlement Fund is divided on a *pro rata* basis, no "unclaimed" portion of the fund will remain after distribution. In the rare event that a Settlement Class member fails to cash his or her check within 90 days of its issuance, after the Settlement Administrator sends the member a reminder notice, the funds from those uncashed checks will first offset administration and notice expenses. Then any remaining funds will be distributed in a *cy pres* fund to the National Consumer Law Center, a not-for-profit organization selected by Plaintiffs, and a not-for-profit organization to be selected by Defendants prior to the Fairness Hearing. *Id.*

All costs of administering the settlement and providing notice of the settlement to the Settlement Class in accordance with the notice program discussed below have been or will be paid *by Defendants* and will *not* diminish the Settlement Fund. The Settlement Administrator has agreed that these costs will not exceed $1 million. Settlement Agreement, § VI(C) (Dkt. No. 112, Ex. A); Berns PA Decl., ¶17. (Dkt. No. 112-1.)

### b. Loan Modification Program

From December 16, 2010, through June 30, 2013, Defendants must offer permanent loan modifications to eligible, qualified Settlement Class C Members who reside in their homes and who are at least 60 days delinquent, as well as eligible, qualified Settlement Class B Members who reside in their homes and who are in "Imminent Default," due to financial hardship, such as death of a borrower, permanent or long-term disability, divorce, or other substantial reduction in income. Settlement Agreement, §§ VI(E), I(1.33). (Dkt. No. 112, Ex. A.)

Eligible Settlement Class Members will first be considered for the federal Home Affordable Modification Program ("HAMP"). If a Settlement Class Member fails to qualify under HAMP or elects not to accept a HAMP

8

1  modification, Defendants will consider the Settlement Class Member for their new

2  modification program known as MAP2R (Mortgage Assistance Program 2). The

3  MAP2R program's goal is to reduce a Settlement Class Member's DTI[3] to 31% or

4  less. Accomplishing this requires Defendants to apply a series of steps to reduce

5  DTI, such as waiver of accrued interest and other charges, temporary principal

6  forgiveness (which can become permanent if the borrower makes timely payments

7  on account of the modified loan), and interest rate reduction. Once the DTI of 31%

8  is reached, the loan will be converted to a fully-amortizing loan and the negative

9  amortization feature will be eliminated. Settlement Agreement, § VI(E). (Dkt. No.

10  112, Ex. A.)

11        To ensure that Settlement Class Members are appropriately considered for a

12  MAP2R Modification in a timely manner, Defendants shall:

13        a.     Maintain a dedicated, adequately-staffed help line to handle inquiries

14  from Settlement Class Members (including Spanish-speaking Settlement Class

15  Members), including Settlement Class B Members who believe that they are in

16  Imminent Default and wish to be considered for the Loan Modification Program;

17        b.     Assign a primary point of contact to each Settlement Class B Member

18  and Settlement Class C Member seeking a loan modification;

19        c.     Notify Settlement Class Members in writing within ten days of their

20  submitting a modification request of any documents believed to be missing and

21  necessary for evaluation for a MAP2R loan modification; and

22

23  [3] "DTI" is the ratio of the Settlement Class Member's first-lien monthly mortgage obligations (including monthly amounts for principal, interest, property taxes,

24  hazard insurance, flood insurance, condominium association fees, and homeowners' association fees, as applicable, regardless of whether any of the

25  foregoing are included in the Settlement Class Member's Monthly Payment, and including any escrow payment shortage amounts subject to a repayment plan) to

26  the Settlement Class Member's gross monthly income, all determined in accordance with HAMP, as defined in Treasury's Supplemental Directive 9-01:

27  Introduction of the Home Affordable Modification Program (Apr. 6, 2009). Settlement Agreement, § 1.22. (Dkt. No. 112, Ex. A.)

28

d.    Establish a formal "second-look" and escalation protocol for all Settlement Class B Members and Settlement Class B Members seeking loan modification. Settlement Agreement, § VI(E)(8). (Dkt. No. 112, Ex. A.)

Settlement Class Members who do not qualify for HAMP or MAP2R Modifications shall receive, within thirty calendar days of the Defendants' receipt of all Settlement Class Members' required documentation, a written description clearly explaining the reasons for denial of modification. *Id.*  This written explanation will also be sent to Lead Class Counsel. *Id.*  The settlement further provides that the Court shall have continuing jurisdiction over the lawsuit and the parties to interpret and enforce the settlement's provisions. Settlement Agreement, § XIV(B). (Dkt. No. 112, Ex. A.)

### c.    Short-Sale/Deed-in-Lieu of Foreclosure Incentives Program

Eligible Settlement Class B Members and Settlement Class C Members who are unable to qualify for modifications under the HAMP or MAP2R guidelines but are qualified for short-sale or deed-in-lieu of foreclosure under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines will be offered incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. These options will remain open through June 30, 2013. Settlement Agreement, § VI(F). (Dkt. No. 112, Ex. A.)

### D.    Notice to Class Members

The parties hired a preeminent firm with expertise in class notice, Kinsella Media, LLC ("Kinsella"), to create the notice program.  The notice program consisted of direct mail notice to each Settlement Class member, publication of a short-form Summary Notice in *USA Today* for three consecutive days, and a dedicated web site (www.pickapaysettlement.com) with links to the Settlement Notices, key documents in this case, the Settlement Agreement and other information intended to assist Settlement Class members in assessing their rights

and options.  Settlement Agreement, § X(B). (Dkt. No. 112, Ex. A.)    As discussed above, Defendants paid directly the entire notice program's costs.

As detailed in the Wheatman Decl. (Berns Final Approval Decl., Ex. 1) and the Lake Aff. (Berns Final Approval Decl., Ex. 2), both filed herewith, the notice program approved by the Court has been fully effectuated.  Wheatman Decl., ¶¶12-21; Lake Aff., ¶¶4-8.

### E.    Claims and Settlement Administration

The response from Settlement Class members has been overwhelmingly positive. Out of the more than 522,000 notices sent, only 36 objections (Berns Final Approval Decl., ¶4) and 456 exclusion requests (Lake Aff., ¶9) were filed.  Additionally, 78,343 claim forms were received from Settlement Class A Members.  Lake Aff., ¶10.  In view of the extensive notice sent to Settlement Class Members, this response demonstrates that the Settlement Class overwhelmingly supports the request for final approval of the settlement.

## III.   ARGUMENT

### A.    The Court Should Approve the Settlement Because It Is Fair, Reasonable, and Adequate

The Ninth Circuit has a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) (noting "overriding public interest in settling and quieting litigation" that "is particularly true in class action suits . . . which frequently present serious problems of management and expense") (footnote omitted). Fed. R. Civ. P. 23(e) dictates that a court should consider the fairness, adequacy and reasonableness of a settlement by balancing many factors, which include: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 261

discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Churchill Vill., L.L.C. v. General Electric*, 361 F.3d 566, 576 (9th Cir. 2004). The Court may also consider the absence of collusion in the settlement process. *Id.* at 575. This list is not exclusive and different factors may predominate in different factual contexts. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). The relative degree of importance of each of these factors varies according to the circumstances of each case and is dictated by the nature of the claim and the type of the relief sought. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

When reviewing these factors, the settlement is entitled to a presumption of fairness because it was negotiated at arm's length by experienced counsel after significant discovery, multiple mediation sessions and months of intensive settlement discussions. *See In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 WL 1594403, at *2, 9 (C.D. Cal. June 10, 2005). A proposed settlement "is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." *Officers for Justice v. Civil Serv. Comm'n of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). The Court must consider the settlement terms "as is" and cannot rewrite terms or conditions drafted by the parties. *Id.* at 630; *accord Hanlon*, 150 F.3d at 1026 ("The settlement must stand or fall in its entirety.").

As described above, the settlement was reached only after extensive motion practice and discovery had been conducted. Negotiations occurred at arm's length over eight months with the assistance of Justice Trotter as mediator (Berns PA Decl., ¶¶11, 29 (Dkt. No. 112-1)), and Plaintiffs were represented by Class Counsel with extensive class action experience. Berns PA Decl., ¶¶34-39. (Dkt. No. 112-1.)

### 1.    The Strength of Plaintiffs' Case

1      Although Plaintiffs largely prevailed on Defendants' motion to dismiss and

2  believe they would have prevailed on the pending motions for class certification

3  and summary judgment concerning the TILA claims and any future dispositive

4  motions concerning the state-law claims filed by Defendants, neither success on

5  dispositive motion practice nor a favorable jury verdict that would then be upheld

6  on appeal was anywhere near a guarantee.

7      Among other obstacles, Plaintiffs faced the risks that the Court could deny

8  class certification or recognize a defense to their claims, or that a fact-finder could

9  determine that Defendants' disclosures in their loan documents was sufficient.  In

10  contrast to the loan documents in other cases involving Option ARM loans that

11  Class Counsel have reviewed, here, Defendants' loan documents list the actual

12  interest rate charged to the borrowers, rather than the teaser rate on which only the

13  initial monthly payments were based.  While Class Counsel believe that disclosing

14  an interest rate that bears no relation to the monthly payment is deceptive, the

15  disclosures by Defendants here precluded an argument that applies to most other

16  cases brought against lenders issuing option arm loans – namely that borrowers

17  were fraudulently led to believe that they were obtaining a loan with an extremely

18  low interest rate for the first three to five years of the loan which turned out to be

19  in effect for only the first month.

20      Also, Plaintiffs had to take seriously the possibility that their state law

21  causes of action could be held preempted under HOLA and OTS regulations in

22  light of the Ninth Circuit's decision in *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d

23  1001 (9th Cir. 2008), and this Court's recent decision in *Jones-Boyle v.*

24  *Washington Mut. Bank, FA*, No. 08-02142 JF (PVT), 2010 WL 2724287 (N.D.

25  Cal. July 8, 2010) (Fogel, J.).  An adverse ruling could have left the Class with

26  TILA claims only, which have a one-year statute of limitations and $500,000

27  statutory damages cap.  *See* 15 U.S.C. § 1640(a).

28      Finally, going to trial in any case is a risk.  The annals of the federal courts

13

are replete with unsuccessful outcomes for plaintiffs in complex mass litigations. *E.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785-87 (7th Cir. 1999) (affirming, in large part, directed verdict during trial held after plaintiffs had obtained reversal of summary judgments in favor of defendant pharmaceutical manufacturers); *MCI Commc'ns Corp.* v. *AT &T Co.*, 708 F.2d 1081, 1166-69 (7th Cir. 1983) (remanding massive antitrust judgment for new trial on damages); *United States Football League* v. *NFL*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986), *aff'd,* 842 F.2d 1335, 1377 (2d Cir. 1988) (culminating in verdict of $1 before trebling after lengthy trial).

In sum, in light of the uncertainties inherent in, and the likelihood of, protracted litigation, the proposed settlement constitutes a fair, reasonable, and adequate recovery for the Class. *See* Declaration of Jeffrey K. Berns in Support of Attorney's Fees and Cost Application ("Berns Fee Decl."), ¶¶29-33. (Dkt. No. 117-2.)

## 2. Risk, expense, complexity, and likely duration of further litigation

"'In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.'" *Nat'l Rural Telecomms. Coop. v. DIRECTV*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (quoting treatise). "[A] court is not required to 'reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.'" *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) (quoting *Officers for Justice*, 688 F.2d at 625).

If the litigation had proceeded without this settlement, class certification was potentially an uphill battle. Even if Plaintiffs had prevailed on the motion to certify the TILA claims that was pending at the time that the parties agreed upon

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 264

1  the settlement, the Court could have denied class certification as to the state-law

2  damages claims or found they were preempted.  *Cf. Quezada v. Loan Center of*

3  *Cal., Inc.*, No. 2:08-00177 WBS KJM, 2009 WL 5113506 (E.D. Cal. Dec. 18,

4  2009) (denying class certification in case asserting analogous claims).  Such a

5  denial would have been extremely damaging to the Class because, as stated above,

6  the TILA claim has a short statute of limitations and a modest statutory damages

7  cap ($500,000 or 1% of the total settlement cash fund here) for class actions.  In

8  other words, several hundred thousand Settlement Class Members would have had

9  to split $500,000.  Berns Fee Decl., ¶31. (Dkt. No. 117-2.)

10  While Plaintiffs' counsel believe they had a reasonable chance of prevailing

11  on the merits of Plaintiffs' claims, the cost of additional and very substantial

12  discovery expenses, retention of experts for class certification and later

13  proceedings, summary judgment and trial would severely deplete even the best-

14  case recovery.  Defendants are represented by nationally- recognized law firms that

15  would have continued to mount a vigorous and thorough defense.  Berns Fee Decl.,

16  ¶57. (Dkt. No. 117-2.)  Defendants are all affiliates of a well-capitalized, public

17  company, which is one of the largest financial institutions in the world. The cost to

18  litigate against such capable and well-funded Defendants would unquestionably be

19  substantial.

20  Setting aside the uncertainties as to the outcome, continued litigation would

21  have meant incalculable delay for the Class.  Had the litigation continued, in

22  addition to the pending summary judgment and class certification motions

23  concerning the TILA claims, there would likely have been a hotly-contested

24  motion for class certification on the state law claims, additional discovery,

25  competing motions for summary judgment on those claims (including a revisiting

26  of Defendants' asserted federal preemption defense), and a lengthy trial.  Even if

27  Plaintiffs were successful, appeals would have potentially followed, thereby

28  causing further expense, delays, and the inherent uncertainties in litigating an

15

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 265

appeal. In contrast, settling the litigation at this time, under the proposed terms, will ensure an immediate monetary recovery for the Settlement Class, particularly since many Settlement Class Members need the settlement benefits now. This is particularly true for those eligible for, and in need of, immediate and ongoing benefits from the loan modification program and deed-in-lieu/short sale payment program. *Cf. Nat'l Rural Telcomms Coop.*, 221 F.R.D. at 527 ("Avoiding such a trial and the subsequent appeals in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation.").

### 3. The Risk of Maintaining Class Action Status Throughout the Trial

As part of the settlement, the parties agreed to stipulate to certification of the three settlement classes that are defined above. *See* Settlement Agreement, § IV(A). (Dkt. No. 112, Ex. A.) Should the settlement not be approved, however, any future certification effort would be a vigorously-contested battle, as shown by the spirited opposition that Defendants mounted against certification of a class to pursue the TILA claims. Finally, even if the Class remained certified throughout the trial and Plaintiffs prevailed, Defendants would challenge class certification on appeal. "If at any point the Class were decertified or certification were reversed on appeal, the Class would recover nothing." *Rodriguez v. West Publ'g Corp.*, No. CV-05-3222 R(MCx), 2007 WL 2827379, at *8 (C.D. Cal. Sept. 10, 2007), *aff'd in relevant part*, 563 F.3d 948 (9th Cir. 2009). Thus, this factor also weighs in favor of approving the settlement.

### 4. The Amount Offered in Settlement

In evaluating the proposed settlement consideration, the Court may similarly look at the difficulties Plaintiffs would face if litigation were to proceed. *In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). In making this assessment, courts have compared "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not

16

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 266

1   prevailing with the amount of the proposed settlement." *Nichols v. SmithKline*

2   *Beecham Corp.*, No. 00-6222, 2005 WL 950616, at \*15 (E.D. Pa. Apr. 22, 2005)

3   (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab.*

4   *Litig.*, 55 F.3d 768, 806 (3d Cir. 1995) (in turn quoting *Manual for Complex*

5   *Litigation* 2d § 30.44 at 252) (internal quotation marks omitted).

6       Here, the result achieved – of $50 million for the Settlement Class, separate

7   payment of notice and administration costs, extensive loan modification and deed-

8   in-lieu/short sale cash payment programs that will be available for over two and

9   one-half years, and the separate payment of Plaintiffs' counsel's fees that will *not*

10  deplete the common fund recovered for the Class – is an extraordinary and

11  exceptional result.[4] *See Officers for Justice*, 688 F.2d at 624 ("the very essence of

12  a settlement is compromise, 'a yielding of absolutes and an abandoning of highest

13  hopes'").

14          **5.      The Extent of Discovery Completed and the Stage of the**
                      **Proceedings**

15      Significant discovery was conducted in this action up to and through the

16  point where settlement was reached.  Berns Fee Decl., ¶7. (Dkt. No. 117-2.)  Class

17  Counsel has vigorously prosecuted this case on behalf of the Class since 2006.

18  This work involved a substantial pre-filing investigation (including the review of

19  hundreds of sets of loan documents and borrower interviews), a hotly-contested

20  motion to dismiss, extensive discovery (including the review of thousands of

21  produced documents and multiple hours of videotapes), and production of

22  documents by, and the depositions of, multiple Plaintiffs.  Berns Fee Decl., ¶¶5-7.

23  (Dkt. No. 117-2.)  Additionally, by the time that the parties reached an agreement

24  through mediation before Justice Trotter, they had already completed the briefing

25

26  _____
    [4]  Plaintiffs' valuation expert has estimated that these components of the settlement
27  are worth in the range of approximately $839 million to $2.7 billion to Settlement
    Class Members.  *See* Declaration of Professor Jonathan Macey (Berns Fee
28  Declaration, Ex. 2). (Dkt. No. 117-2.)

1  of a class certification motion and summary judgment motions concerning the
2  TILA claims.  Berns Fee Decl., ¶¶ 10-11. (Dkt. No. 117-2.)

3      After months of mediation with Justice Trotter's assistance, the parties
4  agreed to a settlement in principle. Months of additional negotiations regarding the
5  terms of that settlement and the dissemination of notice to the Class ensued.  In
6  light of the extensive discovery and independent factual research conducted by
7  Class Counsel, this factor also weighs in favor of final approval.

8              **6.    The Experience and Views of Counsel**

9      Class Counsel has considerable experience in litigating class actions, and
10  other complex litigation.  Berns PA Decl., ¶¶34-39, Exs. B-G. (Dkt. No. 112-1.)  In
11  assessing the adequacy of the terms of a settlement, the trial court is entitled to, and
12  should, rely upon the judgment of experienced counsel for the parties. *See Nat'l*
13  *Rural Telcomms Coop.*, 221 F.R.D. at 528 ("Great weight is accorded to the
14  recommendation of counsel, who are most closely acquainted with the facts of the
15  underlying litigation.") (citation and internal quotation marks omitted). The basis
16  for such reliance is that "[p]arties represented by competent counsel are better
17  positioned than courts to produce a settlement that fairly reflects each party's
18  expected outcome in litigation." *In re Pacific Enters. Secs. Litig.,* 47 F.3d 373, 378
19  (9th Cir. 1995).  Indeed, absent fraud, collusion, or the like, a district court should
20  be hesitant to substitute its own judgment for that of counsel when evaluating a
21  proposed settlement.  *E.g.*, *McNary v. Am. Sav. and Loan Ass'n*, 76 F.R.D. 644,
22  649 (N.D. Tex. 1977) ("Courts have consistently refused to substitute their
23  business judgment for that of counsel, absent evidence of fraud or overreaching").

24      Class Counsel fully support the settlement, and it is their informed opinion
25  that, given the uncertainty and expense of pursuing Defendants through trial, the
26  settlement is fair, reasonable, and adequate and in the best interests of the
27  Settlement Class.  Berns PA Decl., ¶41 (Dkt. No. 112-1); Berns Fee Decl., ¶33.
28  (Dkt. No. 117-2.)    Based on the years of litigating the case and the formal and

18

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 268**

informal discovery taken, the parties understood the strengths and weaknesses of their respective positions and had ample information to make an informed professional judgment regarding the fairness and reasonableness of the Settlement Agreement.

### 7. The Reaction of the Class Members to the Proposed Settlement

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Nat'l Rural Telcomms Coop.*, 221 F.R.D. at 529 (citing cases); *accord In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633, 644 (D.N.J. 2004) ("The absence of objections from the overwhelming majority in response to the Notice to Class Members should be considered in approving the Settlement."); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281(S.D.N.Y. 1999) ("the absence of substantial objections and relative absence of opt-outs strongly favors approval") (citing cases).

Here, the response from Class members has been overwhelmingly positive. Out of the nearly 516,000 notices delivered to Settlement Class Members (White Aff., ¶5), only 36 objections to the settlement were filed, which amounts to approximately a mere 0.007% of Settlement Class Members who received the notice. Berns Final Approval Decl., ¶4. The objection rate here is exceedingly small when compared with objections rates in other class actions. *E.g.*, *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (objections from only 16% of class members was persuasive evidence that settlement was adequate). Especially given the fact that extensive notice was furnished by direct mail to Settlement Class Members, this demonstrates that the Class overwhelmingly supports final approval of the settlement.

Additionally, there have been only 456 requests for exclusion (Lake Aff., ¶9), which amounts to approximately 0.08% of Settlement Class Members. That

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 269**

only a tiny fraction of the entire Class has excluded itself from the case further weighs in favor of final approval. *See Wilson v. Airborne, Inc.*, EDCV 07-770-VAP (OPx), 2008 WL 3854963, at *7 (C.D. Cal. Aug. 13, 2008) (230 opt-outs and 17 objections out of a class of 419,606 weighs in favor of approval).

### 8. Absence of Collusion in the Settlement Process

There was no collusion in the settlement of this action. The parties entered into the Settlement Agreement in good faith, following arm's-length negotiation by counsel, including multiple mediation sessions with the assistance of a nationally known mediator. Spirited negotiations took place over many months. Berns PA Decl., ¶¶ 16-19. (Dkt. No. 112-1.) This factor also supports final approval of the settlement.

### 9. The Objections to the Settlement Have No Merit

The objections that challenge the settlement's substantive terms have no merit and should be rejected.

The Hargett Objection will be discussed first. This objection (Dkt. No. 119) dismisses the settlement's loan modification program and related relief as "pre-existing benefits" that are "identical to and are assured through the Settlement term by separate settlements with many states." Hargett Objections at 4; *see also* Dayton Objections (Dkt. No. 125) at 4 (making same argument). This argument fails for several reasons.

First, the settlement's loan modification program cannot legitimately be deemed a "pre-existing benefit" in States, such as California, which did not enter into settlements with Defendants until *after* this settlement was concluded and received this Court's preliminary approval. *Compare* Dkt. No. 112 (Motion for Preliminary Approval of Settlement, filed Dec. 10, 2010) *with* Berns Final Approval Decl., Ex. 3 (Assurance between State of California and Wells Fargo Bank, N.A., entered into Dec. 16, 2010). Because the Settlement Agreement's relief provisions pre-dated those obtained by States such as California, the relief

20

1  that it provides to Settlement Class Members cannot reasonably be alleged to be "

2  pre-existing."

3      The same is true of the provisions cited to in other earlier State settlements.

4  Class Counsel first required that a loan modification program form a portion of any

5  settlement during settlement negotiations in early 2009. Significantly, this was

6  before any of the Attorneys General had begun their investigations. Berns Final

7  Approval Decl., ¶12. Indeed, many of the components of the MAP2R loan

8  modification program were originally raised by Class Counsel and Class Counsel

9  fought vigorously to insure that those terms, which include principal reduction,

10 permanent principal forgiveness for making payments in accordance with a

11 modification plan, reduced paperwork for borrowers and an expansive definition of

12 imminent danger of default that allows borrowers to apply for modifications before

13 they are in danger of foreclosure, were part of MAP2R. *Id.*

14     Second, and most importantly, these Objectors entirely ignore that the

15 Settlement Agreement gives Class members an important right that they do not

16 enjoy under the State Attorney General settlements, namely, the individual right to

17 enforce its relief provisions. The State settlements expressly and repeatedly

18 disavow any right of borrowers to enforce their provisions. The California

19 settlement, for example, provides that "nothing in this Assurance shall be

20 construed as authorizing any person or entity other than the Office of the Attorney

21 General to enforce or seek remedies under this Assurance or as a result of this

22 Assurance or a breach thereof." Berns Final Approval Decl., Ex. 3 (Cal.

23 Settlement), § IV(B); *see also id.*, § XII(G) (titled "No Third Party Beneficiaries

24 Intended") ("This Assurance is not intended to confer upon any person any rights

25 or remedies, including rights as a third party beneficiary.").

26     By contrast, this settlement is binding upon and enforceable by all of the

27 parties to this action, which includes all Class members. *See* Settlement § XIV(B)

28 (Dkt. No. 112, Ex. A) (providing that "the Court shall retain exclusive and

21

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 271**

1  continuing jurisdiction over the Lawsuit, the Parties, **Settlement Class Members**,

2  and the Settlement Administrator in order to interpret and **enforce the terms,**

3  **conditions, and obligations under this Agreement.**") (emphasis added).

4      Indeed, since finalizing the settlement, Class Counsel worked diligently to

5  ensure that Settlement Class Members receive the full settlement benefit by

6  speaking with thousands of Settlement Class Members who made inquiries

7  concerning the settlement, and by working with the Settlement Administrator and

8  Defendants' counsel to confirm that Settlement Class Member inquires

9  (particularly those relating to the loan modification program) were properly

10  handled. Class Counsel will continue to monitor the administration of the loan

11  modification program on behalf of Settlement Class Members. Berns Final

12  Approval Decl., ¶11.

13      Thus, for all of the above reasons, any objection that the settlement's loan

14  modification program provides no independent benefit is meritless.

15      The Objectors' remaining challenges to the Settlement's substantive terms

16  likewise fail.

17      The Smith Objection (Dkt. No. 124) challenges the settlement's *cy pres*

18  distribution for funds from uncashed checks as improper because some of these

19  funds revert to Defendants and some are distributed to designated charities. *See*

20  Smith Obj. at 11-13. (Dkt. No. 124.) This objection lacks merit. First, the

21  Objectors ignore the fact that the settlement guarantees distribution of the entire

22  $50 million common fund to Settlement Class Members. *See* Settlement

23  Agreement, § VI(A) (Dkt. No. 112) ("The Defendants shall pay or cause to be paid

24  to the Settlement Administrator the total sum of $50 million within five (5)

25  business days after the effective date."). The only part of this fund that is subject

26  to the *cy pres* designation or reversion is that representing checks mailed to

27

28

MEM. P&A's I.S.O. PLAINTIFFS' MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF

Settlement Class Members but never cashed. Of this anticipated minuscule fraction of the Settlement Fund,[5] the only part that could return to Defendants is the portion of the settlement consideration specifically allocated for settlement notice and administration costs– which have been paid by Defendants, not (as typically the case in class action settlements) out of the Settlement Fund. *Id.* (uncashed funds "shall first be used to reimburse the Defendants for Administration Expenses"). Thus, this does not "grant a benefit to Defendants out of their own settlement." Smith Obj. at 12 (Dkt. No. 124). Moreover, in the rare event of any *cy pres* distribution at all, the beneficiaries will have to be approved by this Court. *E.g.*, *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1120 (E.D. Cal. 2009) ("Donations of the residual to these public interest organizations that serve low-income workers is appropriate"). The objection to the *cy pres* provision, limited as it is to funds from *uncashed* checks, is baseless.

The Objectors' procedural challenges to the settlement likewise have no merit.

The Rose Objection (Dkt. No. 127) questions the lack of disclosure of the loan modification program's "net present value" (NPV) formula (Rose Obj. at 12 (Dkt. No. 127)) even though (1) the Objector claims that she is not a member of Settlement Class B or C to which the loan modification program applies, *see id.* at 8 ("Ms. Rose has her own understanding that she is a member of Settlement Class A"); (2) she recognizes that the NPV formula will be made publically available by law early this year, *id.* at 12 n.9; (3) the NPV formula *already has been disclosed* to Lead Class Counsel as part of the settlement's terms evaluation, *see* Settlement § 1.47; and (4) Defendants are prepared to disclose the formula *in camera* to the

---

[5] It is precisely because the number of uncashed checks will likely be so minimal that a second, supplemental distribution of settlement proceeds to Settlement Class Members on a *pro rata* basis would not be practicable given the expense entailed in making such a distribution to so large a class. The expense of calculating and making such distribution would far exceed the total proceeds to be distributed.

MEM. P&A's I.S.O. PLAINTIFFS' MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF
**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 273**

1   Court, if necessary.  *Id.*  Likewise, the request in the Dayton Objections (Dkt. No.

2   125) to postpone the entire settlement process because of the release of the

3   evidence gathered by the Financial Crisis Inquiry Commission ("FCIC") is utterly

4   specious and fails to justify further delay.  Those Objectors cite no "evidence" in

5   the FCIC report that bears upon this action's claims, which are based almost

6   entirely on the deceptiveness of the express terms of Defendants' loan documents.[6]

7       Ten of the remaining Objectors objected on the grounds that they wanted a

8   loan modification, or that the settlement should require Defendants to modify all

9   loans.   In fact, Class Counsel reviewed the loan modification denials and

10  concluded that they were consistent with the settlement terms.  *See* Berns Final

11  Approval Decl., ¶11.   Other Objectors resubmitted their loan modification

12  applications and have subsequently received loan modifications or are under

13  consideration for loan modifications.  *Id.*

14      The remaining objections are from Class Members who suggest that the

15  result should be different.  Some contend that the compensation is not adequate,

16  others request a different method for allocating the $50 million Settlement Fund,

17  and others want the target DTI to be lower.  However, these are nothing more than

18  "should have done better" objections, which Ninth Circuit courts and courts

19  elsewhere have routinely rejected:

20

21  _____

    [6]   Indeed, to the extent the FCIC's report has *any* bearing on the claims and

22  defenses in this case, it may underscore the risk to any recovery posed by federal
    agencies' enactment of regulations used by banks and thrifts, including World

23  Savings, as grounds to *preempt* state-law damages claims.  *See The Financial Crisis
    Inquiry Report* (U.S. Gov't Printing Office 2011) (available at http://fcic-

24  static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf) at 141
    (testimony of Illinois Attorney General Lisa Madigan) ("And I think that it is no

25  coincidence that the era of expanded federal preemption gave rise to the worst
    lending abuses in our nation's history.").  Admittedly, this testimony also suggests a

26  basis for challenging the legality of the preemption regulations at issue.  But the
    point here is that the Objectors do not even understand that this is an issue in the

27  case, let alone the difficulty of resolving it.

28

> [Objectors] offer nothing more than speculation about what damages 'might have been' won had they prevailed at trial. The court has aptly held that 'it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators.'

*Linney v. Cellular Alaska Partn.*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers for Justice*, *supra*, 688 F.2d at 625 (emphasis in original). In sum, the objections to the Settlement have no merit and should be rejected.

## B. Notice of Settlement to the Class Was Adequate and Satisfied All Requirements of Rule 23(e) and Due Process

The settlement's provision of notice by U.S. mail to all Settlement Class members and summary publication on the Internet and in *USA Today*, as this Court approved, provided the best practicable means of informing Class members of their rights and of the settlement's terms. *See*, *e.g.*, *Silber v. Mabon*, 18 F.3d 1449, 1453-54 (9th Cir. 1994) (notice by direct mail or e-mail and publication are often the "best practicable" notice); *Torrisi*, 8 F.3d at 1374-75.

The notice program was carried out in accordance with the Court's preliminary approval order. *See* Wheatman Decl., ¶¶12-21. Class members thus received – both directly via mail and indirectly via Internet and newspaper publication – sufficient notice to inform them of the settlement's terms and its effect on their rights.

### 1. The Objections to the Class Notice Have No Merit

The Hargett Objection (Dkt. No. 119) challenges the Settlement Notice's adequacy because it did not disclose the amount of a Class Member's individual relief and did not fully disclose the scope of the settlement's release of claims. *See* Hargett Objection at 4-6 (Dkt. No. 119); *see also* Smith Objection (Dkt. No. 124.) at 9. Neither challenge has merit.

First, the Settlement Notice did not state the amount of individual relief because that could not be determined at the time when notice was issued. The

25

Settlement provides for a *pro rata* division of the $50 million cash fund among all Settlement Class B and C Members and Settlement Class A Members who submit timely Claim Forms (because they do not have current accounts and contact with Defendants). Because the number of Settlement Class A claimants could not be known when the Settlement Notice was issued, the dollar amount of individual recoveries could not be determined, let alone disclosed. The Court should therefore overrule this objection. *See In re Sprint Corp. ERISA Litig.*, 443 F. Supp. 2d 1249, 1262 (D. Kan. 2006) (so long as class notice explains how settlement shall be distributed, it is unnecessary that it specify precise amount that each individual class member may expect to recover) (citing authorities).

Second, the contention that the Settlement Notice fails to disclose that Class Members will "give up their defenses and counterclaims (the 'Foreclosure Defenses') to any foreclosure lawsuit" (Hargett Objection at 3, 5-6 (Dkt. No. 119)) is based upon a misunderstanding of the settlement's terms. The settlement's "Release" provision provides, in relevant part, that Settlement Class Members will release:

> The Alleged Claims and any and every actual or potential known or unknown claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description that the Releasing Party has or may have . . . against any of the Released Entities ***arising out of the Alleged Claims, the origination of the Settlement Class Member's Pick-a-Payment mortgage loan, the manner in which the Defendants applied the Settlement Class Member's payments to principal and interest, negative amortization, the Pick-a-Payment mortgage loan's potential for negative amortization, the disclosure of the Pick-a-Payment mortgage loan's potential for negative amortization, and the disclosure of the manner in which payments would be applied to principal and interest.***

Settlement Agreement, § V(A) (Dkt. No. 112, Ex. A.) (emphasis added).

Thus, the release is limited in an important way that the Objection does not address: it is limited in scope to claims pertaining to disclosures concerning

1 | negative amortization, or application of payments, made at the time of loan
2 | origination. Given this substantial limitation, the objection to the Class Notice is
3 | premised upon a misunderstanding of the scope of the settlement's release
4 | provision and thus should be overruled.

5 | ### C. Final Certification of The Settlement Class Is Warranted

6 | In order to grant final certification of a settlement class, the requirements of
7 | Rule 23 must be generally satisfied. *See* Fed. R. Civ. P. 23; *Hanlon*, 150 F.3d at
8 | 1019. As the Court preliminarily found with respect to approval of the Settlement
9 | Class, certification is warranted where, as here, it is demonstrated that the four
10 | prerequisites of Rule 23(a), numerosity, commonality, typicality, and adequacy of
11 | representation, and one of three requirements of Rule 23(b), are satisfied. *Id.* The
12 | Court need not address manageability with respect to certification of a class for
13 | settlement purposes because the settlement means that there will be no trial.
14 | *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Here, the proposed
15 | Settlement Class satisfies the requisite threshold elements of Rule 23(a) –
16 | numerosity, commonality, typicality, and adequacy of representation.

17 | ### 1. Numerosity

18 | The proposed Settlement Class easily meets the requirement of numerosity,
19 | in that it is comprised of hundreds of thousands of borrowers. *See Lymburner v.*
20 | *U.S. Fin. Funds, Inc.*, 263 F.R.D. 534, 539 (N.D. Cal. 2010) ("There is no magic
21 | number that will satisfy the numerosity requirement, but numerosity has been
22 | found when a class comprised forty or more members[.]") (citing cases); *see*
23 | *generally Hanlon*, 150 F.3d at 1019 ("The prerequisite of numerosity is discharged
24 | if the class is so large that joinder of all members is impracticable.").

25 | ### 2. Commonality

26 | The Ninth Circuit has made it clear that in the litigation context, the
27 | commonality requirement is to be construed permissively. *See Hanlon*, 150 F.3d at
28 | 1019. Commonality can be established by a showing "that the class is united by a

27

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 277

common interest." *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (holding that "slight differences in class members' positions" will not defeat commonality). "[All questions of fact and law need not be common to satisfy the rule." *Id.*

Here, the common questions of fact and law include the following:

> (a)     Whether the Pick-a-Payment loan documents failed to disclose that the payment amounts listed in the Note and TILDS were insufficient to pay both principal and interest;
>
> (b)     Whether the Pick-a-Payment loan documents failed to disclose that negative amortization was absolutely certain to occur if borrowers made payments according to the payment schedule provided in the TILDS; and
>
> (c) Whether the Pick-a-Payment loan documents violated TILA.

### 3.     Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations and internal quotation marks omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Therefore, slight factual distinctions between the named plaintiff and the claims of absent class members do not undermine typicality. *In re Glassine & Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 304 (E.D. Pa. 1980). Rather, courts focus on the defendants' conduct and the plaintiff's legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

28

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 278

1  The typicality requirement is construed liberally. *Scholes v. Stone, McGuire*

2 *& Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992). When it is alleged that the

3 same unlawful conduct was directed at or affected both the named plaintiffs and

4 the classes that they seek to represent, the typicality requirement is usually

5 satisfied, irrespective of varying fact patterns which underlie individual claims.

6 *Smith v. Univ. of Wash. Law Sch.*, 2 F. Supp. 2d 1324, 1342 (W.D. Wash. 1998)

7 ("Typicality turns on the defendant's actions toward the plaintiff class, not

8 particularized defenses against individual class members."). Accordingly,

9 differences that may exist in the amount of injury suffered by each class member

10 do not render the named plaintiffs' claims atypical. *Armstrong v. Davis*, 275 F.3d

11 849, 869 (9th Cir. 2001).

12  Here, Plaintiffs' claims are typical of those of the absent members of the

13 Settlement Class that they seek to represent. All of them entered into Pick-a-

14 Payment loans and were subject to the same undisclosed or improperly disclosed

15 terms challenged in these suits, and their claims are "reasonably coextensive with

16 those of absent class members." *Hanlon*, 150 F.3d at 1020.

17    **4. Adequacy**

18  In addition, Plaintiffs have demonstrated that they will fairly and adequately

19 protect the interests of the Class. The adequacy requirement has two prongs: "(1)

20 That the representative party's attorney be qualified, experienced, and generally

21 able to conduct the litigation; and (2) that the suit not be collusive and plaintiff's

22 interests not be antagonistic to those of the remainder of the class." *In re United*

23 *Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litigation*, 122 F.R.D.

24 251, 257 (C.D. Cal. 1988).

25  Both prongs are met here. First, Plaintiffs in the various actions have

26 retained counsel who are qualified and experienced to litigate this action. The

27 Court appointed Class Counsel after consolidation by the order of the JPML and

28 these attorneys are highly experienced in consumer class actions and complex

29

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 279**

1 litigation. Berns PA Decl., ¶¶34-39 Exs. B-G. (Dkt. No. 112-1.)  Second,

2 Plaintiffs and Settlement Class Members do not have any antagonistic interests.

3 Plaintiffs have already demonstrated their ability to vigorously pursue absent Class

4 Members' interests through the years of spirited litigation that preceded this

5 settlement, which itself was achieved after vigorous arm's-length negotiations

6 aided by a mediator.  Moreover, no Plaintiff has any conflict of interest with absent

7 members of the Class.  There can be no genuine dispute here concerning Plaintiffs'

8 adequacy to represent absent Class Members' interests.

9 **a.  The Adequacy Objections Have No Merit**

10 The Rose Objection (Dkt. No. 127) challenges (at least implicitly) the

11 adequacy of the representation of Settlement Class A by contending that none of

12 the named Plaintiffs are in Settlement Class A because all Plaintiffs still have their

13 Pick-a-Payment loans, and that there is a "discrepancy" in the relief provided to

14 Class A.  *See* Rose Objection at 8-11. (Dkt. No. 127.)  Both of these arguments

15 fail.

16 First, Proposed Class Representatives Tina Singer, Michael and Jayme

17 Brunkhorst, and Michael and Mary Harber all refinanced their Option ARM loans

18 prior to the Preliminary Approval date.  Additionally, Proposed Class

19 Representative Judith Holley obtained a loan modification prior to that date.  Thus,

20 all of those individuals are members of Settlement Class A.  Berns Final Approval

21 Decl., ¶14.  Moreover, even if none of the proposed Class Representatives was a

22 member of Settlement Class A, the fact that a class consists of persons who are

23 current and former customers and all named plaintiffs fall into one or the other

24 group would not be grounds for denying certification or settlement approval.  *Cf.*

25 *Walsh v. Great Atlantic & Pacific Tea Co., Inc.*, 726 F.2d 956, 964 (3d Cir. 1983)

26 ("On liability issues the interests of the present and former employees with respect

27 to the Plan's excess funds are identical.  The only possible divergence of interests

28 is in the manner in which the settlement fund would be shared.  Such

30

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 280**

1  disagreements over the proper division of a settlement fund do not necessarily
2  create conflicts of interest requiring separate representation.").

3      At any rate, the fact that Settlement Class B and C Members (who still have
4  their loans) will be afforded access to loan modification relief whereas Settlement
5  Class A members will not does not call into question the adequacy of
6  representation or the settlement's fairness and reasonableness. Settlement Class A
7  members no longer have their Pick-a-Payment loans, so there is obviously no loan
8  to modify. The Rose Objection contends that Class A borrowers "have been
9  harmed the most [and] have the most risk." Rose Obj. at 10 (Dkt. No. 127.) This
10  is not true. In fact, Settlement Class B and C members have been harmed more
11  because they they still have their Pick-a-Payment loans which are the subject of
12  this litigation, and thus, they have likely incurred more negative amortization than
13  Settlement Class A members who, in accordance with the Settlement Class
14  definition, "no longer have a Pick-a-Payment mortgage loan because they sold the
15  property securing the loan, refinanced the loan, paid off the loan personally, or
16  have already obtained a loan modification that converted the loan from a Pick-a-
17  Payment mortgage loan." Settlement Agreement, § IV(A) (Dkt. No. 112, Ex. A.)
18  In short, the settlement's relief provisions for the three Settlement Classes do not
19  demonstrate any conflicts within the Settlement Class.

20                **5.**    **Ascertainability**

21      Although this is not an enumerated requirement of Rule 23(a), courts also
22  must determine whether a class is "adequately defined and clearly ascertainable
23  before a class action may proceed." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672,
24  679-80 (S.D. Cal. 1999) (citation omitted). To satisfy this requirement, a class
25  definition should be "precise, objective and presently ascertainable." *O'Connor v.*
26  *Boeing North Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). Ascertainability
27  ensures that it is "administratively feasible to determine whether a particular
28  person is a class member." *Wolph v. Acer Am. Corp.*, --- F.R.D. ---, 2011 WL

1110754, at *2 (N.D. Cal. Mar. 25, 2011).

Here, each of the Settlement Class easily satisfies this requirement. Membership in the Settlement Class is determined based on a person's having obtained a "Pick-a-Payment" mortgage from World Savings Bank, n/k/a Wachovia Mortgage, FSB, between August 1, 2003 and December 31, 2008. A person's membership in the Settlement Class thus is ascertainable based on the objective criteria of whether he or she obtained a specific type of mortgage loan from specific lenders during a specified time period. As to the three Settlement Classes, membership in Settlement Class A is ascertained based on whether a Settlement Class Member no longer has his or her Pick-a-Payment loan, while membership in Settlement Classes B and C is ascertained based on whether a Settlement Class Member still has his or her Pick-a-Payment loan and either is not in default (Settlement Class B) or is in default (Settlement Class C) based on whether their mortgage payments were more than 60 days past due as of the Preliminary Approval date. Settlement Agreement, § 1.18 (Dkt. No. 112, Ex. A.) Thus, each of these Settlement Class definitions is "precise, objective and presently ascertainable." Indeed, the membership of each of the Settlement Classes has already been *ascertained* inasmuch as the Settlement Administrator was able to mail copies of the notices to members of each Settlement Class based upon information provided by Defendants. *See* Lake Aff., ¶¶4-5; Wheatman Decl., ¶¶12-15.

### a.     The Ascertainability Objection Fails

The Rose Objection (Dkt. No. 127) argues that Settlement Class membership is not ascertainable because the Settlement Class definitions require that persons "have not previously released their claims pursuant to another settlement agreement, final judgment, or other dealings with Wachovia Mortgage." *See* Rose Objection at 7-8 (Dkt. No. 127.) That is unavailing. That provision does not employ amorphous criteria, require a mini-trial, or call for inquiry into

32

anyone's state of mind. *E.g., DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (statewide class of residents "active in the peace movement" suffered from definition's "patent uncertainty"); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006) (definition of owners of "non-income producing property" unworkable because "large-scale judicial fact-finding" would be needed to ascertain whether property was "non-income producing"); *Peltier v. City of Fargo*, No. A3-74-78, 1975 WL 169, at *4 (D.N.D. Mar. 19, 1975) (subclass of females "turned away from employment because of the acknowledged all male nature of the police department" not ascertainable because it was impossible to determine who might have been subjectively dissuaded from seeking employment).

The provision does nothing more than prevent persons who have already resolved and released claims with Defendants from re-opening those claims through this settlement. The Objector's contention that this inquiry could result in additional litigation is specious. The factual inquiry for membership exclusion is neither complex nor subjective. To invoke that provision, Defendants would have to demonstrate the existence of a judgment, settlement agreement, or some other objective manifestation of a consumer's release of claims. Simply put, the Settlement Class definitions' exclusion of persons who previously released their claims does not render the membership of the Class unascertainable. *Cf. Vaugh v. Am. Honda Motor Co.*, 627 F. Supp. 2d 738, 751 (E.D. Tex. 2007) (certifying settlement class that excluded "all persons who have previously executed and delivered to Honda releases of their claims").

### 6. Rule 23(b)

Once the four prerequisites of Rule 23(a) are met, "the potential class must also satisfy at least one provision of Rule 23(b)." *Rosario*, 963 F.2d at 1017; *see also General Tel Co. v. Falcon*, 457 U.S. 147, 161 (1982). Here, the Settlement Class satisfies Rule 23(b)(3), which states that a class may be certified when

33

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 283**

1   "questions of law or fact common to the members of the class predominate over

2   any questions affecting only individual members, and […] a class action is superior

3   to other available methods for the fair and efficient adjudication of the

4   controversy."

5        The questions of law and fact common to all class members are set forth

6   above.  These common issues tower over any issues affecting individual Class

7   Members, because the claims of the Settlement Class Members all turn on the

8   sufficiency of the disclosures in the form Pick-a-Payment loan documents.

9   Additionally, a class action is clearly superior to other available methods for the

10  fair and efficient adjudication of the controversy because it is desirable to

11  concentrate the more than half-million claims in one court, the same body of

12  federal and state law applies to all Class Members' claims, and Class Members

13  lack the wherewithal to prosecute their claims individually given the disparity

14  between their anticipated recovery and what it could cost to litigate their claims to

15  conclusion (including expert witness costs) against these well-financed corporate

16  defendants.  Fed. R. Civ. P. 23(b)(3).

17       In sum, class treatment of these claims is eminently suitable.  The Court

18  should accordingly certify the Settlement Class pursuant to Rule 23(b)(3) for

19  purposes of granting final approval to the Settlement.[7]

20       **D.    THE COURT SHOULD APPOINT CLASS COUNSEL AS**

21             **COUNSEL FOR THE SETTLEMENT CLASS**

22       Under Rule 23, "a court that certifies a class must appoint class counsel . . .

23  [who] must fairly and adequately represent the interests of the class." Fed. R. Civ.

24  P. 23(g)(1)(A), (B).  The appointment is to be based on the court's consideration of

25  "the work counsel has done in identifying or investigating potential claims in the

26

27  _____

    [7]  Defendants have agreed not to contest class certification solely for purposes of
28  this Settlement.  Settlement Agreement, § IV(A). (Dkt. No. 112, Ex. A.)

MEM. P&A's I.S.O.  PLAINTIFFS' MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 284**

action," "counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action," "counsel's knowledge of the applicable law," "the resources counsel will commit to representing the class," and "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(A).

As detailed in the firm resumes presented to the Court, Class Counsel (Lead Counsel Jeffrey K. Berns and David M. Arbogast, and the members of Plaintiffs' Executive Steering Committee) have significant experience in litigating class actions. *See* Berns PA Decl., ¶¶34-39, Exs. B-G. (Dkt. No. 112-1.) They have diligently investigated, prosecuted, and settled this litigation. They have dedicated substantial resources to the investigation and prosecution of the claims at issue in the litigation. Finally, they have demonstrated their knowledge of the consumer and borrower protection laws at issue. Thus, the Court should appoint them as Class Counsel for purposes of certification of the Settlement Class, pursuant to Rule 23(g).

## 1. The Objections to the Proposed Award of Attorneys' Fees Have No Merit

The Smith Objection (Dkt. No. 124) focuses primarily on the attorneys' fees application, but none of the issues raised have any merit.

First, the Objection claims that an award based on the percentage of the fund created for the Settlement Class is inappropriate because the "total recovery for the Class is uncertain." Smith Obj. at 4 (Dkt. No. 124). But this argument ignores the fact that the $50 million cash fund provides a guaranteed and certain benefit because the entire fund will be distributed to the Class. *See* Settlement Agreement, § VI(A). (Dkt. No. 112, Ex. A.) Thus, contrary to the Objectors' contention, this is not a case where none of the benefit to the Class can be determined. Because the $50 million cash fund is guaranteed to the Class, even if the Court were just to consider that benefit by itself, the proposed $25 million fee award would represent

35

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 285**

33-1/3% of this portion of the Settlement's cash component – a percentage within the norm in the Ninth Circuit and in this Court.  *See*, *e.g.*, *Mego Fin. Corp.*, 213 F.3d 454 (affirming fee award of 33.3%); *In re Pacific Enters. Secs. Litig.*, 47 F.3d at 379 (affirming fee award of 33% of $12 million settlement fund); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1375 (N.D. Cal. 1989) (awarding fee of 32.8% of settlement fund).

Furthermore, Objectors ignore and, therefore never account for the fact that the Settlement Class will also receive cash payments for deeds-in-lieu of foreclosure and short sales.

Moreover, the Objectors do not dispute that "the loan modification option will certainly be a benefit to some of the Class members."  Smith Obj. at 6 (Dkt. No. 124).  Although Objectors dispute Plaintiffs' expert valuation of this benefit, they provide none of their own.  More fundamentally, because the Objectors concede that the loan modification program will provide a benefit, they recognize that the proposed fee award in fact represents less (and likely far less) than a third of the Settlement's overall provision of benefits.

The Smith Objection also claims that a fee award of less than half that sought by Class Counsel is appropriate because "*[t]his case did not involve novel or unique issues of law or fact.*"  Smith Obj. at 7 (Dkt. No. 124) (emphasis added).  All that demonstrates is that the Objectors put as little work into understanding this litigation as they did into their own objections.  If the legal issues in this case were not novel or unique, one would expect the Objectors to be able to identify a wealth of case law *pre-dating this litigation* that recognizes claims challenging Option ARM loan disclosures under TILA and state law, which also rejects a federal savings association's federal preemption defenses to state-law claims.  In fact, the Objectors identify no such case law because there was none before Plaintiffs and their counsel commenced this litigation and defeated Defendants' motion to dismiss on federal preemption grounds.  The challenge Plaintiffs and their Counsel

36

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 286**

undertook and the risk they faced in litigating this case to the verge of a class certification hearing were considerable, and the Objectors' failure or inability to recognize this challenge and risk speaks volumes about the lack of merit to their objection.

The Objectors also rely on *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010), to challenge the sufficiency of Class Counsel's evidentiary showing of their work in this case. That is unavailing. In *In re Mercury*, the Ninth Circuit held that a submission of a fee petition *after* the deadline for objection was improper because it would not allow the objectors to "provide the court with critiques of the specific work done by counsel when they were furnished with no information of what that work was, how much time it consumed, and whether and how it contributed to the benefit of the class." *Id.* at 994. Here, Class Counsel provided all of that information well before the deadline for objections, allowing Class Members to assess: (1) the specific work done by counsel (*see* Berns Fee Decl., ¶¶ 2-19 (Dkt. No. 117-2) (describing counsel's pre-filing investigation, conduct of litigation, and conduct of settlement negotiation)); (2) the precise amount of billing time and value this work consumed (*id.*, ¶¶ 35-57, and exhibits cited therein); and (3) how it contributed to the benefit of the Settlement Class in light of the results achieved through this settlement (*id.*, ¶¶ 20-28). Class Counsel's timely and thorough submission satisfies all of the *Mercury Interactive* requirements for effective review. *See*, *e.g.*, *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1176 (S.D. Cal. 2007) ("Although counsel have not provided a detailed cataloging of hours spent, the Court **FINDS** the information provided to be sufficient for purposes of lodestar cross-check.") (emphasis in original), *citing In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.").

Finally, the Objectors' challenge to the separation of the proposed fee award

37

**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS PAGE 287**

1   from the cash relief fund on the sole ground that the "incentive, by both Objectors

2   and the Court, to inquire into the fee application is significantly diminished"

3   (Smith Obj. at 9) also is baseless.  The Objectors cite no case law supporting this

4   argument.  Moreover, the premise of this argument – that Class Counsel must put

5   their fees in the same fund as the Class relief so that Counsel and Class members

6   are competing for the same funds in order to increase the likelihood of objector

7   scrutiny – is implausible on its face.  Indeed, courts view this type of settlement

8   structure --where cash relief for the class is separated from moneys for attorneys'

9   fees -- as *supporting* approval of both.  *See*, *e.g.*, *In re Mfrs. Life Ins. Co. Prem.*

10  *Litig.*, 1998 U.S. Dist. LEXIS 23217, at *34 (S.D. Cal. Dec. 21, 1998) ("Because

11  any reduction in the fee would not benefit the class and Manulife is not asking that

12  the fee be reduced, further scrutiny of how the lodestar of over $7 million was

13  calculated would serve no purpose.").

14      In sum, the Smith Objection's challenge to the proposed attorneys' fee

15  award and arguments for recovery of fees for themselves lack merit and should be

16  rejected.[8]

17      **E.      Compensation to the Named Plaintiffs Is Appropriate**

18      Courts often make an award to class representatives for their service to the

19  Class.  *In re Lorazepam & Chlorazepate Antitrust Litig.*, 205 F.R.D. 369, 400

20  (D.D.C. 2002);  *Mego Fin. Corp.*, 213 F.3d at 463 (9th Cir. 2000) (approving

21  incentive awards of $5,000 to each of two class representatives of 5,400 potential

22  _____

23  [8] Since the Smith Objectors' request for attorneys' fees, despite offering nothing of
    value to the Class, suggests the likely motive behind many of the objections on file,
    Plaintiffs request that the Court require objectors to post an appeal bond of at least
24  $150,000 (two years' interest at 1.5%  on the $50 million settlement fund) pursuant
    to Fed. R. App. P. 7 if any objectors appeal the grant of final Settlement approval.
25  *See*, *e.g.*, *Azizian v. Federated Dep't Stores*, 499 F.3d 950, 954-55 (9th Cir. 2007)
    (recognizing Rule 7's application in appeal by class action objectors); *In re Wal-*
26  *Mart Wage and Hour Empl. Pract's Litig.*, No. 2:06-cv-00225, 2010 WL 786513, at
    *2 (D. Nev. March 8, 2010) (same; requiring objectors through counsel to post
27  bonds of $500,000 each).

28

EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 288

1    class members in a settlement of $1.725 million); *In re Catfish Antitrust Litig.*, 939
2    F. Supp. 493, 503-4 (N.D. Miss. 1996) (acknowledging the public benefits of
3    private enforcement efforts in antitrust and similar types of class action litigation
4    by rewarding representative plaintiffs who have been instrumental in obtaining
5    relief on behalf of persons other than themselves).

6        Class Counsel are requesting that the Court approve compensation from the
7    Settlement Fund in the total amount of $125,000 to the 31 Class Representatives,
8    which awards will be based upon their respective contributions to the litigation.
9    Berns Fee Decl., ¶¶61, 67.   (Dkt. No. 117-2.) By shouldering the burdens
10   associated with this litigation, each Class Representative has made a significant
11   contribution to the recovery obtained for the Class. These Plaintiffs played an
12   important role in this litigation -- retaining counsel, producing documents,
13   responding to written discovery, and conferring with counsel on the litigation.
14   Berns Fee Decl., ¶¶62-66.  (Dkt. No. 117-2.)  The requested service payments are
15   quite modest and are within the amounts that Ninth Circuit courts find acceptable.
16   *See, e.g., Presley v. Carter Hawley Hale Profit Sharing Plan*, No. C9704316SC,
17   2000 WL 16437, at *2 (N.D. Cal. 2000) (approving $25,000 incentive awards);
18   *Van Vraken v. Atlantic Richfield, Inc.*, 901 F. Supp. 295, 300 (N.D. Cal. 1995)
19   (approving $50,000 incentive award); *In re McKessonHBOC, Inc. ERISA Litig.*,
20   391 F. Supp. 2d 844, 851 (N.D. Cal. 2005) (approving $5,000 incentive awards).

21       In light of the benefits conferred by the Settlement reached in this case, the
22   role of the Class Representatives in this lawsuit should be acknowledged with a
23   reasonable payment to compensate them for their time and expenses associated
24   with actively participating in this litigation.

25   **IV.   CONCLUSION**

26       For all of the foregoing reasons, the Court should certify the Settlement
27   Class, appoint Plaintiffs as Class Representatives and their counsel as Class
28   Counsel; and give final approval to the settlement.

Dated: April 15, 2011

Respectfully submitted,

**ARBOGAST & BERNS LLP**

By: /s/ Jeffrey K. Berns
Jeffrey K. Berns
David M. Arbogast

*Lead Counsel for Plaintiffs and the Proposed Settlement Class*

**SMOGER & ASSOCIATES**
Gerson H. Smoger
Gerson@texasinjurylaw.com
3175 Monterey Boulevard
Oakland, California 94602-3560
Tel.: (510) 531-4529
Fax: (510) 531-4377

**WILLIAMS CUKER BEREZOFSKY, LLC**
Mark R. Cuker (Admitted *Pro Hac Vice*)
mcuker@wcblegal.com
1515 Market Street, Suite 1300
Philadelphia, Pennsylvania 19102
Tel.: (215) 557-0099
Fax: (215) 557-0673

**BROWNE WOODS GEORGE LLP**
Eric M. George
egeorge@bwgfirm.com
2121 Avenue of the Stars, Suite 2400
Los Angeles, California 90067
Tel.: (310) 274-7100
Fax: (310) 275-5697

**SEEGER WEISS LLP**
Christopher A. Seeger (Adm. *Pro Hac Vice*)
cseeger@seegerweiss.com
One William Street
New York, New York 10004
Tel.: (212) 584-0700
Fax: (212) 584-0799

**KABATEK BROWN KELLNER LLP**
Brian S. Kabateck
bsk@kbklawyers.com
644 S. Figueroa Street
Los Angeles, California 90017
Tel.: (213) 217-5000
Fax: (213) 217-5010

**RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN, LLC**
A. Hoyt Rowell, III (Admitted *pro hac vice*)
hrowell@rpwb.com
1037-A Chuck Dawley Blvd.
Mt. Pleasant, South Carolina 29464
Tel.: (843) 727-6500
Fax: (843) 216-6509

**BUXNER LAW**
Evan D. Buxner (Admitted *pro hac vice*)
ebuxner@buxnerlaw.com
230 South Bemiston, Suite 500
St. Louis, Missouri 63105
Tel.: (314) 720-0623
Fax: (314) 725-9597

*Members of Plaintiffs' Executive Steering
Committee*

MEM. P&A's I.S.O. PLAINTIFFS' MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF
**EXHIBIT H ISO MOTION TO STAY PROCEEDINGS
PAGE 291**

EXHIBIT I

1 | **ARBOGAST & BERNS LLP**
2 | David M. Arbogast (SBN 167571)
  | darbogast@law111.com
3 | Jeffrey K. Berns (SBN 131351)
  | jberns@law111.com
4 | 6303 Owensmouth Avenue, 10th Floor
  | Woodland Hills, CA 91367-2263
5 | Tel.: (818) 961-2000
  | Fax: (818) 936-0232

6 | *Lead Counsel for Plaintiffs and the Class*

7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION**

10 |

11 | IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE
12 | MARKETING AND SALES PRACTICES LITIGATION
13 |
14 | _____
15 | *This Document Relates to*:
16 | ALL INCLUDED ACTIONS

| **Case No. 5:09-md-02015-JF** |
| CLASS ACTION |
| **DECLARATION OF JEFFREY K. BERNS IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

Date: April 29, 2011
Time: 9:00 a.m.
Courtroom: 3, 5th Floor
Judge: Hon. Jeremy Fogel

17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

EXHIBIT H ISO MOTION TO STAY
PAGE 292

I, Jeffrey K. Berns, declare:

1.     I am an attorney licensed to practice by the State of California, and a member of the law firm Arbogast & Berns LLP, Lead Counsel for Plaintiffs in this proceeding. I make this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Final Approval Motion"), of my own personal knowledge and, if called as a witness, I could and would testify competently to the matters stated below.

2.     The relevant facts concerning the procedural history of the litigation, the settlement negotiations and terms, the efforts of Class Counsel, and the risks of continued litigation are set forth at length in my Declaration in Support of Plaintiffs' Motion For An Award Of Attorney's Fees And Costs, filed on February 23, 2011 (Dkt. No. 117-2) (the "Fee Declaration") and my Declaration in Support of Preliminary Approval of Class Action Settlement, filed on December 10, 2010 (Dkt. No. 112-1) (the "Preliminary Approval Declaration"). To avoid unnecessary repetition, this Declaration is limited to additional facts that are relevant to the Final Approval Motion and certain objections raised by Settlement Class Members.

## THE PROPOSED SETTLEMENT

3.     The proposed settlement provides extensive benefits to the Settlement Class, which include a) a $50 million cash Settlement Fund, all of which will be distributed to Settlement Class Members, except for up to $125,000 in awards to the Named Plaintiffs who pursued the actions that comprise this consolidated Multi-District Litigation; b) legal fees and expenses awarded by the Court of up to $25 million; c) all costs of settlement notice and administration, which the settlement administrator has agreed to cap at $1 million; d) an extensive loan modification program for all Settlement Class Members who were in default on their Option ARM loans at the time that the Court preliminarily approved the settlement and all Settlement Class Members who become in imminent danger of default through June 2013; and e) cash payments for approved deeds-in-lieu of

DECLARATION OF JEFREY K. BERNS I.S.O MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 293

1  foreclosure and short sales for Settlement Class Members who do not qualify for
2  loan modifications.  The Settlement Agreement, which was provided to the Court as
3  Exhibit 1 to my Preliminary Approval Declaration, is the result of arm's-length
4  negotiations between the parties that spanned several years and involved multiple
5  mediation sessions.

6  **THE REACTION OF THE SETTLEMENT CLASS TO THE SETTLEMENT**

7          4.      The response from Settlement Class Members to the settlement has
8  been overwhelmingly positive. Out of the more than 516,000 Settlement Notices
9  that were delivered to Settlement Class Members, only 36 total objections to, and
10  457 exclusions from, the settlement were filed.  These remarkably small numbers
11  confirm the fairness of the settlement and provide overwhelming support that the
12  settlement should receive final approval.

13      **CLASS COUNSEL HAS, AND WILL CONTINUE, TO INSURE THAT**
14    **SETTLEMENT CLASS MEMBERS RECEIVE THE MAXIMUM BENEFIT**
15                    **FROM THIS SETTLEMENT**

16          5.      Shortly prior to the settlement becoming public, I, along with other
17  representatives of Class Counsel and Defendants' Counsel, began working with
18  Kinsella Media, LLC, a firm with expertise in class action settlement notification
19  and Rust Consulting LLC (Rust), the settlement administrator, to formulate a plan
20  for notice and administration of the settlement.  *See* Declaration of Shannon
21  Wheatman of Kinsella Media (Ex. 1 hereto) and Affidavit of Amy Lake of Rust
22  (Ex. 2 hereto).  Throughout these discussions, and on weekly conference calls that
23  have continued to date, Class Counsel has worked diligently to insure that all
24  Settlement Class Members receive the necessary information about the settlement
25  and the loan modification program.

26          6.      Once the settlement was made public in December 2010, I, along with
27  other Class Counsel, began receiving communications from Settlement Class
28  Members concerning the settlement, and particularly, the loan modification

3

DECLARATION OF JEFREY K. BERNS I.S.O MOTION FOR FINAL APPROVAL - 5:09-md-02015-JF

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 294

1    program. From the time that the Settlement was announced, through the time that

2    Settlement Notices were sent out, we spoke to thousands of Settlement Class

3    Members and worked closely with counsel for Defendants to resolve any questions

4    that we could not address without further information.

5        7.    In January 2011, prior to when the Settlement Notices were mailed

6    out, I, along with other attorneys for the Parties, traveled to Minneapolis to work

7    with Rust to train the Customer Service Representatives (CSRs) who were going to

8    handle inquiries from Settlement Class Members. As part of the training, we made

9    certain that the CSRs were aware that they should encourage Settlement Class

10   Members to contact Defendants customer service department directly concerning

11   any inquiries that they had regarding the loan modification program. Additionally,

12   we made sure that Rust knew to instruct any Settlement Class Members who were

13   having issues with their modification applications to contact my office directly.

14       8.    In addition to the CSR training, we also worked with Rust on the

15   content of the pre-recorded messages that Settlement Class Members would hear

16   when they called Rust. Further, we made certain that Rust would have a sufficient

17   number of CSRs to handle inquiries without long wait times and, based upon our

18   understanding of the composition of the Settlement Class, that there would be

19   enough Spanish-speaking CSRs.

20       9.    Since the Settlement Notices were mailed out, Class Counsel has

21   spoken to thousands of Settlement Class Members by telephone, in order to assist

22   them with inquiries concerning the settlement and the loan modification program. I

23   personally have spoken to over 700 Settlement Class Members about the settlement

24   and their reaction has been generally positive.

25       10.   During the settlement negotiations, it was important to Class Counsel

26   that Settlement Class Members have the ability enforce the terms of the settlement.

27   Thus, unlike in the State Attorneys General settlements, the Settlement Agreement

28   provides that this Court will have continuing jurisdiction to enforce the terms of the

settlement.  Settlement Agreement, § XIV(B) (Dkt. No. 112, Ex. A.)  For example, Defendants settlement with the State of California expressly provides that "nothing in this Assurance shall be construed as authorizing any person or entity other than the Office of the Attorney General to enforce or seek remedies under this Assurance or as a result of this Assurance or a breach thereof."  *See* Exhibit C hereto (Assurance between State of California and Wells Fargo Bank, N.A., entered into 12/16/10), § IV(B).  To enable Class Counsel to police the Settlement Agreement, Class Counsel negotiated for and obtained a provision Moreover, the Settlement Agreement provides that Settlement Class Members who do not qualify for HAMP or MAP2R Modifications shall receive, within thirty calendar days of the Defendants' receipt of all required documentation from the Settlement Class Member, a written description that clearly explains the reasons that the modification was denied, copies of which will also be sent to Lead Class Counsel. *Id.*, § VI(E)(8).

11.    It was always Class Counsel's intent that we would review the denial materials and work with Defendants to address any circumstance where we felt that the denial of the modification was improper or that there were not sufficient grounds provide for the denial.  This is precisely why the Settlement Agreement requires that Class Counsel receive copies of all written denials of loan modification applications.  *See* Settlement Agreement, § VI(E)(8) (Dkt. No. 112, Ex. A.)  For example, ten objectors objected on the grounds that they wanted a loan modification, or that the settlement should require Defendants to modify all loans. After receiving these objections, Class Counsel reviewed the loan modification denials and concluded that they were consistent with the settlement terms.  Other objectors have resubmitted their loan modification applications and have subsequently received loan modifications or are currently under consideration for loan modifications.

/ / /

5

**CLASS COUNSEL NEGOTIATED THE SETTLEMENT AGREEMENT SEPARATE AND APART FROM THE ATTORNEYS GENERAL**

12. The settlement negotiations are discussed at length in my prior declarations. *See* Fee Declaration, ¶¶ 16-19 and Exhibit 1 thereto (Declaration of the mediator, Hon. John K. Trotter (Ret.)). I initially began discussing settlement with counsel for the Defendants in early 2009. At that time, I proposed a loan modification program that had many of the components that ultimately ended up in the MAP2R modification program that is at the heart of this settlement. To my knowledge, these early negotiations occurred before Defendants had begun negotiations settlements with any Attorneys General. Indeed, at the time that the Parties submitted the Settlement Agreement to the Court for preliminary approval (December 10, 2010), the California Attorney General had not settled with Defendants. *See* Ex. C hereto (Assurance between State of California and Wells Fargo Bank, N.A., entered into 12/16/10).

13. The settlement negotiations were protracted and often heated. While any settlement negotiation involves "give and take," there are certain key components of the modification program that Class Counsel insisted upon and which were ultimately included in the program despite initial opposition from Defendants. These include, principal reduction, permanent principal forgiveness for making payments in accordance with a modification plan, reduced paperwork for borrowers and an expansive definition of imminent danger of default that allows borrowers to apply for modifications before they are in danger of foreclosure.

**SEVERAL OF THE PROPOSED CLASS REPRESENTATIVES ARE MEMBERS OF SETTLEMENT CLASS A**

14. One of the objectors has contended that Settlement Class A was not fairly represented because none of the Proposed Class Representatives is a member of that Class. That is incorrect. Proposed Class Representatives Tina Singer, Michael and Jayme Brunkhorst, and Michael and Mary Harber all refinanced their

6

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 297**

1   Option ARM loans prior to the Preliminary Approval date. Additionally, Proposed

2   Class Representative Judith Holley obtained a loan modification prior to that date.

3   Thus, all of those individuals are members of Settlement Class A.

4                           **CONCLUSION**

5        15.    For all of the reasons contained herein, and in my other Declarations

6   filed in connection with the settlement, and based upon my discussions with

7   Settlement Class Members and a review of the objections, it is my opinion that this

8   settlement is fair and reasonable, and warrants the Court's final approval.

9       I declare under penalty of perjury under the laws of the United States of

10   America that the foregoing is true and correct to the best of my knowledge.

11       Executed at Woodland Hills, California, on April 15, 2011.

12                         */s/ Jeffrey K. Berns*

13                         JEFFREY K. BERNS

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 298**

# EXHIBIT 1

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 299**

<table>
<tr><td>

UNITED STATES DISTRICT COURT, NORTHERN
DISTRICT OF CALIFORNIA – SAN JOSE DIVISION
2112 Robert F. Peckham Federal Building and United States
Courthouse
280 South First Street
San Jose, CA 95113

</td><td></td></tr>
</table>

| UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION 2112 Robert F. Peckham Federal Building and United States Courthouse 280 South First Street San Jose, CA 95113 | |
| IN RE WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION | ▲ COURT USE ONLY ▲ |
| | Case No: M:09-CV-2015-JF |

**DECLARATION OF SHANNON R. WHEATMAN, PH.D. ON IMPLEMENTATION AND ADEQUACY OF SETTLEMENT NOTICE PLAN**

1.      I am a Vice President of Kinsella Media, LLC ("KM"), a legal notification firm in Washington, D.C. specializing in the design and implementation of notification programs to reach unidentified putative class members primarily in consumer and antitrust class actions and claimants in bankruptcy and mass tort litigation. My business address is 2120 L Street, NW, Suite 860, Washington, D.C. 20037. My telephone number is (202) 686-4111.

2.      Here in *In Re Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation*, KM was retained to design a notice (the "Notice") to inform Class Members of the proposed class action settlement.

## RELEVANT EXPERIENCE

3.      I have served as a qualified class action notice expert in many class actions. State and federal courts have accepted my analyses and expert testimony on whether information is effectively communicated to people. My c.v. is attached as **Exhibit 1**.

1

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 300

4.     I have been involved in some of the largest and most complex notification programs, including, *In re Katrina Canal Breaches Consolidated Litig.* (a settlement affecting Hurricane Katrina and Rita survivors), No. 05-4182, E.D. La.; *Lockwood v. Certegy Check Services, Inc.* (data theft settlement involving over 37 million consumers), No. 8:07CV-1434, M.D. Fla.; *Grays Harbor Adventist Christian School v. Carrier Corp.* (nationwide multi-million dollar high efficiency furnace settlement), No. 05-05437, W.D. Wash.; *In re Royal Ahold Securities & ERISA Litig.* (the $1.1 billion settlement of the first globally certified and notified shareholder class), MDL 1539, D. Md., *In re Residential Schools Class Action Litig.* (the approximately $4 billion settlement of numerous class actions involving century-old abuses of Aboriginal people), No. 00-cv-192059, Ont. S.C.J.; *Meckstroth v. Toyota Motor Sales USA, Inc.* (the oil gel settlement affecting over seven million Toyota/Lexus owners), No. 583-318, 24th Jud. D. Ct. La.; and many others.

5.     Courts have admitted expert testimony from me on quantitative and qualitative evaluations of the effectiveness of notice programs and several courts have commented favorably, on the record, regarding the effectiveness of notice plans I have done.  Selected judicial comments are included in the attached c.v.

6.     My qualifications include leadership in the form and content of notice.  For example, while serving with the Federal Judicial Center ("FJC"), I collaborated to write and design the illustrative, "model" forms of notice, designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2).  This research formed the basis for my doctoral dissertation, *The Effects of Plain Language Drafting on Layperson's Comprehension of Class Action Notices* (2001) (Ph.D. dissertation, University of Georgia).  To assist judges and attorneys, in state as well as federal courts, the FJC has posted the notices at www.fjc.gov.

7.     I have authored and co-authored numerous articles on notice and due process. The central premise of these articles is that notice and due process depends upon clear communication with the people affected.  *See, e.g.,* Shannon R. Wheatman & Terri R. LeClercq, *Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements*, 30 REV.

2

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 301

LITIG. 53 (2011); Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually in-form.* GEO J. LEGAL ETHICS, 18 (4), 1359-1382 (2005); and Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 TULANE LAW REV. 1771 (2006).

## SUMMARY OF CONCLUSIONS

8.      The Notice Program we designed and implemented achieved each of the planned objectives:

a.      Each element of the Notice Program approved by the Court has been implemented.

b.      The Notice Program, as implemented, reached approximately 99% of potential Class Members through mailed Notice.

c.      Not reflected in the calculable reach figures is the supplemental publication as well as the website effort that was utilized, but for which reach figures provide qualitative, not quantitative, enhancement.

d.      The Notices were designed to be noticeable, clear, simple, substantive, and informative. No significant or required information was missing.

9.      In my view, the Notice Program provided the best notice practicable under the circumstances of this case, and satisfied due process, including its "desire to actually inform" requirement.[1]

10.      The facts in this report are based on information provided to me by my colleagues

---

[1] "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . ." Mullane v. Central Hanover Trust Bank & Trust Co., 339 U.S. 306, 315 (1950).

3

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 302

and by the claims administration firm working on the case, Rust Consulting, Inc. ("Rust").

11.    The details of the Notice Plan and the basis for my opinion on its adequacy, as well as on the adequacy of the Notice, are outlined below.

## NOTICE PLAN IMPLEMENTATION

### *Individual Notice*

12.    In developing the Notice Program, it was first determined that a comprehensive list of potential Class Members was available, and that it would be reasonable to implement an individual notification effort to reach them.

13.    Starting on January 28, 2011, mailings were sent to 522,183 potential Class Members.

14.    Before sending the mailings to the list of addresses provided by the Defendants, the addresses were checked against the National Change of Address ("NCOA") database maintained by the United States Postal Service ("USPS"). Any mail that was returned with a forwarding address was re-mailed to the new address indicated by USPS. Any mail that was returned without a forwarding address was further checked through an additional third-party source and re-mailed if a new address was found.

15.    As of April 10, 2011, 5,381 mailings or 1% of the total mailings, remain un-delivered. Therefore, overall, Notices reached approximately 99% of the potential Class.

### *Publication Notice*

16.    A quarter-page (5.37" x 10.5") Summary Notice appeared in *USA Today,* a national newspaper with a circulation of 1,768,227, on the following dates and page numbers:

   a.   February 2, 2011 on page B10

   b.   February 8, 2011 on page A2

   c.   February 9, 2011 on page B2

4

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 303

### *Online Media*

17.     On January 28, 2011, the Court-approved website, www.PickaPaySettlement.com, went live.  By logging on to this website, Class Members could obtain additional information about the Settlement, including: the Long Form Notices (in English and Spanish); Settlement Agreement; Preliminary Approval Order; and Corrected Second Amended Class Action Complaint.

18.     The website was prominently displayed in all Notice materials.

19.     As of April 10, 2011, there have been 171,691 visits to the website.

### *Toll Free Number*

20.     On January 28, 2011, the toll-free number, set-up and hosted by Rust, became operational.  By calling this number, Class Members could speak to a live operator, listen to answers to frequently asked questions or request to have a copy of the Long Form Notice and Claim Form mailed to them.

21.     As of April 10, 2011, the toll-free number has handled 27,993 calls.

### *Exclusions and Objections*

22.     As of April 10, 2011, 362 potential Class Members have made timely requests to be excluded from the Settlement Class.

23.     As of April 10, 2011, 41 potential Class Members have filed an objection to the class action Settlement.

### NO SUBSTANTIAL OBJECTIONS TO NOTICE

24.     No objection implicated the method or form of notice in any substantive way. Only one objection complained about notice issues, and in this instance the notice issues raised were either inaccurate or irrelevant from the standpoint of effective communication with Class Members.  I will address here the objection noted in the Memorandum of Points and Authorities

5

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 304**

in Support of Objection to Proposed Settlement, Payment of Fees and Expenses to Class Counsel, and Entry of Judgment and Order of Dismissal ("Hargett Objection").

    a.  As stated in my qualifications listed above, I am well aware that class action notices in federal courts need to be in plain language. Along with my former colleagues at the Federal Judicial Center (the "FJC") we wrote and designed the illustrative, "model" forms of notices to embody the satisfaction of the plain language requirements of Federal Rule of Civil Procedure 23(c)(2). We followed the principles set out in these models for all of the Notices prepared for use in *Mandrigues.*

      i.  The Hargett Objection contends that the Settlement Class B Notice did not inform Class Members about the Settlement. The Settlement Class B Notice has a Flesch Reading Level of 9.5. This means a person who reads at a 9th grade reading level can understand the contents of the Notice.

      ii.  The Long Form Notice that was mailed to Class Members clearly spells out the Settlement benefits and all of the Notice documents contain the toll-free number where Class members could turn with additional questions. The statistics for the toll-free number illustrate that Class members were willing and able to take the simple steps needed to obtain additional information if needed.

      iii.  Information on the release was included in the Long Form Notice. Specifically, question 13 of the Long Form Notice tells Class members what they are giving up if they stay in the Settlement. The Settlement Agreement was referred to in this section and made available at the website and Class members were made aware that they could contact Class Counsel with any questions. Additionally, the model notices do not include any specific release language in the long form notice.

      iv.  Rule 23 requires that a class action notice be clear and concise. It is impossible as a practical matter for the Notices to contain every term from the

6

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 305**

Settlement Agreement and still fulfill these requirements. In my view, and based upon my experience, the Notices contained all of the necessary information for Class Members to determine whether to participate in the Settlement or to opt out.

v. The Hargett Objection contends that the "value" of the Settlement is not clearly stated. I disagree. The Notice expressly states that on page 5, "[t]he Settlement provides for a loan modification program valued at over $600 million and the establishment of a $50 million Settlement Fund." As the Ninth Circuit has explained, "[t]he aggregate amount available to all claimants was specified [in the class notice]….. Nothing more specific is needed." Marshall v. Holiday Magic, 550 F.2d 1173, 1178 (9th Cir. 1977).

## PERFORMANCE AND DESIGN OF NOTICE PROGRAM

25. **Objectives were met.** The primary objective of the Settlement Notice effort in *Wachovia* was to effectively reach the greatest practicable number of Class Members with a "noticeable" Notice of the settlement, and provide them with every reasonable opportunity to understand that their legal rights were affected, to be heard, and to object if they so chose. These efforts were successful.

26. **The Notice reached Class Members effectively.** Our conservative and careful calculations indicate that the mailed notice alone reached approximately 99% of potential Class Members. In addition, although not included in the reach percentage above, the supplemental publication and website effort further enhanced coverage among the Class. In my experience, this reach percentage greatly exceeds that achieved in many other court approved notice programs. Based on our calculations, I can confidently state that the Class was adequately reached.

27. **Plenty of time and opportunity to react to Notice.** The Notices were initially

7

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 306

mailed on January 28, 2011, which allowed plenty of time for Class Members to see the Notice and respond accordingly before the March 16, 2011 exclusion and objection deadlines. With 47 days from Notice until the exclusion, objection and claims deadlines, and 91 days until the fairness hearing, Class Members were allotted more than adequate time to act on their rights.

28. ***Notices were designed to increase noticeability and comprehension.*** The program included steps to bring the Notice to the attention of Class Members. Because mailing recipients are accustomed to receiving junk mail that they may be inclined to discard unopened, the program called for steps to bring the Notice to the attention of Class Members. Once people "noticed" the Notices, it was critical that they could understand them. As such, the Notice was clearly worded with simple, plain language text to encourage readership and comprehension.

29. In fact, the design of the Notices embodied the previously mentioned illustrative "model" notices that I have developed in collaboration with the FJC.

a. The Long Form Notices that were mailed to Class Members included a large, bold headline that captured attention and immediately alerted even casual readers that they should read the Notice and explained why it is important.

b. The Long Form Notices contained a prominent focus on the options that Class Members have, using a straightforward table design, and included details about the settlement, such as who is affected, and their rights. A table of contents, categorized into logical sections, helped to organize the information, while a question and answer format made it easy to find answers to common questions by breaking the information into simple headings and brief paragraphs. The Long Form Notices were available in English and Spanish.

c. The Summary Notice for publication included a large, bold headline that captured attention and immediately alerted even casual readers that they should read the Notice and explained why it is important.

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 307**

## CONCLUSIONS

30.    The notice effort reached approximately 99% of Class Members.  Many courts have accepted and understood, based on evidence that we have given, that a 75 or 80 percent "reach" is more than adequate under the circumstances of analogous cases.  Here we were able to exceed that.  This "reach" indicates that the mailed notice campaign was highly successful in providing direct notice to potential Class Members.

31.    In addition, although not included in the reach percentage above, the publication Notice and website effort further enhanced coverage among the Class.

32.    In preparing the Notices in the *Wachovia* case, we have employed communications methods that are well established in our field, and we have eschewed the idea of producing old-fashioned case-captioned, lengthy, legalistic notice documents.  We have taken to heart the high standards embodied in the Advisory Committee's notes accompanying the proposed changes to Federal Rule 23(c)(2).  We have focused on a primary judicial concern about notice today—effective communication of information about the class action.   As expressed in the Advisory Committee's notes accompanying the changes to Rule 23:

> *The direction that the class-certification notice be couched in plain easily understood language is added as a reminder of the need to work unremittingly at the difficult task of communicating with class members.*

33.    The Notice was prepared in this matter fully account for this concern and were written and designed to the highest communication standards.

34.    We have provided evidence that demonstrate that the notice effort reached a large number of Class Members and we have prepared a Notice that adequately informed Class Members of the class action, properly described their rights, and clearly conformed to the high standards for modern notice programs.  In designing our notice programs, we truly desire to adequately inform the class, and we designed and implemented a program for *Wachovia* that provided a reasonable way of doing so under the circumstances of the case.

9

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 308**

35.     I believe the notice program meets the express requirements of Rule 23 and has provided members of the Class the best notice practicable under the circumstances, including individual notice to all members who could be identified through reasonable effort.

36.     I further believe that our notice effort comported with the guidance for effective notice articulated in the latest edition of the *Manual for Complex Litigation, Fourth*.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Shannon R. Wheatman

Executed in Washington, D.C. this 13th day of April 2011.

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 309

# EXHIBIT 1

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 310



# Shannon R. Wheatman, Ph.D.

Vice-President, Notice
Kinsella Media, LLC
2120 L Street NW, Suite 860
Washington, DC 20037
2010 - Present

Dr. Wheatman began her class action career in 2000 at the Federal Judicial Center where she was instrumental in the development of model notices to satisfy the plain language amendment to Rule 23. Dr. Wheatman has been involved in over a 125 class actions and has been recognized as a notice expert in state and federal courts across the U.S. and in Canada. Dr. Wheatman specializes in designing, developing, analyzing, and implementing large-scale legal notification plans. She provides testimony on the best notice practicable. Her plain language expertise was advanced by her education, including her doctoral dissertation on plain language drafting of class action notice and her master's thesis on comprehension of jury instructions. Dr. Wheatman's selected case experience includes:

### Antitrust

*Brookshire Bros. v. Chiquita*, No. 05-CIV-21962 (S.D. Fla.).

*Friedman v. Microsoft Corp.*, No. 2000-000722 (Ariz. Super. Ct.).

*Gordon v. Microsoft Corp.*, No. 00-5994 (4th Jud. D. Ct. Minn.).

*Peek v. Microsoft Corp.*, No. CV-2006-2612 (Cir. Ct. Ark.).

*Spence v. Microsoft Corp.,* No. 00-CV-003042 (Cir. Ct. Wis.).

### Consumer and Product Liability

*Beringer v. Certegy Check Servs., Inc.,* No. 8:07-cv-1434-T-23TGW (M.D. Fla.) (data breach).

*Carnegie v. Household Int'l.,* No. 98-C-2178 (N.D. Ill.) (rapid tax refund loan).

*Ciabattari v. Toyota Motor Sales, U.S.A., Inc.,* No. C-05-04289 (N.D. Cal.) (run flat tires).

*Cotton v. Ferman Mgmt. Servs Corp.,* No. 02-08115 (13th Jud. Cir. Ct. Fla.) (automotive products).

*Davis v. Am. Home Prods. Corp.*, No. 94-11684 (Civ. D. Ct. La.) (Norplant contraceptive).

*Defrates v. Hollywood Video*, No. 02L707 (Cir. Ct. Ill.) (video rentals).

*Ford Explorer Cases*, JCCP Nos. 4226 & 4270 (Cal. Super. Ct.) (consumer fraud).

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 311**

*Gardner v. Stimson Lumber Co.*, No. 00-2-17633 (Wash. Super. Ct.) (hardboard siding product).

*Grays Harbor v. Carrier Corp.*, No. 05-CIV-21962 (W.D. Wash.) (high efficiency furnace).

*In re Educ. Testing Serv. PLT 7-12 Test Scoring Litig.*, MDL No. 1643 (teacher's testing).

*In re High Sulfur Content Gasoline Prods. Liability Litig.*, MDL No. 1632 (E.D. La.) (tainted gas).

*In re Lupron Marketing & Sales Practices Litig.*, MDL No. 1430 (D. Mass.) (pharmaceutical).

*In re Serzone Prods. Liability Litig.*, MDL No. 1477 (S.D. W. Va.) (pharmaceutical).

*In re TJX Comp. Retail Sec. Breach Litig.*, MDL No. 1838 (D. Mass.) (data breach).

*In re Trans Union Corp. Privacy Litig.*, MDL No. 1350 (N.D. Ill.) (credit report privacy).

*Mantzouris v. Scarritt Motor Group, Inc.*, No. 8:03cv0015 (M.D. Fla) (automotive products).

*Meckstroth v. Toyota Motor Sales, U.S.A., Inc.*, No. 583-318 (24th Jud. D. Ct. La.) (oil gel).

*Nichols v. SmithKline Beecham Corp.*, No. 00-6222 (E.D. Pa.) (Paxil pharmaceutical).

*Palace v. DaimlerChrysler*, No. 01-CH-13168 (Cir. Ct. Ill.) (defective head gasket).

**Environmental**

*Allen v. Monsant Co.*, No. 041465 and *Carter v. Monsanto Co.*, No. 00-C-300 (Cir. Ct. W.V.) (dioxin release).

*Angel v. U.S. Tire Recovery*, No. 06-C-855 (Cir. Ct. W.V.) (tire fire).

*In Re Katrina Canal Breaches Litig.*, No. 05-4182 (E.D. La.). (Hurricanes Katrina and Rita).

*Morrow v. Conoco Inc.*, No. 2002-3860 G and *Thibodeaux v. Conoco Phillips Co.*, No. 2003-481 F (14th J.D. Ct. La.) (air contaminant release).

**Government**

*Tobacco Farmer Transition* Program, U.S. Dept. of Agriculture (tobacco buyout).

*Homeless Shelter Compensation Program*, City of New York.

*In re Residential Schools Class Action Litig.*, No. 00-cv-192059 (Ont. S.C.J.) (Canadian government, aboriginal abuse).



**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 312**

**Insurance**

*Beasley v. Hartford Ins. Co. of the Midwest*, No. CV-2005-58-1 (Cir. Ct. Ark.) (homeowners insurance).

*Bond v. Am. Family Ins. Co.*, No. CV06-01249 (D. Ariz) (property insurance).

*Burgess v. Farmers Ins. Co.*, No. 2001-292 (Dist. Ct. Okla.) (homeowners insurance).

*Desportes v. Am. General Assurance Co.*, No. SU-04-CV-3637 and *Carter v. North Central Life Ins. Co.* (Ga. Super. Ct.) (credit premium insurance).

*First State Orthopaedics et al. v. Concentra, Inc.*, et al., No. 2.05-CV-04951-NS (E.D. Pa.) (PPO).

*Froeber v. Liberty Mutual Fire Ins. Co.,* No. 00C15234 (Cir. Ct. Ore.) (PPO).

*Guidry v. Am. Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.) (cancer insurance).

*Gunderson v. AIG Claim Services, Inc.,* No. 2004-002417 (14th Jud. D. Ct. La.) (PPO).

*Gunderson v. F.A. Richard & Associates, Inc.*, No. 2004-2417-D. (Cir. Ct. 14th Jud. D. Ct. La.) (PPO).

*Hunsucker v. Am. Standard Ins. Co. of Wisc.*, No. CV-2007-155-3 (Cir. Ct. Ark) (bodily injury claims).

*Johnson v. Progressive Casualty Ins.,* Co., No. CV-2003-513 (Cir. Ct. Ark.) (automobile insurance).

*Morris v. Liberty Mutual Fire Ins. Co.*, No. CJ-03-714 (D. Okla.) (homeowners insurance).

*Reynolds v. The Hartford Fin. Servs. Group, Inc.,* No. CV-01-1529-BR (D. Ore) (homeowners insurance).

*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.) (long term care insurance).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.) (automotive premiums).

*Webb v. Liberty Mutual Ins. Co.*, No. CV-2007-418-3 (Cir. Ct. Ark) (bodily injury claims).

*Zarebski v. Hartford Ins. Co. of the Midwest*, No. CV-2006-409-3 (Cir. Ct. Ark.) (bodily injury claims).

**Securities**

*In re Parmalat Securities Litig.*, MDL No. 1653-LAK (S.D. N.Y.).

*In re Royal Ahold Securities and "ERISA" Litig.*, MDL No. 1539 (D. Md.).



**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 313**

***Warnings/Product Recall***

*Bardessono v. Ford Motor Co*., No. 32494 (Wash. Super. Ct.) (15-passenger van rollover warning).

*Kerosene Recall*, Pittsburgh Terminals Corp.

## Articles

Shannon R. Wheatman & Terri R. LeClercq (in press), *Majority of Publication Class Action Notices Fail to Satisfy Rule 23 Requirements*, Rev. Litig.

Shannon R. Wheatman & Katherine K. Kinsella (in press), *International Class Action Notice*, World Class Actions.

Katherine Kinsella & Shannon Wheatman (in press), *US Class Action Notice and Administration*, AAI International Private Enforcement Handbook.

Shannon R. Wheatman & Thomas, E. Willging, *Does Attorney Choice of Forum in Class Action Litigation Really Make a Difference?* 17 Class Actions & Derivative Suits 1 (2007).

Todd B. Hilsee, Gina M. Intrepido & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process: The "Desire-to-Inform" Requirement for Effective Class Action Notice Is Highlighted by Katrina*, 80 Tulane Law Rev. 1771 (2006).

Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?* Notre Dame L. Rev., *81* (2), 101, 161 (2006).

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do you really want me to know my rights? The ethics behind due process in class action notice is more than just plain language: A desire to actually inform.* Geo. J. Legal Ethics, 18 (4), 1359-1382 (2005).

Thomas E. Willging & Shannon R. Wheatman, *An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation.* Federal Judicial Center (2005).

Elizabeth C. Wiggins & Shannon R. Wheatman, *So what's a concerned psychologist to do? Translating the research on interrogations, confessions, and entrapment into policy* in Interrogations, confessions, and entrapment 265, 280 (2004).



**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 314**

Thomas E. Willging & Shannon R. Wheatman, *Attorneys' Experiences and Perceptions of Class Action Litigation in Federal and State Courts. A Report to the Advisory Committee on Civil Rules Regarding a Case Based Survey*. FEDERAL JUDICIAL CENTER (2003).

Shannon R. Wheatman, *Survey of Bankruptcy Judges on Effectiveness of Case-Weights*. FEDERAL JUDICIAL CENTER (2003).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Judicial Evaluation of Bankruptcy Judges*. FEDERAL JUDICIAL CENTER (2003).

Robert Niemic, Thomas Willging, & Shannon Wheatman, *Effects of Amchem/Ortiz on Filing of Federal Class Actions: Report to the Advisory Committee on Civil Rules*. FEDERAL JUDICIAL CENTER (2002).

Shannon Wheatman, Robert Niemic & Thomas Willging, *Report to the Advisory Committee on Civil Rules: Class Action Notices*. FEDERAL JUDICIAL CENTER (2002).

Elizabeth C. Wiggins & Shannon R. Wheatman, *Implementation of Selected Amendments to Federal Rule of Civil Procedure 26 by United States Bankruptcy Courts*. FEDERAL JUDICIAL CENTER (2001).

Shannon R. Wheatman & David R. Shaffer, *On finding for defendants who plead insanity: The crucial impact of dispositional instructions and opportunity to deliberate*. LAW AND HUM. BEH., *25*(2), 165, 181 (2001).

Shannon R. Wheatman, *Distance Learning in the Courts*. FEDERAL JUDICIAL CENTER (2000).

David R. Shaffer & Shannon R. Wheatman, *Does personality influence the effectiveness of judicial instructions?* PSYCHOL. PUB. POL'Y & L., 6, 655, 676 (2000).

## Court Testimony

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct., Calcasieu Parish).

*Webb v. Liberty Mutual Ins. Co.,* No. CV-2007-418-3 (Cir. Ct. Ark).

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).

## Depositions

*Thomas v. A. Wilbert Sons, LLC*, No. 55,127 (18th Jud. Dist. Ct., Iberville Parish).



## Judicial Comments

*In Re Katrina Canal Breaches*, No. 05-4182 (E.D. La.).

The notice here was crafted by Shannon Wheatman, Ph.D., whose affidavit was received as evidence . . . The entire notice was drafted in plain, comprehensible language . . . The Court finds this notice adequately reached the potential class. - Hon. Stanwood R. DuVal, Jr. (2009).

*Jones v. Dominion Transmission Inc.,* No. 2.06-cv-00671 (S.D. W. Va.).

The Parties' notice expert Shannon R. Wheatman, Ph.D. . . . testified that in this case . . . that the mailed notices reached approximately 95.4 percent of the potential class . . . I HOLD that personal jurisdiction exists over the Class Members because notice was reasonable and afforded the Settlement Class an opportunity to be heard and to opt out. - Hon. Joseph R. Goodwin (2009).

*Guidry v. American Public Life Ins. Co.*, No. 2008-3465 (14th Jud. Dist. Ct.).

The facts show that the notice plan . . . as adequate to design and implementation . . . Dr. Shannon R. Wheatman, a notice expert, also testified at the fairness hearing as to the sufficiency of the notice plan. Dr. Wheatman testified that the notice form, content, and dissemination was adequate and reasonable, and was the best notice practicable. - Hon. G. Michael Canaday (2008).

*Webb v. Liberty Mutual Ins. Co.,* (March 3, 2008) No. CV-2007-418-3 (Cir. Ct. Ark).

Ms. Wheatman's presentation today was very concise and straight to the point . . . that's the way the notices were . . . So, I appreciate that . . . Having admitted and reviewed the Affidavit of Shannon Wheatman and her testimony concerning the success of the notice campaign, including the fact that written notice reached 92.5% of the potential Class members, the Court finds that it is unnecessary to afford a new opportunity to request exclusion to individual Class members who had an earlier opportunity to request exclusion but failed to do so . . . The Court finds that there was minimal opposition to the settlement.  After undertaking an extensive notice campaign to Class members of approximately 10,707 persons, mailed notice reached 92.5% of potential Class members. - Hon. Kirk D. Johnson (2008).

*Sherrill v. Progressive Northwestern Ins. Co.*, No. DV-03-220 (18th D. Ct. Mont.).

Dr. Wheatman's affidavit was very informative, and very educational, and very complete and thorough about the process that was undertaken here. . . So I have reviewed all of these documents and the affidavit of Dr. Wheatman and based upon the information that is provided . . . and the significant number of persons who are contacted here, 90 percent, the Court will issue the order. - Hon. Mike Salvagni (2008).



*Shaffer v. Continental Casualty Co.*, No. 06-2235 (C.D. Cal.).

The Class Notice and the notice methodology implemented pursuant to the Settlement Agreement, as described in part in the Declarations of . . . Shannon Wheatman. constituted the best practicable notice. . . was reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and met all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law. - Hon. Philip S. Gutierrez (2008).

*Gray's Harbor v. Carrier Corp.*, No. 05-05437 (W.D. Wash.).

The Court finds that this notice was the best notice practicable under the circumstances, that it provided due and adequate notice of the proceedings and of the matters set forth therein, and that it fully satisfied all applicable requirements of law and due process. - Hon. Ronald B. Leighton (2008).

*Beringer v. Certegy Check Servs., Inc.*, No. 8.07-cv-1434-T-23TGW (M.D. Fla.).

The proposed form of notice and plan for publishing are reasonable and designed to advise members of the Settlement class of their rights . . . A nationally recognized notice specialist, Hilsoft Notifications, has developed the comprehensive Notice Plan. Here, Notice is reasonably calculated to reach the maximum number of potential Settlement Class Members and, thus, qualifies as the best notice practicable. The Notice Plan here is designed to reach the maximum number of Class Members, and it is Plaintiffs' goal to reach at least 80% of the Class—an extraordinary result in consumer class action litigation. - Hon. Steven D. Merryday (2008).

*Palace v. DaimlerChrysler Corp.*, No. 01-CH-13168 (Cir. Ct. Ill.).

The form, content, and method of dissemination of the notice given to the Illinois class and to the Illinois Settlement Class were adequate and reasonable, and constituted the best notice practicable under the circumstances. The notice, as given, provided valid, due, and sufficient notice of the proposed Settlement, the terms and conditions set forth in the Settlement Agreement, and these proceedings, to all Persons entitled to such notice, and said notice fully satisfied the requirements of due process . . . - Hon. Mary Anne Mason (2008).

*Johnson v. Progressive Casualty Ins., Co.*, No. CV-2003-513 (Cir. Ct. Ark.).

Notice of the Settlement Class was constitutionally adequate, both in terms of its substance and the manner in which it was disseminated . . . Notice was direct mailed to all Class members whose current whereabouts could be identified by reasonable effort. Notice reached a large majority of the Class members. The Court finds that such notice constitutes the best notice practicable . . . The forms of Notice and Notice Plan satisfy all of the requirements of Arkansas law and due process. - Hon. Carol Crafton Anthony (2007).



**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 317**

*Beasley v. The Reliable Life Insurance Co.*, No. CV-2005-58-1 (Cir. Ct. Ark).

[T]he Court has, pursuant to the testimony regarding the notification requirements, that were specified and adopted by this Court, has been satisfied and that they meet the requirements of due process. They are fair, reasonable, and adequate. I think the method of notification certainly meets the requirements of due process . . . So the Court finds that the notification that was used for making the potential class members aware of this litigation and the method of filing their claims, if they chose to do so, all those are clear and concise and meet the plain language requirements and those are completely satisfied as far as this Court is concerned in this matter. - Hon. Joe Griffin (2007).

## Education and Experience

### Education

Ph.D., Social Psychology, 2001; The University of Georgia, Athens, GA

Dissertation Title: *The effects of plain language drafting on layperson's comprehension of class action notices.*

M.S., Social Psychology, 1999; The University of Georgia, Athens, GA

Thesis Title: *Effects of verdict choice, dispositional instructions, opportunity to deliberate, and locus of control on juror decisions in an insanity case.*

M.L.S., Legal Studies, 1996; The University of Nebraska-Lincoln, Lincoln, NE

B.A., Psychology, 1993; Millersville University of Pennsylvania, Millersville, PA

Honor's Thesis Title: *The effects of inadmissible evidence and judicial admonishment in individual versus group decisions in a mock jury simulation.*

### Related Experience

Vice President, Notice Director, Hilsoft Notifications
Souderton, PA
2004-2009

Prior to joining Kinsella Media, Dr. Wheatman was the Vice President and Notice Director at Hilsoft Notifications. In that capacity, she worked as a notice expert and oversaw all notice programs implemented during her tenure.



2120 L STREET NW, SUITE 860     WASHINGTON, DC 20037     T 202.686.4111     F 202.293.6961     KINSELLAMEDIA.COM

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 318

Research Associate, Federal Judicial Center
Washington, DC
2000-2004

The Federal Judicial Center is the education and research agency for the Federal Courts. The Research Division performs empirical and explanatory research on federal judicial processes and court management.   Dr. Wheatman worked with the Civil Rules Advisory Committee on a number of class action studies and with the Bankruptcy Administration Committee on judicial evaluations.

*Supplementary Background*

Dr. Wheatman has a strong statistical background, having completed nine graduate level courses as well as teaching undergraduate statistics at the University of Georgia.  She is also a member of several plain language organizations, including the Center for Plain Language, Clarity, and Scribes.



**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 319**

# EXHIBIT 2

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 320**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION | Case No. M:09-CV-2015-JF |
| | Centralized before the Honorable Jeremy Fogel |
| | **AFFIDAVIT OF SETTLEMENT ADMINISTRATOR CONCERNING NOTIFICATION** |

Amy Lake, being of lawful age and duly sworn, deposes and says:

        1.     I am a Senior Project Administrator for Rust Consulting, Inc. ("Rust Consulting"), which serves as the class action administrator for the Settlement of the above-captioned action ("Settlement"). I am responsible for supervising the class action administration services provided by Rust Consulting in connection with the Settlement. I have personal knowledge of the facts set forth below.

        2.     Rust Consulting specializes in class action notification and claims administration. Rust Consulting has provided claims administration services for class actions containing up to seven million Class Members in cases involving consumers, pension benefits, securities, product liability, insurance, antitrust, fraud, property, employment, discrimination, bankruptcy and other types of class action cases. We regularly provide large-scale notification, claim form request processing, claims validation and processing, Settlement benefits distribution, and claims administration services. Rust Consulting has provided claims

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 321**

administration services for over 3,000 class action Settlements and distributed billions of dollars in Settlement assets.

3.    Rust Consulting was engaged as Settlement Administrator to, among other things, (a) arrange for the mailing of the Notice; (b) develop, implement and maintain a Settlement website with links to documents on file with the Court, a link to the Notice in English and Spanish, and the ability to submit a Claim Form online; (c) establish and maintain a toll-free number where Class Members are provided with general Settlement information and the option to speak with a customer service representative in English and Spanish; and (d) rent a post office box for receipt of undeliverable and forward Notices, Claim Forms, exclusion requests, and other communications.

4.    Rust Consulting received an electronic record of the names and last known addresses of Class A members, and names and current addresses of Class B and C members, from Wells Fargo Bank, N.A., and each Class Member's last known address was updated from information available in the National Change of Address database prior to the mailing of the Notices.

5.    On January 28, 2011, the Court-approved Notices were mailed via first class mail to 517,783 Class Members.  On February 18, 2011, an additional 595 Class A Notices, 2,816 Class B Notices, and 940 Class C Notices, were mailed via first class mail, for a total of 522,134 Notices mailed.  On February 18, 2011, 785 letters were mailed via first class mail to mortgage holders of Traditional Adjustable Rate Mortgages that were misidentified in the initial mailing.  As of April 10, 2011, 584 Notices were returned undeliverable with a forward order on file and were promptly re-mailed.  As of April 10, 2011, 25,954 Notices were returned undeliverable with no forward order on file.  Rust Consulting performed an address

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 322**

trace on all undeliverable Notices that did not have a forward order on file. Mailing of the Notices with a new address located through trace was done on a rolling basis, and 17,645 Class A Notices, 701 Class B Notices, and 1,673 Class C Notices were re-mailed March 1, 2011, along with additional 979 Class A Notices, 42 Class B Notices, and 115 Class C Notices remailed on March 11, 2011. As a result of the address trace process a total of 21,155 Notices were remailed. A total of 5,383 remain undeliverable, which is 1% of the original mailing. In my experience this is a low undeliverable notice rate. Copies of the Court-approved Notices are attached as Exhibit A.

6.      On January 28, 2011, Rust Consulting established a website at the domain **http://www.pickapaySettlement.com**. The website provides a summary of the Settlement, and also allows Class Members to view answers to frequently asked questions and review documents relating to the Settlement. Individuals visiting the website are able to download a copy of the Notice in English and Spanish. Prior to the claim filing deadline of March 16, 2011, the Claim Form was available to download and individuals were able to submit their claim online. As of April 10, 2011, Rust Consulting has received 171,691 main page hits to the website. Screen prints of the website are attached as Exhibit B.

7.      On January 26, 2011, Class Counsel and Defense Counsel participated in the training of customer service representatives, who were trained on the details of the Settlement and on a script of questions and answers that was prepared and approved by Counsel.

8.      On January 28, 2011, Rust Consulting established a toll-free telephone number at 1-866-886-7224 with an interactive voice response containing an approved scripted Settlement summary. The automated system allows callers to select from several pre-recorded frequently asked questions to obtain Settlement information, and an option for callers to speak

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 323**

to a live operator. As of April 10, 2011, Rust Consulting has received 27,993 calls to the toll-free number. Of the 27,993 calls received, 12,537 were answered by call center representatives after the caller selected the option to speak with a representative. At the peak of call volume, Rust Consulting had 42 trained customer service representatives answering calls.

9.      As of April 14, 2011, Rust Consulting has received 456 requests for exclusion, which exclude a total of 525 loans and 456 people. 141 of the loans were from Subclass A, 197 of the loans were from Subclass B, and 187 of the loans were from Subclass C. A list of the exclusion requests is attached as Exhibit C.

10.     As of April 14, 2011, Rust Consulting has received 78,343 claims that were timely received, and a total of 830 claims that were postmarked after the March 16, 2011 deadline.   Of the 78,343 claims received, 37,867 were filed online at the Settlement website.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_Amy Lake_
Amy Lake

SWORN TO AND SUBSCRIBED BY ME, on this the 15th day of April, 2011.

LYNN M. WOLANDER
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2014

NOTARY PUBLIC
My Commission Expires: _January 31, 2014_

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 324**

# If You Had a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Money from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allowed borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice. This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- The Settlement will provide payments and other benefits to those who qualify. You will need to file a Claim Form to get a payment from the Settlement.

- Your legal rights are affected whether you act, or don't act. Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM** | The only way to get a payment. |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **OBJECT** | Write to the Court about why you don't like about the Settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Get no payment. Give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 325**

-1-

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** .......................................................................... **PAGE 3**
1. Why is there a notice?
2. What is this lawsuit about?
3. What is a Pick-a-Payment mortgage loan?
4. Why is this a class action?
5. Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** ................................................................ **PAGE 4**
6. How do I know if I am part of the Settlement?

**THE SETTLEMENT BENEFITS** ................................................................ **PAGE 5**
7. What does the Settlement provide?
8. What can I get from the Settlement?
9. What other benefits does the Settlement provide?
10. What am I giving up to stay in the Class?

**HOW TO GET A PAYMENT** ...................................................................... **PAGE 6**
11. How can I get a payment?
12. When will I get my payment?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ...................................... **PAGE 6**
13. How do I get out of the Settlement?
14. If I don't exclude myself, can I sue the Defendants for the same thing later?
15. If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU** ...................................................... **PAGE 7**
16. Do I have a lawyer in the case?
17. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** .......................................................... **PAGE 8**
18. How do I tell the Court that I don't like the Settlement?
19. What's the difference between objecting and excluding?

**THE COURT'S FAIRNESS HEARING** ........................................................ **PAGE 9**
20. When and where will the Court decide whether to approve the Settlement?
21. Do I have to come to the hearing?
22. May I speak at the hearing?

**IF YOU DO NOTHING** ............................................................................ **PAGE 10**
23. What happens if I do nothing at all?

**GETTING MORE INFORMATION** .............................................................. **PAGE 10**
24. How do I get more information?

# BASIC INFORMATION

### 1. Why is there a notice?

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015-F. The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

### 2. What is this lawsuit about?

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

### 3. What is a Pick-a-Payment mortgage loan?

The way the loans work is that borrowers choose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment. When a minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

### 4. Why is this a class action?

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims. All these people are a "class" or "class members," except for those who exclude themselves from the class. U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 327**

-3-

### 5. Why is there a Settlement?

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation. The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected. The Settlement provides the opportunity for payments and other benefits to Class Members.

## WHO IS IN THE SETTLEMENT

### 6. How do I know if I am part of the Settlement?

There are three Settlement Classes. **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class A.** If you believe you are a member of Settlement Class B or Settlement Class C, you should call 1-866-886-7224. You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

#### Settlement Class A **(no longer have a Pick-a-Payment mortgage)**

- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

#### Settlement Class B **(mortgage payments are not 60 or more days past due)**

- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of December 16, 2010, are <u>not</u> 60 or more days past due.

#### Settlement Class C **(mortgage payments are 60 or more days past due)**

- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of December 16, 2010, are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage loan in a prior case against any of the Defendants.

## THE SETTLEMENT BENEFITS

### 7. What does the Settlement provide?

The Settlement provides for a loan modification program valued at over $600 million and the establishment of a $50 million Settlement Fund. After deducting a payment of up to $125,000 for the Class Representatives (*see* Question 17), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C. Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Question 9 below). In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs (*see* Question 17) and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses. Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

The Settlement Agreement, available at the website, contains more details about the Settlement.

### 8. What can I get from the Settlement?

If you submit a valid Claim Form, you can get a payment from the Settlement Fund (*see* Question 11). Your exact payment cannot be calculated at this time. It will depend on the number of valid claims that are filed. Please note that if you had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

### 9. What other benefits does the Settlement provide?

You are not eligible to receive a loan modification or participate in other incentive programs because you no longer have your Pick-a-Payment mortgage loan. However, the Defendants will offer permanent loan modifications to eligible Class Members who still have their Pick-a-Payment mortgage loan (Settlement Classes B and C). Settlement Class B and C Members who are unable to qualify for loan modifications may be eligible for incentive payments of at least $1,500 for a short sale or deed-in-lieu of foreclosure. More information about the Loan Modification Program and the Short Sale/Deed-in-Lieu of Foreclosure Incentive Program can be found at www.PickaPaySettlement.com.

---

**10. What am I giving up to stay in the Class?**

---

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case. It also means that all of the decisions by the Court will bind you. The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

## HOW TO GET A PAYMENT

---

**11. How can I get a payment?**

---

To ask for a payment, simply complete and submit the attached Claim Form. Claim Forms are also available at www.PickaPaySettlement.com or by calling 1-866-886-7224. Please read the instructions carefully, fill out the Claim Form, and mail it postmarked no later than **March 16**, **2011**, to:

> Pick-a-Payment Settlement
> PO Box 2448
> Faribault, MN 55021-9148

---

**12. When will I get my payment?**

---

Payments will be mailed to Class Members who send in valid Claim Forms on time, after the Court grants "final approval" to the Settlement and after any appeals are resolved. If Judge Fogel approves the Settlement after a hearing on April 29, 2011, there may be appeals. It's always uncertain whether these appeals can be resolved, and resolving them can take time.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement Fund, and you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself – or it is sometimes referred to as "opting out" of the Class.

---

**13. How do I get out of the Settlement?**

---

To exclude yourself from the Settlement, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 330**

-6-

- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **March 16, 2011**, to:

> Pick-a-Payment Exclusions
> PO Box 2448
> Faribault, MN 55021-9148

### 14. If I don't exclude myself, can I sue the Defendants for the same thing later?

No. Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit.

### 15. If I exclude myself from the Settlement, can I still get a payment?

No. You will not get any money from the Settlement if you exclude yourself. If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

## THE LAWYERS REPRESENTING YOU

### 16. Do I have a lawyer in the case?

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 17. How will the lawyers be paid?

Class Counsel intends to file a motion on or about February 23, 2011 seeking $25 million for attorneys' fees and costs. The fees awarded by the Court will be

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 331**

-7-

paid by Defendants and will not come from the Settlement Fund. The Court will determine the amount of fees to award. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

## OBJECTING TO THE SETTLEMENT

### 18. How do I tell the Court that I don't like the Settlement?

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The account number(s) of your loan(s),
- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"
- The reasons you object to the Settlement,
- A list of any witnesses you may call to testify at the Fairness Hearing (*see* Question 20),
- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and
- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **March 16, 2011**, to the following four addresses:

| Court | Defense Counsel |
|---|---|
| The United States District Court for the Northern District of California 280 South First Street San Jose, CA 95113 | T. Thomas Cottingham, III WINSTON & STRAWN LLP 214 North Tryon Street, Suite 2200 Charlotte, NC 28202 |
| **Class Counsel** | **Defense Counsel** |
| Jeffrey K. Berns David M. Arbogast ARBOGAST & BERNS LLP 6303 Owensmouth Avenue, 10th Floor Woodland Hills, CA 91367 | Jack R. Nelson REED SMITH LLP 101 Second Street, Suite 1800 San Francisco, CA 94105 |

### 19. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

### 20. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Fairness Hearing at **9:00 a.m. PST** on **April 29, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

### 21. Do I have to come to the hearing?

No. Class Counsel will answer questions Judge Fogel may have. But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to the proper address, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

### 22. May I speak at the hearing?

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intent to Appear." In your letter, you must include the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS**
**PAGE 333**

-9-

- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and

- Your signature.

You must mail your Notice of Intention to Appear, postmarked no later than **March 16, 2011**, to the four addresses in Question 18.

## IF YOU DO NOTHING

### 23. What happens if I do nothing at all?

If you do nothing, you will not get a payment from the Settlement. Unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

## GETTING MORE INFORMATION

### 24. How do I get more information?

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com. You may also write with questions to Pick-a-Payment Settlement, P.O. Box 2448, Faribault, MN 55021-9148. You can also get a Claim Form at the website, or by calling the toll free number, 1-866-886-7224.

FOR OFFICIAL USE ONLY

**FILE YOUR CLAIM ONLINE AT:**

www.PickaPaySettlement.com

# CLAIM FORM

**In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation**

In the United States District Court for the Northern District of California

San Jose Division

Case No. M:09-CV-2015-F

**If you are a Settlement Class A Member and wish to receive a Settlement Payment, your completed Claim Form must be Postmarked on or before March 16, 2011 or Submitted Electronically to the Settlement Administrator at www.PickaPaySettlement.com on or before March 16, 2011.**

```
* 1 2 3 4 5 6 7 8 9 *
```

<<NAME>>
<<ADDR1>>
<<ADDR2>>
<<CITY STATE ZIP>>

☐ If the pre-printed information to the left is not correct or if there is no pre-printed information, please check the box and complete the information in **Part I** below.

Please read the full Notice
(available at www.PickaPaySettlement.com)
carefully before filling out this Claim Form.

Claimant ID#:  <<Clmnt_ID>>

To be eligible to receive any money from the Settlement in this class action lawsuit, **you must either**: (1) complete this Claim Form and mail it postmarked on or before March 16, 2011 to: Pick-a-Payment Settlement, P.O. Box 2448, Faribault, MN 55021-9148; or (2) complete your Claim Form online at www.PickaPaySettlement.com on or before March 16, 2011.  The claims of Settlement Class A Members who fail to submit their Claim Forms on time by U.S. Mail (properly addressed) or fail to fill out an online Claim Form by the deadline will be rejected and the Settlement Class A Member will not be eligible to receive a payment.

**I wish to submit a claim and in support of that claim, I submit the following information:**

## PART 1:  CLAIMANT INFORMATION

Name of Claimant who is a member of Settlement Class A, as that is defined in the Notice: _____

Claimant Current Mailing Address: _____

City: _____     State: ____ ____     Zip Code: ____ ____ ____ ____ ____

Claimant Telephone Number(s):

Daytime: ( ___ ___ ___ ) ___ ___ ___ - ___ ___ ___ ___     Evening: ( ___ ___ ___ ) ___ ___ ___ - ___ ___ ___ ___

## PART 2:  SIGNATURE

Your signature below certifies that to the best of your knowledge the information above is truthful and correct.  You certify that you had, but no longer have, a Pick-a-Payment mortgage loan because you sold the property securing the loan, refinanced the loan, paid off the loan personally, or have already obtained a loan modification that converted the loan from a Pick-a-Payment mortgage loan. You also certify that you have not previously released your claims pursuant to another settlement agreement, final judgment, or other dealings with the Defendants.

Signature: _____     Date: ____ ____ / ____ ____ / ____ ____ ____ ____

```
* P A P S *                                                            * 1 - 1 *
```

# If You Have a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Benefits from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allows borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice. This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- You do not need to do anything to get a payment. Please call 1-877-546-8449 to apply for a loan modification.

- Please note that this Settlement does not change your obligation to continue to make payments on your mortgage loan. You should continue to make your payments.

- Your legal rights are affected whether you act, or don't act. Read this notice carefully.

| Your Legal Rights and Options in the Settlement | |
|---|---|
| **Receive Benefits** | If the Court grants final approval to the Settlement, you will automatically receive benefits if you qualify. |
| **Exclude Yourself from the Settlement** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **Object** | Write to the Court about why you don't like about the Settlement. |
| **Go to a Hearing** | Ask to speak in Court about the fairness of the Settlement. |
| **Do Nothing** | Obtain Settlement benefits and give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Loan modifications are being offered by the Defendants now to eligible Class Members. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**

**PAGE 336**

# WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION** ......................................................................**PAGE 3**
1.  Why is there a notice?
2.  What is this lawsuit about?
3.  What is a Pick-a-Payment mortgage loan?
4.  Why is this a class action?
5.  Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** ...........................................................**PAGE 4**
6.  How do I know if I am part of the Settlement?

**THE SETTLEMENT BENEFITS** ...........................................................**PAGE 5**
7.  What does the Settlement provide?
8.  What about the Attorneys General Settlement with Wells Fargo?
9.  What can I get from the Settlement?
10. What is a loan modification?
11. What is "Imminent Default"?
12. What is the other incentive program?
13. What am I giving up to stay in the Class?

**HOW TO GET BENEFITS** ....................................................................**PAGE 8**
14. How can I get benefits?
15. When will I get my benefits?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** .............................**PAGE 8**
16. How do I get out of the Settlement?
17. If I don't exclude myself, can I sue the Defendants for the same thing later?
18. If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU** .................................................**PAGE 9**
19. Do I have a lawyer in the case?
20. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** .....................................................**PAGE 9**
21. How do I tell the Court that I don't like the Settlement?
22. What's the difference between objecting and excluding?

**THE COURT'S FAIRNESS HEARING** ...................................................**PAGE 10**
23. When and where will the Court decide whether to approve the Settlement?
24. Do I have to come to the hearing?
25. May I speak at the hearing?

**IF YOU DO NOTHING** .......................................................................**PAGE 11**
26. What happens if I do nothing at all?

**GETTING MORE INFORMATION** .........................................................**PAGE 12**
27. How do I get more information?

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 337**

**BASIC INFORMATION**

---

**1. Why is there a notice?**

---

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015. The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, FSB, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

---

**2. What is this lawsuit about?**

---

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

---

**3. What is a Pick-a-Payment mortgage loan?**

---

The way the loans work is that borrowers chose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment. When a minimum payment was insufficient to pay the interest that was owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

---

**4. Why is this a class action?**

---

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims. All these people are a "class" or "class members," except for those who exclude themselves from the class. U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS**
**PAGE 338**

### 5. Why is there a Settlement?

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation. The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected. The Settlement provides the opportunity for payments and other benefits to Class Members.

## WHO IS IN THE SETTLEMENT

### 6. How do I know if I am part of the Settlement?

There are three Settlement Classes. **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class B.** If you believe you are a member of Settlement Class A or Settlement Class C, you should call 1-866-886-7224. You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

#### Settlement Class A (no longer have a Pick-a-Payment mortgage)

- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

#### Settlement Class B (mortgage payments are not 60 or more days past due)

- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of December 16, 2010, are <u>not</u> 60 or more days past due.

#### Settlement Class C (mortgage payments are 60 days or more past due)

- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of December 16, 2010, are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage in a prior case against any of the Defendants.

**THE SETTLEMENT BENEFITS**

---

**7. What does the Settlement provide?**

---

The Settlement provides for a loan modification program valued at over \$600 million and the establishment of a \$50 million Settlement Fund. After deducting a payment of up to \$125,000 for the Class Representatives (*see* Question 20), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C. Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Questions 10 and 12 below). In addition to the Settlement Fund, the Defendants will pay up to \$25 million in attorneys' fees and costs (*see* Question 20) and up to \$1 million to administer the Settlement.

If there is any money remaining in the \$50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses. Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

A Settlement Agreement, available at the website, contains more details about the Settlement.

---

**8. What about the Attorneys General Settlement with Wells Fargo?**

---

If you live in Arizona, Florida, Colorado, New Jersey, Washington, Texas, Illinois, or Nevada, you may receive a separate notice relating to a 2010 Settlement between those states' Attorneys General and Wells Fargo Bank, N.A. (the "Attorneys General Settlement"), which acquired World Savings Bank, FSB/Wachovia Mortgage FSB's Pick-a-Payment mortgage loan portfolio in 2008. In the Attorneys General Settlement, Wells Fargo Bank, N.A. is offering permanent loan modifications to eligible borrowers. You are allowed to participate in both the Attorneys General Settlement and this Settlement.

---

**9. What can I get from the Settlement?**

---

As a member of Settlement Class B, you may be eligible to participate in the loan modification program if you are in "Imminent Default," if you later become in "Imminent Default," or if you later become 60 or more days past due on your mortgage payments. The loan modification program and "Imminent Default" are described below.

You are also eligible to receive a payment from the Settlement Fund after the Court grants final approval to the Settlement (*see* Question 15). Your exact payment cannot be calculated at this time. It will depend on the number of valid claims that are filed by members of Settlement Class A. Members of Settlement Class B do not have to file a claim form to receive a payment from the Settlement Fund. Please note that if you

EXHIBIT L ISO MOTION TO STAY PROCEEDINGS
PAGE 340

had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

---

**10. What is a loan modification?**

---

The Defendants will offer permanent loan modifications to eligible Settlement Class B Members who live in their homes, who are in "Imminent Default," (*see* Question 11), who later become in "Imminent Default," or who later become 60 or more days past due on their mortgage payments. The Loan Modification Program will operate through June 30, 2013. A loan modification is a change to your loan agreement and may include principal forgiveness, loan term extension, interest rate reduction, and principal forbearance (which gives the borrower additional time to pay off the loan principal). Please be aware that a loan modification may affect your credit rating.

Eligible Settlement Class B Members will first be considered for the federal Home Affordable Modification Program ("HAMP"). HAMP provides eligible homeowners the opportunity to modify their mortgages to make them more affordable. If the Settlement Class B Member does not qualify under HAMP or elects not to accept a HAMP loan modification, the Defendants will consider that Settlement Class B Member for their new modification program known as Mortgage Assistance Program 2 ("MAP2R").

Settlement Class B Members who remain current on their modified payments over three years may be able to earn additional principal forgiveness. More details on these programs are in the Settlement Agreement, which is available at www.PickaPaySettlement.com.

---

**11. What is "Imminent Default"?**

---

Imminent Default describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage loan because of financial hardship or other changed circumstances. Generally, the current test for "Imminent Default" is as follows:

1. Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; **and**

2. Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:

   a. Death of a borrower;

   b. Long-term or permanent disability or illness of a borrower or dependent family member;

   c. Legally-documented divorce or separation of the borrower and co-borrower;

    d. Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;

    e. A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; **and**

3. Cash reserves of less than $25,000, excluding retirement accounts; **and**

4. The property is occupied by the borrower as his or her principal residence; **and**

5. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

If you believe you are in Imminent Default, you should contact the Defendants at 1-877-546-8449.

---

**12. What is the other incentive program?**

---

Settlement Class B Members who are unable to qualify for modifications under the HAMP or MAP2R guidelines may qualify for incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. The Settlement Class B Member must qualify for these payments under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines. HAFA guidelines are available at http://makinghomeaffordable.gov/hafa.html.

In a short sale, the bank allows the homeowner to list and sell the mortgaged property with the understanding that the net proceeds from the sale may be less than the total amount due on the first mortgage. Generally, if the borrower makes a good faith effort to sell the property but is not successful, a bank may consider a deed-in-lieu of foreclosure. With a deed-in-lieu of foreclosure, the borrower voluntarily transfers ownership of the property to the bank—provided the title is free and clear of other mortgages and liens.

These options will remain open through June 30, 2013.

---

**13. What am I giving up to stay in the Class?**

---

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case. It also means that all of the decisions by the Court will bind you. The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

---

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 342**

-7-

---

**14. How can I get benefits?**

---

You do not need to do anything to get a payment from the Settlement. If the Court grants final approval to the Settlement, you will automatically be mailed a payment. The Defendants are attempting to contact Settlement Class B Members who are eligible for loan modifications or the incentive program. If you would like to apply for a loan modification or the incentive program, you should contact the Defendants at 1-877-546-8449. If you move after you receive this Notice, please call 1-866-886-7224 to inform the administrator of your new address.

---

**15. When will I get my benefits?**

---

Modifications are now available, and the Defendants are attempting to contact Settlement Class B Members who are eligible for loan modifications or the incentive program. Payments will be distributed to Class Members after the Court grants "final approval" to the Settlement and after any appeals are resolved. If Judge Fogel approves the Settlement after a hearing on April 29, 2011, there may be appeals. It's always uncertain whether these appeals can be resolved, and resolving them can take time.

### EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want a payment from the Settlement Fund, and you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself – or it is sometimes referred to as "opting" out of the Class.

---

**16. How do I get out of the Settlement?**

---

To exclude yourself from the Settlement, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp."Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **March 16, 2011**, to:

Pick-a-Payment Exclusions
PO Box 2448
Faribault, MN 55021-9148

### 17. If I don't exclude myself, can I sue the Defendants for the same thing later?

No. Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit.

### 18. If I exclude myself from the Settlement, can I still get a payment?

No. You will not get any money from the Settlement if you exclude yourself from the Settlement. If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

## THE LAWYERS REPRESENTING YOU

### 19. Do I have a lawyer in the case?

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

### 20. How will the lawyers be paid?

Class Counsel intends to file a motion on or about February 23, 2011 seeking $25 million for attorneys' fees and costs. The fees awarded by the Court will be paid by Defendants and will not come from the Settlement Fund. The Court will determine the amount of fees to award. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

## OBJECTING TO THE SETTLEMENT

### 21. How do I tell the Court that I don't like the Settlement?

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, and telephone number,

- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),

- The account number(s) of your loan(s),

- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"

- The reasons you object to the Settlement,

- A list of any witnesses you may call to testify at the Fairness Hearing (see Question 22),

- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and

- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **March 16, 2011**, to the following four addresses:

| Court | Defense Counsel |
|---|---|
| The United States District Court for the Northern District of California 280 South First Street San Jose, CA 95113 | T. Thomas Cottingham, III WINSTON & STRAWN LLP 214 North Tryon Street, Suite 2200 Charlotte, NC 28202 |
| **Class Counsel** | **Defense Counsel** |
| Jeffrey K. Berns David M. Arbogast ARBOGAST & BERNS LLP 6303 Owensmouth Avenue, 10th Floor Woodland Hills, CA 91367 | Jack R. Nelson REED SMITH LLP 101 Second Street, Suite 1800 San Francisco, CA 94105 |

**22. What's the difference between objecting and excluding?**

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

**23. When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing at **9:00 a.m. PST** on **April 29, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com. At this hearing, the Court will consider whether the Settlement is fair, reasonable and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**24. Do I have to come to the hearing?**

No. Class Counsel will answer questions Judge Fogel may have. But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to the proper address, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

**25. May I speak at the hearing?**

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intent to Appear." In your letter you must include the following:

- Your name, address, and telephone number,

- The name of the case (*In Re: Wachovia Corp."Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015 ),

- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and

- Your signature.

You must mail your Notice of Intention to Appear, postmarked no later than **March 16, 2011**, to the four addresses in Question 21.

## IF YOU DO NOTHING

**26. What happens if I do nothing at all?**

If you do nothing, you will still get benefits from the Settlement. However, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

**GETTING MORE INFORMATION**

---

**27. How do I get more information?**

---

The notice summarizes the proposed Settlement. More details are in a Settlement Agreement. You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com. You may also write with questions to Pick-a-Payment Settlement, P.O. Box 2448, Faribault, MN 55021-9148, or by calling the toll free number, 1-866-886-7224.

# If You Have a Pick-a-Payment Mortgage Loan with World Savings Bank or Wachovia Mortgage,

## You Could Receive Benefits from a Class Action Settlement.

> A Pick-a-Payment mortgage loan allows borrowers to make monthly payments in an amount lower than the monthly amount of interest due on the loan.

*A federal Court authorized this notice. This is not a solicitation from a lawyer.*

- A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Settlement resolves litigation over whether the Defendants failed to make complete and accurate disclosures with respect to their Pick-a-Payment mortgage loans.

- **The Defendants' records show that you obtained a Pick-a-Payment mortgage loan between August 1, 2003 and December 31, 2008.**

- You do not need to do anything to get a payment. Please call 1-877-546-8449 to apply for a loan modification.

- Please note that this Settlement does not change your obligation to continue to make payments on your mortgage loan. You should continue to make your payments.

- Your legal rights are affected whether you act, or don't act. Read this notice carefully.

| Your Legal Rights and Options in the Settlement | |
|---|---|
| **Receive Benefits** | If the Court grants final approval to the Settlement, you will automatically receive benefits if you qualify. |
| **Exclude Yourself from the Settlement** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **Object** | Write to the Court about why you don't like about the Settlement. |
| **Go to a Hearing** | Ask to speak in Court about the fairness of the Settlement. |
| **Do Nothing** | Obtain Settlement benefits and give up rights to ever sue the Defendants about the legal claims in this case. |

- These rights and options – **and the deadlines to exercise them** – are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Loan modifications are being offered by the Defendants now to eligible Class Members. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

**EXHIBIT LISO MOTION TO STAY PROCEEDINGS**
**PAGE 348**

**WHAT THIS NOTICE CONTAINS**

**BASIC INFORMATION** ...................................................................................**PAGE 3**
1. Why is there a notice?
2. What is this lawsuit about?
3. What is a Pick-a-Payment mortgage loan?
4. Why is this a class action?
5. Why is there a Settlement?

**WHO IS IN THE SETTLEMENT** .....................................................................**PAGE 4**
6. How do I know if I am part of the Settlement?

**THE SETTLEMENT BENEFITS** .....................................................................**PAGE 5**
7. What does the Settlement provide?
8. What about the Attorneys General Settlement with Wells Fargo?
9. What can I get from the Settlement?
10. What is a loan modification?
11. What is "Imminent Default"?
12. What is the other incentive program?
13. What am I giving up to stay in the Class?

**HOW TO GET BENEFITS**...........................................................................**PAGE 8**
14. How can I get benefits?
15. When will I get my benefits?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ...........................................**PAGE 8**
16. How do I get out of the Settlement?
17. If I don't exclude myself, can I sue the Defendants for the same thing later?
18. If I exclude myself from the Settlement, can I still get a payment?

**THE LAWYERS REPRESENTING YOU**...........................................................**PAGE 9**
19. Do I have a lawyer in the case?
20. How will the lawyers be paid?

**OBJECTING TO THE SETTLEMENT** .............................................................**PAGE 9**
21. How do I tell the Court that I don't like the Settlement?
22. What's the difference between objecting and excluding?

**THE COURT'S FAIRNESS HEARING**............................................................**PAGE 10**
23. When and where will the Court decide whether to approve the Settlement?
24. Do I have to come to the hearing?
25. May I speak at the hearing?

**IF YOU DO NOTHING**.............................................................................**PAGE 11**
26. What happens if I do nothing at all?

**GETTING MORE INFORMATION** .................................................................**PAGE 12**
27. How do I get more information?

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 349**                                    -2-

**BASIC INFORMATION**

---

**1. Why is there a notice?**

---

You have a right to know about a proposed Settlement of a class action lawsuit, and about your options, before the Court decides whether to approve the Settlement.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015. The people who sued are called Plaintiffs, and the companies they sued, World Savings, Inc.; World Savings Bank, FSB; Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.; Wachovia Corporation; Golden West Financial Corporation; Wachovia Bank, FSB, formerly known as World Savings Bank, FSB-TX; Wachovia Mortgage Corporation; Wells Fargo Home Mortgage; and Wells Fargo Bank, N.A., are called the Defendants.

---

**2. What is this lawsuit about?**

---

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product (*see* Question 3 below). The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

---

**3. What is a Pick-a-Payment mortgage loan?**

---

The way the loans work is that borrowers choose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment. When a minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

---

**4. Why is this a class action?**

---

In a class action, one or more people, called "class representatives," sue on behalf of people who have similar claims. All these people are a "class" or "class members," except for those who exclude themselves from the class. U.S. District Judge Jeremy D. Fogel in the United States District Court for the Northern District of California is in charge of this class action.

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS**
**PAGE 350**

---

**5. Why is there a Settlement?**

---

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation. The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected. The Settlement provides the opportunity for payments and other benefits to Class Members.

## WHO IS IN THE SETTLEMENT

---

**6. How do I know if I am part of the Settlement?**

---

There are three Settlement Classes. **If you received this notice in the mail, the Defendants' records show you are a member of Settlement Class C.** If you believe you are a member of Settlement Class A or Settlement Class B, you should call 1-866-886-7224. You can view the detailed Notices for each Settlement Class at www.PickaPaySettlement.com.

Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

**Settlement Class A (no longer have a Pick-a-Payment mortgage)**

- Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.

**Settlement Class B (mortgage payments are not 60 or more days past due)**

- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of December 16, 2010, are <u>not</u> 60 or more days past due.

**Settlement Class C (mortgage payments are 60 days or more past due)**

- Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
- Whose mortgage payments, as of December 16, 2010, are 60 or more days past due.

Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage loan in a prior case against any of the Defendants.

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS
PAGE 351**

-4-

**THE SETTLEMENT BENEFITS**

---

**7. What does the Settlement provide?**

---

The Settlement provides for a loan modification program valued at over $600 million and the establishment of a $50 million Settlement Fund. After deducting a payment of up to $125,000 for the Class Representatives (*see* Question 20), the net Settlement Fund will be distributed equally to members of Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C. Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program (*see* Questions 10 and 11 below). In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs (*see* Question 19) and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses. Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

A Settlement Agreement, available at the website, contains more details about the Settlement.

---

**8. What about the Attorneys General Settlement with Wells Fargo?**

---

If you live in Arizona, Florida, Colorado, New Jersey, Washington, Texas, Illinois, or Nevada, you may receive a separate notice relating to a 2010 Settlement between those states' Attorneys General and Wells Fargo Bank, N.A. (the "Attorneys General Settlement"), which acquired World Savings Bank, FSB/Wachovia Mortgage, FSB's Pick-a-Payment mortgage loan portfolio in 2008. In the Attorneys General Settlement, Wells Fargo Bank, N.A. is offering permanent loan modifications to eligible borrowers. You are allowed to participate in both the Attorneys General Settlement and this Settlement.

---

**9. What can I get from the Settlement?**

---

As a member of Settlement Class C, you are eligible to participate in the loan modification program, described below.

You are also eligible to receive a payment from the Settlement Fund after the Court grants final approval to the Settlement (*see* Question 15). Your exact payment cannot be calculated at this time. It will depend on the number of valid claims that are filed by members of Settlement Class A. <u>Members of Settlement Class C do not have to file a claim form to receive a payment from the Settlement Fund.</u> Please note that if you had a co-borrower on your Pick-a-Payment mortgage loan, or if you had more than one Pick-a-Payment mortgage loan, you and all other co-borrowers will only get one Settlement Payment.

**10. What is a loan modification?**

The Defendants will offer permanent loan modifications to eligible Settlement Class C Members who live in their homes and who are at least 60 days delinquent on their mortgage payments. Eligible Settlement Class C Members who become less than 60 days delinquent on their mortgage payments still will be eligible for the Loan Modification Program if they become in "Imminent Default" or if they again become at least 60 days delinquent on their mortgage payments. "Imminent Default" is described in section 11 below. The Loan Modification Program will operate through June 30, 2013. A loan modification is a change to your loan agreement and may include principal forgiveness, loan term extension, interest rate reduction, and principal forbearance (which gives the borrower additional time to pay off the loan principal). Please be aware that a loan modification may affect your credit rating.

Eligible Settlement Class C Members will first be considered for the federal Home Affordable Modification Program ("HAMP"). HAMP provides eligible homeowners the opportunity to modify their mortgages to make them more affordable. If the Settlement Class C Member does not qualify under HAMP or elects not to accept a HAMP loan modification, the Defendants will consider that Settlement Class C Member for their new modification program known as Mortgage Assistance Program 2 ("MAP2R").

Settlement Class C Members who remain current on their modified payments over three years may be able to earn additional principal forgiveness. More details on these programs are in the Settlement Agreement, which is available at www.PickaPaySettlement.com.

**11. What is "Imminent Default"?**

Imminent Default describes a borrower who meets a test to show the borrower is reasonably likely to default on his or her Pick-a-Payment mortgage loan because of financial hardship or other changed circumstances. Generally, the current test for "Imminent Default" is as follows:

1. Long Term Hardship, meaning a borrower that is having difficulty making his or her mortgage payments and the duration of that difficulty is expected to be greater than 12 months; **and**

2. Financial Hardship, defined as one of the following that currently exists or occurs prior to June 30, 2013:

   a. Death of a borrower;

   b. Long-term or permanent disability or illness of a borrower or dependent family member;

   c. Legally-documented divorce or separation of the borrower and co-borrower;

d. Separation of borrowers unrelated by marriage, civil union, or similar civil domestic partnership under applicable law;

e. A combination of reduction of income and increase in housing expenses (principal and interest only) that exceeds 10% of current income. The comparison period shall be approximately 12 months prior to the date modification is sought; however, a greater period may be used if the condition has been consistent; **and**

3. Cash reserves of less than $25,000, excluding retirement accounts; **and**

4. The property is occupied by the borrower as his or her principal residence; **and**

5. The borrower's loan-to-value ratio must exceed 80%, or the loan must have a positive "Net Present Value."

---

**12. What is the other incentive program?**

Settlement Class C Members who are unable to qualify for modifications under the HAMP or MAP2R guidelines may qualify for incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure. The Settlement Class C Member must qualify for these payments under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines. HAFA guidelines are available at http://makinghomeaffordable.gov/hafa.html.

In a short sale, the bank allows the homeowner to list and sell the mortgaged property with the understanding that the net proceeds from the sale may be less than the total amount due on the first mortgage. Generally, if the borrower makes a good faith effort to sell the property but is not successful, a bank may consider a deed-in-lieu of foreclosure. With a deed-in-lieu of foreclosure, the borrower voluntarily transfers ownership of the property to the bank—provided the title is free and clear of other mortgages and liens.

These options will remain open through June 30, 2013.

---

**13. What am I giving up to stay in the Class?**

Unless you exclude yourself from the Settlement, you can't sue the Defendants, continue to sue, or be part of any other lawsuit against the Defendants about the legal issues in this case. It also means that all of the decisions by the Court will bind you. The "Release of Claims" is described more fully in the Settlement Agreement and describes exactly the legal claims that you give up if you get benefits from the Settlement. The Settlement Agreement is available at www.PickaPaySettlement.com.

**How to Get Benefits**

---

**14. How can I get benefits?**

---

You do not need to do anything to get a payment from the Settlement. If the Court grants final approval to the Settlement, you will automatically be mailed a payment. The Defendants are attempting to contact Settlement Class C Members who are eligible for loan modifications or the incentive program. If you would like to apply for a loan modification or the incentive program, you should contact the Defendants at 1-877-546-8449. If you move after you receive this Notice, please call 1-866-886-7224 to inform the administrator of your new address.

---

**15. When will I get my benefits?**

---

Modifications are now available, and the Defendants are attempting to contact Settlement Class C Members who are eligible for loan modifications or the incentive program. Payments will be distributed to Class Members after the Court grants "final approval" to the Settlement and after any appeals are resolved. If Judge Fogel approves the Settlement after a hearing on April 29, 2011 there may be appeals. It's always uncertain whether these appeals can be resolved, and resolving them can take time.

## Excluding Yourself From The Settlement

If you want to keep the right to sue or continue to sue the Defendants on your own about the legal issues in this case, then you must take steps to get out. This is called excluding yourself – or is sometimes referred to as opting out of the Class.

---

**16. How do I get out of the Settlement?**

---

To exclude yourself from the Settlement, you must send a letter that includes the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp."Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- A statement that you want to be excluded from this Settlement, and
- Your signature.

You must mail your exclusion request, postmarked no later than **March 16, 2011**, to:

> Pick-a-Payment Exclusions
> PO Box 2448
> Faribault, MN 55021-9148

---

For More Information: Call 1-866-886-7224 or Visit www.PickaPaySettlement.com

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 355**

-8-

**17. If I don't exclude myself, can I sue the Defendants for the same thing later?**

No. Unless you exclude yourself, you give up the right to sue the Defendants for the claims that the Settlement resolves. If you have a pending lawsuit, speak to your lawyer in that lawsuit immediately. You must exclude yourself from this Class to continue your own lawsuit.

**18. If I exclude myself from the Settlement, can I still get a payment?**

No. You will not get any money if you exclude yourself from the Settlement. If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

### THE LAWYERS REPRESENTING YOU

**19. Do I have a lawyer in the case?**

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

**20. How will the lawyers be paid?**

Class Counsel intends to file a motion on or about February 23, 2011 seeking $25 million for attorneys' fees and costs. The fees awarded by the Court will be paid by Defendants and will not come from the Settlement Fund. The Court will determine the amount of fees to award. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

### OBJECTING TO THE SETTLEMENT

**21. How do I tell the Court that I don't like the Settlement?**

If you are a Class Member, you can object to the Settlement or to Class Counsel's requests for fees and expenses. To object, you must send a letter that includes the following:

- Your name, address, and telephone number,

- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),

- The account number(s) of your loan(s),

- A sentence stating that "You confirm under penalty of perjury that you are a Settlement Class Member,"

- The reasons you object to the Settlement,

- A list of any witnesses you may call to testify at the Fairness Hearing (see Question 21),

- Copies of any exhibits you intend to present to the Court at the Fairness Hearing, and

- Your signature.

Your objection, along with any supporting material you wish to submit, must be mailed and postmarked no later than **March 16, 2011**, to the following four addresses:

| Court | Defense Counsel |
|-------|-----------------|
| The United States District Court for the Northern District of California 280 South First Street San Jose, CA 95113 | T. Thomas Cottingham, III WINSTON & STRAWN LLP 214 North Tryon Street, Suite 2200 Charlotte, NC 28202 |
| **Class Counsel** | **Defense Counsel** |
| Jeffrey K. Berns David M. Arbogast ARBOGAST & BERNS LLP 6303 Owensmouth Avenue, 10th Floor Woodland Hills, CA 91367 | Jack R. Nelson REED SMITH LLP 101 Second Street, Suite 1800 San Francisco, CA 94105 |

### 22. What's the difference between objecting and excluding?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement and any requests for fees and expenses. You may attend and you may ask to speak, but you don't have to.

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS PAGE 357**

-10-

**23. When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Fairness Hearing at **9:00 a.m. PST** on **April 29, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check www.PickaPaySettlement.com. At this hearing the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**24. Do I have to come to the hearing?**

No. Class Counsel will answer questions Judge Fogel may have. But, you may come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to the proper address, the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

**25. May I speak at the hearing?**

Yes. You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intent to Appear." In your letter you must include the following:

- Your name, address, and telephone number,
- The name of the case (*In Re: Wachovia Corp. "Pick-a-Payment" Mortgage Marketing and Sales Practices Litigation*, Case No. M:09-CV-2015),
- The name, address, and telephone number of any attorney(s) who will be appearing on your behalf at the Fairness Hearing, and
- Your signature.

You must mail your Notice of Intention to Appear, postmarked no later than **March 16, 2011**, to the four addresses in Question 20.

## IF YOU DO NOTHING

**26. What happens if I do nothing at all?**

If you do nothing, you may still get benefits from the Settlement. However, unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

---

**27. How do I get more information?**

---

The notice summarizes the proposed Settlement. More details are in a Settlement Agreement. You can get a copy of the Settlement Agreement at www.PickaPaySettlement.com. You may also write with questions to Pick-a-Payment Settlement, P.O. Box 2448, Faribault, MN 55021-9148, and you can call the toll free number, 1-866-886-7224.

About the Administrator · Contact Information

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

**About this Settlement** | **Making a Claim** | **More Information**

Overview    FAQs    What are your rights    Notice

### Welcome to the Information Website for the Class Action Settlement for Wachovia "Pick-A-Payment"



**IF YOU HAVE OR HAD A PICK-A-PAYMENT MORTGAGE LOAN WITH WORLD SAVINGS BANK OR WACHOVIA MORTGAGE, A CLASS ACTION LAWSUIT MAY AFFECT YOUR RIGHTS**

You may be affected by a class action lawsuit if: Anytime between August 1, 2003 and December 31, 2008, you were a borrower who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB, now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.

Please use the links above to obtain additional information.

**January 28, 2011 - Friday, January 28, 2011**

For questions about this Settlement, please call Rust at 1-866-886-7224. Do not contact the Defendants with questions about this Settlement, including questions about the notice you received or questions regarding how much your settlement payment will be. If you have specific questions about your loan or wish to discuss or apply for a loan modification, contact the Defendants at 1-877-546-8449. Again, please do not contact the Defendants with questions about this Settlement, as those callers will be referred back to this website.

**Settlement Update - Wednesday, December 22, 2010**

Preliminary Approval

December 16, 2010

### Disclaimer

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 360**

About the Administrator  •  Contact Information

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

| About this Settlement | Making a Claim | More Information |
|---|---|---|

Overview    FAQs    What are your rights    Notice



## Frequently Asked Questions

**What is this lawsuit about?**

**Answer:**

The lawsuit claims that the Defendants violated various state and federal laws in connection with the Pick-a-Payment mortgage loan product. The Pick-a-Payment mortgage loan permitted the borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased ("negative amortization"). The Plaintiffs claim that the Defendants did not adequately disclose the Pick-a-Payment loan's potential for negative amortization.

The Defendants deny all claims made against them, deny that their lending practices violated any laws, and deny that they financially harmed any of their customers.

**What is a Pick-a-Payment mortgage loan?**

**Answer:**

The way the loans work is that borrowers choose one of up to four monthly payment options: a minimum payment, an interest only payment, a 15-year amortizing payment, or a 30-year amortizing payment. When a minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

**Why is there a Settlement?**

**Answer:**

The Defendants are not admitting that they did anything wrong, but both sides want to avoid the cost of further litigation. The Court has not decided in favor of the Plaintiffs or the Defendants. The Class Representatives and their attorneys think the Settlement is best for everyone who is affected. The Settlement provides the opportunity for payments and other benefits to Class Members.

**How do I know if I am part of the Settlement?**

**Answer:**

There are three Settlement Classes. Each Class includes borrowers who obtained a Pick-a-Payment mortgage loan (for a primary residence) from World Savings Bank, FSB or Wachovia Mortgage, FSB (now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.) anytime between August 1, 2003 and December 31, 2008.

**Settlement Class A (no longer have a Pick-a-Payment mortgage)**
·    Includes borrowers who no longer have their Pick-a-Payment mortgage loan because they sold the property securing the loan, refinanced the loan, personally paid off the loan, or have already obtained a loan modification that converted the loan to a regular mortgage.
**Settlement Class B (mortgage payments are not 60 or more days past due)**
·    Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
·    Whose mortgage payments, as of December 16, 2010, are not 60 or more days past due.
**Settlement Class C (mortgage payments are 60 or more days past due)**
·    Includes borrowers who still have their Pick-a-Payment mortgage loan **and**
·    Whose mortgage payments, as of December 16, 2010, are 60 or more days past due.
Please note that the Classes do not include any borrowers who have already released their claims involving their Pick-a-Payment mortgage loan in a prior case against any of the Defendants.

**What does the Settlement provide?**

**Answer:**

The Settlement provides for a loan modification program valued at over $600 million and the establishment of a $50 million Settlement Fund. After deducting a payment of up to $125,000 for the Class Representatives, the net Settlement Fund will be distributed equally to members of

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 361**

Settlement Class A who submit a valid Claim Form and all members of Settlement Classes B and C. Borrowers who still have a Pick-a-Payment mortgage loan (Settlement Classes B and C) may also be eligible for loan modifications or another incentive program. In addition to the Settlement Fund, the Defendants will pay up to $25 million in attorneys' fees and costs and up to $1 million to administer the Settlement.

If there is any money remaining in the $50 million Settlement Fund after all claims are paid, the Defendants will be reimbursed for the administration expenses. Any remaining funds will be distributed to The National Consumer Law Center, a not-for-profit organization selected by the Class Representatives, and a not-for-profit organization selected by the Defendants.

The Settlement Agreement, available at this website, contains more details about the Settlement.

### How can I request a loan modification?

**Answer:**

The Defendants are attempting to contact Settlement Class B Members and Settlement Class C Members who are eligible for loan modifications or the incentive program.  If you would like to discuss or apply for a loan modification or the incentive program, you should contact the Defendants at 1-877-546-8449.

### How can I get a payment?

**Answer:**

If you are a member of Settlement Class B or Settlement Class C, you do not need to do anything to receive a payment. If the settlement receives final approval, you will automatically be mailed a payment. Members of Settlement Class A had to complete and submit a Claim Form to receive a payment. The Claim Form had to be postmarked not later than March 16, 2011.  The deadline to submit a Claim Form has now passed.

### When will I get my payment?

**Answer:**

Payments will be mailed to Class Members after the Court grants final approval to the Settlement and any appeals are resolved. If the Court approves the Settlement after a hearing on April 29, 2011, there may be appeals. It's always uncertain whether these appeals can be resolved, and resolving them can take time.

### How do I get out of the Settlement?

**Answer:**

Exclusion requests had to be sent by mail postmarked no later than March 16, 2011.  The deadline to exclude yourself from the settlement has now passed.

### If I exclude myself from the Settlement, can I still get a payment?

**Answer:**

No. You will not get any money from the Settlement if you exclude yourself.  If you exclude yourself from the Settlement, do not send in a Claim Form asking for benefits.

### Do I have a lawyer in the case?

**Answer:**

Yes. The Court has appointed these lawyers and firms as "Class Counsel," meaning that they were appointed to represent you and all Class Members: Jeffrey K. Berns and David M. Arbogast of Arbogast & Berns LLP; Gerson Smoger of Smoger & Associates; Mark Cuker of Williams Cuker Berezofsky; Eric George of Browne Woods George, LLP; Christopher Seeger of Seeger Weiss LLP; Brian Kabateck of Kabateck Brown Kellner LLP; A. Hoyt Rowell of Richardson, Patrick, Westbrook & Brickman LLP; and Evan Buxner of The Buxner Law Firm.

Class Counsel has spent over three years working on this lawsuit, including over a year of mediation to get to this Settlement. You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

### How will the lawyers be paid?

**Answer:**

Class Counsel intends to file a motion on or about February 23, 2011 seeking $25 million for attorneys' fees and costs. The fees awarded by the Court will be paid by Defendants and will not come from the Settlement Fund. The Court will determine the amount of fees to award. Class Counsel will also request that up to $125,000 be paid from the Settlement Fund to the 26 Class Representatives who helped the lawyers on behalf of the whole Class.

### How can I Object?

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 362**

**Answer:**

If you did not exclude yourself from the settlement, you had the option to object to the settlement by mailing in a written objection no later than the postmark deadline of March 16, 2011.  The deadline to object to the settlement has now passed.

**What's the difference between objecting and excluding?**

**Answer:**

Objecting is simply telling the Court that you don't like something about the Settlement. You can object to the Settlement only if you do not exclude yourself from the Settlement. Excluding yourself from the Settlement is telling the Court that you don't want to be part of the Settlement. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you.

**When and where will the Court decide whether to approve the Settlement?**

**Answer:**

The Court will hold a Fairness Hearing on **April 29, 2011**, at the United States District Court for the Northern District of California, located at 280 South First Street, San Jose, CA, 95113, in Courtroom #3. The hearings may be moved to a different date or time without additional notice, so it is a good idea to check with this website. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. The Court will also consider how much to pay Class Counsel and the Class Representatives. If there are objections, the Court will consider them at this time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**What happens if I do nothing at all?**

**Answer:**

If you are a member of Settlement Class A and you do nothing, you will not get a payment from the Settlement. Unless you exclude yourself, you won't be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendants about the legal issues in this case, ever again.

**How do I get more information?**

**Answer:**

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at this website. You may also write with questions to Pick-a-Payment Settlement, P.O. Box 2448, Faribault, MN 55021-9148.

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 363**

About the Administrator • Contact Information

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

**About this Settlement** | **Making a Claim** | **More Information**

Overview    FAQs    What are your rights    Notice

## What are your Rights?



| Your Legal Rights and Options in the Settlement | |
|---|---|
| **Submit a Claim Form** | Settlement Class A must submit a claim. Settlement Classes B and C do not have to submit a claim. |
| **Exclude Yourself from the Settlement** | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. |
| **Object** | Write to the Court about why you don't like about the Settlement. |
| **Go to a Hearing** | Ask to speak in Court about the fairness of the Settlement. |
| **Do Nothing** | Settlement Class A will not get a payment and will give up rights to ever sue the Defendants about the legal claims in this case. Settlement Classes B and C will obtain Settlement benefits and give up rights to ever sue the Defendants about the legal claims in this case. |

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 364**

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

**About this Settlement**     **Making a Claim**     **More Information**

Overview     FAQs     What are your rights     Notice

## Notice




Acrobat Reader is free and is required to view and print these documents

The documents below include:

**Agreement and Stipulation of Settlement of Class Action** which is made for the sole purpose of attempting to consummate settlement of this action on a class-wide basis.

**Pick-A-Payment Class Notice** which is the notice that, according to The Defendants' records, will be mailed to those that obtained a Pick-A-Payment mortgage loan.

You can view or print these documents by clicking on the title or download below.

| Title | Size | |
|-------|------|---|
| Agreement and Stipulation of Settlement of Class Action | 273.04 KB | Download |
| Pick-A-Payment Class A Notice | 380.35 KB | Download |
| Pick-A-Payment Class A Notice, Espanol | 300.14 KB | Download |
| Pick-A-Payment Class B Notice | 415.95 KB | Download |
| Pick-A-Payment Class B Notice, Espanol | 321.07 KB | Download |
| Pick-A-Payment Class C Notice | 410.57 KB | Download |
| Pick-A-Payment Class C Notice, Espanol | 318.79 KB | Download |

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 365**

About the Administrator • Contact Information

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

| About this Settlement | Making a Claim | More Information |
| --- | --- | --- |

Court Documents    For More Information

## Court Documents

A Settlement has been reached in a class action involving Pick-a-Payment mortgages. The Court in charge of this case still has to decide whether to approve the Settlement. Payments will be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.



Acrobat Reader is free and is required to view and print these documents

| Title | Size | |
| --- | --- | --- |
| Preliminary Approval Order | 709.21 KB | Download |
| Agreement and Stipulation of Settlement of Class Action | 273.04 KB | Download |
| Corrected Second Amended Class Action Complaint | 2.48 MB | Download |

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 366**

Case 5:09-cv-02675-JF Document 154-2 Filed 04/15/11 Page 376 of 412

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

**About this Settlement** | **Making a Claim** | **More Information**

Court Documents    For More Information

## More Information



The notice summarizes the proposed Settlement.  More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at this website.  You may also write with questions to Pick-a-Payment Settlement, P.O. Box 2448, Faribault,  MN 55021-9148.

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 367**

About the Administrator • Contact Information

## IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation

Case No. M:09-CV-2015-JF

**About this Settlement**     **Making a Claim**     **More Information**

Claim Form     Opt-Out Info     Important Dates

## Important Dates



Preliminary Approval: December 16, 2010

Notice Mail Date: January 28, 2011

Notice of Intent to Appear/Objections Deadline: March 16, 2011

Opt Out Deadline: March 16, 2011

Claim Submission Deadline: March 16, 2011

Final Fairness Hearing: April 29, 2011

Please do not contact either Wachovia Bank or Wells Fargo Bank or the court about this settlement. Any and all callers will be directed to this website. If you have questions, please refer to the FAQ's and the other information posted here.

This site is not operated by Wachovia Bank or Wells Fargo Bank. This class action settlement is supervised by the court and is administered by a claims administration firm that handles all aspects of claims processing. Wachovia Bank or Wells Fargo Bank is not authorized to respond to questions from members of the plaintiff class regarding the settlement.

View our **Privacy Statement**

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 368**

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 3144961 | ADELE P NAVARRETE | | 24131468/2 | | |
| 1121780 | ADUNI A UBAKA | | 27157783/1 | | |
| 3051177 | ALAN AFRAIM | | 48413421/2 | | |
| 4827825 | ALAN W LAITSCH | LESLIE A LAITSCH | 45400330/3 | | |
| 4725459 | ALBERT HAYES | | 46650040/3 | | |
| 767958 | ALBERT W ROONEY | YVONNE M LINTHWAITE ROONEY | 21336243/1 | | |
| 4686002 | ALEKSANDRA TOCZEK | | 48392716/3 | | |
| 4071792 | ALEXANDER W CORLETT | | 47310172/2 | | |
| 1675047 | ALEXANDRA RAMIREZ | | 26099531/1 | | |
| 302647 | ALEXIS ESQUILIN | ANTHONY ESQUILIN | 45234069/1 | | |
| 5013333 | ALFREDO ESCOBEDO | | 48015309/3 | | |
| 2054186 | ALLAN DEAN | VICTORIA MARIE DEAN | 44588044/1 | 44588044/2 | |
| 3095164 | AMY METZINGER | EMMA METZINGER | 24774945/2 | | |
| 434058 | ANDREA B GOLD | | 23827850/1 | | |
| 4816515 | ANDREA C PAGE | | 44308781/3 | | |
| 2091266 | ANDREA FEIER | | 28355089/1 | 28355089/2 | |
| 5004584 | ANDY J NAVA | SUSAN E NAVA | 42864603/3 | | |
| 4699484 | ANGELA DIBENEDETTO | | 46998647/3 | | |
| 4290063 | ANGELA T STARK | | 42723403/2 | | |
| 4842590 | ANITA L BOWDEN | | 45363231/3 | | |
| 98434 | ANN PAULSON | THE ANN PAULSON TRUST | 43784578/1 | | |
| 1285628 | ANNA M DE OCA | | 45603685/1 | | |
| 3668979 | ANNA M RUCKER | | 25210220/2 | | |
| 3840283 | ANNE CHANEY | | 47601331/2 | | |
| 4918400 | ANTHONY STERN | JOANNE STERN | 44801710/3 | | |
| 4854647 | ARLENE BELL-SPARROW | RONALD W SPARROW | 45782745/3 | | |
| 4988458 | ARMANDO R GIL | | 46025300/1 | 46025300/3 | |
| 5022267 | ARTHUR JAMES TENNIER | LOIS GEAN TENNIER | 47839667/3 | | |
| 2375403 | ARTHUR P PRISCO | | 25752023/1 | 25752023/2 | |
| 70201 | ARTHUR R TUBBS | JANE M TUBBS | 25272253/1 | | |
| 5137473 | AUSTIN BROWN | | 48117584/3 | | |
| 4728917 | BARBARA L STEPHENS | | 27032689/3 | | |
| 4832010 | BARBARA W BEESON REVOCABLE TR | | 42564617/3 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 369**
Page 1 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 2986180 | BARNETT GOODMAN | JANICE F GOODMAN | 44212777/2 | | |
| 4809302 | BENJAMIN A ERNST | | 46141115/3 | | |
| 5050970 | BENJAMIN MENJIVAR | SARA MENJIVAR | 46652475/3 | | |
| 4100317 | BENJAMIN PUENTES | | 25655689/2 | | |
| 4049043 | BERNADINE C HOLMAN | KENT B HOLMAN | 28145365/2 | | |
| 4921752 | BETHANY M ASH | RICHARD E ASH | 43360155/3 | | |
| 4941453 | BEVERLEY NELLIGAN | | 41732405/3 | | |
| 5051960 | BILL J TINKER | NORMA WALKER | 47551494/3 | | |
| 95220635 | BJORN BLOMBERG | BLOMBERG MARGITA | 42581173/3 | | |
| 3628614 | BLANCA C DARKHOR | SAEED DARKHOR | 42009316/2 | | |
| 4677468 | BRADFORD HERRICK | | 46350302/3 | | |
| 4924180 | BRANDON L MERCY | TERRI MERCY | 45878121/3 | | |
| 2455273 | BRENDA P SMITH | | 29887031/1 | 29887031/2 | |
| 5188505 | BRIAN J THOMPSON | DULCE E DE LEON | 27960509/1 | | |
| 3502419 | BRIAN J WOODALL | WOODALL MARY JANE KOENEN | 44328961/2 | | |
| 1196139 | BRYCE A MCCULLOUGH | | 41057266/1 | | |
| 3739044 | CARILLON P NICOL | JOHN M NICOL | 25319559/2 | | |
| 4754169 | CARL PRETO | | 45267952/3 | | |
| 3240298 | CARLOS A GUERRESCHI | SONIA E GUERRESCHI | 46503579/2 | | |
| 3284759 | CARLOS A MIRANDA | | 46422853/2 | | |
| 5034611 | CARMEN A MEZA | JOSEPHINE MEZA FAMIL JOSEFINA | 48012587/3 | | |
| 3200285 | CAROL CLEARY | | 26591610/2 | | |
| 2968643 | CAROLE A SINASON | | 48420095/1 | 48420095/2 | |
| 4687290 | CAROLYN J COOPER | | 46763371/3 | | |
| 4033813 | CAROLYN L CORY | | 27735703/2 | | |
| 2429199 | CAROLYN W SANDFORD | PAUL F SANDFORD | 43926120/1 | 43926120/2 | |
| 4762737 | CHARLES COLAIZZI | CARLENNE COLAIZZI | 47118039/3 | | |
| 4850878 | CHARLES D HENLEY AND GINA I H | | 47361795/3 | | |
| 3170229 | CHARLES Q SCHOCH | | 46334108/2 | | |
| 2940137 | CHERYL F GLASS | | 25353970/2 | | |
| 95209241 | CHRIS P BURGER | | 41271826/2 | | |
| 3623671 | CHRIS ROPPEL | | 24746679/2 | | |
| 3870884 | CHRISTIAN BERTOLI | PATRICIA BERTOLI | 47369020/2 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 370**

Page 2 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 4813637 | CHRISTINA HORTON | | 42386573/3 | | |
| 3120552 | CHRISTINE LODER | | 42547141/2 | | |
| 5029204 | CHRISTOPHER A ROMO | DULIA ROMO | 27460104/3 | | |
| 2415963 | CLAUDETTE L ROZAL | FRED S ROZAL | 29003407/1 | 29003407/1 | |
| 4106173 | CLAUDIA COLEMAN | | 46977104/2 | | |
| 3095010 | CLEON JONES | | 22779383/2 | | |
| 4694212 | CLIFFORD J CESPEDES | | 29624368/3 | | |
| 4996071 | COLETTE DUMAS | | 47189477/1 | 47189477/3 | |
| 1930702 | CONCHITA C ANG | | 47453501/1 | 47453501/3 | |
| 4816720 | CONNIE T KIM | | 45330412/3 | | |
| 1645149 | CONSUELO NOLASCO | | 40691859/1 | | |
| 4532965 | CORAZON T GONZALES | AVELINA GONZALES | 46745956/2 | | |
| 4966647 | CRAIG A SAMPLE | EILEEN K SAMPLE | 44588937/1 | 44588937/3 | |
| 5172948 | CRISTIAN A BONZI | JANI M HUHTA-BONZI | 43090257/3 | | |
| 2947075 | CRYSTAL WHITE | | 40821902/2 | | |
| 4851738 | CURLEE C DENNIS | | 47426341/3 | | |
| 4854364 | CYNTHIA LYN HENDERSON | | 47298278/3 | | |
| 2958002 | DAMARIS SANCHEZ-MELE | | 45663549/2 | | |
| 3091449 | DANE GITTINGS | | 41663295/2 | | |
| 878227 | DANIEL A DETLEFSEN | SUSAN D DETLEFSEN | 20724274/1 | | |
| 2898193 | DANIEL BOWMAN | CORINNE BOWMAN | 44921427/2 | | |
| 155847 | DANIEL M TROY | CYNTHIA TROY | 41938887/1 | | |
| 3310984 | DANNY F HOOD | | 47949938/2 | | |
| 3379462 | DARLENE A CREATURO | | 47060546/2 | | |
| 5056828 | DARREN E WASSELL | JULIE S WASSELL | 41763087/3 | | |
| 4800026 | DAVID F BENCIVENGA | | 40939449/3 | | |
| 3380079 | DAVID L CREATURO SR | | 28331593/2 | | |
| 3062906 | DAVID L MENZIES | JUDY M MENZIES | 46560553/2 | | |
| 3182185 | DAVID M RAHN | CYNTHIA RENEE RAHN | 23394919/2 | | |
| 4971948 | DAVID RUFF | | 44946937/3 | | |
| 3649237 | DAVID V MOUA | | 45767555/2 | | |
| 4682974 | DEAN J CAMMARATA | MARY E CAMMARATA | 27186683/3 | | |
| 4797081 | DEBORAH A ORR | | 46788253/3 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 371**
Page 3 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 4895480 | DENNIS H PORTER | | 47185780/3 | | |
| 4332404 | DEREK L DAVENPORT | LOYCE C DAVENPORT | 43407816/2 | | |
| 3806913 | DESIREE DURBANO | DONALD DURBANO | 41533985/2 | | |
| 3179079 | DIANE D FRAME | | 47124029/2 | | |
| 2980300 | DIANE J KOENIG | MARVIN H KOENIG | 27173186/2 | | |
| 5046553 | DIANE L BASKER | | 44289973/3 | | |
| 5036974 | DIANE TENUTO | | 40515702/3 | | |
| 5137015 | DMITRI VELIKORETSKI | IRINA NIKOLAEVA | 22466874/3 | | |
| 2032719 | DONELL R COOPER | MIKKI L COOPER | 43406628/1 | 43406628/3 | |
| 3079959 | DOUGLAS A CONVERSE | ROBIN J CONVERSE | 32433153/2 | | |
| 4788744 | DOUGLAS M WILMER | | 46158994/3 | | |
| 5026821 | DOUGLAS ROBERTS | | 45661048/3 | | |
| 3823361 | DOUGLAS RUSSELL | | 27091594/2 | | |
| 5076994 | EBLIS PRIETO | RENEA L PRIETO | 29524204/3 | | |
| 4701057 | EDMUND FRANCIS | | 47274196/3 | | |
| 3068991 | EDWARD SANDKUHL | SANDRA SANDKUHL | 29518230/2 | | |
| 4121589 | ELAINE C CAMPBELL | | 44175727/2 | | |
| 267885 | ELISABETH TURNER | | 28320307/1 | | |
| 3009925 | ELMO A JEFFREY | | 47353933/2 | | |
| 3294338 | ELSIE R CARTER | | 47674544/1 | 47674544/2 | |
| 4765202 | ERNEST ALZATE | ELENA O ALZATE | 44790665/3 | | |
| 307727 | ERNEST MCGILL | TRACEY MCGILL | 46601670/1 | | |
| 4731214 | ESTATE OF RAYMOND T MAJEWSKI | | 27448257/3 | | |
| 2911762 | ESTATE OF STANLEY R LEVINE | | 43483874/2 | | |
| 4728184 | ETHEL R WILSON | | 41592411/3 | | |
| 4774921 | EUGENE KROLL | | 41238171/3 | | |
| 2331201 | EVA ANNIKA NORD | | 48593875/1 | 48593875/2 | |
| 5071883 | EVELYN NARVAEZ | | 44871002/3 | | |
| 4283102 | FARHAD GHAZVINI | | 45232402/2 | | |
| 322249 | FRANK E GRABOWSKI | | 31876840/1 | | |
| 324779 | FRANK PLAYO | | 24776411/1 | | |
| 3014455 | FRANK VIGLIOTTI | | 45824612/2 | | |
| 4678991 | FRASER BOTWRIGHT | CAROL L BOTWRIGHT-BROWN | 41983206/3 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 372**

Page 4 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 3720172 | FRED T BREWSTER | DEANA L BREWSTER | 43941285/2 | | |
| 3216552 | FRED W TWERS | KATHLEEN O TWERS | 47315015/1 | 47315015/2 | |
| 2763903 | FREDDY RUGERIO | GUADALUPE RUGERIO | 46269049/1 | 46269049/2 | |
| 4968665 | G RICHARDS | | 45650587/3 | | |
| 4884675 | GAIL L BAKER | | 22520043/3 | | |
| 3666531 | GARY W BROWN | FRED B BROWN | 46653432/2 | | |
| 4288763 | GEORGENA M COOK | | 42935817/2 | | |
| 4741329 | GEORGINA DESOUZA | | 22591119/3 | | |
| 5077144 | GERALD I ESPARCIA | | 40053415/3 | | |
| 4849773 | GERALD L DICK SR | | 40570392/3 | | |
| 3000724 | GLENN HARBER | GRETCHEN WYNEGAR | 47149067/2 | | |
| 4796695 | GLENN MEE | | 45920238/3 | | |
| 4928201 | GLORIA MARTINEZ | CHRIS MARTINEZ | 29304037/3 | | |
| 2940618 | GREGORY M PLISKO | AMRI T PLISKO | 29219755/1 | 29219755/2 | |
| 3480540 | GREGORY S DUNHAM | CAROLINE A MCNABB | 46273579/2 | | |
| 3759189 | GREGORY W SCHWARTZ | | 25210014/2 | | |
| 5124435 | GUADALUPE SANCHEZ | | 45207198/3 | | |
| 1388992 | GWENDOLYN J HOLLINQUEST | | 44724706/1 | | |
| 223003 | HAZEL PIERCE | ERMA PIERCE | 27589712/1 | 27589712/1 | |
| 5169719 | HECTOR ESCOBAR | | 29603628/3 | | |
| 3670545 | HELENA W PEREZ-REILLY | | 44013977/2 | | |
| 1750720 | HENRY SY | | 25942319/1 | | |
| 5055517 | HERMAN J JOHNSON | JOYCE A JOHNSON | 26675009/3 | | |
| 5118618 | HILDA P SANCHEZ | | 40763823/3 | | |
| 4772767 | IAN R FRASER | WENDY W FRASER | 26823336/1 | 41985649/3 | |
| 3633359 | IMOGENE MCNEES | | 45755790/2 | | |
| 2904917 | INGRID MURRAY | | 41879099/2 | | |
| 4721246 | IZABELA UZNANSKA | | 46668992/3 | | |
| 4031543 | J RUSSELL SLACK | | 46037354/2 | | |
| 4977698 | JACK A NISSIM | | 41291980/3 | | |
| 3937754 | JAIME B FLORES-LOVO | KAREN M FLORES-LOVO | 29998051/2 | | |
| 2915883 | JAMES B BIGELOW | | 24502726/2 | | |
| 783644 | JAMES D HALL | | 44782308/1 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 373**
Page 5 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 1467277 | JAMES G COOPER | TAMMY L COOPER | 22522734/1 | | |
| 2885612 | JAMES KAROS | | 42288977/2 | | |
| 2245744 | JAMES LOCKLEY | VERONICA LOCKLEY | 24729253/1 | 24729253/2 | |
| 3206867 | JAMES POWELL | | 45509502/2 | | |
| 3614303 | JAMES R JOYCE | | 29585247/2 | | |
| 4880233 | JAMES ROBERT WHITAKER | CHRISTINE WHITAKER | 26969360/3 | | |
| 4805021 | JANET JUSTUS | | 27732866/3 | | |
| 3738337 | JANICE R BROWN | | 45438769/2 | | |
| 3302385 | JANICE R COBLE | KERMIT COBLE | 46077780/2 | | |
| 5002603 | JANICE R GONZALES | MICHAEL A GONZALES | 44292415/3 | | |
| 4437987 | JAROM A STRADLING | AMY R STRADLING | 42593582/1 | 42593582/2 | |
| 3131800 | JASON A STANAWAY | | 29472735/2 | | |
| 283755 | JASON D PLUCINSKI | | 41744335/1 | | |
| 3498057 | JASON R HARDTKE | | 40982977/2 | | |
| 4434658 | JASON T WAGNER | | 46735957/2 | | |
| 3368732 | JAY A ANDREWS | EDNA G ANDREWS | 42521617/2 | | |
| 287050 | JEFF BRACKEN | | 47894464/1 | | |
| 4704317 | JEFFREY DEMBICER | | 25136078/3 | | |
| 3255605 | JEFFREY M GORDON | | 48005623/2 | | |
| 3968635 | JEFFREY T DOYLE | PAGE INGRAM-DOYLE | 43441229/2 | | |
| 4939344 | JENEENE GANNATAL | | 48023808/3 | | |
| 4714750 | JENNA GUARIGLIA | | 43805761/3 | | |
| 297011 | JEROME LARKE | MARILYN LARKE | 42338228/1 | | |
| 3954812 | JESS OJEDA | ERMA OJEDA | 27567171/2 | | |
| 3137529 | JOAN P KLAYTON | | 28682326/2 | | |
| 2616940 | JOAN WADDELL | | 46654208/1 | 46654208/3 | |
| 5077571 | JOANNE MALISSOVAS | | 47231147/3 | | |
| 3812075 | JOHN BAKER | GLORIA BAKER | 27167279/2 | | |
| 3973844 | JOHN C MASCARI | MARY ANN MASCARI | 44587236/2 | | |
| 5033898 | JOHN C RECKLING | DEBRA L RECKLING | 44931533/3 | | |
| 5086849 | JOHN DAVID MCDOUGALL | JENNIFER L MCDOUGALL | 27407147/3 | | |
| 4751755 | JOHN F SCHAEFER SR | FLORENCE G SCHAEFER | 44610038/3 | | |
| 4238690 | JOHN KIM | | 40171175/2 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 374**
Page 6 of 14

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 240963 | JOHN P MISTLER | SHARON K MISTLER | 42292326/1 | | |
| 3039472 | JOHN R LEUCI | DOMENICA S LEUCI | 22947022/2 | | |
| 3755785 | JOHNNY R TERRONES | MARY T TERRONES | 28758530/1 | 28758530/2 | |
| 1264487 | JOSE AMPARIAN VALDEZ | | 24479719/1 | | |
| 95182339 | JOSE J GARCIA | GARCIA ROCIO | 40792384/1 | | |
| 2398921 | JOSE L RIVAS | JOSEPHINE RIVAS | 48006571/1 | 48006571/2 | |
| 2853994 | JOSE RODRIGUEZ | GLORIA RORIGUEZ | 43521699/1 | 43521699/2 | |
| 3103906 | JOSEPH BROOKS | | 47872312/2 | | |
| 207881 | JOSEPH COONEY | GRACE COONEY | 28932622/1 | | |
| 4818151 | JOSEPH HENNING | | 41823030/3 | | |
| 4722847 | JOSEPH J MUZIO | | 28281442/1 | 43132141/3 | |
| 5018796 | JOSEPH MICHAEL ORTON | KATHLEEN ORTON | 43140888/3 | | |
| 4735670 | JOSEPH PATTERSON | DIANE PATTERSON | 42514182/3 | | |
| 4806776 | JOSEPH R ERNST | | 46451936/3 | | |
| 4881445 | JOSEPH STEPHENS | | 24374076/3 | | |
| 4004783 | JUDGE CARSON PURIFOY | | 44883726/1 | 44883726/2 | |
| 4895459 | JUDY A CHASTAIN | JOHN A MORARRE | 41070889/3 | | |
| 5022984 | JUDY JEAN PATAPOFF | | 47281613/3 | | |
| 5171866 | JUERGEN STAHL | | 43690486/3 | | |
| 3837542 | JULIA ELLIOTT | SABRA L STEPAK | 44684769/2 | | |
| 3593479 | JULIE ANNE THOMAS | | 42182147/1 | 42182147/2 | |
| 3512685 | JUNIOUS TAYLOR JR | MYRA MING | 42274860/2 | | |
| 2536798 | KAREN B WILLIAMS | | 25806191/1 | 25806191/3 | |
| 4697800 | KAREN KEELEY | | 42805796/3 | | |
| 4730804 | KAREN L GABRIEL | | 46599791/3 | | |
| 4154013 | KAREN M STREET | | 26472670/2 | | |
| 3196649 | KATE M COOPER | | 44578458/2 | | |
| 2900674 | KATHLEEN M KEEFE | | 45321577/1 | | |
| 3853894 | KATHY A CHRISTOPHER | | 40728446/2 | | |
| 4113805 | KAYVAN PEJOOH | ROSEMARIE ANN PEJOOH | 40926982/2 | | |
| 4806523 | KEITH AARON VANN | | 40633646/3 | | |
| 3963678 | KEITH M NORDBY | KIMBERLY NORDBY | 23955826/2 | | |
| 2390840 | KEITH RELPH JR | | 46768636/1 | 46768636/3 | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 375**
Page 7 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 4978824 | KENI MAE MEYER | | 47645650/3 | | |
| 5004843 | KENNETH DAVIS | | 27694082/3 | | |
| 4718192 | KENNETH E SILMAN | | 47956222/3 | | |
| 4982579 | KERRI DANIELS | | 40829459/3 | | |
| 3167991 | KEVIN P MCLAUGHLIN | | 26005405/2 | | |
| 3028865 | KRISTEEN ESPINOZA | | 42554162/2 | | |
| 4844914 | LARA KARAKASEVIC | | 40383143/3 | | |
| 3108376 | LARRY E WALKER | PATRICIA WALKER | 24897381/1 | 24897381/2 | |
| 5041282 | LATANJA CHAMBERS | | 41899113/3 | | |
| 2896267 | LAURENCE A DIAMOND | HOLLY S DIAMOND | 43466549/1 | 43466549/2 | |
| 323574 | LAWRENCE A STINGER | DEBORAH STINGER | 24443723/1 | | |
| 1977684 | LAWRENCE BREAN | MARCELLA B BREAN | 43485093/1 | 43485093/2 | |
| 5038794 | LAWRENCE J KIRKPATRICK | ELIZABETH L KIRKPATRICK | 45957750/3 | | |
| 4704249 | LEONARD BURKE | RANDY LEVINE | 43045806/3 | | |
| 1897852 | LEONARD MC KENZIE | LOUISE MCKENZIE | 22900948/1 | | |
| 1941319 | LEONARD V AVILA | | 43237122/1 | 43237122/1 | |
| 1130751 | LEOPOLDO ASUNCION | | 26031831/1 | 26031831/1 | |
| 5064830 | LESLIE L TALLETT | MARISSA L TALLETT | 45819059/3 | | |
| 3963401 | LESTER LAMBERT | | 30061048/2 | | |
| 3220009 | LINDA D QUARLES | WILLIAM E BROWN | 29481793/2 | | |
| 1192827 | LINDA G WILLIAMS | | 47631494/1 | | |
| 3182383 | LINDA S SUSWAL | | 23829526/2 | | |
| 5220045 | LINDSEY MULLETT | | | | |
| 3736739 | LISA G POST | JOHN J TORNES | 47908199/2 | | |
| 2847528 | LOLITA A SY | | 25944943/1 | 25944943/2 | |
| 2314709 | LORETTA MORSE | | 41879818/1 | 41879818/2 | |
| 4697374 | LOUIS GIOIA JR | | 22022909/3 | | |
| 3123386 | LOUIS J DIDIO | SUZAN M DIDIO | 42718403/2 | | |
| 3357859 | LOVENIA A CUMBIE | | 46643052/2 | | |
| 3325148 | LOYAL A SLECHTA | SUSAN MARGRETHE SLECHTA | 43655307/2 | | |
| 3006740 | LUCILLE H RICHARDSON | | 47012356/2 | | |
| 4452461 | LUIGI SGANDURRA | SABRINA GRAZIANO | 40082133/2 | | |
| 3846490 | LUZ V DALISAY | LEONARDO P DALISAY | 44454064/2 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 376**
Page 8 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 3065259 | LYDIA H LOCKMAN | | 44963486/2 | | |
| 3308875 | MAMIE Y THOMAS | | 47491394/1 | 47491394/2 | |
| 1223286 | MANUEL J RODRIGUEZ SR | DOROTHY C RODRIGUEZ | 29186657/1 | | |
| 1931648 | MARC ANTHONY | | 40092561/1 | 40092561/3 | |
| 4362807 | MARCELINO LLANOS | | 45518297/2 | | |
| 3237076 | MARCIA A GAYNOR | | 48310239/2 | | |
| 2209005 | MARCY F KAPLAN | | 40523227/1 | 40523227/3 | |
| 4717546 | MARGARET CRUICKSHANK | | 26756999/3 | | |
| 3799062 | MARGARET MCCORMICK | | 44689735/2 | | |
| 5122400 | MARGARITA RIOS | | 25556820/3 | | |
| 3043325 | MARIA A SCHIANO | | 22549919/2 | | |
| 5021338 | MARIA FUENTES | | 44613651/3 | | |
| 4870630 | MARIA H TURNBLOM | | 23157936/3 | | |
| 1774344 | MARIA L FLORES | APRIL L MACABUHAY | 42244673/1 | | |
| 3127858 | MARIA SANDOR | | 46198149/ 2 | | |
| 668613 | MARIA TERESA FERNANDEZ | | 25561754/1 | | |
| 2371771 | MARIAN A PORTER | | 45198272/1 | 45198272/3 | |
| 253161 | MARIAN STUPKA | | 28882181/1 | | |
| 4688983 | MARILYN N LEHANE | | 47868716/3 | | |
| 4906155 | MARK ALLYN FISHER | | 40510943/3 | | |
| 95180632 | MARK D HYSEN | | 29490992/1 | | |
| 4113126 | MARK J CORDEIRO | LISA K CORDEIRO | 42847533/2 | | |
| 4851196 | MARK K BRASWELL | | 47080932/3 | | |
| 592123 | MARK R NICELY | DENISE L NICELY | 23942840/1 | | |
| 1099607 | MARK S JONES | ROBERTA D JONES | 43457068/1 | | |
| 5065141 | MARY A WADSWORTH | | 41413626/3 | | |
| 4680994 | MARY ANN CURRIE | | 43570274/3 | | |
| 3684979 | MARY K ERASMUS | | 42224014/2 | | |
| 4981022 | MATTHEW R FROINES | | 48108328/3 | | |
| 4814382 | MAUREEN MCARDLE | | 24790073/3 | | |
| 3596913 | MCHATTIE ROBYN DEAN | | 26835066/2 | | |
| 3110836 | MEGAN E KELLEY | | 27592286/2 | | |
| 4793700 | MELISSA DAWN RUSH | | 42070953/3 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS PAGE 377**

Page 9 of 14

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 3297391 | MELISSA K WISHON | BRYAN R WISHON | 46611539/2 | | |
| 4725350 | MELVIN ESTES | MARY ESTES | 47195888/3 | | |
| 4286509 | MICHAEL A HOFFMAN | TRACIE LEE HOFFMAN | 413604472/2 | | |
| 333078 | MICHAEL D GIMBEL | MARGARET M GIMBEL | 25484213/1 | | |
| 4847052 | MICHAEL HILLA | | 46258794/3 | | |
| 218276 | MICHAEL J LAFFERTY | REGINA LAFFERTY | 25482068/1 | | |
| 5159383 | MICHAEL J TAHENY | MARIA T TAHENY | 21217575/3 | | |
| 4834380 | MICHAEL LAWVER | MARGARET OVESON | 22128904/3 | | |
| 4980353 | MICHAEL S MESSING | LICETH MESSING | 43278662/3 | | |
| 5044535 | MICHELLE MOQUIN | | 40640575/3 | | |
| 4764762 | MIRIAM RIVERA | | 47703343/3 | | |
| 4894483 | MIRVIA F MEYER | | 47093067/3 | | |
| 2263564 | MIYOKO H MANALISAY | SACHI H MANALISAY | 47907712/1 | 47907712/2 | |
| 3234419 | MYRA JANE ROBERTSON | | 24190399/2 | | |
| 4972150 | NADER SHATERIAN | | 46956348/3 | | |
| 3790328 | NANCY D NICKERSON | | 43852524/1 | 43852524/2 | |
| 4751946 | NANCY DORAZIO | | 43746692/3 | | |
| 4819592 | NANCY R SICOLI | | 47577788/3 | | |
| 5006786 | NATHAN J BONAPARTE | | 44756641/3 | | |
| 27663 | NELSON A CASTRO | ADELA M CASTRO | 21600796/1 | | |
| 4774990 | NEWTON GAYNOR | | 45488137/3 | | |
| 4797555 | NICK TRIANTAFYLLOPOLOUS | ELIZABETH GRASHO | 46630703/3 | | |
| 2061979 | NICOLE DIAMOND | | 28628303/1 | 28628303/2 | |
| 4689355 | NICOLE M FRATARCANGELI | | 29124252/3 | | |
| 3736715 | NYSSA RENE HAWKINS | | 42421743/2 | | |
| 3260661 | OSEO O SORATORIO | FIDELA G SORATORIO | 47743257/1 | 47743257/2 | |
| 3089354 | PATRICIA A ANTONUCCI | DOMINIQUE NIKI WARNER | 42286807/2 | | |
| 4024828 | PATRICIA GODWIN | SCOTT GODWIN | 46193363/2 | | |
| 4975472 | PAUL F SANDFORD | NANCY J SANDFORD | 48218333/3 | | |
| 4169918 | PAULA J LOEFFLER | | 43290253/2 | | |
| 3573167 | PAULA NELL RAINEY | JOEL A RAINEY | 41708413/2 | | |
| 4688358 | PAWEL TOCZEK | | 43302355/3 | | |
| 4934899 | PEDRO ENRIQUE LOPEZ | | 45238243/3 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 378**
Page 10 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 3158159 | PENELOPE O CAPOZZI | | 31878127/2 | | |
| 2483924 | PHILIP TESORIERO | LISA TESORIERO | 47555255/1 | 47555255/3 | |
| 2339085 | PRISCILLA ONEIL | | 41476433/1 | 41476433/2 | |
| 2650968 | RACHEL MUNGOMA | | 21292396/1 | 21292396/1 | 45041076/2 |
| 4799900 | RALPH S SPURLOCK | | 44341477/3 | | |
| 4097051 | RALPH W BOYD | GEORGENE L BOYD | 47916903/2 | | |
| 4334828 | RANDAL LA ROCCA | LISA LA ROCCA | 45450772/2 | | |
| 5003068 | RANDY DEAN VELLIS | ALYSSA VELLIS | 41380494/3 | | |
| 4893462 | REGINA A C NARVAEZ | CONNIE R PABON | 40121543/1 | 40121543/3 | |
| 294751 | REGINA S WEIR | | 29481587/1 | | |
| 1251234 | REGINALD C ROGOFF | | 23904030/1 | | |
| 4547273 | RENE ALBERTO ESQUER | DULCE MARIA ALONSO | 45237757/2 | | |
| 4904533 | RENE L LARSON | | 24229429/3 | | |
| 3847206 | REX A HILL | | 45083193/2 | | |
| 3360804 | RICHARD A ROSENTHAL | | 43772243/1 | 43772243/2 | |
| 4697879 | RICHARD BOEHME | PATRICIA BOEHME | 40965261/3 | | |
| 4691525 | RICHARD FRIEDMAN | LESLIE FRIEDMAN | 46487161/3 | | |
| 4681786 | RICHARD J WOLOSKI SR | DEBRA J CUTLER | 22877872/3 | | |
| 327718 | RICHARD NASUTI | | 46692497/1 | | |
| 4806325 | RICHARD R STROH | | 42917666/3 | | |
| 4731542 | RICHARD SIMONELLI | | 29288859/3 | | |
| 1162363 | RICHARD W HAINES | | 41171976/1 | | |
| 5038343 | ROBERT BLAIR KRUEGER | | 48015077/3 | | |
| 2897578 | ROBERT CLARKE | | 22873145/2 | | |
| 5020317 | ROBERT D DALE | | 46526133/3 | | |
| 256568 | ROBERT FRAZIER | JENNIFER FRAZIER | 29480498/1 | | |
| 4036371 | ROBERT HARRICK | GERALDINE HARRICK | 46910642/2 | | |
| 5050161 | ROBERT LITONJUA | | 42915561/3 | | |
| 3129968 | ROBERT M BAYLIS | ROSEMARY E | 47294582/2 | | |
| 3334980 | ROBERT M KENT | LAURA E KENT | 41998691/1 | 41998691/2 | |
| 3156667 | ROBERT MARTENS | WENDY MARTENS | 45380987/2 | | |
| 4001386 | ROBERT S MEYER | | 40554321/2 | | |
| 3962459 | ROBERT W MAYS | | 45148426/1 | 45148426/2 | |

EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 379

Page 11 of 14

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 95212241 | ROCKY EMERY | | 23227226/3 | | |
| 4904229 | RODERICK J WEINBERG | ANDREA M WEINBERG | 42264325/1 | 42264325/3 | |
| 3984086 | ROEHL AMANTE | CHARLENE AMANTE | 47368980/2 | | |
| 95214924 | ROGER A HAGEN | HAGEN MARY E | 40025645/3 | | |
| 4743484 | RON AROLD | JILL D AROLD | 42580761/1 | 42580761/3 | |
| 5045488 | RONALD H WHITE | LINDA J WHITE | 48574529/3 | | |
| 292580 | RONALD J PALUMBO | NANCY PALUMBO | 41193475/1 | | |
| 3366806 | RONALD L DUNHAM | | 45989241/2 | | |
| 2582795 | RONALD WILLIAM DUMAS | | 43792795/1 | 43792795/3 | |
| 4872696 | ROSALIND M ROBINSON | | 26875948/3 | | |
| 3046975 | ROSARIO SPATOLA | GEORGINA SPATOLA | 41154089/2 | | |
| 4769880 | ROSE A MCCLOSKEY | | 29860368/3 | | |
| 4790709 | ROSE JAMES DOUGLAS | | 44713402/3 | | |
| 5015993 | ROSIE DUNNE | | 47391982/3 | | |
| 3071106 | SADIQA CODRINGTON | | 43344555/1 | 43344555/2 | |
| 3829035 | SALLY S CARMODY | | 47006788/2 | | |
| 4975700 | SAMANTHA L WILLIAMS | | 27939172/3 | | |
| 3241288 | SAMUEL HAMMAKER | | 47373592/2 | | |
| 297028 | SANDRA BONAFINO | | 41125634/1 | | |
| 2254654 | SANDRA DEE LUJAN | JOHN J LUJAN SR | 40316598/1 | 40316598/2 | |
| 3857670 | SANDRA M PETERSON LIVING TRUS | | 46904157/2 | | |
| 4700920 | SANDRA R WALOWACK | | 45563152/3 | | |
| 4417699 | SANDY LUMSEYFAI | | 41748716/1 | 41748716/2 | |
| 3881286 | SARA M DE LEON | PEDRO DE LEON | 43727437/2 | | |
| 2229508 | SCOTT H LANSING | | 26383828/1 | 26383828/3 | |
| 3768891 | SERGIO RAMOS | OLGA ELIAS | 40126765/2 | | |
| 36580 | SHARON BASCH | | 278336491/1 | | |
| 297868 | SHAWN P WALSH | SUSAN ENGLE-WALSH | 25269184/1 | | |
| 4121671 | SHEILA L FREEMAN | THOMAS W FREEMAN | 23637614/2 | | |
| 2220253 | SHIRLEY MAE KNIGHT-HARRIS | | 43323534/1 | 43323534/2 | |
| 5157778 | SHIRLEY TONG PANG | CHRIS TUNG-SHING PANG | 47007992/3 | | |
| 4937883 | STANLEY W EPPERLEY | KATHRYN A EPPERLEY | 47513353/3 | | |
| 5061815 | STEPHEN R MASON | | 44543635/3 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 380**

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 3536452 | STEPHEN W BLOTNER | | 23317266/2 | | |
| 3836927 | STEVE A GOLDEN | | 43863083/2 | | |
| 3739099 | STEVE ALVERSON | | 48607055/2 | | |
| 3425442 | STEVE C SPENCER | | 43088483/2 | | |
| 2201689 | STEVEN A JOHNSON | | 44184091/1 | 44184091/3 | |
| 3968123 | STEVEN B HOMAN | KATHRYN A HOMAN | 41853920/2 | | |
| 4840879 | STUART TAUB | HEATHER TAUB | 41139866/3 | | |
| 4708902 | SUSAN BACHMANN | | 44012268/3 | | |
| 4729648 | SUSAN L MARTURANO | PHILIP L MARTURANO | 44705689/3 | | |
| 4896616 | SUSAN L WEIDMAN | PETER C WEIDMAN | 24824930/3 | | |
| 306065 | SUSAN M ROBINSON | | 22549380/1 | | |
| 3142776 | SUZANNE FORMAN | | 43177906/2 | | |
| 2052793 | SUZETTE J DE LA ROCHA | | 41966003/1 | 41966003/3 | |
| 569651 | SY SHAMSEDEEN | | 43079979/1 | | |
| 3751367 | SYLVIA V AMBROSE | | 43886902/2 | | |
| 4815853 | TAKASHI HIROTANI | | 44889996/3 | | |
| 3123287 | TAMI L MORRISON | | 43504950/1 | 43504950/2 | |
| 2637280 | TAMRA S SMITH | CHARLES R SMITH | 47527783/1 | 47527783/2 | |
| 1067569 | TANYA DENNIS | | 43644681/1 | | |
| 1000276 | TED R CARLSON | CAROLE F CARLSON | 24616963/1 | 40662421/1 | 40662421/3 |
| 3726518 | TEOFILO K ALLAS TRUSTEE | LETICIA A ALLAS TRUSTEE | 29807104/2 | | |
| 3991749 | THERESE M AUSTIN | | 43689041/2 | | |
| 3704219 | THOMAS A CROSS | NOLA E CROSS | 29928413/1 | 29928413/2 | |
| 267748 | THOMAS C FOLEY | | 29841236/1 | | |
| 107181 | THOMAS G LYONS | | 24696627/1 | | |
| 754934 | THOMAS G MAUGHAN | LISA A WALDER MAUGHAN | 47648092/1 | | |
| 2541938 | THOMAS M WITTE | | 43727197/1 | | |
| 3179901 | THOMAS N COCCIA | DOROTHY M COCCIA | 45379518/2 | | |
| 40204 | THOMAS OBRIEN MOLONEY | | 24646432/1 | | |
| 4107255 | THOMAS R CANTWELL JR | | 47920475/2 | | |
| 3756690 | THOMAS W MARCKWARDT | GINGER MARCKWARDT | 46820361/2 | | |
| 4781097 | THOMAS W RIDDICK | | 46916870/3 | | |
| 598101 | TIMOTHY M SMARTT | DEBRA T SMARTT | 22801757/1 | | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS**
**PAGE 381**

Exhibit C - Exclusion List

| Claimant ID | Name1 | Name2 | Loan 1 and Class | Loan 2 and Class | Loan 3 and Class |
|---|---|---|---|---|---|
| 5001187 | TOBIN LAMPSON | | 47407903/3 | | |
| 3091463 | TODD C GITTINGS JR | HEATHER A GITTINGS | 23492515/2 | | |
| 3151693 | TODD C GITTINGS SR | DENISE GITTINGS | 21820212/2 | | |
| 4824282 | TRACY C IVERSEN | | 48184444/3 | | |
| 1123470 | TRUST MILAGROS B CUBE LIVING | MILAGROS B CUBE TRUSTEE | 41415985/1 | | |
| 1644142 | VALENCIA GUADALUPE CRUZ | OLGA CRUZ | 29290277/1 | | |
| 3372678 | VANCE A LANG | | 28669182/2 | | |
| 1115383 | VERNITA DUMAS | | 41139791/1 | | |
| 3610367 | VICKI S RIVERA | | 40977860/2 | | |
| 661065 | VICKIE L CAVINS | | 23632862/1 | | |
| 5029075 | VICTORIA BIDDULPH | BARRY BIDDULPH | 48071088/3 | | |
| 4393078 | VINCENT OSHEA | | 43146414/2 | | |
| 5242252 | VIOLA M ROHLING | | 43628643/2 | | |
| 4716778 | VKR FAMILY TRUST | | 47877204/3 | | |
| 4697060 | WALTER CURTIS | | 44438455/3 | | |
| 3184295 | WALTER KOTHGASSER | DEBORAH KOTHGASSER | 27102854/2 | | |
| 3237786 | WANDA R SANTIAGO | | 47598743/1 | 47598743/2 | |
| 95182711 | WAYNE JACK | JACK BRITA M | 41584814/1 | | |
| 5023158 | WILLIAM E VIETS | ANNE M VIETS | 46180253/3 | | |
| 4869467 | WILLIAM GATES | MARJORIE HAMILTON-GATES | 43347723/3 | | |
| 3136799 | WILLIAM J BRADY JR | JOAN BRADY | 26006668/2 | | |
| 4743606 | WILLIAM J EGAN III | DOMINIQUE M EGAN | 42480996/3 | | |
| 4120384 | WILLIAM L SPIVEY | WANDA SPIVEY | 47350103/2 | | |
| 2896007 | WILLIAM V PAIGE | | 47865795/2 | | |
| 1514209 | WINIFRED S DUFFY | | 44742369/1 | | |
| 5176588 | YOUN J NA | | 46312401/3 | | |
| 1120028 | ZDZISLAW BAK | | 43866219/1 | 43866219/1 | |

**EXHIBIT I ISO MOTION TO STAY PROCEEDINGS
PAGE 382**

EXHIBIT J

**E-filed 5/17/2011**

1
2
3
4
5
6
7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10          SAN JOSE DIVISION

11

12  IN RE WACHOVIA CORPORATION "PICK-A-         Case No. 5:09-md-02015-JF
    PAYMENT" MORTGAGE MARKETING AND
13  SALES PRACTICES LITIGATION.                 ORDER (1) GRANTING FINAL
                                                APPROVAL OF CLASS ACTION
14                                              SETTLEMENT; (2) ADDRESSING
                                                OBJECTIONS; (3) DENYING
15                                              MARCELLA ROSE'S MOTION TO
                                                INTERVENE; (4) APPROVING
16                                              SERVICE PAYMENTS TO CLASS
                                                REPRESENTATIVES; AND (5)
17                                              AWARDING ATTORNEYS' FEES
                                                AND COSTS
18
19
20
21
22

23          On April 29, 2011, the Court conducted a hearing with respect to the following motions

24  and objections: (1) motion of named Plaintiffs and Defendants for final approval of class action

25  settlement; (2) objections of Michael Hargett, Marcella Rose, and others; (3) Marcella Rose's

26  motion to intervene; (4) request for service payments to class representatives; and (5) motion of

27  class counsel for an award of attorneys' fees and costs. The Court has considered the documents

28  filed in connection with these motions and objections as well as the oral argument presented at

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS PAGE 383**

1    the hearing.  The Court finds and concludes as follows:

2    **I. FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

3    This multi-district litigation concerns Defendants' "Pick-a-Payment" mortgage loans,

4    which permitted borrowers to select and make a minimum payment amount for a limited time

5    and subject to certain conditions.  Borrowers could choose to make:  (1) a fully-amortizing

6    30-year interest and principal payment such that the loan would be satisfied in the traditional

7    30-year term; (2) a fully-amortizing 15-year interest and principal payment such that the loan

8    would be satisfied in a 15-year term; (3) an "interest-only payment"; or (4) a lesser, "minimum

9    payment."  When a payment was insufficient to pay the interest owed, unpaid interest was added

10   to the loan balance and the outstanding loan balance increased.  Plaintiffs allege that the loans

11   violated the federal Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and various state

12   laws, because the relevant loan documents failed to make adequate disclosures regarding the

13   certainty of negative amortization, the actual payment schedules, the interest rates on which these

14   schedules were based, and the full terms of the parties' legal obligations.

15   In August 2007, Lead Plaintiffs' counsel filed a putative class action in this Court,

16   *Mandrigues v. World Savings, Inc., et al.*, Case No. 5:07-cv-04497-JF.  *Mandrigues* was litigated

17   vigorously for several years, during which time the United States Judicial Panel on Multidistrict

18   Litigation transferred to the undersigned for coordinated pretrial proceedings numerous other

19   "Pick-a-Payment" class actions and single-plaintiff actions.  After extensive motion practice and

20   the completion of briefing with respect to Plaintiffs' motion for class certification and the parties'

21   cross-motions for summary judgment, the parties reached settlement with the assistance of Judge

22   John K. Trotter (Ret.).  On December 16, 2010, following a hearing, the Court granted

23   preliminary approval of the settlement, certified three classes for settlement purposes, and

24   appointed class representatives and class counsel.

25   The settlement classes comprise individuals who entered into "Pick-a-Payment" loans

26   with Defendants between August 1, 2003 and December 31, 2008.  Settlement Class A consists

27

28

2

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

of borrowers who no longer hold their "Pick-A-Payment" loans[1]; Settlement Class B consists of

borrowers who still hold their loans and are not in default; and Settlement Class C consists of

borrowers who still hold their loans and are in default. Under the terms of the settlement,

Defendants will pay $50 million to the class. The entire amount of the settlement fund, less

service payments to class representatives in a maximum total amount of $125,000 (discussed

below), will be distributed on a *pro rata* basis to Settlement Class A members who have

submitted timely, valid claim forms and to Settlement Class B and C members who have not

excluded themselves from the settlement. Because the settlement fund will be divided on a *pro

rata* basis, no unclaimed portion of the fund will remain after distribution. In the event that a

class member fails to cash his or her check within ninety days after issuance despite a required

reminder notice from the settlement administrator, the funds from uncashed checks will be used

to offset administration and notice expenses; any remaining funds will be distributed by means of

a *cy pres* fund to non-profit organizations.

   In addition to paying $50 million to the class, Defendants will implement a loan

modification program available to qualified Settlement Class C members and to qualified

Settlement Class B members who are in "imminent default." Eligible class members first will be

considered for the federal Home Affordable Modification Program ("HAMP"). If the class

member does not qualify under HAMP or elects not to accept a HAMP modification, the member

will be considered for Defendants' new loan modification program, Mortgage Assistance

Program 2 ("MAP2R"). The goal of the MAP2R program is to reduce a class member's "DTI"[2]

to thirty-one percent or less. In order to accomplish this, Defendants will apply a series of steps

such as waiver of accrued interest and other charges, forgiveness of principal, and reduction in

interest rate. Once a DTI of thirty-one percent is reached, the loan will be converted into a fully-

---

[1] Settlement Class A includes borrowers who paid off their loans by selling their homes, by refinancing, or by other means. Borrowers who lost their homes as a result of foreclosure are excluded from the class.

[2] "DTI" is the ratio of the class member's first-lien monthly mortgage obligations to his or her gross monthly income.

3

amortizing loan and the negative amortization feature will be eliminated.  Class members who do not qualify for HAMP or MAP2R modifications will receive a written explanation of the reasons for denial.  Class counsel will be copied on all such denials and will follow up with Defendants to ensure that the loan modification program is functioning as intended.  This Court will retain continuing jurisdiction to interpret and enforce the settlement agreement.  Plaintiffs' expert values the benefit to the class conferred by the loan modification program in the range of $839 million to $2.7 billion.  The loan modification program will remain in place through June 2013.

Eligible Settlement Class B and C members who are unable to qualify for modifications under HAMP or MAP2R guidelines but who qualify for short-sale or deed-in-lieu of foreclosure under the Home Affordable Foreclosure Alternatives ("HAFA") guidelines will be offered incentive payments of at least $1,500 for a short-sale or deed-in-lieu of foreclosure.  Additionally, Defendants will pay $1 million for class notices and claims administration costs, and up to $25 million in attorneys' fees and costs.  These latter items – incentive payments, administration costs, and attorneys' fees and costs – will be paid separately by Defendants and will not diminish the $50 million settlement fund.

The Court finds the settlement to be "fundamentally fair, adequate and reasonable" as is required under Federal Rule of Civil Procedure 23(e) and applicable Ninth Circuit authority.  *See Mego Financial Corp. Sec.* Litig., 213 F.3d 454, 458 (9th Cir. 2000); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982).  "Assessing a settlement proposal requires a district court to balance a number of factors:  the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement."  *Mego Financial*, 213 F.3d at 458.  The district court also must satisfy itself that the settlement is not the product of collusion among the negotiating parties.  *Id.*

Although Plaintiffs' pleadings survived a number of motions to dismiss, given the evolution of case law regarding claims such as those at issue here, there is no guarantee that

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS
PAGE 386**

1   Plaintiffs would have prevailed on summary judgment or at trial.  This case is complex, both

2   because of the conglomeration of multiple lawsuits from throughout the country and because of

3   the large number of class members; trial likely would have been protracted.  Defendants have

4   offered a substantial amount of money in settlement, and the loan modification program provides

5   significant benefits to the class, as described above.  Extensive discovery has been completed –

6   numerous depositions have been taken, and more than 15,000 pages of documents have been

7   produced.  Plaintiffs' counsel, who are experienced attorneys, believe that the settlement is

8   extremely favorable to the class.  Approximately 516,000 notices were delivered by direct mail to

9   class members, but only a very small percentage objected or opted out, as is discussed more fully

10  below.  The settlement was reached after lengthy, arms-length negotiations overseen by Judge

11  Trotter, a nationally known and respected mediator.

12      The Court also concludes that notice of settlement to the class was adequate and satisfied

13  all requirements of Federal Rule of Civil Procedure 23(e) and due process.  Class members

14  received direct notice by United States mail, and additional notice was given by publication on

15  the Internet and in *USA Today*.  These were the best practicable means of informing class

16  members of their rights and of the settlement's terms.  *See Silber v. Mabon*, 18 F.3d 1449, 1453-

17  54 (9th Cir. 1994) (affirming district court's conclusion that notice by direct mail and publication

18  was best practicable notice).

19      The Court concludes that final certification of the settlement class is appropriate.  The

20  four prerequisites of Rule 23(a) are met:  the proposed settlement class includes hundreds of

21  thousands of borrowers (numerosity); all class members obtained similar "Pick-a-Payment" loans

22  (commonality); the named class representatives entered into "Pick-a-Payment" loans, and their

23  claims are reasonably coextensive with those of the class as a whole (typicality); and class

24  counsel are experienced and qualified to conduct the litigation, and there is no evidence of

25  collusion (adequacy).  The class is adequately defined and clearly ascertainable – class members

26  are individuals who obtained "Pick-a-Payment" mortgage loans from Defendants between

27  August 1, 2003 and December 31, 2008.  Finally, common questions of law or fact predominate,

28  as all class members would have to demonstrate that the "Pick-a-Payment" mortgages violated

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

1  federal and/or state laws.  *See* Fed. R. Civ. P. 23(b)(3).

2      Finally, the Court concludes that Plaintiffs' attorneys are experienced and able, and fairly

3  and adequately have represented and will continue to represent the interests of the class.  *See* Fed.

4  R. Civ. P. 23(g).  Accordingly, Plaintiffs' attorneys will be appointed as class counsel for

5  purposes of certification of the settlement class.

6                                    **II. OBJECTIONS**

7      As noted above, 516,000 notices were delivered by direct mail to class members, but only

8  thirty-six timely objections to the settlement were received.  This is an objection rate of .007%.[3]

9  Only 456 class members – .08% – requested exclusion.[4]  This positive response from the class

10  weighs strongly in favor of approving the settlement, despite the dissatisfaction of some

11  individuals.  *See Churchill Village, LLC v.  General Electric*, 361 F.3d 566, 577 (9th Cir. 2004)

12  (affirming district court's approval of settlement where forty-five of 90,000 class members

13  objected to the settlement, and 500 class members opted out).  However, as the Court noted at the

14  hearing, even one valid objection would be sufficient to show that the settlement is not in the

15  best interests of the class.  Accordingly, the objections will be addressed as follows.

16  **A.    Difficulty Navigating the Loan Modification Program**

17      A number of class members expressed concern about their ability to navigate the loan

18  modification program.  Some related their own negative experiences in detail.  As it has

19  expressed on the record a number of times, the Court is particularly concerned with ensuring that

20  the loan modification program actually will work as outlined in the settlement agreement.  In the

21  months prior to the final approval hearing, the Court has referred a number of inquiries to class

22

23      [3] Five of the thirty-six objections were received from individuals who also opted out of
24  the settlement.  Class members who opt out lack standing to object to a settlement.  *See In re
    Vitamins Antitrust Class Actions*, 215 F.3d 26, 28-29 (D.D.C. 2000).  If these five objections are
25  excluded, the objection rate is .006%.

26      [4] Seven additional class members made oral requests for exclusion at the hearing.  Those
27  requests were granted on the record.  An eighth class member, Mr. Vega, made an oral request
    for exclusion, which was granted, but he subsequently submitted a note to chambers requesting
28  that he be permitted to remain in the class.  If the seven additional individuals are considered,
    then .09% of class members have been excluded from the settlement.

6

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS
PAGE 388**

1 counsel, who have committed to ongoing involvement in the loan modification process. Class

2 counsel represented that during the sixty days prior to the final approval hearing they assisted

3 thirty to forty class members in obtaining loan modifications. Class counsel also stated on the

4 record that they would be happy to speak with any class member about his or her loan

5 modification efforts. Moreover, the Court expressly has retained jurisdiction over this matter.

6 The Court concludes that these are the best safeguards that realistically could be expected in this

7 type of settlement.

8 It should be noted that not every class member will be entitled to loan modification.

9 Class counsel confirmed at the hearing that they have reviewed certain denials which were

10 consistent with the terms of the settlement. To the extent that some individuals wish that class

11 counsel had held out for a more favorable program, this type of "should have done better"

12 objection routinely is rejected. *See, e.g., Linney v. Cellular Alaska Partn.*, 151 F.3d 1234, 1242

13 (9th Cir. 1998).

14 **B.      Whether the Loan Modification Program Confers a Benefit upon the Class**

15 Certain objectors contend that the loan modification program does not confer a benefit

16 upon the class because California and other states have entered into Assurances with Defendants

17 which provide for the identical relief. The Court notes that most of the loans at issue in this case

18 were executed in California, and that California did not enter into an Assurance until after the

19 motion for preliminary approval was filed. The MAP2R program thus was a significant benefit

20 when it was negotiated. More importantly, the state attorney general settlements do *not* give

21 individual borrowers a private right of enforcement. The instant settlement is binding and

22 enforceable, and class members may assert their individual rights under the settlement

23 agreement. Finally, only ten states have entered into Assurances with Defendants; the settlement

24 agreement makes the loan modification program an option to class members in the other forty

25 states.

26 **C.      Adequacy of Class Notice**

27 Other objectors assert that the class notice was inadequate because it did not disclose how

28 much money each class member would receive under the settlement. It was impossible for the

7

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS
PAGE 389**

1    notice to disclose precisely how much money each class member would receive, because

2    although members of Class B and C will receive checks automatically, members of Class A must

3    file claim forms in order to receive a distribution.  Because class counsel could not predict how

4    many claim forms would be submitted, they could not predict the amount that will be distributed

5    to each class member.

6    **D.    Distribution of Funds Derived from Uncashed Checks**

7          Some objectors challenge the use of undistributed settlement funds to pay administration

8    costs, claiming that this would result in a windfall to Defendants, who otherwise would have to

9    pay administration costs out of pocket.  Because the *entire* $50 million will be distributed to class

10   members on a *pro rata* basis, the only funds at issue are funds from checks that class members

11   fail to cash within ninety days.  The administrator is obligated to send out reminder notices with

12   respect to uncashed checks.  Accordingly, the amount of money at issue is likely to be quite

13   small.  Class counsel assert, and the Court has no reason to doubt, that the cost of redistributing

14   such funds to class members likely would exceed the amount of the funds themselves.  Class

15   counsel also point out that in large class actions the administration costs often come out of the

16   funds set aside for distribution to the class.  Because Defendants have agreed to pay

17   administration costs of up to $1 million in this case, separate and apart from the $50 million set

18   aside for distribution to the class, and given the likelihood that the amount of money in question

19   is likely to be negligible, the Court concludes that there is nothing inherently unfair in permitting

20   funds derived from unclaimed checks to be used for administrative expenses.

21   **E.    Argument That Class B  Members Should Receive More Benefits Than Class A and**

22   **Class C Members**

23         One class member has expressed dissatisfaction with the fact that all class members are

24   treated equally under the settlement agreement.  In her view, an individual who made all her loan

25   payments should be treated more favorably than an individual who defaulted on a loan.  While

26   the Court recognizes the frustration that must lie behind such an argument, the Court cannot

27   agree that the settlement's equal treatment of all class members renders the settlement unfair.

28

8

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS**
**PAGE 390**

**F.  Mr. Hargett's Objection Regarding Potential Deficiency Judgments**

Class member Michael Hargett, an attorney proceeding *pro se* in this matter, filed more than 200 pages of documents objecting to the settlement.  He raises a number of the points discussed above, but his primary concern is the possibility that Defendants will pursue deficiency judgments against class members.  However, Defendants' recent responses to requests for admission ("RFAs") propounded by Mr. Hargett alleviated this concern.  Mr. Hargett read into the record Defendants' responses to a number of RFAs in which Defendants stated that as a general business practice they do not pursue deficiency judgments in connection with foreclosure proceedings involving Pick-a-Payment loans secured by the borrower's primary residence.  Based upon those assurances, Mr. Hargett withdrew his objections.[5]

**G.  Ms. Jones's Objections**

Alberta Jones appeared telephonically at the hearing.  She expressed generalized concerns regarding the settlement, and she requested leave to opt out of the class.  Class counsel responded by noting that Ms. Jones is not a class member, as she obtained her Pick-a-Payment loan prior to the start of the class period.  After the hearing, Ms. Jones filed documents suggesting that she believes that she should be a class member.  Based upon the redacted copy of Ms. Jones's adjustable rate mortgage note that was submitted by Defendants, it is clear that Ms. Jones obtained her loan on May 23, 2003, which is outside the class period of August 1, 2003 through December 31, 2008.  Because Ms. Jones is not a class member, she has no standing to raise objections, *see In re Vitamins Antitrust Class Actions*, 215 F.3d at 28-29, and her request to opt out is moot.

**H.  Ms. Rose's Objection Re Nondisclosure Of NPV Formula**

Marcella Rose, whose motion to intervene is addressed below, additionally filed an objection to the settlement based upon Defendants' failure to disclose their "net present value" or "NPV" formula.  The NPV formula compares the expected economic outcome of the loan with

---

[5] At the hearing, class counsel acknowledged Mr. Hargett's contributions and requested leave to compensate him.  The Court recognized that Mr. Hargett contributed a great deal to the final approval process and directed class counsel to submit an administrative motion regarding the compensation issue.

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

EXHIBIT J ISO MOTION TO STAY PROCEEDINGS
PAGE 391

and without the proposed modification.  The calculation depends in part upon the current value of the property securing the loan.  The NPV formula has been disclosed to class counsel, who are satisfied.  Defendants have offered to disclose the NPV formula to the Court *in camera*.  The Court concludes that Defendants are not required to disclose their NPV formula to class members; the loan modification program is laid out in detail in the settlement agreement – Defendants need not disclose every aspect of their methodology in order to render the settlement fair and adequate.

### III. MOTION TO INTERVENE

Ms. Rose also has filed a motion to intervene.  She presently is litigating a separate lawsuit, *Rose v. Wachovia*, in the Central District of California.  That lawsuit asserts a number of claims that are unrelated to the failure disclose negative amortization at loan origination.  Ms. Jones argues that her Central District complaint could be read broadly enough that there would be some overlap between that suit and this one.  She also contends that she should be permitted to intervene in the instant action in order to represent individuals who were "forced" to sell their homes in order to pay off their loans.

In the Ninth Circuit, there are four requirements for intervention as of right under Federal Rule of Civil Procedure 24(a)(2):  "(1) the application for intervention must be timely; (2) the applicant must have a 'significantly protectable' interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties in the lawsuit."  *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996) (citation omitted).  Alternatively, a court may grant permissive intervention under Rule 24(b) if there is an independent ground for jurisdiction, the motion to intervene is timely, and a common question of law or fact exists.  *Southern Calif. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002).  Even if the threshold requirements for permissive intervention are met, a court has discretion to deny permissive intervention.  *Id*.

These requirements are not satisfied here.  The application for intervention is untimely.

10

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS PAGE 392**

1   As noted above, this action has been litigated vigorously for almost four years.  The instant

2   settlement is the product of months-long, arms-length negotiations.  Ms. Rose's application, filed

3   on the eve of the final approval hearing, simply is too late.  The bulk of Ms. Rose's legal claims

4   appear to be unrelated to the claims that are the subject of the instant action.  To the extent that

5   Ms. Rose is a Class A member, her interests are represented in this action.  While she attempts to

6   carve out a group of class members who have been "forced" to sell their homes in order to pay

7   off their loans, the Court understands that borrowers who ended up with Pick-a-Payment loans

8   often felt financial pressure to either sell their homes, or to refinance the loans.  The Court is at a

9   loss to discern a legally significant difference between those who chose to sell and those who

10  chose to refinance.

11       If Ms. Rose believes that a better deal may be struck with Defendants, she is free to opt

12  out and try her luck with her own lawsuit.  At the hearing, the Court granted Ms. Rose's

13  alternative request to opt out of this settlement.

14                      **IV. SERVICE PAYMENTS TO CLASS REPRESENTATIVES**

15       Courts often award service payments to class representatives in compensation for

16  shouldering significant burdens during the litigation:  retaining counsel, producing documents,

17  responding to written discovery, and conferring with counsel.  *See, e.g., Mego Financial*, 213

18  F.3d at 463 (9th Cir. 2000) (approving incentive awards of $5,000 to each of two class

19  representatives in a settlement of $1.725 million).  The Court concludes that the proposed

20  incentive payments, ranging between $2,500 and $14,250 per named plaintiff and totaling

21  $125,000, are appropriate.

22                      **V. ATTORNEYS' FEES AND COSTS**

23       "Under Ninth Circuit law, the district court has discretion in common fund cases to

24  choose either the percentage-of-the-fund or the lodestar method."  *Vizcaino v. Microsoft Corp.*,

25  290 F.3d 1043, 1047 (2002).  The benchmark award is twenty-five percent of the recovery

26  obtained, "with 20-30% as the usual range."  *Id*.  Although the twenty-five percent benchmark

27  rate is a starting point for analysis, it may be inappropriate in some cases.  *Id*. at 1048.  "Selection

28  of the benchmark or any other rate must be supported by findings that take into account all of the

Case No. 5:09-md-02015-JF
ORDER (1) GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT ETC.
(JFLC2)

1    circumstances of the case." *Id.* Relevant circumstances include the results achieved for the

2    class, the risk to class counsel, benefits to the class other than the cash settlement fund, market

3    rates for contingency fee retainers, and the burdens assumed by class counsel during the

4    representation. *Id.* at 1048-50. The lodestar method may be used as a cross-check of the

5    percentage method. *Id.* at 1050.

6          Class counsel request an award of $25 million. Defendants have agreed to pay attorneys'

7    fees and expenses of up to $25 million separate and apart from the class fund of $50 million and

8    administrative costs up to $1 million. If the Court were to consider only these cash components

9    of the settlement, counsel request approximately one-third of the recovery. However, the loan

10   modification component of the settlement confers a significant additional benefit on the class.

11   Class counsel present the opinion of Yale Law Professor Jonathan Macy, who estimates that the

12   value of the loan modification component is in excess of $800 million and possibly as high as

13   $2.7 billion. If these figures are even remotely accurate, then $25 million is far less than the

14   twenty-five percent benchmark commonly awarded in this circuit. A lodestar cross-check

15   supports an award of $25 million. Counsel have documented hourly fees in excess of $11

16   million. Thus an award of $25 million would require application of a multiplier of 2.2, which is

17   well within the acceptable range. *See, e.g., Vizcaino*, 290 F.3d at 1051 (approving multiplier of

18   3.65).

19         The Court recognizes that class counsel assumed substantial risks and burdens in

20   representing Plaintiffs in this action. Numerous "Pick-a-Payment" class actions and single-

21   plaintiff actions have been rolled into the original case for coordinated pretrial proceedings. The

22   case has been vigorously contested: extensive discovery has been conducted, several motions

23   have been heard, and several more have been briefed. Class counsel have committed to render

24   continuing aid to class members who are attempting to obtain loan modifications. In the Court's

25   opinion, class counsel comported themselves in a capable and professional manner throughout

26   the case, and they obtained an excellent result for the class. Accordingly, the Court has no

27   hesitation in awarding attorneys' fees and costs in the amount of $25 million.

28

12

1          **VI. ORDER**

2     (1)     The motion for final approval of the class action settlement is GRANTED;

3     (2)     The objections to the settlement are OVERRULED;

4     (3)     Marcella Rose's motion to intervene is DENIED;

5     (4)     The proposed service payments to class representatives are APPROVED; and

6     (5)     The motion for attorneys' fees and costs in the amount of $25 million is

7              GRANTED.

8

9

10   DATED:  5/17/2011                              _____

11                                                  JEREMY FOGEL
                                                    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

**EXHIBIT J ISO MOTION TO STAY PROCEEDINGS PAGE 395**

EXHIBIT K

**E-filed 5/17/2011**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

IN RE WACHOVIA CORPORATION "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION.

Case No. 5:09-md-02015-JF

JUDGMENT

The Court having granted final approval of the class action settlement,

The action is HEREBY DISMISSED WITH PREJUDICE.

DATED:  5/17/2011

_____
JEREMY FOGEL
United States District Judge

**EXHIBIT K ISO MOTION TO STAY PROCEEDINGS PAGE 396**

EXHIBIT L

FILED

UNITED STATES COURT OF APPEALS

AUG 30 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

In re: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION,

No. 11-16507

D.C. No. 5:09-md-02015-JF
Northern District of California,
San Jose

DOLORES MANDRIGUES; et al.,

      Plaintiffs - Appellees,

ORDER

  v.

MARCELLA M. ROSE,

      Objector - Appellant,

  v.

WORLD SAVINGS, INC.; et al.,

      Defendants - Appellees.

Appellant's motion to dismiss this appeal is granted. Fed. R. App. P. 42(b).

The parties shall bear their own costs on appeal.

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS
PAGE 397**

This order served on the district court shall act as and for the mandate of this

court.

FOR THE COURT:


By: Peter W. Sherwood
Circuit Mediator


PWS/Mediation

2

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS
PAGE 398**

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JUN 30 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: WACHOVIA CORP. "PICK-A-PAYMENT" MORTGAGE MARKETING AND SALES PRACTICES LITIGATION, | No. 11-16510 <br><br> D.C. No. 5:09-md-02015-JF <br> Northern District of California, San Jose |
| DOLORES MANDRIGUES; et al., <br><br> Plaintiffs - Appellees, <br><br> v. <br><br> NATHANIEL C. DAYTON; et al., <br><br> Objectors - Appellants, <br><br> v. <br><br> WORLD SAVINGS, INC.; et al., <br><br> Defendants - Appellees. | ORDER |

The parties have stipulated to the dismissal of this appeal under Fed. R. App. P. 42(b). This appeal is dismissed. Costs shall be allocated according to the provisions of the stipulation. A copy of this order sent to the district court shall act as and for the mandate of this court.

For the Court:
MOLLY C. DWYER
Clerk of the Court:

Cathie A. Gottlieb, Deputy Clerk
Ninth Cir. R. 27-7/Advisory Note to Rule 27
    and Ninth Circuit 27-10

6.27.11/cag/Pro Mo

**EXHIBIT L ISO MOTION TO STAY PROCEEDINGS
PAGE 399**

ANGLIN FLEWELLING RASMUSSEN CAMPBELL & TRYTTEN LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# CERTIFICATE OF SERVICE

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City of Pasadena, California; my business address is Anglin, Flewelling, Rasmussen, Campbell & Trytten LLP, 199 S. Los Robles Avenue, Suite 600, Pasadena, California 91101-2459.

On January 17, 2012, I served a copy of the foregoing document entitled:

**DEFENDANT WELLS FARGO'S REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF MOTION TO STAY PROCEEDINGS**

on the interested parties in said case as follows:

***Served Electronically Via the Court's CM/ECF System:***

| *Counsel for Plaintiff:* | *Counsel for NDeX West, LLC:* |
| --- | --- |
| Anita L. Steburg<br>Steburg Law Firm<br>1798 Technology Drive, Suite 258<br>San Jose, CA 95110<br>*Tel: 408.573.1122; Fax: 408.573.1126* | Edward A. Treder, Esq.<br>edwardt@bdfgroup.com<br>BARRETT DAFFIN FRAPPIER<br>TREDER & WEISS, LLP<br>20955 Pathfinder Road, Suite 300<br>Diamond Bar, CA 91765<br>*Tel: 626.915.5714; Fax: 909.595.7640* |

☒     FEDERAL:  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.  This declaration is executed in Pasadena, California on **January 17, 2012**.

| Vanessa Ngo | */s/ Vanessa Ngo* |
| --- | --- |
| (Type or Print Name) | (Signature of Declarant) |

CASE NO.:  4:11-CV-005677-PSG
CERTIFICATE OF SERVICE